**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION**

PRESIDENT DONALD J. TRUMP, 45th President
of the United States of America, in his
individual capacity,

       Plaintiff,

    v.

SIMON & SCHUSTER, INC., a New York
corporation, ROBERT WOODWARD p.k.a.
BOB WOODWARD, an individual, and
PARAMOUNT GLOBAL, a Delaware
corporation f/k/a VIACOMCBS, INC., a
Delaware corporation, f/k/a Viacom Inc.,
successor by merger to CBSCorporation,
a Pennsylvania corporation f/k/a Westinghouse
Electric Corporation,

       Defendants.

_____/

Civil Action Number:


**JURY TRIAL DEMANDED**

**COMPLAINT**

    Plaintiff, President Donald J. Trump, 45th President of the United States of America ("President Trump"), by and through his attorneys, GS2 Law PLLC, upon personal knowledge and upon information and belief as to all other matters, files this Complaint against the Defendants, Simon & Schuster, Inc. ("SSI"), Robert Woodward, professionally known as Bob Woodward ("Woodward"), and Paramount Global, a Delaware corporation f/k/a VIACOMCBS, Inc., a Delaware corporation, f/k/a Viacom Inc., successor by merger to CBSCorporation, a Pennsylvania corporation f/k/a Westinghouse Electric Corporation ("Paramount") (collectively, "Defendants") and further alleges as follows:

**Nature of Action**

"The media today probably does not dig deeply enough or spend sufficient time on stories. The best way to ensure that sources will be open and honest is to treat them fairly." This is an excerpt from a response provided by journalist Bob Woodward posted in a Questions and Answers section on his website, bobwoodward.com. When it came to treating President Trump fairly, Mr. Woodward talked the talk, but he failed to walk the walk.

This case centers on Mr. Woodward's systematic usurpation, manipulation, and exploitation of audio of President Trump gathered in connection with a series of interviews conducted by Mr. Woodward. Said audio was protected material, subject to various limitations on use and distribution—as a matter of copyright, license, contract, basic principles of the publishing industry, and core values of fairness and consent. In usurping, manipulating, and exploiting such material, Mr. Woodward has acted in concert with (i) SSI, a major publishing company which brings the work of many authors, including Woodward, to hundreds of countries and territories, and (ii) SSI's parent company, Paramount. Individually and collectively, these entities have systematically, blatantly, and unlawfully usurped President Trump's copyright interests, his contractual rights, and the rights he holds as an interviewee,[1] through the

---

[1] The Defendants' actions are, *inter alia*, in direct contravention of the law laid out in the compendium of U.S. Copyright Office Practices, which sets forth a presumption that "the interviewer and the interviewee own the copyright in their respective questions and responses unless (i) the work is claimed as a joint work; (ii) the applicant provides a transfer statement indicating that the interviewer or the interviewee transferred his or her rights to the copyright claimant, or (iii) the applicant indicates that the interview was created or commissioned as a work made for hire. *See Compendium of U.S. Copyright Office Practices, 3d Ed.* (2021).

publication of an audiobook (and other works, as set forth below) predicated upon the subject audio—solely for their own financial gain and without any accounting or recompense to him.

Prior to commencing this litigation, President Trump and his counsel confronted Defendants with their wrongdoing; however, they brazenly refused to recognize President Trump's copyright and contractual rights. Instead, they proffered various flawed and irrelevant justifications which are unavailing and devoid of any legal merit. Rather than cease their infringement, or even account to President Trump, the Defendants have doubled down; in an avaricious attempt to reap more benefits from their ongoing violation of President Trump's rights, Defendants have converted the audio not only into an audiobook but also into derivative works, including a CD, paperback, and e-book—again, all at the expense of President Trump and without accounting to him.

The Defendants' ongoing concerted efforts to profit off the protected audio recordings and the works they have distributed derived from the protected audio recordings have caused President Trump to sustain substantial damages, necessitating the institution of this action. Through this action, the President Trump seeks, *inter alia*, a declaration of his copyright interests in the subject audiobook, CD, paperback and e-book, and recovery of the damages sustained.

**Parties**

1.    Plaintiff, President Trump, is an individual who is a citizen and resident of Palm Beach County, Florida, and is otherwise *sui juris*.

2.    Defendant, SSI is headquartered in New York, New York, and is a wholly-owned subsidiary of Paramount.

3.     Founded in 1924, SSI is the fourth-largest U.S. trade book publisher. It has over thirty (30) U.S. imprints (a trade or brand name for a specific group of editors) across three (3) publishing groups and publishes over 1,000 new titles annually in the U.S. In 2020, SSI earned over $760 million in U.S. publishing revenues.

4.     Defendant, Woodward is an individual who, upon information and belief, is a resident of Washington, D.C, and is otherwise *sui juris*.

5.     Paramount is an international media and entertainment company, headquartered in New York, New York.  Paramount is also registered as a foreign profit corporation in the State of Florida. The name and address of Paramount's registered agent is The Prentice-Hall Corporation System, Inc., 1201 Hays Street, Tallahassee, FL 32301.

6.     Paramount's assets include SSI, and Paramount exerts direct control over the executive leadership of SSI.

### Nature of the Action and Relief Sought

7.     This action further seeks, *inter alia*, declaratory relief and attorney's fees as set forth hereinafter, as well as any and all further relief in accordance with the appropriate statutes and common law.

### Jurisdiction and Venue

8.     This action arises under the Declaratory Judgment Act, 28 U.S.C. § 2201 and §2202; Florida Deceptive and Unfair Trade Practices Act; and unjust enrichment and breach of contract under the Laws of the State of Florida. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and §1338(a) as this action arises under the U.S. Copyright Act of 1976, as amended, 17 U.S.C. § 101 et. seq.

9.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because President Trump is a citizen of Florida while the Defendants are not, and the amount in controversy exceeds $75,000.

10.     To the extent the Court does not have subject matter jurisdiction over any state law claim pursuant to the above, this Court has supplemental or pendent jurisdiction over any such remaining claims pursuant to 28 U.S.C. § 1367 because such claims are so closely related to President Trump's claim for declaratory relief brought pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 and §2202, that they form part of the same case or controversy.

11.     SSI and Woodward are each engaged in interstate commerce and in activities substantially affecting interstate commerce.

12.     SSI acquires publishing rights from authors and provide publishing services, including editing, marketing, sales, and distribution of books, throughout the United States.

13.     Woodward is an investigative journalist who has written a number of books, including the one that underlies the subject claims against the Defendants.

14.     This Court has personal jurisdiction over each of the Defendants. SSI has consented to personal jurisdiction in this District, as it is a corporation that transacts business within this District through, among other things, its acquisition of content from and provision of publishing services to authors. Woodward has consented to personal jurisdiction in this District, as he transacts business within the District through his investigative journalism and publication of literary materials. Paramount has consented to personal jurisdiction in this District, as it transacts business within the District through its wholly-owned division, SSI. This Court has personal jurisdiction over each of the Defendants pursuant to Florida's long-arm statute, as each of the

Defendants transact business within the State of Florida, committed tortious acts and omissions in Florida, and their tortious acts and omissions caused injury to President Trump in Florida.

15.     The Defendants have purposefully engaged in the business of publishing, distributing, promoting, and selling various sources of literature throughout the United States, including Florida, for which they have each derived significant income. The Defendants reasonably expected that such literature, including the materials that are the subject of this lawsuit, would be sold and distributed in Florida.

16.      Each of the Defendants conducted or has conducted significant revenue-producing business, including interstate and intrastate commerce, in Florida. Each can reasonably expect the sale and distribution of said literature to have consequences in Florida.

17.     The commercial activities of each of the Defendants in the State of Florida were not isolated, and each has maintained sufficient contacts with Florida and/or transacted substantial revenue-producing business in Florida to subject them to the jurisdiction of this Court pursuant to Florida Statute §§ 48.181, 48.182, and 48.193.

18.     Venue is proper in this jurisdiction pursuant to 28 U.S.C. § 1391(b)(2).

## GENERAL ALLEGATIONS

### *Publishing Background of the Parties*

19.     SSI, controlled by Paramount, is the fourth-largest U.S. book publisher and is one of what the industry calls the "Big Five" U.S. publishers. Publishers such as SSI pay significant advances to authors whose books are expected to have commercial success.

6

20.     SSI is also able to offer authors the extensive editorial, production, marketing, and publicity support generally needed to produce a top-selling book, as well as the sales and distribution networks necessary to place books into readers' hands.

21.     The licenses obtained by SSI generally include the right to publish a book in various formats (print, e-book, audiobook) within a particular geographic area. SSI competes for these rights in a number of ways. In addition to paying authors advances and royalties, SSI provides editorial, design, marketing, publicity and other services to authors. SSI also arranges for printing and distribution of books to wholesalers and retailers.

22.     Woodward is an author who has published numerous books.

23.     Authors like Woodward are compensated in the form of royalties and advances. An advance is an up-front payment of royalties that are expected to accrue from future sales of the book.

24.     In the United States, books are sold through several retail sales channels, including online retailers such as Amazon, national bookstore chains such as Barnes & Noble and Books-A-Million, independent bookstores such as The Strand and Politics & Prose, big-box stores such as Target, Walmart and Costco, and specialty retailers such as Anthropologie and Bass Pro Shops.

25.     Books also are sold to retailers and institutional buyers (including schools and libraries) through wholesalers such as Ingram and Readerlink. Publishers set the cover or "list price" of a book and sell the books to retailers at a standard discount from the list price (a little less than half-off for most types of print books). SSI also may offer retailers marketing and other promotional discounts in addition to the standard discount applied to the list price.

26.     President Trump is personally and professional familiar with the book publishing industry, having authored and co-authored many titles, including, but not limited to the following (most of which have become best sellers):

- *Trump: The Art of the Deal*
- *Why We Want You To Be Rich: Two Men One Message*
- *Trump: Think Like a Billionaire: Everything You Need to Know About Success, Real Estate, and Life*
- *Trump Never Give Up: How I Turned My Biggest Challenges into Success*
- *Great Again: How to Fix Our Crippled America*
- *Think Big: Make It Happen in Business and Life*
- *Midas Touch: Why Some Entrepreneurs Get Rich-And Why Most Don't*
- *Trump: How to Get Rich*
- *Trump: The Art of the Comeback*
- *Trump: The Best Real Estate Advice I Ever Received: 100 Top Experts Share Their Strategies*
- *Trump: Surviving at the Top*
- *Time to Get Tough: Make America Great Again!*
- *Trump: The Way to the Top: The Best Business Advice I Ever Received*
- *Trump: The Best Golf Advice I Ever Received*
- *Think BIG and Kick Ass in Business and Life CD*
- *Trump 101: The Way to Success*
- *Donald J. Trump - Think like a Champion*

27.     President Trump has recently published and sold the highly successful book, "Our Journey Together."

28.     As a published author with a publishing contract for future books with Winning Team Publishing, President Trump has the clear right and capability to publish his own words and his own voice.

8

***The Defendants' Publications regarding President Trump***

29.     SSI, Paramount, and Woodward have had a great deal of commercial and financial success with publications on the subject of President Trump.

30.     The Defendants collected large revenues generated from *Fear: Trump in the Whitehouse*[2] ("Fear"), which was published September 10, 2019. *Fear* sold over 2 million copies in the first three months of publication[3], breaking the 94-year first-week sales record of SSI, and became the #1 New York Times Bestseller and #1 International Bestseller.[4]

31.     Woodward then sought President Trump's consent to be recorded for a series of interviews with President Trump and repeatedly informed him that such interviews were for the sole purpose of a *book*. That book, entitled *Rage*, was released on September 14, 2021.[5]

32.     Woodward conducted interviews with President Trump for *Rage* at the White House, President Trump's home of Mar-a-Lago in Palm Beach, Florida, and over the phone between December 2019 and late July 2020, as follows:

    (a) Thursday, December 5, 2019
    (b) Friday, December 13, 2019
    (c) Monday, December 30, 2019
    (d)  Monday, January 20, 2020
    (e) Wednesday, January 22, 2020
    (f) Friday, February 7, 2020
    (g) Wednesday, February 19, 2020
    (h) Thursday, March 19, 2020
    (i) Saturday, March 28, 2020
    (j) Sunday, April 5, 2020
    (k) Monday, April 13, 2020

---

[2] ISBN13: 9781501175527
[3] https://www.bobwoodward.com/books/fo3ts5c6ljss8h25q3j2x92thehuey
[4] https://www.simonandschuster.com/books/Fear-Bob-Woodward/9781501175527
[5] ISBN13: 9781982131746

     (l)  Wednesday, May 6, 2020

     (m) Friday, May 22, 2020

     (n) Wednesday, June 3, 2020

     (o) Friday, June 19, 2020

     (p) Monday, June 22, 2020

     (q) Wednesday, July 8, 2020

     (r)  Tuesday, July 21, 2020

     (s)  Friday, August 14, 2020

(each, an "Interview," and collectively, the "Interviews" or "Interview Sound Recordings"). According to Woodward, he also interviewed President Trump "in 2016 when he was a presidential candidate."[6]

33.     In publishing *Rage*, Woodward clearly hoped to replicate the success of *Fear,* but he failed to do so. Faced with the reality that *Rage* was a complete and total failure, Woodward decided to exploit, usurp, and capitalize upon President Trump's voice by releasing the Interview Sound Recordings of their interviews with President Trump in the form of an audiobook.

34.     Specifically, SSI and Woodward conspired to, and did, collate and cobble together more than eight hours of "raw" interviews with President Trump. Without President Trump's permission, on October 25, 2022, Defendants released the recordings as an audiobook dubbed *The Trump Tapes: Bob Woodward's Twenty Interviews with President Donald Trump* ("Audiobook").[7]

35.     The Defendants proceeded with such publication knowing that President Trump's voice is one of the most recognizable voices in the world and hearing his words from his mouth or as

---

[6] https://www.simonandschuster.com/p/the-trump-tapes

[7] ISBN13: 9781797124735

directly articulated by him, is much more valuable and marketable than Woodward's interpretation of the interviews in *Rage*.

36.     Indeed, amid the publication of *The Trump Tapes,* Woodward began advertising President Trump's voice, stating that "[h]earing Trump speak is a completely different experience to reading the transcripts or listening to snatches of interviews on television or the internet,"[8] and describing President Trump's voice as "the most recognizable voice in the world, perhaps."[9]

37.     Moreover, Paramount, SSI, and Woodward proceeded with such publication despite knowing that President Trump had consented to being recorded only for the purposes of "the book," namely *Rage*, and never consented to release of any audio recording, inclusive of the Interview Sound Recordings.

38.     SSI credits on the Audiobook on Fig 1 below admit President Trump's rights in stating "Read by Donald J. Trump and Bob Woodward."



*Fig 1*

---

[8] https://www.simonandschuster.com/books/The-Trump-Tapes/Bob-Woodward/9781797124735
[9] https://www.youtube.com/watch?v=CzA2YX1y8E4

39.     Online sites where the Audiobook can be purchased credit President Trump as author and

"Narrator," recognizing that he has rights in the publication. See Fig 2.



Fig. 2

40.     On November 11, 2022, Paramount, SSI, and Woodward released a CD version of the

Audiobook.[10] On January 17, 2023, SSI and Woodward released a paperback[11] and e-book[12]

version of the Audiobook (the CD, paperback, and e-book collectively are referred to herein as

"Derivative Works").

---

[10] ISBN13: 9781797124728
[11] ISBN13: 9781668028148
[12] ISBN13: 9781668030981

***Woodward Sought and President Trump Granted a License of Limited Scope***

41.     During the Interviews, President Trump repeatedly stated to Woodward, in the presence of others, that he was agreeing to be recorded for the *sole purpose* of Woodward being able to write a single book.

42.     President Trump made Woodward aware on multiple occasions, both on and off the record, of the nature of the limited license to any recordings, therefore retaining for himself the commercialization and all other rights to the narration. At no time did President Trump ever relinquish such rights or license.

43.     Notably, the Interviews reflect that Woodward was prone to exercising his own discretion in recording President Trump, despite the foregoing limitations instituted by President Trump regarding recording. For instance, several minutes into Interview 8, Woodward says "I'm going to turn on my recorder," failing to tell President Trump that the recording had already begun.

44.     Interview 4 recorded at Mar-A-Lago on December 30, 2019 clearly manifests the understanding between President Trump and Woodward that Woodward's rights were limited and that the parties intended that the copyright of any recordings would remain with President Trump. At 3:34:37, Woodward confirms the recording is being taken for "the book," and both President Trump and Hogan Gidley confirm the scope and limitations of the license:

> **Woodward**: On the record for the book, unless you—
> **Trump**:        For the book only, right? Only for the book.
> **Woodward**: The book only, yeah, I'm not—
> **Trump**: For the book only, right? So there's no—
> **Gidley**: Right. So there's no stories coming out, okay.

45.     Similarly, at minute 2:25 of Interview 9, Woodward starts the interview acknowledging the mutual understanding of the scope and limitation of the license:

**Woodward**: This again is for the book to come out before the Election.

46.     At no time did Woodward request from President Trump that he expand the subject license or furnish a release to use the Interview Sound Recordings for an audiobook or any other derivative work, as is customary in the book publishing and recording industries. President Trump told Woodward numerous times that the Interviews were to be used by Woodward—and Woodward only—for the sole purpose of accurately quoting President Trump for the "written word," i.e., *Rage*, and not for any other purpose, including providing, marketing, or selling the Interviews to the public, press, or the media, in any way, shape, or form.

47.     President Trump never sought to create a work of joint authorship, and in the hours of the Interviews, there is neither allusion to nor confirmation of such.

48.     President Trump never conveyed any copyright in his material, nor did he ever expand the scope of the license given.

49.     Woodward appears to have had no intention to release an audiobook when initially recording President Trump; such a decision arose much later, after the complete and total failure of *Rage*. Woodward has admitted as such in stating that it was not in keeping with industry standards to release such interview tapes; and yet, he "decided to take this unusual step of releasing these recordings after relistening in full to all 20 interviews."[13]

50.     If Woodward intended to create an oral history in which he could claim rights, then according to best industry practices, he would have had President Trump as the participant sign over his rights as part of the standard procedures of conducting the interview, after each

---

[13] https://www.simonandschuster.com/books/The-Trump-Tapes/Bob-Woodward/9781797124735

recording or at the end of the last interview. Woodward did not adhere to this standard and, as such, relinquished any such rights.

51.     While Woodward and SSI have admitted that President Trump has a copyright interest in the work by crediting him as a reader on the Audiobook and the CD, they have never accounted to him in any manner whatsoever for the Audiobook and the Derivative Works.

**SSI and Woodward U*nlawfully Manipulate the Recordings***

52.     Woodward writes in *Rage* that the third interview took place December 30, 2019, at Mar-a-Lago: "We sat next to each other at a large table. Hogan Gidley, his deputy press secretary, sat more than six feet away on the other side of the table, recording the interview on his mobile phone."

53.     A comparative analysis of this Interview in the Audiobook with Gidley's recording of the same reveals a substantial difference; the deviation reveals that Woodward and SSI took extensive and unacceptable liberties with the words actually spoken by President Trump. Specifically, portions of the Interview are selectively omitted in the Audiobook, as reflected in the stricken-out language below:

> **Trump**: Ready? The Whistleblower Report…
> **Woodward**: You, you…
> **Trump**: Okay, before I do the transcript…
> **Woodward**: You know me well enough …
> **Trump**: I know, I know…
> **Woodward**: …to know that I'm neutral…
> **Trump**: …and I think, but I think you're wrong. Okay, ready?
> **Woodward**: Okay.
> **Trump**: The Whistleblower Report—before you ever heard of a transcript…
> **Woodward**: Yeah, yeah.
> **Trump**: …it was given to Congress…
> **Woodward**: It doesn't have any standard.
> **Trump**: It blew up…
> ~~**Woodward**: Yeah.~~

**Trump**: It blew up. We were getting, and all we had—it was going to be a disaster.

**Woodward**: But it's not truth.

**Trump**: It was a false report written by a guy whose lawyer is a scumbag, okay? A real scumbag. Look at the background of these people.

**Woodward**: Yeah.

**Trump**: The Whistleblower Report was a fraud. ~~Okay, it blew up. It was going to be a disaster. Schiff got up before the United States Congress, and he gave a false statement on what I said.~~

~~**Woodward**: I totally understand that, I understand that.~~

**Trump**: ~~If I didn't put out,~~ if I didn't put out…

**Woodward**: Okay.

**Trump**: …this very innocent conversation I had with the President of Ukraine, who then confirmed the conversation, saying there was no pressure put on a Whistleblower.

**Woodward**: Okay, you're willing to have this conversation, and you know me well enough. I'm, I really want to understand in a comprehensive…

~~**Trump**: But you haven't even read the Whistleblower…~~

~~**Woodward**: …and let me share that…~~

~~**Trump**: …but you haven't read the Whistleblower Report.~~

~~**Woodward**: No, no, no, but that's, it's not…~~

~~**Trump**: You can't have this conversation.~~

~~**Woodward**: But it's not evidence. It's…~~

~~**Trump**: Do you understand what I'm saying?~~

~~**Gidley**: Of course…~~

~~**Woodward**: Yeah, yeah, it's not…~~

~~**Gidley**: Of course…~~

~~**Trump**: Now I know you're…do you agree?~~

~~**Gidley**: We were at UNGA, Mr. President…~~

~~**Trump**: If I didn't have…~~

~~**Gidley**: …and that's all I was getting, was questions about this Report…~~

~~**Trump**: The Wh—~~

~~**Woodward**: Okay, yeah.~~

~~**Gidley**: all I was getting…~~

**Trump**: Let me ask you…

~~**Gidley**: …for days, all the deals.~~

**Trump**: So, I have an innocent conversation—Do us, the United States, a favor, and then I say, our Country. I don't say…

**Woodward**: I understand.

**Trump**: …my Campaign. I say, our Country. And then I say the Attorney General of the United States, okay? ~~And, by the way, if anybody looked at that horrible tape with Biden, you'd fully understand that, and he brought up the name Rudy Giuliani, by the way, he did—the President.~~

~~**Woodward**: Okay.~~

~~**Trump**: I didn't bring it up. Okay, ready?~~ If I didn't have that very accurate transcription, and now it's been proven to be accurate, because even the Lieutenant Colonel's agreed

that it was accurate. Okay, so, you know, I don't know, I think it would have been a disaster. ~~You were getting killed.~~

~~Gidley: Killed.~~

~~Trump: The only reason I and, by the way, I got approval from Ukraine before I did it, because I was very, I said—Geez, you know, it's a terrible thing to do. A terrible thing to do. So, we called Ukraine. We said—Do you mind if we release this conversation? And we got approval. Otherwise, I wouldn't have been able to release it.~~

**Woodward**: I'm gonna tell you something from my experience.

**Trump**: Go ahead.

**Woodward**: Because you've been very…

**Trump**: You—nobody more experienced.

**Woodward**: You're willing to have this. As you know, in the Nixon case, I always said afterwards…

**Trump**: …by the way, there's a much different case.

**Woodward**: Yes. I'm the first to say that…

**Trump**: …I mean, you know, this is peanuts compared to that.

**Woodward**: But as soon as the Watergate burglars were caught, if Richard Nixon had gone on television and said—You know, I'm the man at the top. I'm indirectly responsible for this. I am sorry. I apologized.

**Trump**: Yeah.

**Woodward**: It would have gone …

**Trump**: Okay.

**Woodward**: …away.

**Woodward**: You don't think so?

**Trump**: I would never have done it here.

**Woodward**: Yeah.

**Trump**: Yeah, Nixon should have done that.

**Woodward**: He should have done that.

**Trump**: But I can't, I shouldn't have done that, because I did nothing wrong

54.     Far from being a "raw" and unedited recording, it seems that extreme license was taken with the responses provided by President Trump in which he has a copyright interest, and the answers were manipulated to alter President Trump's language as well as to support the particular narrative desired by Woodward, SSI, and Paramount.

55.     Paramount, SSI, and Woodward deviated from industry standard practices, did not obtain the requisite releases, misappropriated President Trump's copyright interests, manipulated the recordings to benefit Woodward's desired narrative while peddling the story that the recordings

are "raw," and deprived President Trump of the opportunity to publish or not to publish his words, read in his voice.

56.    It seems that in the view of the Defendants, the only way to rectify the failure of *Rage* was for experienced publishers and authors to throw their values to the wind and trample on established rights for the sake of profit. Woodward was not telling anything new; it was who was doing the telling that made the difference.

57.    Accordingly, President Trump has been harmed.

58.    Published sources indicate that the *Fear* sold more than two (2) million copies, which is the amount of copies that the Audiotape can be estimated to sell. Based upon the purchase price of the Audiotape, $24.99, the damages President Trump has sustained due to the actions of the Defendants as set forth herein are estimated to be at least $49,980,000.00, exclusive of punitive damages, attorney's fees, and costs.

**COUNT I**
**DECLARATORY RELIEF REGARDING OWNERSHIP OF COPYRIGHTS**
**(Pursuant to 28 U.S.C. §§ 2201, et seq.)**
**(SSI, WOODWARD, PARAMOUNT)**

59.    President Trump repeats and reincorporates by reference the allegations in Paragraphs 1 through 58 as though fully set forth herein.

60.    This claim arises under the declaratory judgment provision of 28 U.S.C. § 2201 and § 2202 and under the Copyright Laws of the United States, 17 U.S.C. §§ 101 et. seq.

61.    As a result of the acts described in the preceding paragraphs, there exists a controversy of sufficient immediacy and reality to warrant the issuance of declaratory relief.

62.    An actual and justifiable controversy exists sufficient for this Court to declare the rights and remedies of the parties in that there is a dispute between President Trump and the

Defendants concerning their respective rights and interests in the Interview Sound Recordings, Audiobook, and Derivative Works at issue.

63.     A judicial declaration is necessary so that President Trump may ascertain his rights regarding the rights and interests in the Interview Sound Recordings, Audiobook, and Derivative Works.

64.     President Trump is entitled to a declaratory judgment that he owns the Interview Sound Recordings, Audiobook, and Derivative Works in full and therefore is entitled to all revenues arising from the exploitation of such works.

65.     In the alternative, President Trump is entitled to declaratory judgment that President Trump owns the copyright in his responses in the Interview Sound Recordings, Audiobook, and Derivative Works in accordance with, *inter alia*, the established practices of the U.S. Copyright office (Compendium Third Edition) and therefore is entitled to the pro rata revenues arising from the exploitation of such works.

66.     President Trump is further entitled to a declaratory judgment from this Court that the sound recordings at issue were not created pursuant to a work-for-hire agreement.

WHEREFORE, the Plaintiff, President DONALD J. TRUMP respectfully requests that the Court grant the following relief against the Defendants in this matter:

(a) Enter declaratory judgment adjudging that President Trump has a full copyright interest in the Interview Sound Recordings, Audiobook, and Derivative Works at issue;

(b) In the alternative, enter declaratory judgment adjudging that President Trump has a copyright interest in his responses in the Interview Sound Recordings, Audiobook, and Derivative Works at issue;

(c)  Enter declaratory judgment adjudging that the sound recordings at issue were not created pursuant to a work-for-hire agreement;

(d)  Award of compensatory, punitive damages and disgorgement of Defendants of at minimum, $49,980,000.00;

(e)  Order the Defendants to pay to President Trump all fees, expenses, and costs associated with this action;

(f)  Order the Defendants to pay to President Trump all pre- and post-judgment interest on his damages; and

(g)  Award such other and further relief as the Court deems just, proper, and equitable.

## COUNT II
## ACCOUNTING
## (SSI, WOODWARD, PARAMOUNT)

67.    President Trump realleges and incorporates the allegations in Paragraphs 1 through 66 above as though fully set forth herein.

68.    Defendants have been and are engaged in the intentional and continued exploitation of the Interview Sound Recordings, Audiobook, and Derivative Works at issue.

69.    Defendants unjustly have the sole and exclusive control over the books and records that establish the applicable amounts of revenue on which royalties for the Interview Sound Recordings, Audiobook, and Derivative Works at issue are to be calculated.

70.    Based upon Defendants' position of exclusive control over such books and records, the Defendants owe to President Trump a duty to account and pay all royalties in connection with the Interview Sound Recordings, Audiobook, and Derivative Works at issue.

71.     Upon information and belief, Defendants have not properly accounted to President Trump for income earned on the Interview Sound Recordings, Audiobook, and Derivative Works at issue.

72.     An accounting is necessary because Defendants have erroneously and unlawfully failed to recognize President Trump's rights and must account to him for all income derived from exploitation of the Interview Sound Recordings, Audiobook, and Derivative Works at issue.

73.     An accounting is also necessary and appropriate under the circumstances since the precise amount of money due to President Trump is unknown and cannot be ascertained without an accounting.

74.     President Trump has no adequate remedy at law.

WHEREFORE, the Plaintiff, President DONALD J. TRUMP, respectfully requests that this Court enter an order declaring that the actions of the Defendants, SIMON & SCHUSTER, INC., ROBERT WOODWARD, and PARAMOUNT GLOBAL entitle President Trump to an accounting of all income and profits derived from the Interview Sound Recordings, Audiobook, and Derivative Works, for compensatory damages, prejudgment interest, post-judgment interest, attorney's fees, costs of the action, and such other relief as the Court deems appropriate.

**COUNT III**
**UNJUST ENRICHMENT**
**(WOODWARD)**

75.     President Trump realleges and incorporates the allegations above in Paragraphs 1 through 58 as though fully set forth herein.

76.     This is an action for unjust enrichment against Woodward.

77.     President Trump has conferred a benefit upon Woodward by engaging with him in the Interviews and allowing recordation of the Interview Sound Recordings in connection with a singular book, which benefit Woodward accepted.

78.     Woodward has exploited the Interview Sound Recordings to enrich himself, as he converted the Interview Sound Recordings into an unauthorized Audiobook and Derivative Works through which he has derived and received the benefit of revenues, fees, royalties, and other consideration.

79.     Woodward has directly profited, and continues to profit, from such benefit without accounting to and compensating President Trump, and without the authority or consent of the President Trump.

80.     Woodward has failed to acknowledge or cite to President Trump's contributions to the Audiobook and all Derivative Works, instead harvesting all of the benefit for himself and his publisher, SSI.

81.     It is inequitable and not in good conscience that the Woodward continue to reap such benefits from President Trump without compensating President Trump for the value of monies received in connection with the Audiobook and all Derivative Works.

82.     Woodward's receipt of the benefits and privilege that President Trump has conferred without paying the royalties and other charges owing to President Trump in return for those benefits and privileges constitutes unjust enrichment and has damaged President Trump.

83.     It would be entirely inequitable for Woodward to retain any benefit without paying the value of any monies, including but not limited to royalties and other fees, generated from the Audiobook and all Derivative Works.

WHEREFORE, the Plaintiff, President DONALD J. TRUMP, respectfully requests that this Court enter a judgment against the Defendant, ROBERT WOODWARD, for damages, together with costs, pre-judgment interest, attorney's fees, and such other and further relief that this Court deems just and proper.

**COUNT IV**
**UNJUST ENRICHMENT**
**(SSI)**

84.     President Trump realleges and incorporates the allegations above in Paragraphs 1 through 58 as though fully set forth herein.

85.     This is an action for unjust enrichment against SSI.

86.     President Trump has conferred a benefit upon SSI through SSI's acquisition of the Interview Sound Recordings, which benefit SSI accepted.

87.     SSI has exploited the Interview Sound Recordings to enrich itself, as it converted and facilitated the conversion of the Interview Sound Recordings into an unauthorized Audiobook and Derivative Works through which SSI has derived and received the benefit of revenues, fees, royalties, and other consideration.

88.     SSI has directly profited, and continues to profit, from such benefit without accounting to and compensating President Trump, and without the authority or consent of the President Trump.

89.     SSI has failed to acknowledge or cite to President Trump's contributions to the Audiobook and all Derivative Works, instead harvesting all of the benefit for itself, its parent company Paramount, and its author Woodward.

90.     It is inequitable and not in good conscience that SSI continue to reap such benefits from President Trump without compensating President Trump for the value of monies received in connection with the Audiobook and all Derivative Works.

91.     SSI's receipt of the benefits and privilege that President Trump has conferred without paying the royalties and other charges owing to President Trump in return for those benefits and privileges constitutes unjust enrichment and has damaged President Trump.

92.     It would be entirely inequitable for SSI to retain any benefit without paying the value of any monies, including but not limited to royalties and other fees, generated from the Audiobook and all Derivative Works.

WHEREFORE, the Plaintiff, President DONALD J. TRUMP, respectfully requests that this Court enter a judgment against the Defendant, SIMON & SCHUSTER, INC. for damages, together with costs, pre-judgment interest, attorney's fees, and such other and further relief that this Court deems just and proper.

## COUNT V
## UNJUST ENRICHMENT
## (PARAMOUNT)

93.     President Trump realleges and incorporates the allegations above in Paragraphs 1 through 58 as though fully set forth herein.

94.     This is an action for unjust enrichment against Paramount.

95.     President Trump has conferred a benefit upon Paramount through SSI's acquisition of the Interview Sound Recordings, which benefit Paramount accepted.

96.     Paramount has exploited the Interview Sound Recordings to enrich itself, as it converted and facilitated the conversion of the Interview Sound Recordings into an unauthorized

Audiobook and Derivative Works through which Paramount has derived and received the benefit of revenues, fees, royalties, and other consideration.

97.     Paramount has directly profited, and continues to profit, from such benefit without accounting to and compensating President Trump, and without the authority or consent of the President Trump.

98.     Paramount has failed to acknowledge or cite to President Trump's contributions to the Audiobook and all Derivative Works, instead harvesting all of the benefit for itself, its parent company Paramount, and its author Woodward.

99.     It is inequitable and not in good conscience that Paramount continue to reap such benefits from President Trump without compensating President Trump for the value of monies received in connection with the Audiobook and all Derivative Works.

100.    Paramount's receipt of the benefits and privilege that President Trump has conferred without paying the royalties and other charges owing to President Trump in return for those benefits and privileges constitutes unjust enrichment and has damaged President Trump.

101.    It would be entirely inequitable for Paramount to retain any benefit without paying the value of any monies, including but not limited to royalties and other fees, generated from the Audiobook and all Derivative Works.

WHEREFORE, the Plaintiff, President DONALD J. TRUMP, respectfully requests that this Court enter a judgment against the Defendant, PARAMOUNT GOLOBAL for damages, together with costs, pre-judgment interest, attorney's fees, and such other and further relief that this Court deems just and proper.

**COUNT VI**
**PROMISSORY ESTOPPEL**
**(WOODWARD)**

102.     President Trump realleges and incorporates the allegations above in Paragraphs 1 through 58 as though fully set forth herein.

103.     Woodward affirmatively represented to President Trump that the Interview Sound Recordings would be utilized for the publication of a single written book. Woodward reasonably expected that this promise would induce President Trump to consent to the Interviews.

104.     President Trump consented to the Interviews in reliance upon said promise.

105.     Enforcement of that promise is necessary to avoid injustice to President Trump.

WHEREFORE, the Plaintiff, President DONALD J. TRUMP, respectfully requests that this Court enter a judgment against the Defendant, ROBERT WOODWARD, for damages, together with costs, pre-judgment interest, attorney's fees, and such other and further relief that this Court deems just and proper.

**COUNT VII**
**VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT**
**(SSI, WOODWARD, PARAMOUNT)**

106.     President Trump realleges and incorporates the allegations above in Paragraphs 1 through 58 as though fully set forth herein.

107.     This is an action for actual damages suffered by President Trump as a result of the Defendants' violations of the "Florida Deceptive and Unfair Trade Practices Act" ("FDUTPA"). Fla. Stat. § 501.201, et seq. 65.

108.     President Trump is a "consumer" as defined by FDUPTA.

109.     Defendants at all material times have engaged in "trade or commerce" as defined in Fla. Stat. § 501.203, of FDUTPA.

110.     FDUPTA "shall be construed liberally" to, in pertinent part, "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2).

111.     Fla. Stat. § 501.204(1) provides that "[u]nfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

112.     Defendants, at all times material hereto, provided goods or services and were engaged in trade or commerce as defined by Fla. Stat. § 501.203(8).

113.     Defendants committed an unconscionable act or practice or an unfair or deceptive act in the conduct of trade or commerce in violation of FDUPTA when they engaged in unlawful, unfair and fraudulent business acts, practices, or competition, including but not limited to:

> (i)     Publication of the Interview Sound Recordings via the Audiobook and the Derivative Works with knowledge of President's Trump rights to ownership of the same and the limitations of any license granted to publish portions of the same;

> (ii)    Publication of the Interview Sound Recordings to capitalize and benefit from President Trump's voice to the detriment of President Trump's ability to publish his own voice given his position as author.

      (iii)     Publication of the Interview Sound Recordings with alteration in the spoken words and removal of context, in order to cast a poor light on President Trump and to mislead and deceive other customers into viewing him in a poor light.

114.    Each of the foregoing violations of FDUPTA caused President Trump to suffer actual damages, including but not limited to a complete and utter lack of payment of any monies, including but not limited to royalties and other fees, generated from the Audiobook and all Derivative Works. That amount is estimated to be at least $49,980,000.00 as explained above.

115.    President Trump is entitled to recover these actual damages from the Defendants, jointly and severally, as set forth in Fla. Stat. § 501.211.

116.    President Trump has had to retain the services of undersigned counsel for this action and is entitled to recover his reasonable attorneys' fees and costs pursuant to Fla Stat. § 501.2105.

WHEREFORE, the Plaintiff, requests that this Honorable Court enter a judgment against the Defendants as follows: (a) that the Court adjudge and decree that the conduct complained of herein constitute deceptive and unfair trade practices in violation of FDUPTA; (b) that the Court award against the Defendants, jointly and severally, damages, civil penalties, attorney's fees, prejudgment interest and costs to President Trump for the prosecution of this violation pursuant to Fla. Stat. § 501.207(3); (c) enter an injunction enjoining future violations of the Act pursuant to Section 501.211(1), Fla. Stat.; (d) award any such equitable or other relief pursuant to Fla. Stat. § 501.207(3); and (e) award such other and further relief as the Court deems just and proper.

**COUNT VIII**
**BREACH OF CONTRACT**
**(WOODWARD)**

117.     President Trump realleges and incorporates the allegations above in Paragraphs 1 through 58 as though fully set forth herein.

118.     President Trump granted Woodward a limited license that recordings of the Interviews could be utilized for the purposes of writing a singular book.

119.     Woodward agreed to the terms of the limitations in such license.

120.     President Trump performed and gave the requested Interviews such that Woodward could write a singular book.

121.     Woodward breached the terms of the license upon publication of the Audiobook.

122.     Woodward further breached the terms of the license upon publication of the Derivative Works.

123.     Woodward has caused harm to President Trump arising from such breaches of the license.

WHEREFORE, the Plaintiff, President DONALD J. TRUMP, respectfully requests that this Court enter a judgment against the Defendant, ROBERT WOODWARD, for damages, together with costs, pre-judgment interest, attorney's fees, and such other and further relief that this Court deems just and proper.

**COUNT IX**
**BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING**
**(WOODWARD)**

124.     President Trump realleges and incorporates the allegations above in Paragraphs 1 through 58 as though fully set forth herein.

125.    All contracts in Florida, including the license, impose an implied covenant of good faith and fair dealing upon the parties thereto. This covenant requires that the parties cooperate so that each party may obtain full benefit under the license.

126.    Woodward breached this covenant in numerous and diverse ways, by, *inter alia*,

      a.   Publication of the Interview Sound Recordings via the Audiobook and the Derivative Works with knowledge of President's Trump rights to ownership of the same and the limitations of any license granted to publish portions of the same;

      b.   Publication of the Interview Sound Recordings to capitalize and benefit from President Trump's voice to the detriment of President Trump's ability to publish his own voice given his position as author.

      c.   Publication of the Interview Sound Recordings with alteration in the spoken words and removal of context, in order to cast a poor light on President Trump and to mislead and deceive other customers into viewing him in a poor light.

127.    As a direct and proximate result thereof, President Trump has been damaged.

WHEREFORE, the Plaintiff, President DONALD J. TRUMP, respectfully requests that this Court enter a judgment against the Defendant, ROBERT WOODWARD, for damages, together with costs, pre-judgment interest, attorney's fees, and such other and further relief that this Court deems just and proper.

## JURY DEMAND

President Trump hereby requests a trial by jury on all issues so triable.

## PUNITIVE DAMAGES

President Trump reserves the right to amend any of these causes of action and seek punitive

damages if such is warranted after discovery.


Dated: January 30, 2023.

**GS2 LAW PLLC**

By: _/s/ Robert Garson_____

Robert Garson, Bar No. 1034548

Yanina Zilberman, Bar No. 105665

20803 Biscayne Blvd., #405

Aventura, Florida 33180

(305) 780-5212

rg@gs2law.com; yz@gs2law.com

*Attorneys for Plaintiff*