# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# PENNSACOLA DIVISION

PRESIDENT DONALD J. TRUMP, 45th President of the United States of America, in his individual capacity,

                Plaintiff,

      v.

SIMON & SCHUSTER, INC., a New York corporation, ROBERT WOODWARD p.k.a. BOB WOODWARD, an individual, and PARAMOUNT GLOBAL, a Delaware corporation, f/k/a Viacom Inc., successor by merger to CBS Corporation, a Pennsylvania corporation f/k/a Westinghouse Electric Corporation,

              Defendants.

3:23-cv-02333-MCR-ZCB

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' RULE 12(B)(6) MOTION TO DISMISS THE COMPLAINT

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................1

FACTUAL BACKGROUND.............................................................................4

    A.   Woodward Interviews President Trump and Publishes Rage.................. **4**

    B.   Woodward Creates the Work Using His Raw Interviews ......................... **9**

    C.   The Complaint ........................................................................ **13**

ARGUMENT ...................................................................................................13

  I.  THE COPYRIGHT CLAIMS FAIL BECAUSE PRESIDENT TRUMP
     LACKS A VALID COPYRIGHT REGISTRATION ......................................... 14

  II.  PRESIDENT TRUMP DOES NOT OWN A COPYRIGHT IN
      WOODWARD'S INTERVIEWS OR WORK...................................................... 15

    A.   Woodward Is the Copyright Owner, Not President Trump..................... **15**

    B.   President Trump Cannot Own His Interview Responses Because They
        Are Government Works under Copyright Law ............................................. **20**

  III.  THE PUBLICATION OF THE WORK WAS FAIR USE ............................... 25

  IV.  THE STATE LAW CLAIMS ARE PREEMPTED BY THE COPYRIGHT
      ACT .................................................................................................................. 28

    A.   The State Law Claims Are Barred by Conflict Preemption..................... **28**

    B.   The State Law Claims Are Expressly Preempted by 17 U.S.C. § 301 **.. 31**

        1.   The Unfair Competition Claims Are Preempted by Section 301 .....32

        2.   The Contract Claims Are Preempted by Section 301 ......................34

  V.  THE STATE LAW CLAIMS MUST BE DISMISSED FOR FAILURE TO
     STATE A VALID CAUSE OF ACTION ............................................................ 36

    A.   The Contract Claims Are Meritless.............................................................. **36**

    B.   The Unfair Competition Claims Are Meritless ........................................... **39**

  VI.  NO VOLITIONAL CONDUCT WAS PLEADED AGAINST
      PARAMOUNT .................................................................................................. 41

CONCLUSION ..............................................................................................42

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*16 Casa Duse, LLC v. Merkin*,
 791 F.3d 247 (2d Cir. 2015) ................................................................17, 18, 19

*Aalmuhammed v. Lee*,
 202 F.3d 1227 (9th Cir. 2000) ...........................................................17

*American Geophysical Union v. Texaco*,
 60 F.3d 913 (2d Cir. 1994) ................................................................27

*Banks v. Manchester*,
 128 U.S. 244 (1888)............................................................................20

*Bell Atl. Corp. v. Twombly*,
 50 U.S. 544 (2007)..............................................................................35

*Bongino v. Daily Beast Co.*,
 LLC, 477 F. Supp. 3d 1310 (S.D. Fla. 2020) ....................................39

*Bonito Boats v. Thunder Craft Boats*,
 489 U.S. 141 (1989)............................................................................28

*Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.*,
 373 F.3d 296 (2d Cir. 2004) .........................................................32, 35

*Carroll v. Trump*,
 49 F.4th 759 (2d Cir. 2022) ...............................................................21

*Clinton v. Jones*,
 520 U.S. 681 (1997)............................................................................22

*Comercial Ltda v. BPI Sports, LLC*,
 2016 WL 9375202 (S.D. Fla. Aug. 11, 2016) ....................................39

*Community For Creative Non-Violence v. Reid*,
 490 U.S. 730 (1989)......................................................................16, 18

*Compco Corp. v. Day-Brite Lighting*,
 376 U.S. 234 (1964)............................................................................28

ii

*Council on Am. Islamic Rels. v. Ballenger*,
444 F.3d 659 (D.C. Cir. 2006).............................................................22

*Current Audio, Inc. v. RCA Corp.*,
71 Misc. 2d 831 (Sup. Ct. N.Y. Cnty. 1972).......................................17

*Dahlgren v Muldrow*,
2007 WL 2827671 (N.D. Fla. Sept. 27, 2007).......................................5

*Dish Network LLC v. TV Net Solutions, LLC*,
2014 WL 6685351 (M.D. Fla. Nov. 25, 2014)......................................31

*Does v. Haaland*,
973 F.3d 591 (6th Cir. 2020)...............................................................22

*Dowbenko v. Google Inc.*,
582 F. App'x 801 (11th Cir. 2014).......................................................15

*Estate of Hemingway v. Random House, Inc.*,
23 N.Y.2d 341 (1968)..........................................................................18

*Extraordinary Title Servs, LLC v. Fla. Power & Light Co.*,
1 So. 3d 400 (Fla. Ct. App. 2009)........................................................42

*Fastcase, Inc. v. Lawriter, LLC*,
907 F.3d 1335 (11th Cir. 2018)...........................................................15

*Five for Ent. S.A. v. Rodriguez*,
877 F. Supp. 2d 1321 (S.D. Fla. 2012).................................................39

*Foley v. Luster*,
249 F.3d 1281 (11th Cir. 2001)...............................................28, 31, 32

*Fourth Estate Pub. Ben. Corp. v. Wall-Street.com, LLC*,
139 S. Ct. 881 (2019)...........................................................................14

*Garcia v. Google, Inc.*,
786 F.3d 733 (9th Cir. 2014) (en banc).................................16, 19, 24

*Garrett-Alfred v. Facebook, Inc.*,
540 F. Supp. 3d 1129 (M.D. Fla.2021).................................................39

*Gary Friedrich Enterprises, LLC v. Marvel Enterprises, Inc.*,
713 F. Supp. 2d 215 (S.D.N.Y. 2010) .................................................................34

*Georgia v. Public.Resource.Org, Inc.*,
140 S. Ct. 1498 (2020) .................................................................20, 24

*Gharib v. Wolf*,
518 F. Supp. 2d 50 (D.D.C. 2007) .......................................................38

*Goldstein v. California*,
412 U.S. 546 (1973) .............................................................................28

*Google v. Oracle*,
141 S. Ct. 1183 (2021) .................................................................26, 27

*Guerroro v. Target Corp.*,
889 F. Supp. 2d 1348 (S.D. Fla. 2012) ...............................................40

*Hanson Hams, Inc. v. HBH Franchise Co., LLC*,
2004 WL 5470401 (S.D. Fla. Dec. 21, 2004).....................................40

*Hello I am Elliot, Inc. v. Sine*,
2020 WL 3619505 (S.D.N.Y. July 2, 2020).........................................15

*ICC Evaluation Serv., LLC v. Int'l Ass'n of Plumbing & Mech. Offs., Inc.*,
2016 WL 11769565 (D.D.C. Sept. 19, 2016)................................31, 34

*Jaggon v. Rebel Rock Ent., Inc.*,
2010 WL 3468101 (S.D. Fla. Sept. 1, 2010) .......................................33

*Kauffman v. Int'l. Brotherhood*,
950 A.2d 44 (D.C. 2008) .....................................................................38

*Korman v. Iglesias*,
778 Fed. Appx. 680 (11th Cir. 2019)...................................................21

*Lipscher v. LRP Publications*,
266 F.3d 1305 (11th Cir. 2001) ..........................................................34

*Millennium Travel & Promotions, Inc. v. Classic Promotions & Premiums, Inc.*,
2008 WL 2275555 (M.D. Fla. June 2, 2008) .......................................33

*Mizioznikov v. Forte*,
   2017 WL 5642383 (S.D. Fla. Mar. 27, 2017) ....................................................27

*Montgomery v. Wells Fargo Bank, N.A.*,
   2017 WL 5127715 (N.D. Ala. Nov. 6, 2017) .....................................................37

*Myers v. Fabrics*,
   101 A.D.2d 777 (N.Y. App. Div. 1st Dep't 1984),
   *aff'd in relevant part*, 65 N.Y.2d 75 (1985) ......................................................38

*Nation v. Harper & Row*,
   471 U.S. 539 (1985)..............................................................................................22

*Pacific and Southern Co., Inc. v. Duncan*,
   792 F.2d 1013 (11th Cir. 1986) ...........................................................................17

*Pegasus Imaging Corp. v. Northrop Grumman Corp.*
   2008 WL 5099691 (M.D. Fla. Nov. 25, 2008)....................................................41

*Pena-Rivera v. Ed. Am. S.A.*,
   1997 WL 363975 (S.D. Fla. May 5, 1997)..........................................................32

*Psychic Readers Network, Inc. v. Take-Two Interactive Software Inc.*,
   2018 WL 1517690 (S.D. Fla. Feb. 5, 2018) ........................................................33

*Reed Elsevier, Inc. v. Muchnick*,
   559 U.S. 154 (2010)..............................................................................................15

*Ross v. Apple, Inc.*,
   2016 WL 8808769 (S.D. Fla. Dec. 30, 2016)......................................................33

*Sears Roebuck & Co v. Stiffel Co.*,
   376 U.S. 225 (1964)..............................................................................................29

*SFM Holdings. Ltd. v. Banc of Amer. Sec.*,
   LLC, 600 F.3d 1334 (11th Cir. 2010)....................................................................5

*Sieger Suarez Architectural P'ship Inc. v. Arquitectonica Int'l Corp.*,
   998 F. Supp. 2d 1340 (S.D. Fla. 2014) ..................................................................5

*Sonders v. Roosevelt*,
   64 N.Y.2d 869 (N.Y. 1985) ................................................................................38

*Strauss v. NewMarket Global Consult. Gp., LLC*,
  5 A.3d 1027 (D.C. 2010) ..................................................................36

*Stripteaser, Inc. v. Strike Point Tackle, LLC*,
  2014 WL 866396 (S.D. Fla. Mar. 5, 2014) ......................................33

*Stuart Weitzman, LLC v. Microcomputer Res., Inc.*,
  542 F.3d 859 (11th Cir. 2008) .........................................................14

*Suid v. Newsweek Magazine*,
  503 F. Supp. 146 (D.D.C. 1980).......................................................18

*SunTrust Bank v. Houghton Mifflin Co.*,
  268 F.3d 1257 (11th Cir. 2001) ........................................................26

*Swatch Group Mgmt. Serv. v. Bloomberg L.P.*,
  756 F.3d 73 (2d Cir. 2014) ..................................................25, 26, 27

*Taggart v. WMAQ Channel 5 Chicago*,
  2000 WL 1923322 (S.D. Ill. Oct. 30, 2000)....................................16

*Truman v. Brown*,
  434 F. Supp. 3d 100 (S.D.N.Y. 2020) ..............................................38

*United States v. Bestfoods*,
  524 U.S. 51 (1998)............................................................................41

*Vault Corp. v. Quaid Software Ltd.*,
  847 F.2d 255 (5th Cir. 1988) ............................................................29

*Wilson v. Libby*,
  535 F.3d 697 (D.C. Cir. 2008).........................................................22

*Wuterich v. Murtha*,
  562 F.3d 375 (D.C. Cir. 2009).........................................................22

*Zimmerman v. Al Jazeera Am., LLC*,
  246 F. Supp. 3d 257 (D.D.C. 2017)..................................................34

**Statutes**

17 U.S.C. §§
  101..........................................................................................16, 22, 20

§105 *et seq* .......................................................................................20, 28
§ 102(a)(1) ...............................................................................................31
§ 102(a)(7) ...............................................................................................31
§ 107...........................................................................................................25
§ 201(a) ....................................................................................................16
§ 301..............................................................................................*passim*

D.C. Code Ann. § 28-3502 ....................................................................37

## Other Authorities

*1 Nimmer on Copyright* § 1.01[B][1][a] (1997) ....................................35

Fed. R. Evid. 201(b)...................................................................................5

H.R. Rep. No. 94-1476 (1976)...............................................................29

M.C. Amerine, *Wrestling Over Republication Rights: Who Owns the Copyright of Interview?*, 21 Marq. Intell. Prop. L. Rev. 159 ..............................................18

*6 Patry On Copyright* §18:51 (2023).....................................................32

## INTRODUCTION

For more than two centuries, Presidents of the United States have relied on journalists to communicate their views to their constituents.  On May 4, 1789, *The Hartford Courant* published President Washington's inaugural speech to Congress.  During the Civil War, an interview with President Lincoln was published to explain why Black troops should be permitted to fight for the Union.  *An Interview with the President*, N.Y. TIMES (Sept. 8, 1864).  With modern technology, audiences became accustomed to hearing their leaders directly via radio, television, online news, and social media.  Presidents from Kennedy to Biden spoke to the Nation through interviews conducted by reporters like Walter Cronkite, Barbara Walters, and Bob Woodward.  Far from being passive bystanders in these conversations, journalists frame the agenda, ask Presidents tough questions, and contextualize their responses.  Ultimately, this long tradition of candid reporting depends on an axiomatic principle—reflected in copyright law—that the words a sitting President speaks while discussing his duties are not private property, but rather they belong to the People.

No President before or since Donald Trump has ever claimed to own a copyright in presidential interviews or demanded royalties for their republication. Yet President Trump has filed a copyright lawsuit against Bob Woodward ("Woodward"), Simon & Schuster ("S&S"), and Paramount Global ("Paramount")

(collectively "Defendants") for publishing *The Trump Tapes: The Historical Record* (the "Work").  In the final year of the Trump Administration, Woodward, one of this country's most prominent journalists, conducted a series of nineteen interviews with President Trump (the "Interviews").  Drawing on decades of experience as a presidential interviewer, Woodward was the architect and true author of the Interviews—it was he who devised the questions, who decided when to press President Trump (or when to let him speak unchallenged), and who ultimately preserved the Interviews for posterity by tape recording them.

As Woodward notes in the Work, he relistened to the Interviews after President Trump left office and decided "to put as much of Trump's voice, his own words, out there for the historical record"—including the then-President's views on subjects ranging from his first impeachment, to U.S. relations with North Korea, to the government's response to COVID-19.  But Woodward did not simply publish the raw Interviews.  Rather, to achieve his historical purpose, Woodward edited the Interviews for clarity, succinctness, and sound quality, and authored original content, including 227 "commentaries" offering critical context and an Introduction and Epilogue that seek to define President Trump's place in the pantheon of Presidents. The Work was published as an audiobook—presenting President Trump as Woodward heard him—and as a substantively identical text edition.  As Woodward concluded in the Work, "Trump's view of the presidency that comes across over and

over again in our interviews" is that "'[e]verything is mine.'  The presidency is mine.  It is *still* mine.  The only view that matters is mine."

As if on a mission to prove this "everything is mine" thesis, the Complaint asserts that Donald Trump, "in his individual capacity," owns Woodward's entire Work because it features words spoken by "President Trump, 45th President of the United States of America."  And President Trump seeks to profit from public service by demanding Defendants pay him nearly $50 million for publishing statements he made while in the White House.  But the Complaint ignores Woodward's role as the author of both the Interviews and the Work, making him the sole copyright owner.  More fundamentally, this lawsuit offends the basic principle—codified in the Copyright Act—that government officials speak for the People and cannot own the words they speak while carrying out official duties.

For obvious reasons, President Trump's Complaint has no legal merit.  Counts I and II (the "Copyright Claims") fail because President Trump failed to obtain a copyright registration prior to filing suit.  *See* POINT I.  President Trump also lacks a protectable copyright interest in the Interviews or the Work because Woodward is their sole author, whereas President Trump's contributions are non-copyrightable government works under the Copyright Act.  *See* POINT II.  And, in any event, it is fair use to quote a President for a Work subtitled "the Historical Record."  *See* POINT III.  Counts III through IX (the "State Law Claims") fare no better.

The common thread is that Woodward allegedly violated a promise that he would use his recordings exclusively for his book *Rage*, published two years before the Work. But the Interviews themselves make clear that no such promise was made and that Woodward was under no obligation to mothball his Interviews. As nothing more than backdoor copyright claims, the State Law Claims are preempted by the Copyright Act (*see* POINT IV) and fail to state a cognizable cause of action. *See* POINT V. Finally, the claims against Paramount Global ("Paramount") fail because the Complaint fails to allege that it, as S&S's parent company, played an actionable role in the Work's publication. *See* POINT VI.

President Trump's unprecedented effort to extract private benefit from his public duties should be dismissed in its entirety.

## FACTUAL BACKGROUND

### A.    Woodward Interviews President Trump and Publishes *Rage*

For more than 50 years, Bob Woodward has covered Presidents and politics for *The Washington Post*. Woodward—who has shared two Pulitzer Prizes—came to prominence by publishing groundbreaking reporting about President Nixon's role in Watergate with his *Post* colleague, Carl Bernstein, which served as the basis for their 1974 classic *All the President's Men*. Since then, Woodward has "written books about 10 presidents from Nixon to Biden" and "interviewed Presidents Carter, Clinton, George W. Bush, and Obama" in the Oval Office. *See* Ex. A, 417, "Also

By Bob Woodward" page.[1]  In September 2018, Woodward published *Fear: Trump in the White House*, which chronicled the first year of the Trump presidency through scores of interviews with administration officials (but not President Trump, who declined to be interviewed).  Compl. ¶30.

After Woodward announced he would write a follow-up to *Fear*, President Trump agreed to be interviewed because he "wish[ed] he met with [Woodward] for the last book."  Ex. A, 47.  Woodward conducted his first presidential interview with President Trump on December 5, 2019 in the Oval Office.  *Id.* 45.  As Woodward explained:

> Our interviews took place during one of the most consequential years in American history.  Trump was impeached, the COVID-19 pandemic erupted, and the murder of George Floyd sparked the largest racial justice protests in the United States since the civil rights movement. I pressed Trump on these topics as well as foreign policy.

*Id.* 2.  At the December 5 interview, Woodward emphasized that "policy is what matters" for "the public, for history."  *Id.* 49.  In subsequent Interviews, Woodward repeated his intention to memorialize President Trump's views on important subjects, in his own words, "for history."  *Id.* 119; *see, e.g., id.* 139 ("But help me,

---

[1] The Work is incorporated by reference and can be properly considered on a Rule 12(b)(6) motion.  *SFM Holdings. Ltd. v. Banc of Amer. Sec.*, LLC, 600 F.3d 1334, 1337 (11th Cir. 2010); *Sieger Suarez Architectural P'ship Inc. v. Arquitectonica Int'l Corp.*, 998 F. Supp. 2d 1340, 1349 (S.D. Fla. 2014).  This Court can take judicial notice of Woodward's bibliography because it is "not subject to reasonable dispute."  Fed. R. Evid. 201(b); *Dahlgren v Muldrow,* 2007 WL 2827671, at *1 (N.D. Fla. Sept. 27, 2007) (same).

for the history, Mr. President."); *id.* 275 ("But what I want to ask you—for the history …"); *id.* 330 ("Can you tell me, just real quickly for the history…").

Each of the Interviews was "on the record"—*i.e.,* anything that President Trump said could be attributed to him freely—and openly tape-recorded by Woodward, which was his general practice for interviewing Presidents. *Id.* 47, 137. Woodward "tried to do [his] homework" before each interview and "asked questions directly." *Id.* 417. As Woodward recognized, "Trump could take you on a freeway to nowhere in an instant," (*id.* 85) and Woodward often used his experience as an interviewer to steer the conversation to important matters of policy. *See, e.g.*, *id.* 49-50, 118 ("TRUMP: How about my instinct?  Do I get credit for that? … COMMENTARY: Our time was running out.  I wanted to move to foreign policy.").

Between December 5, 2019 and August 14, 2020, Woodward interviewed President Trump nineteen times while he was the sitting President.  The first three Interviews were in person (two in the Oval Office, the third at Mar-a-Lago) and Woodward's tape recorder was visible throughout.  *Id.* 45, 47, 86, 136-137.  The remaining Interviews took place over the telephone, especially during COVID lockdowns, with Woodward either calling President Trump from his Washington D.C. home or receiving calls there.  *See id.* 175-294, 311-419.  President Trump was apparently located in the White House for all of the calls, except one call he received

on Air Force One.  *Id.* 212-22.[2]  Woodward frequently reminded President Trump

that the calls were being recorded noting, for example, that he was "turning [his]

recorder on for our history."  *Id.* 376; *see also id.* 361 ("BW:  I've got—as I always

do, I have my tape recorder on.  TRUMP: That's okay.  I don't mind.").  At no point

did President Trump object to being recorded, claim to own the Interviews, or state

that Woodward was prohibited from using them after publishing his next book.

The Work demonstrates that President Trump fully understood that he had no

control over how Woodward used the Interviews.    As President  Trump

acknowledged, he could not tell Woodward what to write and could only "hope" that

he "write[s his] answer[s]" fairly.  *Id.* 55.  More than once, President Trump

observed that President Bush came "out terribly" in books based on his interviews

with Woodward.  *Id.* 285.  When Woodward responded that President Bush "had his

say [and] didn't object," President Trump acknowledged his lack of control:  "Ugh.

And in the end you'll probably write a lousy book.  What can I say?  I respect you

as an author."  *Id.  See also id.* 323-24 ("TRUMP:  You're probably going to screw

me.  Because, you know, that's the way it goes.").

---

[2] The first telephone interview occurred on January 20, 2020, when Woodward
received a call "out of the blue" from the "White House switchboard operator."
*Id.* 175.  Woodward made handwritten notes of this conversation, but "started to
leave handheld recorders around [his] house within easy reach of the phone" for
when President Trump called again.  *Id.* 176.

While Woodward did tell President Trump that the Interviews were for "the book to come out before the election," this was merely a promise not to publish content from the Interviews in contemporaneous news articles.  *Id.* 237, 289-90. Woodward referenced this limited embargo during the first interview in the Oval Office: "remember, this [interview] is for next year, for the book."  *Id.* 84.  During the third interview, President Trump reiterated that the Interviews would be "[f]or the book only"—which Deputy Press Secretary Gidley clarified as meaning "[n]o stories coming out, no nothing" prior to the book's proposed publication in the fall of 2020.  *Id.* 137; Compl. ¶44.

Government officials serving in the Trump Administration frequently attended the Interviews and often provided commentary.  The December 5 interview included "Senator Lindsey Graham, Senior Political Counselor Kellyanne Conway, and two of Trump's aides, Deputy Press Secretary Hogan Gidley and Chief of Staff Mick Mulvaney," with Vice President Pence joining towards the end.  *Id.* 45, 78. Deputy Press Secretary Gidley also joined the December 30, 2019 interview at Mar-a-Lago, interjecting comments.  *Id.* 136; Compl. ¶52.  Senior Advisor Jared Kushner and Deputy Chief of Staff for Communications Dan Scavino joined other Interviews. *Id.* 86, 112, 169, 173, 221.

These Interviews became the core of Woodward's follow-up book to *Fear*. *Rage* was published by S&S on September 14, 2020.[3] Compl. ¶31. President Trump continued to speak to Woodward after *Rage* was substantially complete—three Interviews occurred after Woodward had submitted initial manuscripts and a fourth after "the book was done." Ex. A 338, 376, 389, 408. Approximately "20 percent of" *Rage* derived from the Trump Interviews (*id.* 411) and Woodward published 38 audio clips from the Interviews when *Rage* was published. *See* Compl. n.9. Woodward provided these excerpts to various news organizations, which played them on air and online, including *The Washington Post*'s website.[4] The Complaint asserts no claim arising out of the use of the Interviews in *Rage* or Woodward's prior release of the recordings.

### B.    Woodward Creates the Work Using His Raw Interviews

Woodward relistened to the Interviews in early 2022 and "decided to take the unusual step of releasing these recordings" as an audiobook because "[h]earing Trump speak is a completely different experience to reading the transcripts or listening to snatches of interviews…" Ex. A, 1.

---

[3] The Complaint claims that *Rage* was a "total failure" (*see* Compl. ¶33), but it debuted at No. 1 on The New York Times non-fiction best-seller list. *See* Best Sellers – Books, *The New York Times* (Oct. 4, 2020), https://www.nytimes.com/ books/best-sellers/2020/10/04/.

[4] *See* R. Costa & P. Rucker, *Woodward Book*, WaPo (Sept. 9, 2020), available at https://www.washingtonpost.com/politics/bob-woodward-rage-book-trump/2020/09/09/0368fe3c-efd2-11ea-b4bc-3a2098fc73d4_story.html.

The Work consists primarily of edited versions of the Interviews.  "[F]or the most part the interviews proceed uninterrupted, fulfilling Woodward's goal of presenting Trump's voice and words for the historical record, and offering listeners the chance to hear and judge and make their own assessments." *Id.*  But Woodward also interspersed the Interviews with copious original content.  The Work contains an Introduction and Epilogue, which place the Interviews—and the Trump Administration—into a broader historical and political context.  In the Introduction, for instance, Woodward writes: "'On history's clock it was sunset,' the brilliant author Barbara Tuchman wrote of 1914 before World War I … Just over a century later, the year 2016 and the election of Trump turned out to be another sunset.  The old political order was dying and is now dead." *Id*. 3.  The Epilogue states in similar vein that "Trump aspired to be a colossus like FDR.  He lives his own self-inflicted melodrama.  Everything is mine." *Id.* 419.  Woodward drew the "everything is mine" quote from an interview where President Trump took credit for a speech that his aides wrote because "[t]he ideas are mine … Everything is mine." *Id.* 331, 414.  Foreshadowing this lawsuit, the Work presents Woodward's "central conclusion" that "Trump does not believe in democracy" and "treated the presidency like his own property." *Id.* 414-15.

The Work also includes "227 new commentaries" written by Woodward and interwoven into the Interviews in order "to provide essential context or

clarification." *Id.* vii, 2. Each interview opens with Woodward setting the scene, like the note stating that the first interview started "[a] few hours after Pelosi's press conference [announcing President Trump's first impeachment]." *Id.* 45. The Work also provides factual background, such as the comment following President Trump's statement that he "get[s] along very well" with Erdogan—"COMMENTARY: Recep Erdogan, the 68-year old strongman leader of Turkey… is widely considered one of the world's most notorious autocrats." *Id.* 181. Elsewhere, Woodward contrasts President Trump's words with his previous statements or statements from other government officials, past or present. *See, e.g.*, *id.* 260 (juxtaposing President Trump's statement that "I'm a big fan of hydroxychloroquine" with statement from Dr. Fauci that the drug was never shown to be effective); *id.* 405-07 (comparing President Trump's rhetoric to FDR speech).

The commentaries also frequently "break frame from the interviews" (*id.* 2) to point out when President Trump said something inaccurate or misleading—especially when Woodward strategically decided not to challenge those statements during the Interviews. For instance, President Trump claimed that he "banned people coming in from China [at the outbreak of the pandemic]. Fauci was against it. So was everyone else…." *Id.* 287. Immediately after this false statement, Woodward's "commentary" states: "Again, this is not true at all…" *Id. See also id.*

113-14, 356 (clarifying that "[t]he Mueller report cited ten instances of possible obstruction of justice").

Woodward also devotes an entire chapter of the Work to "one of the most important interviews for… *Rage*," which "wasn't with Trump" but "with National Security Adviser Robert O'Brien and Deputy National Security Advisor Matthew Pottinger." *Id.* 295. Those interviews revealed that O'Brien and Pottinger gave a "stark, dramatic warning" very early in the pandemic about the dangers of the coronavirus. Woodward then documents how President Trump largely ignored these warnings—at great cost to human life—by reviewing inculpatory statements President Trump made in the Interviews and elsewhere. *Id.* 295-310.

On a technical level, Woodward oversaw the editing of raw interview tapes to remove "excessive repetition, irrelevant material, background noise and unintelligible audio." *Id.* 2; Compl. ¶53. S&S engaged an audio producer to record Woodward's commentaries and splice them into the interview tapes, ensure "sound production quality" and process the interview audio "to remove [background] music for copyright reasons." *Id.* vii, 137. President Trump does not claim to have contributed to the audio-editing process, or any of the other work Woodward performed to transform the Interviews into the Work.

S&S published the Work as an audiobook on October 25, 2022, complete with Woodward's original content.  Compl. ¶34.  A few months later, S&S published print editions which transcribe the audiobook content.  *Id.* ¶40.

### C.    The Complaint

The Complaint alleges that Woodward's publication of the Interviews and Work infringed President Trump's exclusive "copyright interests."  Compl. ¶¶55-66.  Without ever claiming that President Trump registered a copyright in the underlying material, the Complaint demands "a declaratory judgment that [President Trump] owns [the Work and the Interviews] in full and therefore is entitled to" recover "at least $49,980,000, exclusive of punitive damages."  *Id.* ¶58.   In the alternative, President Trump requests a judgment that he "owns the copyright in his responses" to Woodward's Interview questions and is "therefore entitled to … pro rata revenues...."  *Id.* ¶65.  The Complaint also includes interrelated State Law Claims—including unjust enrichment, breach of contract, promissory estoppel, and violation of the FDUTPA—and seeks millions of dollars in damages for each of these as well.  *Id.* ¶¶75-127.

### ARGUMENT

For the reasons set forth below, the Complaint should be dismissed for failure to state a valid cause of action.

## I.     THE COPYRIGHT CLAIMS FAIL BECAUSE PRESIDENT TRUMP LACKS A VALID COPYRIGHT REGISTRATION

The Copyright Claims (Counts I-II) fall at the first hurdle because President Trump does not allege he has obtained (and, in fact, has not obtained) the copyright registration he needs to bring this lawsuit.  As the Supreme Court has reiterated, plaintiffs "must comply with [17 U.S.C.] §411(a)'s requirement that 'registration … has been made'" before filing suit.  *Fourth Estate Pub. Ben. Corp. v. Wall-Street.com, LLC*, 139 S. Ct. 881, 887-88 (2019).  This prerequisite is satisfied only "when the Register has registered a copyright after examining a properly filed application."  *Id.* 892.  Copyright law thus imposes a stringent requirement to "receive the Copyright Office's decision on [an] application before instituting suit."  *Id.* 891.  President Trump's failure to do so requires dismissal of his Copyright Claims as a matter of law.[5]

President Trump cannot evade the registration requirement by denominating his Copyright Claims as "Declaratory Relief Regarding Ownership of Copyrights" and "Accounting" under "the Copyright Laws of the United States."  Compl. ¶¶59-74.  This gambit fails because registration is required before a declaratory-judgment plaintiff may sue to establish copyright ownership or recoup damages.  *See Stuart Weitzman, LLC v. Microcomputer Res., Inc.*, 542 F.3d 859, 862-63 (11th Cir. 2008)

---

[5] Although not relevant to this Motion, S&S and Woodward have filed an application to register a copyright in their Work, and that application is pending.

(vacating order permitting declaratory judgment action to proceed without registration); *Dowbenko v. Google Inc.*, 582 F. App'x 801, 805 (11th Cir. 2014) (affirming dismissal where plaintiff "failed to plead that he registered the copyright"); *Hello I am Elliot, Inc. v. Sine*, 2020 WL 3619505, at \*11 (S.D.N.Y. July 2, 2020) (same).[6]

In short, binding precedent from the Supreme Court and Eleventh Circuit requires dismissal of the Copyright Claims for failure to register a copyright.

## II.   PRESIDENT TRUMP DOES NOT OWN A COPYRIGHT IN WOODWARD'S INTERVIEWS OR WORK

Even if President Trump had a valid copyright registration (or obtains one), his Copyright Claims fail on the merits because (A) Woodward is the sole owner of the copyright in his Interviews and the Work, and (B) President Trump's contributions, taken alone, are government works that reside in the public domain.

### A.   Woodward Is the Copyright Owner, Not President Trump

As the sole author of the Interviews and the Work, Woodward is the exclusive owner of the copyright interests at issue. President Trump disclaims joint

---

[6] Following the Supreme Court's clarification that the "registration requirement is a precondition to filing a claim that does not restrict a federal court's subject-matter jurisdiction," *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 157 (2010), the Eleventh Circuit refashioned the *Weitzman* holding so that "a complaint claiming infringement of an unregistered copyright can be dismissed for failure to state a claim." *Fastcase, Inc. v. Lawriter, LLC*, 907 F.3d 1335, 1341 (11th Cir. 2018).

authorship.   Compl. ¶47.[7]   He asserts instead that he "owns [the Work and Interviews] in full" or, alternatively, "owns the copyright in his [interview] responses" (as opposed to Woodward's questions). *Id*. ¶¶64-65.  Both arguments fail.

Copyright ownership "vests initially in the author or authors of the work." 17 U.S.C. §201(a).  The "general rule" recognized by the Supreme Court dictates that "the author is the party who *actually creates the work*, that is, the person who *translates the idea* into a *fixed, tangible expression* entitled to copyright protection." *Community For Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (1989) (emphasis added) (citing 17 U.S.C. §102).  *See also Garcia v. Google, Inc.*, 786 F.3d 733, 743-44 (9th Cir. 2014) (en banc) (actress had no copyrightable interest in film since she was not the one who "fixed [her] acting performance in [a] tangible medium").

Few courts have had the opportunity to apply these general principles to determine who owns interviews—perhaps because it is so obvious that ownership vests in the journalist, particularly when interviewing government officials—but several courts have held journalists to own their interviews outright.  *See, e.g.*, *Taggart v. WMAQ Channel 5 Chicago*, 2000 WL 1923322, at *3-5 (S.D. Ill. Oct. 30, 2000) (journalist owned jailhouse interview because, *inter alia*, prisoner had not

---

[7] A "joint work" is "prepared by two or more authors with the intention that their contributions be merged into inseparable…parts of a unitary whole."  17 U.S.C. §101.

fixed his oral expression in any tangible medium of expression); *Current Audio, Inc. v. RCA Corp.*, 71 Misc. 2d 831, 834-35 (Sup. Ct. N.Y. Cnty. 1972) (holding Elvis Presley had no "property right" in press conference responses "which supersedes the right of its free dissemination"). Accordingly, the Eleventh Circuit has indicated that news organizations most likely hold the sole copyright in interviews with government officials since they "make [the] audio, filming and editing choices in the presentation of [the] material." *Pacific and Southern Co., Inc. v. Duncan*, 792 F.2d 1013, 1014 n.1 (11th Cir. 1986). Indeed, vesting full ownership in the reporter is critical to fostering the "free dissemination of thoughts [and] ideas [on] newsworthy events and matters of public interest." *Current Audio*, 71 Misc. 2d at 834-35.

Woodward's ownership of the Interviews (and the Work as a whole) is buttressed by analogous decisions involving other types of works that involve creative input from multiple contributors, such as movies, which also "define[] the author as the person to whom the work owes its origin and who superintended the whole work, the 'master mind.'" *Aalmuhammed v. Lee*, 202 F.3d 1227, 1233 (9th Cir. 2000). The Second Circuit similarly held that when, as here, "multiple individuals lay claim to the copyright in a single, [non-joint] work, the dispositive inquiry" as to ownership "is which of the putative authors is the 'dominant author.'" *16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 260 (2d Cir. 2015) (rejecting film

director's claim to own raw footage he shot because producer was the "dominant author" of the project).  *See also* M.C. Amerine, *Wrestling Over Republication Rights:  Who Owns the Copyright of Interview?*, 21 MARQ. INTELL. PROP. L. REV. 159 at 181-84 (arguing that copyright rests with journalists who "mastermind," "shape," and "control" the interview by "performing the initial research, devising a theme, tailoring questions, to developing a rapport").[8]

Here, Woodward was the "dominant author" of the Interviews.  It was Woodward, not President Trump, who initiated the project (*see* Compl. ¶31) and exercised the "decision making authority" that is a critical hallmark of sole copyright ownership.  *16 Casa Duse*, 791 F.3d at 260.  It was Woodward who "actually creat[ed]" the Interviews by taping them, thus "translat[ing] an idea into a fixed, tangible expression."  *Reid*, 490 U.S. at 737.  And it was Woodward who "superintended" or "masterminded" the Interviews by deciding what topics to cover, what questions to ask, when to press President Trump, or when to let him keep talking, all while steering President Trump back to matters of policy whenever he

---

[8] The decisions reaching a contrary result are generally old cases based on outdated rationales or defunct doctrines.  Several were decided under common law copyright principles superseded by Section 102 of the 1976 Copyright Act.  *See, e.g., Estate of Hemingway v. Random House, Inc.,* 23 N.Y.2d 341 (1968).  Others were decided before *Reid*, 490 U.S. at 737, and relied on now-improper understandings of Section 102's definition of authorship.  Some arose in different factual settings involving private citizens, not government officials, and contain limited reasoning.  *See, e.g., Suid v. Newsweek Magazine*, 503 F. Supp. 146 (D.D.C. 1980).

strayed.  *See, e.g.*, Ex. A, 118; *supra*, 6.  President Trump's multiple on-the-record admissions that he did not control how the Interviews would be used underscore Woodward's ownership.  *See, e.g.*, Ex. A, 323-24; *supra*, 7.  *See also Garcia*, 786 F.3d at 744 (where participant had no control over how the work was presented she could "hardly argue that the [Interviews were] fixed 'by or under her authority'").

Even more untenable is President Trump's claim that he owns the Work "in full."  Compl. ¶64. This ignores Woodward's editorial role and authorship of *all* the original content that transformed the raw Interviews into a coherent "historical record."   The Work contextualizes the Interviews with an original Introduction, Epilogue and "227 commentaries" written by Woodward.  Woodward also incorporated the voices of many executive branch officials other than President Trump, including a whole chapter devoted to two Trump Administration officials. *See* Ex. A, 295-310; *see also* Dkt. 27-2 (appendix summarizing federal employees mentioned in the Work, hereafter the "Appendix").  And Woodward, together with S&S audiobook editors and sound engineers, edited the raw Interviews for clarity, repetition, and sound quality.  Because Woodward is the true and dominant author of his Work derived from his on-the-record Interviews of a sitting president, copyright law and public policy dictate that Woodward is the sole copyright owner— not President Trump.  *See 16 Casa Duse*, 791 F.3d at 256-59.

**B.    President Trump Cannot Own His Interview Responses Because They Are Government Works under Copyright Law**

The Copyright Claims independently fail for the basic reason that he was President of the United States when he participated in the Interviews and his responses belong to the People, not him personally.  The Copyright Act expressly states that "copyright protection…is not available for any work of the United States Government," which is defined as any "work prepared by [1] an officer or employee of the United States Government [2] as part of that person's official duties" ("Government Works").    17 U.S.C. §§101, 105.    The Supreme Court recently confirmed the breadth of this exemption, observing that the "bar on copyright protection for federal works sweeps…broadly" and "applies to works created by all federal 'officer[s] or employees'" during their employment.    *Georgia v. Public.Resource.Org, Inc.*, 140 S. Ct. 1498, 1509-10 (2020).    In other words, the work product of government representatives—including the President—is common property that exists to benefit the public, not an emolument to be exploited for personal gain.    *Cf. Banks v. Manchester*, 128 U.S. 244, 253 (1888) ("Judges, as is well understood, receive from the public treasury a stated annual salary, fixed by law, and can themselves have no pecuniary interest or proprietorship, as against the public at large, in the fruits of their judicial labors.").

President Trump has admitted that he satisfies the first element of Section 105, *i.e.*, that he was an "employee" of the federal government. As he stated himself in a submission to the Second Circuit, "[p]residents plainly are employees of the Government…" Ex. C, 6. The Second Circuit agreed, finding that President Trump was an "employee" of the federal government for the purposes of invoking immunity under the Federal Tort Claims Act in a defamation action. *Carroll v. Trump*, 49 F.4th 759, 770 (2d Cir. 2022) ("[T]he President is a government employee in the most basic sense of the term.").[9]

It is equally clear that President Trump contributed to the Interviews as "part of his official duties" for the purposes of Section 105. When President Trump was sued for defamation over statements he made during a press conference, the Department of Justice certified that he "was acting within the scope of his office as the President of the United States at the time of the alleged conduct." Ex. D, 2. And President Trump filed a brief in those proceedings stating that "more than any other public official, the President is expected to respond to questions from the media

---

[9] Having instructed the Justice Department to certify that he was acting within the scope of his employment (*see* Ex. D), President Trump is judicially estopped from taking a contrary position in this action. *See Korman v. Iglesias*, 778 Fed. Appx. 680, 682 (11th Cir. 2019) ("Judicial estoppel may be applied when the plaintiff 'took a position under oath in the [prior] proceeding that was inconsistent with the plaintiff's pursuit of the [present] lawsuit' and she thus 'intended to make a mockery of the judicial system.'") (quoting *Slater v. U.S. Steel Corp.*, 871 F.3d 1174, 1180 (11th Cir. 2017)).

that affect his ability to maintain the trust of the American people and effectively carry out his official duties… [S]peaking to the press and communicating with the public is clearly conduct 'of the kind [a President] is employed to perform.'" Ex. E, 8, 19. And President Trump is correct: Courts have consistently held that public officials act "within the scope of employment" when they discuss issues relevant to the performance of their duties "in response to a reporter's inquiries." *Council on Am. Islamic Rels. v. Ballenger*, 444 F.3d 659, 664 (D.C. Cir. 2006); *Does v. Haaland*, 973 F.3d 591, 601-02 (6th Cir. 2020) (tweets posted by Senators fell within the scope of their duties); *Clinton v. Jones*, 520 U.S. 681, 686 (1997) (statements made to the press about a President's personal life "may involve conduct within the outer parameter of the President's official responsibilities"); *Wuterich v. Murtha*, 562 F.3d 375, 384–85 (D.C. Cir. 2009) (congressman's media interviews); *Wilson v. Libby*, 535 F.3d 697 (D.C. Cir. 2008).[10]

Here, the Interviews all occurred when President Trump was in office (Compl. ¶32) and were clearly "part of [his] official duties." 17 U.S.C. §101. Indeed, Woodward conducted the first two Interviews from inside the Oval Office, the

---

[10] Memoirs written after a President leaves office are not written in the course of his duties and are outside the scope of Section 105. *See Nation v. Harper & Row*, 471 U.S. 539, 557 n. 6 (1985) ("[T]he Copyright Act recognized a public interest warranting specific exemptions in a number of areas not within traditional fair use *see, e.g.*, … §105 (no copyright in Government works))."

innermost seat of presidential power.[11]   Post-COVID, President Trump made or received telephone calls to Woodward from the White House or Air Force One. *See* Appendix.  On substance, the Interviews addressed the weightiest issues facing the Trump Administration and the American public—such as President Trump's impeachment, COVID-19 and foreign relations.[12]   *See, e.g.*, Ex. A, 50-51, 132-34, 137-42, 259-272.  A coterie of executive branch staffers monitored and participated in the Interviews—including the Press and Communications Deputies, whose jobs are focused on the Administration's public messaging.  *See, e.g.*, Compl. ¶44; Ex. A, 45, 169-73; *supra*, 8.  Finally, President Trump confirmed that he was conducting presidential business by repeatedly telling Woodward to follow up on certain subjects with other federal officials, like National Security Advisors O'Brien and Pottinger.  *See, e.g.*, Ex. A, 121, 176, 191, 295-310.

Defendants are aware of no authority permitting President Trump to own statements he made to Woodward while serving as president.  The Complaint misguidedly cites the Copyright Office's Compendium of Practices, which includes a default administrative rule permitting interviewers and interviewees to register

---

[11] The Complaint excluded the interview Woodward conducted with then-candidate Trump in 2016 from the list of Interviews supporting the Copyright Claims. *See* Compl. ¶32.

[12] Underscoring his "official duties," President Trump provided Woodward with special access to government documents, such as official correspondence with Kim Jong Un of North Korea.  Ex. A, 423-54.

separate copyrights in their respective questions and responses.  *See* Compl. n.1.
The Compendium speaks to interviews generally.  It does not address, and clearly
does not overrule, Section 105's statutory prohibition on private ownership of
government works.  Further, "the Compendium is a non-binding administrative
manual" and courts are required to "follow it only to the extent it has the power to
persuade."  *Public.Resource.Org, Inc.*, 140 S. Ct. at 1510.  Here, the argument for
"splinter[ing]" a journalist's interviews of a sitting President or other government
actors into a "Swiss cheese of copyrights" is unpersuasive. *Garcia*, 786 F.3d at 742.
Such a regime would give President Trump and other public officials interviewed
by the press the right to sue over any critical or unwelcome use of their statements.
Copyright equates to legal control over expression and requiring journalists to
negotiate authorship rights away from interviewees, particularly public officials,
would invite contractual censorship of criticism and chill open discourse.
Any decision granting President Trump private ownership of his statements to the
press as President would stymie discussion of his place in American history and
contradict the long tradition of opening up a President's words to public scrutiny.

In sum, President Trump's contributions to the Interviews for "the historical
record" are government works that copyright law bars him from owning in a personal
capacity.  Dismissal is warranted for this independent reason.

24

### III.    THE PUBLICATION OF THE WORK WAS FAIR USE

Even assuming President Trump owns a copyright in the Interviews, the Copyright Claims should still be dismissed because Woodward's incorporation of that material into the Work is a fair use. The Copyright Act provides that "the fair use of a copyrighted work" for "purposes such as criticism, comment [or] news reporting… is not an infringement of copyright." 17 U.S.C. § 107.

Here, Woodward's use of the Interviews is classic news reporting, using President Trump's actual words and tone as the foundation for the Work's extensive comments and criticism. In a leading decision, the Second Circuit held that *Bloomberg*'s unauthorized publication of an entire recorded earnings telephone call led by Swatch executives was fair use based on the rationale that, "in news reporting," the "need to convey information to the public accurately may in some instances make it desirable and consonant with copyright law for a defendant to faithfully reproduce an original work without alteration." *Swatch Group Mgmt. Serv. v. Bloomberg L.P.*, 756 F.3d 73, 84 (2d Cir. 2014). As the Second Circuit stated, "a speaker's demeanor, tone and cadence can often elucidate his or her true beliefs far beyond what a stale transcript or summary can show." *Id.*

If there were ever a case that called out for summary application of the *Swatch* principle, this is it. The Work at issue—entitled *The Trump Tapes: The Historical Record*—is a paradigmatic example of the "need to convey information to the public

accurately." *Id*.  As Woodward states in the Work, he "publish[ed] long excerpts" from his presidential Interviews because he "wanted to put as much of [President] Trump's voice, his own words, out there for the historical record and so people could hear and judge and make their own assessment."  Ex. A, 2.  *See also* Ex. B, CD Back Cover ("[L]isteners will hear Trump as Woodward did: profane, incautious, divisive, and deceptive, but also engaging and entertaining…").

Section 107's four fair use factors all strongly favor dismissal.  The first factor looks to the purpose and character of the use.  Through its Introduction, Epilogue, 227 original commentaries, and related interviews of other government officials, the Work uses the Interviews for the transformative and presumptively fair purpose of "commenting" upon and "criticizing" statements Trump made during the Interviews and his Administration more broadly.  *See, e.g.*, *SunTrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1265 (11th Cir. 2001).

The second factor—the nature of the original work—plays a prominent role here because a President's off-the-cuff, oral responses to an interviewer's questions have a "manifestly factual character" that deserves "thin" copyright protection at best.  *Swatch*, 756 F.3d at 89.  *See also Google v. Oracle*, 141 S. Ct. 1183, 1206-08 (2021) (non-creative works are "far from the core of copyright" and more susceptible to fair use).

As for the third factor—amount and substantiality of the use—Woodward used most of the Interviews, but the amount was commensurate with the Work's purpose to capture the "historical record" and allow the audience to experience President Trump explaining his presidency in his own, frequently voluminous words. *Swatch*, 756 F.3d at 90 ("[C]opying the entirety of a work is sometimes necessary for a fair use.")

Finally, the fourth factor examines the effect on the potential market for the original and weighs strongly in favor of fair use. There is no traditional market or likely-to-be-developed market for Presidents to exploit interviews conducted during their presidency, particularly when those discussions covered matters of state. *American Geophysical Union v. Texaco*, 60 F.3d 913, 930 (2d Cir. 1994). It would be perverse to recognize such a market, and contrary to public policy to enable public officials to profit from speaking to the press while in office. *See, e.g.*, *Oracle*, 141 S. Ct. at 1206 (2021) (assessing "public benefits" as part of fourth factor analysis).

This is one of the rare cases where fair use is so evident from the face of the Complaint that immediate dismissal is appropriate. *Mizioznikov v. Forte*, 2017 WL 5642383, at *3, 8 (S.D. Fla. Mar. 27, 2017) (granting Rule 12(b)(6) motion when fair use "defense appears on the face of the complaint") (quoting *Quiller v. Barclays American/Credit*, 727 F.2d 1067, 1069 (11th Cir. 1984)).

## IV.   THE STATE LAW CLAIMS ARE PREEMPTED BY THE COPYRIGHT ACT

The State Law Claims (Counts III-IX) should all be dismissed because they are preempted by the Copyright Act according to the doctrines of (A) "conflict preemption" and (B) "explicit preemption" under 17 U.S.C. §301.  These two preemption doctrines are independently applicable and either one provides a basis for dismissal.  *See Foley v. Luster*, 249 F.3d 1281, 1285-89 (11th Cir. 2001) (applying different categories of preemption to copyright claims).

### A.   The State Law Claims Are Barred by Conflict Preemption

Conflict preemption bars the State Law Claims because they all require this Court to enforce President Trump's alleged ownership interest in the Interviews in violation of the Copyright Act's clear directive that "[c]opyright protection…is not available for any work of the United States Government."  17 U.S.C. § 105(a).

Conflict preemption arises "where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Foley*, 249 F.3d at 1287 (quoting *Pacific Gas & Elec. Co. v. State Energy Res. Conservation*, 461 U.S. 190, 204 (1983)) (quotations and citations omitted). "[W]hen an article is unprotected by a patent or a copyright, state law may not forbid others to copy that article.  To forbid copying would interfere with the federal policy, found in Art. I., § 8 of the Constitution and in the implementing federal statutes, of allowing free access to copy whatever the federal patent and copyright laws leave in

the public domain." *Compco Corp. v. Day-Brite Lighting*, 376 U.S. 234, 237 (1964).

*See also Goldstein v. California*, 412 U.S. 546, 559 (1973) (explaining that "[w]here the need for free and unrestricted distribution of a writing is thought to be required by the national interest, … a State [cannot] protect that which Congress intended to be free from restraint . . ."); *Bonito Boats v. Thunder Craft Boats*, 489 U.S. 141, 167 (1989) (preempting Florida law that "restrict[ed] the public's ability to explore ideas that the patent system mandates shall be free for all to use"); *Vault Corp. v. Quaid Software Ltd.*, 847 F.2d 255, 270 (5th Cir. 1988) (conflict preemption bars breach of contract claims that conflict with the Copyright Act).

Here, conflict preemption preempts the State Law Claims because they attempt to thwart Congress by permitting President Trump to "block off from the public something which federal law said belongs to the public." *Sears Roebuck & Co v. Stiffel Co.*, 376 U.S. 225, 231-32 (1964). Each State Law Claim asks this Court to contravene Section 105, whose express purpose is to ensure that "the individual Government official or employee who wrote the work could not secure copyright in it or restrain its dissemination by the Government or anyone else." H.R. Rep. No. 94-1476 at 59 (1976). For example, President Trump's contract-based claims (*see* Compl. ¶¶102-05, 117-127, the "Contract Claims") all rest on the erroneous assumption that President Trump personally owns a copyright interest that he could then license to Woodward—precisely what Section 105 prohibits.

29

The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") claim is also based on an ownership right that federal law prohibits.  It alleges that Defendants engaged in unfair practices through "Publication of the Interview[s]… *with knowledge of President Trump's rights to the ownership of the same*" and "to capitalize and benefit from President Trump's voice to the detriment of President Trump's ability to publish his own voice *given his position as author*."  Compl. ¶113. And the Complaint's remaining claims similarly rely on a theory that "unauthorized" publication of the Interviews constituted unjust enrichment because President Trump deserves to be "compensate[ed]" for the "benefit" of granting interviews to Woodward (*e.g.*, Compl. ¶¶79, 82), again seeking a private benefit for public works. *See* Compl. ¶¶75-101 (collectively with FDUTPA, the "Unfair Competition Claims").

No matter how President Trump labels his claims, their underlying foundation remains the same—claiming an exclusive, private right to control and be compensated for the dissemination of interviews with journalists he conducted as part of his presidential duties.  That is precisely what the Copyright Act forbids. In other words, contrary to the Supremacy Clause, the State Law Claims seek to eviscerate Section 105 by permitting public officials—who are supposed to be faithful representatives of the People—to convert government work product into private property at will.  Since the President speaks for the People, his words belong

to the People.  The State Law Claims, by contrast, improperly seek to privatize the historical record and should be dismissed as preempted.

**B.      The State Law Claims Are Expressly Preempted by 17 U.S.C. § 301**

While the Court need not go any further to dismiss the Complaint in its entirety, the State Law Claims are independently barred by 17 U.S.C. § 301, which expressly preempts the application of any state laws that (1) fall within the "subject matter of copyright" and (2) are "equivalent to" the exclusive rights established in the Copyright Act.  17 U.S.C. § 301.[13]  The first element is easily satisfied across the board because the State Law Claims arise out of the use of the Interviews in the Work, which falls squarely within copyright's subject matter.  *See* 17 U.S.C. §102(a)(1) and (7) (listing literary works and sound recordings as works of authorship).

As for the second element, both the D.C. and Eleventh Circuits apply the "extra element" test to determine whether there is equivalency:

"[I]f an extra element is required instead of or in addition to the acts of reproduction, performance, distribution or display, in order to

---

[13] This Court should apply District of Columbia law to the State Law Claims in the few instances where there are material conflicts with Florida law.  Since "[t]he Copyright Act provides no guidance regarding choice of law," courts employ common law choice of law principles and look to the jurisdiction "with the most significant relationship."  *Dish Network LLC v. TV Net Solutions, LLC*, 2014 WL 6685351, at *2-3 (M.D. Fla. Nov. 25, 2014).  For the reasons stated in Defendant's motion to dismiss for improper venue, Washington, D.C. has the most significant relationship with the Work, and its law is thus applicable here.  *See* Dkt. 27, 17.

> constitute a state-created cause of action, then the right does not lie
> within the general scope of copyright and there is no preemption."

*Foley,* 249 F.3d at 1285 (citation omitted); *ICC Evaluation Serv., LLC v. Int'l Ass'n of Plumbing & Mech. Offs., Inc.*, 2016 WL 11769565, at \*5–8 (D.D.C. Sept. 19, 2016). "A state law claim is not preempted if the extra element changes the nature of the action so that it is *qualitatively* different from a copyright infringement claim." *Foley*, 249 F.3d at 1285 (emphasis in original). None of the State Law Claims, as pleaded, have an extra element that is qualitatively different from a copyright infringement claim. As such, each is preempted.

### 1.   The Unfair Competition Claims Are Preempted by Section 301

President Trump's Unfair Competition Claims (Counts III-V) turn on his allegation that he "conferred a benefit" on Defendants by participating in the Interviews, which Defendants "accepted" and then improperly enriched themselves by publishing the Work "without accounting to and compensating President Trump…." Compl. ¶87. Numerous courts have found such claims preempted under Section 301 because "enrichment" is not an extra element. As one explained, "[w]hile enrichment is not required for copyright infringement, we do not believe that it goes far enough to make the unjust enrichment claim qualitatively different from a copyright infringement claim." *Briarpatch Ltd., L.P v. Phoenix Pictures,*

*Inc.*, 373 F.3d 296, 306-07 (2d Cir. 2004).[14]  This conclusion is underscored since President Trump does not allege that there was an expectation and agreed terms of payment in the event that Woodward used the Interviews.  Absent that foundation, the Unfair Competition Claims are nothing more than claims for damages arising from allegedly unauthorized copying.  *See, e.g.*, *Psychic Readers Network, Inc. v. Take-Two Interactive Software Inc.*, 2018 WL 1517690, at *3 (S.D. Fla. Feb. 5, 2018) (preemption where plaintiff alleged defendant used the "look and sound" of plaintiff's Miss Cleo character in defendant's video game "without paying"); *Ross v. Apple, Inc.*, 2016 WL 8808769, at *5 (S.D. Fla. Dec. 30, 2016) (preemption where plaintiff alleged Apple sought out abandoned copyrights to steal for their own gain).[15]

President Trump's FDUTPA claim is also barred for lack of an extra element.  The gist of the claim is that Defendants engaged in an unfair act by depriving President Trump of his rights as a "consumer" by publishing a Work in

---

[14] Other authority supports dismissal of the Unfair Competition Claims as preempted.  *See* 6 *Patry On Copyright* §18:51 (2023) ("[T]ypical unjust enrichment claims are preempted because they are mere attempts to state a claim for damages for unauthorized copying or other activity encompassed by Section 106"); *Pena-Rivera v. Ed. Am. S.A.*, 1997 WL 363975, at *2 (S.D. Fla. May 5, 1997) (unjust enrichment claim preempted).

[15] Florida courts are split over whether unjust enrichment claims are preempted.  *Compare Psychic Readers Network*, 2018 WL 1517690 *with Jaggon v. Rebel Rock Ent., Inc.*, 2010 WL 3468101, at *3 (S.D. Fla. Sept. 1, 2010).

contravention of his "rights to ownership" and "position as an author"—concepts parallel to his copyright claim. Compl. ¶¶106-116. The Complaint's "reiteration of the elements of an FDUTPA claim is not enough to save its… copyright infringement claims from preemption." *Millennium Travel & Promotions, Inc. v. Classic Promotions & Premiums, Inc.*, 2008 WL 2275555, at *3 (M.D. Fla. June 2, 2008). *See also Stripteaser, Inc. v. Strike Point Tackle, LLC*, 2014 WL 866396, at *5 (S.D. Fla. Mar. 5, 2014). Nor can President Trump evade preemption by offering as an extra-element conclusory, non-specific allegations that Woodward harmed his reputation by editing the Interviews deceptively (Compl. ¶113(iii))—especially since the one example (Compl. ¶53) shows innocuous edits for clarity that fall far short of a valid false light claim. *See, e.g.*, *Zimmerman v. Al Jazeera Am., LLC*, 246 F. Supp. 3d 257, 280 (D.D.C. 2017) (dismissing false light claim).[16]

## 2. The Contract Claims Are Preempted by Section 301

The Contract Claims (Counts VI, VIII-IX) are all premised on the notion that Woodward unlawfully reproduced the Interviews in conflict with a supposed promise that they would only be "used for the purposes of writing a single book." Compl. ¶118. While there is a Circuit split on whether Section 301 preempts breach

---

[16] Accounting—even if a separate claim—is also preempted under §301. *See, e.g.*, *Gary Friedrich Enterprises, LLC v. Marvel Enterprises, Inc.*, 713 F. Supp. 2d 215, 233 (S.D.N.Y. 2010) ("[A]ccounting claims based primarily on copyright infringement do not satisfy the 'extra element' test and are preempted.").

of contract claims, courts in several circuits including D.C. (the proper venue in this action whose law should apply) hold that a "promise" to "refrain" from "reproducing" or "distributing" a copyrighted work is not sufficient to constitute an extra element and are preempted.[17] *ICC Evaluation Serv.*, 2016 WL 11769565, at *5–8 (citing *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 455–58 (6th Cir. 2001) and *Am. Movie Classics Co. v. Turner Entm't Co.*, 922 F. Supp. 926, 931 (S.D.N.Y. 1996)); *see also 1 Nimmer on Copyright* § 1.01[B][1][a] at 1–22 (1997) (although "the vast majority of contract claims will presumably survive scrutiny...nonetheless preemption should continue to strike down claims that, though denominated 'contract,' nonetheless complain directly about the reproduction of expressive materials"). President Trump's quasi-contractual claims of promissory estoppel and breach of the covenant of good faith and fair dealing should be preempted for essentially the same reason. *Cf. Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004) (state law cause of action for *quasi* contract should be regarded as an 'equivalent right' to copyright and hence pre-empted).

---

[17] The Eleventh Circuit holds that contract claims are generally not preempted by Section 301, while recognizing the views of other circuits. *Lipscher v. LRP Publications*, 266 F.3d 1305, 1318-19 (11th Cir. 2001).

## V.   THE STATE LAW CLAIMS MUST BE DISMISSED FOR FAILURE TO STATE A VALID CAUSE OF ACTION

The State Law Claims should also be dismissed for failure to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 50 U.S. 544, 570 (2007).  Because President Trump has "not nudged [his] claims across the line from conceivable to plausible, [his] complaint must be dismissed." *Id*.

### A.   The Contract Claims Are Meritless

President Trump's breach of contract claim against Woodward should be dismissed because he has failed to identify any clear enforceable promise that Woodward would not use the Interviews as part of the Work.  "The party asserting the existence of the oral contract has the burden of proving that an enforceable agreement exists." *Strauss v. NewMarket Global Consult. Gp., LLC,* 5 A.3d 1027, 1033 (D.C. 2010) (citing *Kramer Assocs. v. Ikam, Ltd,* 888 A.2d 247, 251 (D.C. 2005)).

Here, the Complaint alleges that "President Trump made Woodward aware on multiple occasions, both on and off the record, of the nature of the limited license to any recordings"—*i.e.*, that the Interviews were "for the sole purpose of accurately quoting President Trump for…*Rage*."  Compl. ¶46.  As support for this position, President Trump cherry-picks two excerpts from the Work in which Woodward agreed that the Interviews would be "for the book." *Id.* ¶¶44-45.  But the context in

which these snippets of conversation appear make clear that the only relevant limitation that Woodward, a veteran *Washington Post* reporter, placed on himself was not to roll out a series of individual press "stories" based on his Interviews before publishing *Rage* in fall 2020. *See, e.g.*, Ex. A, at 137.

The Complaint alleges no facts supporting a conclusion that Woodward ever agreed that President Trump owned the Interviews or that they would never be used for any purpose other than providing quotations for *Rage*—nor could it, which is likely why it plucks a few words out of context. To the contrary, President Trump repeatedly indicated that he had no control over how Woodward would use the Interviews in Woodward's depiction of him. *See supra*, 7. And Interviews continued even after Woodward had submitted his manuscript for *Rage*, contradicting the notion that the Interviews were for the limited purpose of quotation in the book. *See supra*, 9. There is nothing approaching a plausible allegation that there was a meeting of the minds in which Woodward agreed that President Trump actually "owned" the Interviews and only granted Woodward a "limited license" to use quotes from the Interviews in *Rage.* No experienced journalist would agree to such onerous terms—particularly with respect to materials that form part of "the historical record"—and nothing in the tapes remotely suggests that Woodward had taken the extraordinary step of agreeing to President Trump's alleged terms, which requires dismissal of the Contract Claims. *See, e.g.*, *Montgomery v. Wells Fargo*

*Bank, N.A.*, 2017 WL 5127715, at *5 (N.D. Ala. Nov. 6, 2017) (contract claim dismissed where it was "implausible to construe [the alleged] series of events as an acceptance of a contract").

The statute of frauds provides an independent ground for dismissing the breach of contract claims. "[A]n action may not be brought… upon an agreement that is not to be performed within one year from the making thereof, unless the agreement [is in writing]." D.C. Code Ann. § 28-3502. Here, President Trump's purported agreement with Woodward prohibiting his reuse of the Interviews extended into perpetuity. Thus, as a services contract that cannot be performed within one year, it is subject to the stringent writing and signature requirement. *See, e.g.*, *Myers v. Fabrics*, 101 A.D.2d 777, 778 (N.Y. App. Div. 1st Dep't 1984) (holding that oral license "runs afoul of the Statute of Frauds"), *aff'd in relevant part*, 65 N.Y.2d 75 (1985). Here, since it is uncontested there is no signed "writing set[ting] forth the essential terms of the agreement," the breach of contract claims should be dismissed. *Gharib v. Wolf*, 518 F. Supp. 2d 50, 54-55 (D.D.C. 2007). *See also Sonders v. Roosevelt*, 64 N.Y.2d 869, 871 (N.Y. 1985) (tape recorded conversations did not satisfy Statute of Frauds); *Truman v. Brown*, 434 F. Supp. 3d 100, 114 (S.D.N.Y. 2020) ("motley communications" including "phone call transcripts … do not satisfy the Statute of Frauds").

As for President Trump's duplicative claims for promissory estoppel and breach of the covenant of good faith and fair dealing, they should also be dismissed because they "merely… restate his breach of contract claim in other dress." *Kauffman v. Int'l. Brotherhood*, 950 A.2d 44, 49 (D.C. 2008).

### B.    The Unfair Competition Claims Are Meritless

The Complaint fails to state a claim under FDUPTA.   First, and most fundamentally, President Trump's FDUTPA claims should be dismissed because they arise from the publication of expressive speech.   "For the FDUTPA to apply, the alleged violation must have taken place 'in the conduct of any trade or commerce,' which is defined as 'the advertising, soliciting, providing, offering, or distributing' of goods, services, property, 'or any other article, commodity, or thing of value.'" *Bongino v. Daily Beast Co.*, LLC, 477 F. Supp. 3d 1310, 1321 (S.D. Fla. 2020) (quoting Fla. Stat. §§ 501.203(8), 501.204(1)).   The Eleventh Circuit has mandated, however, that the publication of "editorial" content—*i.e.*, non-commercial speech—is categorically exempt from FDUTPA liability. *Id*. (dismissing FDUTPA claim based on news article) (quoting *Tobinick v. Novella*, 848 F.3d 935, 950 (11th Cir. 2017)).   The Work is unquestionably expressive in nature, not commercial speech, and the claim fails as a matter of law.

Second, "FDUPTA applies only to actions that occurred within the state of Florida." *Five for Ent. S.A. v. Rodriguez*, 877 F. Supp. 2d 1321, 1330 (S.D. Fla.

2012) (dismissing claim where deceptive conduct occurred outside Florida); *W.W. Sports Importadora Exportadora e Comercial Ltda v. BPI Sports, LLC*, 2016 WL 9375202, at *5 (S.D. Fla. Aug. 11, 2016) (dismissing FDUTPA claim against "non-resident defendant accused of no wrongful conduct in Florida"). Clearly, the primary conduct at issue occurred in Washington, D.C., not Florida.

Finally, President Trump does "not allege harm caused to consumers" and therefore "failed to state a claim for relief." *Garrett-Alfred v. Facebook, Inc.*, 540 F. Supp. 3d 1129, 1141 (M.D. Fla.2021). Relevant here, he cites boilerplate language about "mislead[ing] and deceiv[ing] other customers into viewing him in a poor light" to circumvent his failure to otherwise allege a harm to an actual consumer. Compl. ¶ 113. An unflattering opinion of President Trump cannot amount to consumer injury. *Hanson Hams, Inc. v. HBH Franchise Co., LLC*, 2004 WL 5470401, at *8–9 (S.D. Fla. Dec. 21, 2004) (plaintiff must show "actual damages proximately caused by the unlawful conduct"). Even so, such injury is purely speculative, as he has alleged no actual consumer who has been injured in this manner.

President Trump's unjust enrichment claims should be dismissed as duplicative because they "seek[] recovery for the exact same wrongful conduct as in [his] FDUTPA claim" and Contract Claims, *i.e.*, publication of the Interviews in the Work. *Guerroro v. Target Corp.*, 889 F. Supp. 2d 1348, 1356 (S.D. Fla. 2012) ("[I]f

Plaintiff cannot prevail on her FDUTPA claim, she cannot prevail on her unjust enrichment claim."). Moreover, there is nothing remotely "unjust" about Defendants' publication of the Interviews in the Work, which President Trump willingly engaged in with no sense that he controlled them. *See* Ex. A, 292; *supra*, 7. Moreover, the claim that "Woodward has failed to acknowledge or cite to President Trump's contributions to the [Work]" is flatly contradicted by the title—*The Trump Tapes*—and by the Complaint itself, which reproduces webpages for the Work that identify President Trump as a contributor. *See* Compl. ¶¶38-39.

In short, the State Law Claims fail on their own merits in addition to being preempted as Copyright Claims by another name.

## VI.   NO VOLITIONAL CONDUCT WAS PLEADED AGAINST PARAMOUNT

Finally, the unfair competition and Copyright Claims against Paramount should be dismissed because the Complaint includes no plausible allegation that Paramount (as the parent of S&S) was responsible for any of the allegedly unlawful conduct at issue in this action. "It is a general principle of corporate law... that a parent corporation... is not liable for the acts of its subsidiaries." *United States v. Bestfoods,* 524 U.S. 51, 61 (1998). In the copyright context, this means that a parent corporation cannot be held liable for the infringement of its subsidiary "unless there is a 'substantial and continuing connection' between the infringing acts of the parent and subsidiary." *Pegasus Imaging Corp. v. Northrop Grumman Corp.* 2008 WL

5099691, at *1 (M.D. Fla. Nov. 25, 2008) (quoting *Howard Johnson v. Khimani,* 892 F.2d 1512, 1518 (11th Cir.1990)).

Here, the only specific allegation of Paramount's involvement with the Work is that its "assets include [S&S]" and it "exerts direct control over the executive leadership" thereof.  Compl. ¶6.  This is not nearly enough to establish copyright infringement against Paramount for its subsidiary's alleged infringement of President Trump's copyright.  *See, e.g.*, *Pegasus*, 2008 WL 2268323, at *1 (M.D. Fla. May 30, 2008) (dismissing copyright claim because "a parent corporation… is not liable for the acts of its subsidiaries").  The tag-along claims of unjust enrichment and violation of the FDUTPA against Paramount fail for substantially the same reason.  *See, e.g.*, *Extraordinary Title Servs, LLC v. Fla. Power & Light Co.*, 1 So. 3d 400, 404 (Fla. Ct. App. 2009).

## CONCLUSION

Defendants respectfully request that this Court dismiss the Complaint with prejudice and award such other relief it deems just and proper.

Dated:  April 3, 2023

**DAVIS WRIGHT TREMAINE LLP**

*/s/ Elizabeth A. McNamara*

Elizabeth A. McNamara (NYBN 1930643)
Linda J. Steinman (NYBN 2137305)
John M. Browning (NYBN 5213038)
Leena M. Charlton (NYBN 5622147)
1251 Avenue of the Americas, 21st Floor
New York, NY 10020
Phone: (212) 489-8230
Email: lizmcnamara@dwt.com
          lindasteinman@dwt.com
          jackbrowning@dwt.com
          leenacharlton@dwt.com

**GUNSTER, YOAKLEY & STEWART, P.A.**

Kenneth B. Bell (FBN 347035)
Lauren V. Purdy (FBN 93943)
Derek K. Mountford (FBN127172)
One Independent Dr., Suite 2300
Jacksonville, FL 32202
Phone: (904) 354-1980
Email: kbell@gunster.com
          lpurdy@gunster.com

*Attorneys for Robert Woodward,
Simon & Schuster, Inc. and
Paramount Global*

**WILLIAMS & CONNOLLY***

Kevin T. Bane (DCBN 438394;
*pro hac vice pending)*
Thomas G. Hentoff (DCBN 128600)

680 Maine Avenue SW
Washington, DC 20024
Phone: (202) 434-5804

Email: kbaine@wc.com
              thentoff@wc.com

*Of counsel to Robert Woodward*

## CERTIFICATION OF WORD COUNT

I hereby certify that this Memorandum of Law in Support of Defendants Rule 12(b)(6) Motion to Dismiss complies with Rule 7.1(F) of the Local Rules for the Northern District of Florida and this Court's order granting permission to file an oversized document, not to exceed 10,000 words.  Dkt. 22.

According to the word-processing system used to prepare this Motion to Dismiss or, in the Alternative, to Transfer for Improper Venue, the total word count for all printed text exclusive of the material omitted under Rule 7.1 is 9,994 words.

Dated: April 3, 2023                           */s/ Elizabeth A. McNamara*
                                                Elizabeth A. McNamara

## CERTIFICATE OF SERVICE

I hereby certify that on April 3, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

*/s/ Elizabeth A. McNamara*
Attorney
