Exhibit C

# 20-3977-cv(L), 20-3978-cv(CON)

## United States Court of Appeals

*for the*

## Second Circuit

E. JEAN CARROLL,

*Plaintiff-Appellee,*

— v. —

DONALD J. TRUMP, in his personal capacity,

*Defendant-Appellant,*

UNITED STATES OF AMERICA,

*Movant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX
## FOR DEFENDANT-APPELLANT

MARC KASOWITZ
KASOWITZ BENSON TORRES LLP
*Attorneys for Defendant-Appellant*
1633 Broadway
New York, New York 10019
(212) 506-1700

# TABLE OF CONTENTS

**Page**

JURISDICTIONAL STATEMENT ...........................................................................1

ISSUES PRESENTED FOR REVIEW .....................................................................2

    A.    Nature of Case and Procedural History.................................................3

    B.    Factual Background...............................................................................3

SUMMARY OF ARGUMENT .................................................................................5

    A.    The Westfall Act Applies to the President............................................5

    B.    The President Acted Within the "Scope of Employment."...................8

ARGUMENT ..........................................................................................................14

I.      STANDARD OF REVIEW.........................................................................14

II.    THE WESTFALL ACT APPLIES TO THE PRESIDENT OF THE
      UNITED STATES........................................................................................15

    A.    The Expansive Definition of Employee Includes the President .........15

    B.    The Westfall Act's Failure to Exclude the President Establishes
         that the President is Included in the Definition...................................19

    C.    The Legislative History Makes Clear That Congress Intended to
         Include the President ..........................................................................23

    D.    The President is Part of the Executive Departments as That
         Term is Used in the Westfall Act........................................................23

    E.    The Administrative Requirements in the Westfall Act Do Not
         Preclude it From Applying to the President.......................................29

III.   THE PRESIDENT'S STATEMENTS AT THE WHITE HOUSE
      WERE MADE "WITHIN THE SCOPE OF HIS OFFICE OR
      EMPLOYMENT"..........................................................................................32

A.    The President's Statements to The Press At The White House Were Made "Within the Scope of His Office or Employment" .........32

      1.    Speaking to the Press is "Of the Kind" a President is Employed to Perform. ..................................................36

      2.    The Statements Were Substantially Within An Authorized Time and Place........................................38

      3.    The Statements Were Actuated in Part by a Purpose to Serve the Master........................................................39

B.    The District Court's Complaints with Ballenger Are Unfounded ......43

C.    The Master-Servant Test is Irrelevant But Satisfied ..........................47

      1.    The Master-Servant Test is Irrelevant Here.............................47

      2.    A Master-Servant Relationship Exists ......................................50

CONCLUSION .............................................................................................53

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACLU v. Nat'l Sec. Agency*,
   925 F.3d 576 (2d Cir. 2019) ....................................................................4

*Ali Jaber v. United States*,
   155 F. Supp. 3d 70 (D.D.C. 2016)..........................................................16

*Ali v. Rumsfeld*,
   649 F.3d 762 (D.C. Cir. 2011)................................................................37

*Azar v. Alina Health Servs.*,
   139 S. Ct. 1804 (2019)............................................................................46

*B & A Marine Co. v. Am. Foreign Shipping Co.*,
   23 F.3d 709 (2d Cir. 1994) ...............................................12, 30, 46, 49

*Barr v. Matteo*,
   360 U.S. 564 (1959)..................................................................8, 34, 47

*Bello v. United States*,
   93 F. App'x 288 (2d Cir. 2004) .............................................................14

*Blair v. District of Columbia*,
   190 A.3d 212 (D.C. 2018) .............................................40, 41, 42, 43

*Bowles v. United States*,
   685 F. App'x 21 (2d Cir. 2017) ....................................................*passim*

*Bradley v. Nat'l Collegiate Athletic Ass'n*,
   249 F. Supp. 3d 149 (D.D.C. 2017)........................................................48

*Brown v. Argenbright Sec., Inc.*,
   782 A.2d 752 (D.C. 2001) ......................................................................42

*Carroll v. Trump*,
   --- F. Supp. 3d ----, No. 20-CV-7311 (LAK), 2020 WL 6277814
   (S.D.N.Y. Oct. 27, 2020) .........................................................................3

*Chapman v. Rahall*,
   399 F. Supp. 2d 711 (W.D. Va. 2005) ................................................................. 33

*Christopher v. SmithKline Beecham Corp.*,
   567 U.S. 142 (2012) ......................................................................................... 17, 18

*Clinton v. Jones*,
   520 U.S. 681 (1997) ............................................................................................ *passim*

*Conyers v Westphal*,
   235 F. Supp. 3d 72 (D.D.C 2017) ...................................................................... 32

*Council on Am. Islamic Relations v. Ballenger*,
   444 F.3d 659 (D.C. Cir. 2006) ........................................................................... *passim*

*Davila v. United States*,
   247 F. Supp. 3d 650 (W.D. Pa. 2017) ................................................................ 18

*District of Columbia v. Bamidele*,
   103 A.3d 516 (D.C. 2014) .................................................................................. 41, 42

*Does 1-10 v. Haaland*,
   973 F.3d 591 (6th Cir. 2020) ....................................................................... 16, 33, 53

*Fed. Land Bank of St. Paul v. Bismarck Lumber Co.*,
   314 U.S. 95 (1941) ............................................................................................ 17, 20

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992) ........................................................................................ 7, 21, 22

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
   561 U.S. 477 (2010) ........................................................................................... 53

*Guadagni v. New York City Transit Auth.*,
   387 F. App'x 124 (2d Cir. 2010) ....................................................................... 14

*Gutierrez de Martinez v. Lamagno*,
   515 U.S. 417 (1994) ........................................................................................... 18, 28

*Harbury v. Hayden*,
   522 F.3d 413 (D.C. Cir. 2008) ..................................................................... 10, 32, 44

*Hechinger Co. v. Johnson*,
    761 A.2d 15 (D.C. 2000) ...................................................................45

*Hui v. Castaneda*,
    559 U.S. 799 (2010) ........................................................................17

*Jacobs v. Vrobel*,
    724 F.3d 217 (D.C. Cir. 2013) ...............................................10, 32, 37

*Johnson v. Weinberg*,
    434 A.2d 404 (D.C. 1981) ...............................................................45

*Klayman v. Obama*,
    125 F. Supp. 3d 67 (D.D.C. 2015) .....................................................16

*Knight First Amendment Inst. at Columbia Univ. v. Trump*,
    928 F.3d 226 (2d Cir. 2019) ........................................................37, 39

*Levin v. United States*,
    568 U.S. 503 (2013) ........................................................................17

*Littlejohn v. Obama*,
    No. CA 7:14-812-JMC-KFM, 2014 WL 8266142 (D.S.C. Mar. 18,
    2014) ............................................................................................16

*Littlejohn v. South Carolina*,
    No. CA6:100940RBHWMC, 2010 WL 1791419 (D.S.C. Apr. 16,
    2010) ............................................................................................31

*Littlejohn v. United States*,
    No. CA 6:13-870-JMC-KFM, 2013 WL 1840050 (D.S.C. Apr. 9,
    2013) ............................................................................................15

*McNamara v. United States*,
    199 F. Supp. 879 (D.D.C. 1961) ............................................18, 24, 25

*Ex parte Milligan*,
    71 U.S. (4 Wall.) 2 (1866) ...............................................................53

*Nixon v. Fitzgerald*,
    457 U.S. 731 (1982)..............................................22, 23, 27, 39

*Operation Rescue Nat'l v. United States,*
   147 F.3d 68 (1st Cir. 1998).................................................................16, 28, 54

*Osborn v. Haley,*
   549 U.S. 225 (2007)...................................................................................2

*Palmer v. Flaggman,*
   93 F.3d 196 (5th Cir. 1996) ......................................................................48

*Presidential Gardens Assocs. v. U.S. ex rel. Sec'y of Hous. & Urban Dev.,*
   175 F.3d 132 (2d Cir. 1999) ......................................................................15

*Richards v. United States,*
   369 U.S. 1 (1962).....................................................................................32

*Saleh v. Bush,*
   848 F.3d 880 (9th Cir. 2017) .....................................................................16

*SAS Institute, Inc. v. Iancu,*
   138 S. Ct. 1348 (2018)..............................................................................16

*Smith v. Clinton,*
   886 F.3d 122 (D.C. Cir. 2018)..............................................................28, 36

*Sniado v. Bank Austria AG,*
   378 F.3d 210 (2d Cir. 2004) ......................................................................15

*Sullivan v. United States,*
   21 F.3d 198 (7th Cir. 1994) .......................................................................49

*Trump v. Hawaii,*
   138 S. Ct. 2392 (2018)..............................................................................37

*Trump v. Mazars USA, LLP,*
   140 S. Ct. 2019 (2020)..........................................................................38, 45

*Trump v. Vance,*
   140 S. Ct. 2412 (2020)....................................................................11, 15, 39

*United States v. Hatter,*
   532 U.S. 557 (2001)..................................................................................19

*United States v. LePatourel*,
571 F. 2d 405 (8th Cir. 1978) ........................................................20, 21, 50, 54

*United States v. United States Fidelity and Guaranty Co.*,
309 U.S. 506 (1940)........................................................................................15

*Velez-Diaz v Vega-Irizarry*,
421 F.3d 71 (1st Cir 2005)................................................................................2

*Weinberg v. Johnson*,
518 A.2d 985 (D.C. 1986) .............................................................................42

*West v. Trump*,
No. 3:19-CV-2522-K-BH, 2020 WL 4721291 (N.D. Tex. July 23,
2020) .....................................................................................................16, 30

*Westfall v. Erwin*,
484 U.S. 292 (1988)..........................................................................26, 27, 31

*Williams v. United States*,
71 F.3d 502 (5th Cir. 1995) ......................................................................33, 54

*Wilson v. Libby*,
535 F.3d 697 (D.C. Cir. 2008)..................................................................*passim*

*Wuterich v. Murtha*,
562 F.3d 375 (D.C. Cir. 2009).................................................................*passim*

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952)........................................................................................6, 53

**Statutes**

3 U.S.C. § 102 ...............................................................................................19, 51

5 U.S.C. § 7322 ................................................................................................21

28 U.S.C. § 451 ...............................................................................................8, 24

28 U.S.C. § 516 ................................................................................................29

28 U.S.C. § 519 ................................................................................................29

28 U.S.C. § 1291 ..............................................................................................2

28 U.S.C. § 1346(b)(1)................................................................5, 16

28 U.S.C. § 2679.................................................................5, 16, 29

28 U.S.C. § 2671...................................................................*passim*

28 U.S.C. § 2672............................................................................29

28 U.S.C. § 2673............................................................................30

28 U.S.C. § 2675.....................................................................31, 49

28 U.S.C. § 2674...................................................................*passim*

28 U.S.C. § 2680.....................................................................23, 46

42 U.S.C. § 410(a)........................................................................19

Act of June 25, 1948, ch. 646, § 451, 62 Stat. 869, 907 ........................24

**Other Authorities**

H.R. Rep. 100-700 (June 14, 1988) ........................................6, 8, 23, 26

*Hearings on S. 2690 Before a Subcomm. of the Senate Comm. on the Judiciary*, 76th Cong., 3d Sess. 9 (1940) (memorandum to the Att'y Gen. from Special Ass't Alexander Holtzoff dated June 7, 1939) ...................................................................................24

Restatement (Second) of Agency....................................................*passim*

Restatement (Third) of Agency 6 (2006)........................................50, 51

U.S. Const. art. II, § 1 ...............................................................6, 19, 51

Defendant-appellant President Donald J. Trump respectfully submits this memorandum of law in support of his appeal from the October 27, 2020 Opinion and Order ("Order") (SPA-1)[1] of the United States District Court for the Southern District of New York, the Honorable Lewis A. Kaplan, denying the United States' motion, pursuant to the Westfall Act, 28 U.S.C. § 2679(d)(2), to substitute the United States as defendant in place of President Trump.[2]

## JURISDICTIONAL STATEMENT

Plaintiff-appellee E. Jean Carroll filed this action on November 4, 2019 against President Trump in New York State Supreme Court, New York County, alleging that he defamed her in June 2019 when he denied, in a White House Press Office statement and two responses to questions from the press, her accusation that he had sexually assaulted her in a Bergdorf Goodman dressing area 24 years earlier.

Pursuant to the Westfall Act, codified at 28 U.S.C. §§ 2671, 2674 and 2679, the United States Department of Justice certified that President Trump "was acting within the scope of his office as the President of the United States at the time of the alleged conduct," and the United States removed the action to the District Court

---

[1] References to the Joint Appendix are to "JA-__" and to the Special Appendix are to "SPA-__." Citations to "ECF" refer to the District Court docket.

[2] Pursuant to Fed. R. App. P. 28(i), President Trump joins in the opening brief of the United States.

pursuant to Section 2679(d)(2), which is the basis for the District Court's subject-matter jurisdiction.

Also pursuant to Section 2679(d)(2), the United States moved in the District Court to substitute the United States for President Trump as the defendant.  (JA-19; JA-12).  On October 27, 2020, the District Court entered the Order denying the motion to substitute (SPA-1).

The Order is immediately appealable as a collateral order, and this Court has jurisdiction to review the Order pursuant to 28 U.S.C. § 1291.  *Osborn v. Haley*, 549 U.S. 225, 238 (2007).

On November 25, 2020, the United States and President Trump filed timely notices of appeal from the Order.  (JA-421; JA-423.)[3]

## ISSUES PRESENTED FOR REVIEW

1.  Whether the President of the United States is an employee of the Government within the meaning of the Westfall Act.

2.  Whether the President of the United States is acting within the scope of his or her office or employment within the meaning of the Westfall Act, when he or she communicates with the press.

---

[3] Both the United States and President Trump have standing to appeal.  *Velez-Diaz v Vega-Irizarry*, 421 F.3d 71, 75-76 (1st Cir 2005) (holding "the United States has standing to appeal the denial of Westfall Act substitution along with the individual defendants"); *see Bowles v. United States*, 685 F. App'x 21, 22 (2d Cir. 2017) (appeal taken by both the United States and employee defendant).

A. **Nature of Case and Procedural History.**

Ms. Carroll commenced this action in New York State Supreme Court, New York County, asserting a single claim for defamation against President Trump, allegedly arising out of his denials in June 2019 of her accusation that he sexually assaulted her in a Bergdorf Goodman dressing area 24 years earlier. (JA-24.)

On September 8, 2020, the United States, pursuant to the Westfall Act, removed this action to the United States District Court for the Southern District of New York and filed a motion in that court to substitute the United States as defendant. (JA-12; JA-19.) On October 27, 2020, Judge Lewis A. Kaplan denied the motion to substitute, holding that, as a matter of law, the Westfall Act does not apply to the President of the United States and the alleged conduct was not within the President's scope of employment. *Carroll v. Trump*, --- F. Supp. 3d ----, No. 20-CV-7311 (LAK), 2020 WL 6277814 (S.D.N.Y. Oct. 27, 2020).

This appeal and the United States' appeal followed.

B. **Factual Background.**

Ms. Carroll's defamation claim arises out of three statements in June 2019 denying her accusation that the President had assaulted her:

(1) A statement emailed by the Deputy White House Press Secretary to the press denied the accusation, compared it to accusations against Supreme Court Justice Kavanaugh, commented that false accusations "diminish the severity of real

3

assault," and solicited "information that the Democratic Party was working with Ms. Carroll or New York Magazine." (JA-78 ¶ 82; JA-403.) The statement was published by the Office of the Federal Register, National Archives and Records Administration, in its Compilation of Presidential Documents under "Budget and Presidential Materials."[4]

(2) In responding to reporters' wide-ranging questions while on the South Lawn of the White House on his way to the Presidential Helicopter, Marine One, including questions concerning the economy, foreign affairs, potential reactions to Iran's targeting a U.S. drone, immigration issues and Ms. Carroll's accusation, the President denied the accusation, compared it to those against Justice Kavanaugh, and commented on the role of the media.[5]

(3) In responding to questions from reporters from *The Hill* during a 45-minute wide-ranging interview in the Oval Office concerning the Federal Reserve, the Supreme Court, taxes and trade, the presidential election campaign, the

---

[4] JA-327; JA-403 (citing *Statement on the Assault Allegation by E. Jean Carroll*, Daily Comp. Pres. Docs., 2019 DCPD No. 00410 (June 21, 2019), https://www.govinfo.gov/app/details/DCPD-201900410.) This Court may take judicial notice of government publications. *See ACLU v. Nat'l Sec. Agency*, 925 F.3d 576, 599 n.126 (2d Cir. 2019) ("[T]he Government's . . . public statements are precisely the sort of materials of which we may take judicial notice.").

[5] JA-80-81 ¶ 91; JA-81 n.11 (citing *Remarks by President Donald Trump Before Marine One Departure*, WHITE HOUSE (June 22, 2019)); *Remarks in an Exchange With Reporters Prior to Departure for Camp David, Maryland*, Daily Comp. Pres. Docs., 2019 DCPD No. 00414 (June 22, 2019), https://www.govinfo.gov/content/pkg/DCPD-201900414/pdf/DCPD-201900414.pdf, at 3-4. *See ACLU*, 925 F.3d at 599 n.126.

President's authority to take military action against Iran and Ms. Carroll's accusation, the President denied the accusation.[6]

## SUMMARY OF ARGUMENT

### A. The Westfall Act Applies to the President.

Until this case, it had not been doubted that the Westfall Act -- which provides all federal employees with immunity from state tort law claims arising from conduct within the scope of their employment -- applies to the President. The Act has been applied by federal courts to the President at least five times -- in a case against President Clinton, a case against President George W. Bush, three cases against President Obama and, not counting this case, a case against President Trump.

The District Court's erroneous holding below that the Westfall Act does not apply to the President is contrary not only to the established understanding evidenced by those and other cases, but it is contrary to the plain language of the Westfall Act, which by its terms applies to "any employee of the Government," 28 U.S.C. §§ 1346(b)(1), 2679(b).

---

[6] JA-42 n.13 (citing Jordan Fabian & Saagar Enjeti, *EXCLUSIVE: Trump Vehemently Denies E. Jean Carroll Allegation, Says "She's Not My Type"*, HILL (June 24, 2019)); *see also* JA-329 (noting that "Trump discussed a range of topics, including the upcoming 2020 election as well as the possibility that President Barack Obama might endorse Vice President Biden in that race."); *READ: Trump's full exclusive interview with The Hill*, HILL (June 25, 2019), https://thehill.com/homenews/administration/450229-read-trumps-full-exclusive-interview-with-the-hill.

Presidents plainly are employees of the Government, and Congress plainly intended Presidents to be covered by the Westfall Act -- notwithstanding the District Court's strenuous but strained and unsuccessful effort to show otherwise here. The President's duties and responsibilities are set forth in and governed by and serve the purposes of Article II of the Constitution and Congressional statutes – that is, the Government. *See, e.g.*, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952) (President's powers derive "from an act of Congress or from the Constitution itself."). Under Article II, section 1, the President is the "President of the United States of America," holds an "Office" -- which could only be an Office of the Government -- and "receive[s] for his [or her] services, a Compensation" from the Government. U.S. Const. art. II, § 1. And, not surprisingly given these facts, both Congress and the Supreme Court have referred to the President as an employee of the Government.

And, that Congress intended to include the President under the Westfall Act is conclusively confirmed by the legislative history of Section 2674 of the Act, which allows the United States to assert as a defense any immunities or statutory defenses belonging to the employee for whom the United States substitutes as defendant -- as the legislative history puts it, "[t]he United States would also be able to continue to assert other functional immunities, "*such as Presidential . . . immunity*, recognized in the constitution and judicial decisions." H.R. Rep. No.

6

100-700, at 5 (1988) (emphasis added), *as reprinted in* 1988 U.S.C.C.A.N. 5945,

5948. Congress enacted Section 2674 with the President specifically in mind, and

it is therefore clear that Congress intended to include the President in the Westfall

Act's protections.

The District Court nonetheless erroneously reasoned that the Westfall Act's

failure to explicitly include the President evidences that Congress intended to

exclude the President. But as the Westfall Act itself and other statutes make clear,

when Congress intends to exclude the President or anyone else, it *explicitly*

excludes them. Moreover, the Supreme Court has made clear that statutory silence

should be read to afford the President, not exclude the President from, the

protection of a statute. *See, e.g.*, *Franklin v. Massachusetts*, 505 U.S. 788, 800

(1992) ("Out of respect for the separation of powers and the unique constitutional

position of the President, we find that textual silence is not enough to subject the

President" to review under the Administrative Procedures Act.).

Equally erroneous are the District Court's other justifications for its novel

finding that the President is not an employee of the Government covered by the

Westfall Act. The District Court found support for its conclusion in its claim that

the Westfall Act defines the term "employees of the Government" as "includ[ing]

the executive departments," 28 U.S.C. § 2671, but not the "executive branch."

(SPA-19-21.) But the District Court's reading runs contrary to the governing

definition of "department" in 28 U.S.C. § 451 ("'*department*' means one of the executive departments…unless the context shows that such term was intended to describe the executive, legislative, or judicial *branches* of the government"), as well as statutory rules of construction established by the Supreme Court whereby what follows the term "including" is not an exclusive list and the legislative history showing that Congress repeatedly referred to the Westfall Act as applying to the "Executive Branch." It is plain that the use of the term "departments" was in no way an expression of a Congressional intent to exclude the President, but was a carry-over from the original enactment in 1946 of the FTCA, the statute the Westfall Act amended in 1988. *See, e.g.*, H.R. Rep. No. 100-700, at 5.

## B. The President Acted Within the "Scope of Employment."

Until this case, the courts uniformly have held that speaking to the press is within the scope of employment of policy-making public officials. As the Supreme Court observed in *Barr v. Matteo*, 360 U.S. 564 (1959), which involved allegedly defamatory statements by an acting agency director, "[i]t would be an unduly restrictive view of the scope of the duties of a policymaking executive official to hold that that a public statement of agency policy in respect to matters of wide public interest and concern is not action in the line of duty." *Id.* at 575. *A fortiori,* it is within the "scope of duties of the President to make public statements on "matters of wide public interest and concern," and Ms. Carroll's accusation is

without question such a matter. *See Clinton v. Jones,* 520 U.S. 681, 686 (1997)

(President Clinton's agents' allegedly defamatory denials to the press of sexual

harassment accusations against him were "arguably…within the outer perimeter of

the President's official responsibilities."); *Council on Am. Islamic Relations v.*

*Ballenger*, 444 F.3d 659, 663 (D.C. Cir. 2006) (allegedly defamatory statements to

the press were within the scope of Congressman's employment for Westfall Act

purposes); *Wilson v. Libby*, 535 F.3d 697 (D.C. Cir. 2008) (extending *Ballenger* to

executive branch officials).

     As the *Ballenger* and *Libby* courts found, District of Columbia law compels

this result.  In *Ballenger*, a Congressman was sued for allegedly defamatory

statements during a telephone interview concerning his personal life.  The court,

applying District of Columbia law, held that this conduct fell within the scope of

his employment for purposes of the Westfall Act, noting that "[t]he appropriate

question . . . is whether that telephone conversation [with the reporter] -- not the

allegedly defamatory sentence -- was the kind of conduct Ballenger was employed

to perform," and that "speaking to the press during regular work hours in response

to a reporter's inquiry falls within the scope of a congressman's authorized duties."

*Id.* at 664.

     In *Libby*, the D.C. Circuit extended *Ballenger* to Executive Branch officials.

*Libby* concerned an invasion of privacy suit against Vice President Cheney and his

Chief of Staff for allegedly revealing to the media the identity of a covert CIA agent critical of the administration.  The court upheld the Attorney General's Westfall Act certification because "[o]f course, the defendants may discredit public critics of the Executive Branch."  *Id*. at 711.  In so holding, the D.C. Circuit also reaffirmed that "D.C. scope-of-employment law (not to mention the plain text of the Westfall Act)" requires courts "'to look beyond alleged intentional torts themselves' to the underlying conduct in determining whether that conduct was within the scope of employment."  *Id.*

Under District of Columbia law, courts, in determining whether conduct falls within the scope of employment, examine whether the conduct: (a) is "of the kind" an employee is "employed to perform;" (b) "occurs substantially within the authorized time and space limits;" and (c) is "actuated, at least in part, by a purpose to serve the master." *Wuterich v. Murtha*, 562 F.3d 375, 383 (D.C. Cir. 2009) (citing Restatement § 228(1) (1958)).  *See also Harbury v. Hayden*, 522 F.3d 413, 422 n.4 (D.C. Cir. 2008) (Kavanaugh, J.) (Courts "apply the scope-of-employment test very expansively," to ask "whether the defendant merely was on duty or on the job when committing the alleged tort.'")

In determining whether the conduct is "of the kind" the defendant is employed to perform, courts examine the context of the allegedly actionable conduct, not the content of the conduct.  *See Ballenger*, 444 F.3d at 664; *Jacobs v.*

*Vrobel*, 724 F.3d 217, 222 (D.C. Cir. 2013) ("District law requires that we focus on the type of act [defendant] took that allegedly gave rise to the tort, not the wrongful character of that act."). The President speaking with the press is plainly "of the kind" of conduct, the President is "employed to perform."

As for the second prong of the test -- whether the statements were made within authorized time and space limits -- the President, who must "be always in function," *Trump v. Vance*, 140 S. Ct. 2412, 2423 (2020) (quoting Letter from T. Jefferson to G. Hay (June 17, 1807), in 10 Works of Thomas Jefferson 400-401, n. (P. Ford ed. 1905)), is authorized, indeed required, to carry out his or her duties no matter where he is or when.

The statements also satisfy the third prong because they were actuated, at least in part, by a purpose to serve the master -- here the Government. The District Court erred in finding that "a slight purpose to serve the master is not enough." (SPA-48.) Under applicable law, conduct is outside the scope of employment only if it was done *solely* for the accomplishment of a personal goal. Here, the President's statements to the press were at "least in part," *Wuterich*, *supra,* done to serve the Government, because they addressed a matter of undoubted public concern. *See Ballenger*, 444 F.3d at 665 (elected official's "remarks, made to the media to ensure his effectiveness as a legislator, can 'fairly and reasonably be deemed to be an ordinary and natural incident or attribute' of his job as a

11

legislator." (citing *Chapman v. Rahall*, 399 F. Supp. 2d 711, 714 (W.D. Va. 2005)).

The District Court, recognizing that *Ballenger*'s reasoning would compel upholding certification here, found it "wanting." (SPA-51), essentially because it "would mean that a president is free to defame anyone who criticizes his conduct or impugns his character -- without adverse consequences to that president." (SPA-54.)  However, as this Court has recognized, it precisely "was the intention of Congress" in enacting the Westfall Act to leave the plaintiff who brings a defamation claim "without any remedy." *B & A Marine Co. v. Am. Foreign Shipping Co.*, 23 F.3d 709, 715 (2d Cir. 1994).

The District Court also applied an incorrect test for scope of employment -- whether under state *respondeat superior* law there is a master-servant relationship. The court, relying on its incorrect conclusion that the President has no "master" -- as shown below, the President, according to the Supreme Court, is subject to the partial control of the other branches -- incorrectly held that therefore the statements here were not within the scope.  But for purposes of the Westfall Act, courts look only to the other prong of state *respondeat superior* law -- scope of employment -- to determine scope of employment.  Whether there is a master-servant relationship is irrelevant, because the Westfall Act replaces that inquiry with whether the defendant is an "employee of the Government."  Courts apply the master-servant

test for purposes of the Westfall Act only when they look to federal common law to determine whether the defendant is an "independent contractor."  Moreover, even if the master-servant relationship were relevant, it was inappropriate for the District Court look to the Restatement of Agency for guidance in this instance, because the Restatement "does not state the special rules applicable to public officers . . . ."  Restatement (Second) of Agency ("Restatement") Scope Note (1958).

In any event, the District Court erred in finding that the President does not satisfy the master-servant test by taking an overly restrictive view of whether the master "controls" the servant that is not even borne out by the Restatement.  Because the District Court could not point to a person that controls the President, it found that there can be no master-servant relationship.  However, the Restatement is clear that the master-servant relationship may exist, for example, for officers of corporations, who have no "master" but "give their time to their employers" -- just as Presidents "give their time" to the Government.  Restatement § 2 cmt. c. Moreover, contrary to the District Court's conclusion, the President can in fact be controlled by other co-equal branches of Government.

Accordingly, the District Court's Order should be reversed.

# ARGUMENT

## I.   STANDARD OF REVIEW.

On appeal from a ruling on a motion for substitution pursuant to the Westfall Act, this Court reviews "the district court's factual findings for clear error and its legal conclusions *de novo*." *Bello v. United States*, 93 F. App'x 288, 290 (2d Cir. 2004). Here, the District Court's rulings were legal conclusions, *see* SPA-42 n.103 (scope of employment "is decided appropriately as a legal question of law in this case"), and this Court's review is therefore *de novo*.

On review, this Court may also consider arguments raised by the United States below which the District Court erroneously held were waived (SPA-19 n.48). Those arguments were appropriately raised by the United States on reply in response to arguments Ms. Carroll raised in opposing the motion to substitute on which she has the burden.[7] *See Guadagni v. New York City Transit Auth.*, 387 F. App'x 124, 125-26 (2d Cir. 2010). In any event, this Court has discretion to consider arguments raised for the first time on appeal "where necessary to avoid a manifest injustice" or "where [as here] the argument presents a question of law and

---

[7] The Westfall Act provides that on review by the courts, the Attorney's General certification that a federal employee's conduct was within the scope of employment is "*prima facie* evidence that the employee was acting within the scope of his [or her] employment," *Bowles v. United States*, 685 F. App'x 21, 24 (2d Cir. 2017)(quoting *Wuterich v. Murtha*, 562 F.3d 375, 381 (D.C. Cir. 2009), and to rebut the certification, it is plaintiff's burden to "allege sufficient facts that, taken as true, would establish that the defendant's actions exceeded the scope of his employment." *Wuterich*, 562 F.3d at 381 (citation omitted).

there is no need for additional fact-finding." *Sniado v. Bank Austria AG*, 378 F.3d 210, 213 (2d Cir. 2004). And, as the Supreme Court has held, where the appeal involves the President, "'appellate review … should be particularly meticulous.'" *Trump v. Vance*, 140 S. Ct. at 2430 (quoting *Nixon v. Fitzgerald,* 457 U.S. 731 (1982)).[8]

## II.     THE WESTFALL ACT APPLIES TO THE PRESIDENT OF THE UNITED STATES.

The District Court erred in holding that the Westfall Act does not apply to the President of the United States.

### A.     The Expansive Definition of Employee Includes the President.

Until this case, it had not been doubted that the Westfall Act applies to the President. The Act has been applied by federal courts in a case against President Clinton, a case against President George W. Bush, three cases against President Obama and, not counting this case, a case against President Trump. *See Littlejohn v. United States*, No. CA 6:13-870-JMC-KFM, 2013 WL 1840050, at *2 (D.S.C. Apr. 9, 2013), *report and recommendation adopted*, No. 6:13-CV-00870-JMC, 2013 WL 1840025 (D.S.C. Apr. 30, 2013) (United States substituted for President

---

[8] Moreover, a "responsible official," here the Department of Justice, may not waive sovereign immunity by failing to raise an objection. *See United States v. United States Fidelity and Guaranty Co.*, 309 U.S. 506, 513 (1940); *Presidential Gardens Assocs. v. U.S. ex rel. Sec'y of Hous. & Urban Dev.*, 175 F.3d 132, 140 (2d Cir. 1999) (no official is empowered to consent to suit against the United States and any such waiver acceded to by an official is beyond the scope of his or her authority).

Clinton); *Saleh v. Bush*, 848 F.3d 880, 891 (9th Cir. 2017); *Ali Jaber v. United States*, 155 F. Supp. 3d 70, 73 n.1 (D.D.C. 2016)*, aff'd*, 861 F.3d 241 (D.C. Cir. 2017); *Klayman v. Obama*, 125 F. Supp. 3d 67, 84-85 (D.D.C. 2015); *Littlejohn v. Obama*, No. CA 7:14-812-JMC-KFM, 2014 WL 8266142, at *2 (D.S.C. Mar. 18, 2014), *report and recommendation adopted*, No. CIV.A. 7:14-812-BHH, 2015 WL 1275346 (D.S.C. Mar. 18, 2015), *aff'd*, 615 F. App'x 121 (4th Cir. 2015); *West v. Trump*, No. 3:19-CV-2522-K-BH, 2020 WL 4721291, at *3 (N.D. Tex. July 23, 2020).  Several courts, emphasizing the expansive reach of the Westfall Act, have also noted that it applies "to all officers, up to the president."  *See Does 1-10 v. Haaland*, 973 F.3d 591, 598 (6th Cir. 2020); *Operation Rescue Nat'l v. United States*, 147 F.3d 68, 70-71 (1st Cir. 1998) (same).

The District Court's erroneous holding below that the Westfall Act does not apply to the President is contrary not only to the established understanding evidenced by those cases, but is contrary to the expansive language of the Westfall Act, which by its terms applies to "*any* employee of the Government," 28 U.S.C. §§ 1346(b)(1), 2679(b) (emphasis added).  "When used (as here) with a 'singular noun in affirmative contexts,' the word 'any' ordinarily 'refer[s] to a member of a particular group or class without distinction or limitation' and in this way 'impl[ies] *every* member of the class or group.'"  *SAS Institute, Inc. v. Iancu*, 138 S. Ct. 1348, 1354 (2018) ("The word 'any' naturally carries 'an expansive

meaning.'").  Thus, as the Supreme Court has repeatedly noted, the Westfall Act applies to "all federal employees."  *Levin v. United States*, 568 U.S. 503, 509 (2013); *Hui v. Castaneda*, 559 U.S. 799, 809-10 (2010) (same).

The Westfall Act defines "employee of the Government" in 28 U.S.C. § 2671, by setting forth illustrative, non-exclusive examples.  That provision provides, in relevant part, that "employee of the government *includes* officers or employees of any federal agency . . . and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation."  28 U.S.C. § 2671 (emphasis added).  "Federal agency," in turn, is defined to "*include*[] the executive departments, the judicial and legislative branches, the military departments, independent establishments of the United States, and corporations primarily acting as instrumentalities or agencies of the United States, *but does not include* any contractor with the United States."  *Id.* (emphasis added).

These definitions are "introduced with the verb 'includes,'" which "makes clear that the examples enumerated . . . are intended to be illustrative, not exhaustive." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 162 (2012) (interpreting Fair Labor Standards Act ("FLSA")); *see also Fed. Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 100 (1941) ("[T]he term 'including' is not one of all-embracing definition, but connotes simply an illustrative application

17

of the general principle."); *Davila v. United States*, 247 F. Supp. 3d 650, 661 n.18

(W.D. Pa. 2017) ("The use of the word 'includes' [in the Westfall Act] . . .

suggests that persons not clearly within the scope of these [enumerated] categories

may nonetheless be covered." (citation omitted)); *McNamara v. United States*, 199

F. Supp. 879, 880 (D.D.C. 1961) (definition of "federal agency" in FTCA is "not

an exclusive definition.").  When Congress sought to limit the definitions of terms

in the Westfall Act to specifically enumerated categories, it used the words

"means" instead of "includes."[9]  *See Christopher*, 567 U.S. at 162 ("Congress used

the narrower word 'means'" in the same and "other provisions of the FLSA when

it wanted to cabin a definition.").

In other words, the only question is whether, under the expansive definition

intended to cover "the entire Federal workforce," *Gutierrez de Martinez v.

Lamagno*, 515 U.S. 417, 425-26 (1994) (citation omitted), Presidents are

"employee[s] of the Government" -- with the definitions in 28 U.S.C. § 2671

providing only illustrations of "employee."

Presidents plainly are employees of the Government, and Congress plainly

---

[9] *See* 28 U.S.C. § 2671 ("'Acting within the scope of his office or employment', in the case of a member of the military or naval forces of the United States or a member of the National Guard . . . *means* acting in line of duty." (emphasis added)); *id.* § 2680 ("'[I]nvestigative or law enforcement officer' *means* any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law." (emphasis added)).

intended Presidents to be covered by the Westfall Act -- notwithstanding the District Court's strenuous but strained and unsuccessful effort to show otherwise here.  Under Article II, section 1, the President is the "President of the United States of America," holds an "Office" of the Government and "receive[s] for his [or her] services, a Compensation" from the Government.  *See* U.S. Const. art. II, § 1, cl. 7 ("The President shall, at stated Times, receive for his Services, a Compensation . . . .); 3 U.S.C. § 102 (setting Presidential compensation including expense allowance to defray costs of performing "official duties").

Not surprisingly given these facts, both Congress and the Supreme Court have referred to the President as an employee of the Government.  In *United States v. Hatter*, 532 U.S. 557, 563 (2001), in discussing a Congressional statute concerning the participation of governmental employees in the social security program, the Supreme Court expressly referred to the President as included in a "class of current federal employees."  And in that statute, Congress itself referred to "service performed as the President" as a category of "[s]ervice performed in the employ of the United States."  42 U.S.C. § 410(a)(5)(C).

Accordingly, by the plain understanding of the term, the President is an employee of the Government.

### B.     The Westfall Act's Failure to Exclude the President Establishes that the President is Included in the Definition.

The District Court erroneously held "that the failure to mention the president

should be understood as *excluding* him from the scope of the Westfall Act and Section 2671." (SPA-28 (emphasis in original)). But as the Westfall Act itself and other statutes make clear, when Congress intends to exclude the President or anyone else, it *explicitly* excludes them.

Thus, the Westfall Act excludes from its coverage one potential class of employee: "any contractor with the United States," 28 U.S.C. § 2671. As the Supreme Court noted in *United States v. Smith*: "if Congress had intended to limit the protection under the [Westfall] Act to employees not covered . . . it would have said as much." 499 U.S. 160, 173 (1991); *cf. Fed. Land Bank*, 314 U.S. at 100 ("If the broad exemption accorded to 'every Federal land bank' were limited to the specific illustrations mentioned in the participial phrase introduced by 'including', there would have been no necessity to except from the purview of section 26 the real estate held by the land banks.").

Accordingly, Congress's failure to exclude the President specifically -- as it did with independent contractors -- confirms that the Westfall Act covers the President. Other courts have also interpreted the FTCA in this manner. For example, in *LePatourel*, the Eighth Circuit interpreted the definition of "any government employee" in the pre-Westfall Act version of the FTCA to include federal judges, even though "federal agency" was then only defined to "include[] the executive departments, the military departments, independent establishments of

20

the United States, and corporations primarily acting as instrumentalities or

agencies of the United States, but does not include any contractor with the United

States." *United States v. LePatourel*, 571 F. 2d 405, 408 (8th Cir. 1978).  The

court noted that, as here, "[w]here Congress wished to limit the Act's coverage, as

in the case of independent contractors, the language employed conferred a clear

and specific exemption." *Id.*  Thus, because Congress "chose to define 'employees

of the government' . . . inclusively rather than exclusively," the FTCA applied to

federal judges.  *Id.*  Under the same reasoning, the Westfall Act includes the

President.

In other circumstances, when Congress intended to *exclude* the President

from its definition of federal employees it has so specified.  For example, the

Hatch Act's prohibition against federal employees engaging in certain political

activities defined "employee" as "any individual, other than the President and the

Vice President  . . . ."  *See* 5 U.S.C. § 7322.

Moreover, the Supreme Court has made clear that statutory silence should be

read to afford the President, not exclude the President from, the protection of a

statute.  In *Franklin v. Massachusetts*, 505 U.S. 788 (1992), the Supreme Court

held that the Administrative Procedures Act ("APA"), which provides for judicial

review of final agency actions, does not allow review of Presidential actions,

notwithstanding the fact that the APA did not explicitly exclude the President.  The

Supreme Court held that "out of respect for the separation of powers and the
unique constitutional position of the President, we find that textual silence is not
enough to subject the President to the provisions of the APA." *Id.* at 800-01 (citing
*Nixon v. Fitzgerald,* 457 U.S. at 748, n. 27).  Similarly, as the Supreme Court
recognized in *Franklin*, in *Nixon v. Fitzgerald*, 457 U.S. at 748 n.27, the Court
noted that it would take "express legislative action to *subject* the President" to
damages claims, while reserving decision on whether that would be
constitutionally permissible.

Notwithstanding *Franklin*'s clear import, the District Court read *Franklin* to
support the proposition that, by excluding the President from the protections of the
FTCA, it was, in fact following the direction in *Franklin* to avoid expanding
Presidential liability.  (SPA-29-32.)  Specifically, the District Court reasoned that
reading the FTCA to apply to the President would *authorize* private actions
reviewing the President's official conduct.  That concern is easily disposed of by
28 U.S.C. § 2674, which allows the United States to assert any pre-existing
immunities possessed by the individual defendant, which, under these
circumstances, would include the President's immunity from civil damages suits
under *Fitzgerald*.[10]  In any event, the FTCA does not permit review of

---

[10] 28 U.S.C. § 2674 provides, in relevant part, that "the United States shall be entitled to assert
any defense based upon judicial or legislative immunity which otherwise would have been

discretionary acts, as the District Court feared.  28 U.S.C. § 2680(a).

### C. The Legislative History Makes Clear That Congress Intended to Include the President.

If there are any lingering doubts as to the intent of Congress to include the President in the Westfall Act's coverage, it is removed by the legislative history of 28 U.S.C. § 2674.  Congress enacted this section with the President, specifically, in mind, intending that when the United States is substituted as a defendant, "[t]he United States would also be able to continue to assert other functional immunities, *such as Presidential* and prosecutorial *immunity*, recognized in the constitution and judicial decisions."  H.R. Rep. 100-700, at 5 (emphasis added), *as reprinted in* 1988 U.S.C.C.A.N. 5945, 5948.

### D. The President is Part of the Executive Departments as That Term is Used in the Westfall Act.

The District Court also erred in drawing a distinction between "executive departments" and the "Executive Branch," finding that because the Westfall Act defines "employees of the Government" as "includ[ing] the executive *departments*," 28 U.S.C. § 2671 (emphasis added), it does not include the President, whom the District Court found occupies the "executive *branch*." (SPA-19-21 (emphasis added).)

---

available to the employee of the United States whose act or omission gave rise to the claim, as well as any other defenses to which the United States is entitled."

First, statutory rules of construction established by the Supreme Court establish that the definition is not limited to the specific categories of "employees of the Government" set forth in Section 2671.  *See supra* Section II. A, B.

Second, the District Court's reading runs contrary to the governing definition of "department" in 28 U.S.C. § 451, as "describ[ing] the executive, legislative, or judicial *branches* of the government" where "the context shows that such term was intended."[11]  As numerous courts have concluded, the "context" of the Westfall Act and its predecessor FTCA makes clear its definitions were intended to be expansive and include "the entire Federal workforce," including the executive branch.  *See supra* Section II. A.  Indeed, in *McNamara v. United States*, Judge Holtzoff, who, as a member of the Justice Department assisted with drafting the final version of the original FTCA,[12] held not only that "the phraseology of the statute . . . is not limited to the *Executive Branch*," but that "the statute applies to *all three branches* of the Government."  199 F. Supp. at 880-81.  And in *Wilson v.*

---

[11] Act of June 25, 1948, ch. 646, § 451, 62 Stat. 869, 907 (emphasis added) (current version at 28 U.S.C. § 451), *available at* https://www.loc.gov/law/help/statutes-at-large/80th-congress/session-2/c80s2ch646.pdf.  The 1948 version of Title 28, which the District Court cites (SPA-16 n.42), provided that "the term- 'Federal agency' includes the executive departments and independent establishment of the United States . . . but does not include any contractor with the United States."

[12] *See, e.g.*, *Tort Claims Against the United States: Hearings on S. 2690 Before a Subcomm. of the Senate Comm. on the Judiciary*, 76th Cong., 3d Sess. 9, at 11-13 (1940) (memorandum to the Att'y Gen. from Special Ass't Alexander Holtzoff dated June 7, 1939); *id.* at 33-53 (statement of Alexander Holtzoff).

*Libby*, 535 F.3d 697, 712 (D.C. Cir. 2008), the D.C. Circuit Court of Appeals upheld Westfall Act certification for the Vice President and three senior executive officials related to claims arising out of their purported invasion of privacy by disclosing the identity of a cover agent.

Other contemporaneous judicial decisions also confirm that the term "department" would have applied to the "Executive Branch." For example, in *Shaughnessy v. United States ex rel. Mezei*, the Supreme Court referred to "the Government's political *departments*" to mean "Congress" and "the President." 345 U.S. 206, 210 (1953) (emphasis added). Accordingly, "executive department" as used in the Westfall Act does mean the executive branch.

Third, it is irrelevant that the White House website "draw[s] a clear distinction between 'the executive branch,' 'the executive departments,' and 'federal agencies,'" as the District Court noted. (SPA-24.) The relevant inquiry is the intent of Congress when it enacted the Westfall Act, not the drafters of the White House website.

Fourth, the legislative history shows that Congress repeatedly referred to the Act as applying to the "Executive Branch," notwithstanding the use of the term "departments" carried over from the original enactment of the FTCA. Congress enacted the Westfall Act in response to the Supreme Court's decision in *Westfall v. Erwin*, 484 U.S. 292 (1988) -- which limited federal employees' ability to assert

25

immunity to actions arising out of their discretionary conduct -- intending to "remedy[] an immediate crisis involving the prospect of personal liability and the threat of protracted personal tort litigation for the *entire Federal workforce*." § 2(a)(5), 102 Stat. 4563 (emphasis added).

Congress recognized that "[t]he potential increase in liability from the Westfall decision affects officers and employees of *all three branches* of government." H.R. Rep. No. 100-700, at 3, *as reprinted in* 1988 U.S.C.C.A.N. 5945, 5947 (emphasis added); *see also id.* at 5 ("[t]he FTCA currently covers employees of the *Executive Branch* only." (emphasis added)). Congress increased the scope of the FTCA "by inserting after 'executive departments,'" the phrase "'the judicial and legislative branches.'" Westfall Act, Pub. L. No. 100-694 (HR 4612) at § 3. In this way, Congress intended "*to make explicit* that employees of the judicial and legislative branches are included within the coverage of the [FTCA] . . . in the same way as employees of the *Executive Branch*." H.R. Rep. 100-700, at 8, *as reprinted in* 1988 U.S.C.C.A.N. 5945, 5952 (emphasis added); *see also id.* at 11 ("Judicial and Legislative Branch employees, as well as *Executive Branch* employees, are covered by the FTCA." (cost estimate statement of James Blum, Cong. Budget Office Acting Director) (emphasis added)).

Accordingly, it is irrelevant, as the District Court noted, that the Westfall Act refers to the "executive *departments*" and the "legislative and judicial

branches," where Congress had understood "executive departments" to refer to the Executive Branch when it enacted the Westfall Act and was merely tacking on an additional phrase some forty years after the FTCA's enactment.

The District Court, however, misread the legislative history, focusing on the Supreme Court's statement that Congress had "one purpose firmly in mind" when enacting the Westfall Act, which was "to return Federal employees to the status they held prior to the *Westfall* decision." (SPA-27-28 (citing *Gutierrez de Martinez*, 515 U.S. at 425).) The District Court noted that, at the time of *Westfall v. Erwin*, the President already had immunity from suit for conduct falling within the outer perimeter of his or her official duties as a result of the Supreme Court's decision in *Nixon v. Fitzgerald*, 457 U.S. 731 (1982). Accordingly, the District Court reasoned that: (1) because the President has immunity from *Nixon v. Fitzgerald* that *Westfall v. Erwin* did not alter, (2) the Westfall Act did not need to "return" the President to any pre-*Westfall* status and, therefore, (3) the President was not encompassed by the "one purpose" of the Westfall Act. (SPA-27.)

That conclusion does not follow. The District Court places undue emphasis on an out-of-context statement by the Supreme Court. Congress had several purposes in mind, including explicitly expanding the scope of the Westfall Act to include the other branches of Government and creating a certification mechanism and a removal process. *See Operation Rescue Nat'l*, 147 F.3d at 69 (not only did

27

the Westfall Act remove the discretionary requirement, but it also increased

"increased the scope of the FTCA by adding employees of the judicial and

legislative branches to those of the *executive branch*." (emphasis added)).[13]

Indeed, in *Smith*, the Supreme Court expressly rejected this very argument

that the Westfall Act "was meant to apply solely to those Government employees

not already protected from tort liability . . . by a pre-existing federal immunity."

499 U.S. at 172. The Supreme Court noted that Congress was clearly aware of

"pre-Act immunity" and its "enactment of . . . express limitations of immunity . . .

indicates that if it intended to limit the Act's protection to employees not covered

under . . . pre-Act immunity . . ., it would have said this expressly." *Id.* at 173.

Finally, as shown (*supra* Section II. C), Congress expressly intended that the

United States would be able to "continue" to assert pre-existing immunities,

including "Presidential," under 28 U.S.C. § 2674.

---

[13] In the portion of *Gutierrez de Martinez* quoted by the District Court, the Supreme Court was merely addressing whether the Attorney General's certification was conclusive on the issue of scope of employment. (SPA-27 (citing *Gutierrez de Martinez*, 515 U.S. at 425).) The Supreme Court reasoned that by returning Federal employees to their pre-*Westfall* status, Congress was not making the Attorney General the sole arbiter of scope-of-employment, but returning to a scheme in which the courts would make that determination. *Gutierrez de Martinez*, 515 U.S. at 425-26. Thus, the Supreme Court's focus was simply on Congress's purpose of returning federal employees to their pre-*Westfall* immunity.

E.     **The Administrative Requirements in the Westfall Act Do Not Preclude it From Applying to the President.**

The District Court also erroneously concluded that the Westfall Act cannot apply to the President based on the phrasing of certain administrative claim submission requirements clearly intended to apply to the vast majority of the entire federal workforce that routinely avails itself of the Westfall Act. Those administrative requirements do not provide a basis to prevent the President from availing him or herself from the Westfall Act's important protections.

First, the District Court found it significant that, under 28 U.S.C. § 2672 of the Westfall Act, a defendant must seek the "prior written approval of the Attorney General" to settle claims "in excess of $25,000," because the court could not "imagine that Congress intended . . . to require the president to seek the approval of the Attorney General." (SPA-22.) However, the Attorney General and the Department of Justice have presumptive responsibility for all litigation involving the United States and its agencies. *See* 28 U.S.C. §§ 516, 519. Furthermore, the Attorney General is specifically charged by the Westfall Act with defending "any civil action or proceeding . . . against any employee of the Government . . . for any such damage or injury" 28 U.S.C. § 2679(c), "arising or resulting from the . . . wrongful act . . . of any employee of the Government while acting within the scope of his office or employment," *id.* § 2679(b)(1). It is therefore entirely conceivable

29

that the Westfall Act requires settlement of all claims, including against the President, to be submitted to the Attorney General.

Moreover, any claims for damages brought against the United States are permitted solely by virtue of Congress's waiver of sovereign immunity for certain claims in the FTCA. *See B & A Marine*, 23 F.3d at 712 ("The FTCA is a limited waiver of sovereign immunity . . . ."); *West v. Trump*, 2020 WL 4721291, at *3 ("The basic rule of federal sovereign immunity is that the United States cannot be sued at all without the consent of Congress." (quoting *Block v. N.D. ex rel. Bd. of Univ. & Sch. Lands*, 461 U.S. 273, 287 (1983)).  It is thus entirely appropriate for Congress to have delegated authority to make settlement determinations for payment of funds for which it waived sovereign immunity to anyone it pleased, including the Attorney General.

Second, the District Court found that, because the President has not submitted any claims to Congress, which heads of agencies are required to do under 28 U.S.C. § 2673 of the Westfall Act, the President cannot be the head of an agency, and therefore does not fall within the definition of "officers or employees of any federal agency," 28 U.S.C. § 2671.  However, as shown, the President is covered by the more expansive definition of "any Government employee" as well as the definition of "executive departments" and need not be the head of a "federal agency."

30

Third, the District Court was concerned that the requirement, under 28 U.S.C. § 2675 of the Westfall Act, that a plaintiff who wishes to sue under the FTCA shall "first present a claim to the appropriate Federal agency," would not make sense if a claimant had to present a claim to the President.  (SPA-23.)  However, this claim makes no less sense than when applied to Members of Congress, who are also at the apex of their branch.[14]  In any event, courts have recognized that if a claim is brought against the President, the claimant may simply "first submit notice of a claim to the Department of Justice or other appropriate agency."  *See, e.g.*, *Littlejohn v. South Carolina*, No. CA6:100940RBHWMC, 2010 WL 1791419, at \*3 (D.S.C. Apr. 16, 2010) ("Since the complaint does not show that the plaintiff has submitted a Standard Form 95 to the appropriate federal agency or to the United States Department of Justice, this case should be dismissed for failure to exhaust federal administrative remedies."), *report and recommendation adopted*, No. 6:10-CV-00940-RBH, 2010 WL 1791416 (D.S.C. May 4, 2010).

---

[14] The Senate has in fact promulgated rules that "the Sergeant at Arms of the Senate, in accordance with regulations prescribed by the Attorney General . . . may consider and ascertain and . . . determine, compromise, adjust and settle" claims against any Senator under the FTCA.  *See* S. Res. 492, 97th Cong. (1982), *as reprinted in* S. Manual § 109, 113th Cong., *available at* https://www.govinfo.gov/content/pkg/SMAN-113/pdf/SMAN-113.pdf (last visited Jan. 10, 2021).  Notably, this resolution passed before *Westfall*, and before Congress amended the definitions provision to make "explicit" the "legislative branch," further underscoring the expansive meaning of "employee of the Government" under the Westfall Act and the FTCA.  In other words, prior to the Westfall Act, Congress understood the FTCA to apply to it based on the definition of "any employee of the Government."

31

Therefore, based on the plain language of the statute, the legislative history, and the "common understanding" of numerous courts, it is clear that the President is an "employee of the Government" for purposes of the Westfall Act.

## III. THE PRESIDENT'S STATEMENTS AT THE WHITE HOUSE WERE MADE "WITHIN THE SCOPE OF HIS OFFICE OR EMPLOYMENT"

The District Court erred in holding that the statements at issue were not made within the scope of the President's office or employment.[15]

### A. The President's Statements to The Press At The White House Were Made "Within the Scope of His Office or Employment"

Courts, including this Court, "apply the scope-of-employment test very expansively," to ask "whether the defendant merely was on duty or on the job when committing the alleged tort.'" *Harbury*, 522 F.3d at 422 n.4 (Kavanaugh, J.); *see also Ballenger*, 444 F.3d at 664 (noting the duties test is to be "liberally construe[d]"); *Bowles*, 685 F. App'x at 23 ("[T]he scope of employment inquiry addresses whether [the employee's] allegedly defamatory statements were made

---

[15] The District Court properly "agreed with the Government" that the alleged tort occurred in the District of Columbia. (SPA-36); *see also Richards v. United States*, 369 U.S. 1, 9 (1962) (under the FTCA, the Court applies "the law of the place where the act or omission occurred" not the law of the state where the alleged tort had its operative effect"). As a result, D.C. law applies, including its choice of law principles. *Id.* at 11. While the District Court questioned whether the substantive law or the choice of law principles of District of Columbia would apply (SPA-37), that inquiry is irrelevant. Under those choice of law principles, courts look to "the substantive law of the jurisdiction where the employment relationship exists," *Vrobel*, 724 F.3d at 221, which here is the District of Columbia; *Conyers v Westphal*, 235 F. Supp. 3d 72, 77 (D.D.C. 2017).

'on duty at the time and place of an "incident" alleged in a complaint.'") (quoting *Osborn*, 549 U.S. at 247).

Until this case, the courts uniformly have held that speaking to the press is within the scope of employment of public officials and, therefore, *a fortiori* of the President.  *See, e.g.*, *Does 1-10*, 973 F.3d at 600 ("unsolicited comments by elected officials on an event of widespread public interest" within the scope); *Wuterich*, 562 F.3d at 384 (holding that a Congressman's statement, at his campaign office, that a Marine committed atrocities were within the scope of his office); *Libby*, 535 F.3d at 712 (upholding Westfall Act certification for Vice President and three senior executive officials because "[o]f course, the defendants may discredit public critics of the Executive Branch"); *Ballenger*, 444 F.3d at 664-66 (holding allegedly defamatory comments made by Congressman, at his office, during telephone interview with reporter about his marital status, were within scope of office); *Williams v. United States*, 71 F.3d 502, 505 (5th Cir. 1995) (statements in press interview within scope of employment); *see also Rahall*, 399 F. Supp. 2d at 713-15 (holding Congressman was acting within the scope of office under West Virginia law when he allegedly defamed a commentator by calling him a "bigoted, right wing, redneck, racist wacko").

This is so because a "primary obligation of" elected officials "in a representative democracy is to serve and respond to his or her constituents."  *See*

33

*Wuterich*, 562 F.3d at 385 (quoting *Williams*, 71 F.3d at 507) (referring to

Members of Congress).  Moreover, an elected official's "ability to do his job" or to

govern "effectively is tied . . . to the [official's] relationship with the public and in

particular his constituents and colleagues . . . ."  *Ballenger*, 444 F.3d at 665; *see*

*also Barr*, 360 U.S. at 575 ("[i]t would be an unduly restrictive view of the scope

of the duties of a policymaking executive official to hold that that a public

statement of agency policy in respect to matters of wide public interest and concern

is not action in the line of duty.").

    *Council on Am. Islamic Relations v. Ballenger*, 444 F.3d 659 (D.C. Cir.

2006) is dispositive.  *Ballenger* involved a defamation claim against a

Congressman arising out of statements made during a telephone interview, from

his office, with a reporter.  In response to a question about his separation from his

wife, the Congressman stated that his wife had moved because she did not want to

live across the street from the offices of the plaintiff, the Council on American

Islamic Relations, which, he stated, was the "fund-raising arm for Hezbollah."  *Id.*

at 662.  The D.C. Circuit Court of Appeals found that the conduct fell within the

scope of employment noting that "[t]he appropriate question . . . is whether that

telephone conversation [with the reporter] -- not the allegedly defamatory sentence

-- was the kind of conduct Ballenger was employed to perform," and that

"[s]peaking to the press during regular work hours in response to a reporter's inquiry falls within the scope of a congressman's 'authorized duties.'" *Id.* at 664.

Similarly, in *Wilson v. Libby*, the D.C. Circuit extended *Ballenger* to Executive Branch officials. 535 F.3d at 712. *Libby* concerned an invasion of privacy suit against Vice President Cheney and President George W. Bush's senior advisors for allegedly revealing to the media the identity of a covert CIA agent critical of the administration. The court upheld the Westfall Act certification because "[o]f course, the defendants may discredit public critics of the Executive Branch." *Id*. In so holding, the D.C. Circuit also reaffirmed that "D.C. scope-of-employment law (not to mention the plain text of the Westfall Act)" requires courts "'to look beyond alleged intentional torts themselves' to the underlying conduct in determining whether that conduct was within the scope of employment." *Id.* at 711 (quoting *Ballenger*, 444 F.3d at 664). *See also Bowles*, 685 F. App'x at 25 (conduct is not "outside the scope of employment simply because, if proved, it would constitute an intentional tort."); Restatement § 231 ("An act may be within the scope of employment although consciously criminal or tortious.")).

Under each of the factors examined by D.C. Courts, the President's conduct falls within the scope of employment. Courts look to the Restatement (Second) of Agency, which examines whether the conduct: (a) is "of the kind" an employee is "employed to perform;" (b) occurs substantially within the authorized time and

space limits;" and (c) is "actuated, at least in part, by a purpose to serve the master." *See Wuterich*, 562 F.3d at 383 (citing Restatement § 228(1)).  The President speaking to the press here plainly satisfies each element.

### 1.    Speaking to the Press is "Of the Kind" a President is Employed to Perform.

Speaking to the press and communicating with the public is clearly conduct "of the kind [a President] is employed to perform."  Restatement § 228(1).

Under D.C. law, "this prong is 'liberally construe[d].'"  *Ballenger*, 444 F.3d at 664 (citation omitted).  In determining whether the conduct is "of the kind" the defendant is employed to perform, courts examine the context of the allegedly actionable conduct, not the content of the conduct.  *See id.* ("The appropriate question . . . is whether that telephone conversation [with the reporter] -- not the allegedly defamatory sentence -- was the kind of conduct Ballenger was employed to perform."); *see also*, *e.g.*, *Smith v. Clinton*, 886 F.3d 122, 126-27 (D.C. Cir. 2018) (wrongful death action allegedly arising from Secretary of State Hillary Clinton's use of a private email server was subject to the Westfall Act because her use of emails concerning government operations was within the context of her office); *Vrobel*, 724 F.3d at, 222 (examining whether "responding to a prospective employer's request for a reference" is the "*type of act*" that defendant was employed to perform in defamation claim arising out of that conversation (emphasis in original)); *Ali v. Rumsfeld*, 649 F.3d 762, 774-75 (D.C. Cir. 2011)

(plaintiffs' alleged torture and illegal detention by Secretary of Defense Donald Rumsfeld and high-ranking Army officers were within the scope of their offices under the Westfall Act).

Here, because speaking and responding to the media is of the "type of act," *Vrobel*, 724 F.3d at 222, that the President is expected to perform, this prong is satisfied.

As in *Ballenger* and *Libby*, here, when making the statements, the President was fulfilling his duties to address the press and respond to critics on matters of public concern. *See Trump v. Hawaii*, 138 S. Ct. 2392, 2417-18 (2018) ("The President of the United States possesses an extraordinary power to speak to his fellow citizens."); *Knight First Amendment Inst. at Columbia Univ. v. Trump*, 928 F.3d 226, 235 (2d Cir. 2019) (President "acts in an official capacity when he tweets"). Indeed, as the Supreme Court has explicitly found, because "[t]he President is the only person who alone composes a branch of government[,] . . . there is not always a clear line between his personal and official affairs." *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2034 (2020). Rather, "'[t]he interest of the man' is often 'connected with the constitutional rights of the place.'" *Id.* (quoting THE FEDERALIST No. 51).

That the conduct is within the President's scope of employment is also supported by the Supreme Court's holding in *Clinton v. Jones*. There, the plaintiff,

Paula Jones sued President Clinton for alleged sexual misconduct prior to the President taking office. President Clinton asserted that he was immune from suit in federal court for that unofficial conduct. One of Jones's claims, however, was that President Clinton defamed her while he was in office by denying her accusations. The Supreme Court expressly noted that this defamation claim "arguably may involve conduct within the outer perimeter of the President's official responsibilities," qualifying the President for immunity under *Nixon v. Fitzgerald. Clinton v. Jones*, 520 U.S. at 686. Thus, the Supreme Court recognized that responding to accusations of misconduct are at least "arguably" within the President's official responsibilities.[16] *Id.*

### 2. The Statements Were Substantially Within An Authorized Time and Place.

The statements at issue also satisfy the second prong of the Restatement test because they occurred "substantially within the authorized time and space limits." Restatement § 228(1); *see also Ballenger*, 444 F.3d at 317 (noting Congressman

---

[16] The District Court erroneously read this *dicta* as supporting the premise that President Trump's conduct here falls *outside* the scope of employment, reasoning that the Supreme Court meant that "at most" the President's conduct fell within the "outer perimeter" of the President's official duties. (SPA-55-56.) However, the Supreme Court was not addressing where on a spectrum between "outer perimeter" and "scope of employment" the President's conduct fell, as the District Court interpreted that statement, because the Supreme Court was not addressing the Westfall Act. The Supreme Court's assertion concerned only whether the President's conduct was within the "outer perimeter of the President's official responsibilities" – the immunity test set forth by the Supreme Court in *Nixon v. Fitzgerald*. That the Court found that the President's conduct "arguably" did, only supports that the conduct is also within the scope of employment.

called a reporter "from his congressional office during regular business hours"). The statements were all made at the White House. *See supra* Section III. A. Moreover, because the President must "be always in function," the "authorized time" limits do not apply. *Trump v. Vance*, 140 S. Ct. at 2423 (citation omitted); *Clinton v. Jones*, 520 U.S. at 717 (Breyer, J., concurring) (same). However, in fact the statements all were within "regular business hours." *See supra* Section III. A. Finally, the first two statements were published by the "Office of the Federal Register, National Archives and Records Administration" in the "Compilation of Presidential Documents" under "Budget and Presidential Materials."[17] *Cf. Knight*, 928 F.3d at 239 ("[T]he President's initial tweets (meaning those that he produces himself) are government speech.").

### 3. The Statements Were Actuated in Part by a Purpose to Serve the Master.

Finally, the President's statements satisfy the third prong of the Restatement test because they were "actuated, at least in part, by a purpose to serve the master." Restatement § 228(1). As the Court in *Ballenger* noted, "even a *partial* desire to serve the master is sufficient." *Ballenger*, 444 F.3d at 665. Thus, speaking to the press to "maintain the 'continued trust and respect of . . . constituents' in order to preserve [the] 'ability to carry out' governmental duties" is sufficient, because an

---

[17] *See* JA-327; JA-403 (citing DCPD-201900410 - Statement on the Assault Allegation by E. Jean Carroll, *available at* https://www.govinfo.gov/app/details/DCPD-201900410.)

elected official's "ability to do his job . . . effectively is tied . . . to the [official's] relationship with the public and in particular his constituents and colleagues." *Id.*

The District Court asserted that *Ballenger* misstated D.C. law, because, the District Court claimed, "a slight purpose to serve the master is not enough." (SPA-48 (citing *Blair v. District of Columbia,* 190 A.3d 212, 226 (D.C. 2018); *District of Columbia v. Bamidele*, 103 A.3d 516, 525 (D.C. 2014); *Brown v. Argenbright Sec., Inc.*, 782 A.2d 752, 758 (D.C. 2001).) To the contrary, the D.C. Circuit's decision in *Ballenger* faithfully apply the longstanding law of the District of Columbia.

As the District of Columbia Court of Appeals in *Blair*, cited by the District Court, recently reaffirmed, "an employee's conduct will be outside th[e] scope [of employment] *only if* the employee's actions are *entirely disconnected* from the work of the master, or the actions . . . were done *solely* for the accomplishment of the independent . . . mischievous purpose of the servant." *Blair*, 190 A.3d at 228 (emphasis added).

*Blair* involved an off-duty police officer who was alleged to have assaulted a patron at the bar. The District of Columbia argued that it was not vicariously liable, because the officer had been motivated by a "personal vendetta," inasmuch as he had been hit in the back of the head before entering the fight. *Id.* at 228. The Court of Appeals disagreed, reversing summary judgment and finding that the officer's "professional and personal motives for his actions . . . were significantly

intertwined," because, he "didn't enter the altercation[,] the altercation was thrust

upon him," and he "began to react to an assault on fellow officers, as well as

bouncers . . . as was his duty." *Id.* at 227-28.

By contrast, in *Balmidele*, also cited by the District Court, police "officers

were off-duty, they were not in uniform, and they were at the restaurant for purely

personal reasons," when one officer "beg[a]n beating [plaintiff]," another patron,

in response to a harmless comment by plaintiff that did not affect any police

interest. 103 A.3d at 526. As the District of Columbia Court of Appeals noted in

*Blair*, the officer's conduct was thus "***in no way*** connected to, or in furtherance of,

their duties as police officers." *Blair*, 190 A.3d at 227 (emphasis added). In fact,

the court in *Balmidele* also recognized that "if the employee acts in part to serve

his employer's interests, the employer will be held liable for the intentional torts of

his employee even if prompted partially by personal motives, such as revenge."

103 A.3d at 525.

Similarly, in *Brown*, the D.C. Court of Appeals found that there was a jury

question as to whether an employee who was alleged to have sexually assaulted a

customer whom he suspected of shoplifting while performing a search was

motivated in part to serve his master. 782 A.2d at 758-59. The relevant question,

the court noted was "whether his conduct, if proven, was motivated to ***any extent***

by his desire to serve his employer or was *entirely* his own personal adventure . . .
." *Id.* (emphasis added).

Thus, none of the cases cited by the District Court support the proposition
that a slight purpose to serve the master is insufficient.  Further, in all of these
cases, it was clear that the courts were examining not the content of the conduct –
i.e., the assault -- but its context, i.e., intervening in a fight, as in *Blair*, or
searching a shoplifter, as in *Brown*.  Indeed, D.C. Courts have long treated even
intentional torts as falling within the scope of employment so long as the tort was
performed in the context of the employee's performance of his duties*. See, e.g.*,
*Weinberg v. Johnson*, 518 A.2d 985, 991-92 (D.C. 1986) (upholding verdict that
imposed respondent superior liability when laundromat employee shot customer
during dispute).

Here, it is clear that the context of President Trump's conduct -- speaking to
the press at the White House -- was "actuated, at least in part, by a desire to serve
the [Government's] interest," particularly because it was in response to a widely
reported accusation that, as in *Blair*, was "thrust upon him." Ms. Carroll herself
stated that expected her article to lead to a "media storm" of attention including
from "leading news sources" "around the world."  (JA-350 (emphasis added); JA-
74, 79, 82, 90 ¶¶ 62, 84, 98, 142 & nn.10, 14.)  *See Ballenger*, 444 F.3d at 665
(elected official's "remarks, made to the media to ensure his effectiveness as a

legislator, can 'fairly and reasonably be deemed to be an ordinary and natural incident or attribute' of his job as a legislator" (quoting *Rahall*, 399 F. Supp. 2d at 715)).  Moreover, as in *Ballenger*, it is irrelevant that the specific statements at issue involved the President's personal life, because the relevant inquiry concerns the context of the President speaking with the press, not the content of specific statement at issue.  *See Ballenger*, 444 F.3d at 666.

### B.    The District Court's Complaints with Ballenger Are Unfounded.

The District Court, while recognizing that *Ballenger* compels upholding certification, found its "reasoning is wanting." (SPA-51.)  None of its criticisms, however, withstand scrutiny.

First, the District Court took issue that the court found that speaking to the press fell within "the scope of a congressman's 'authorized duties'" because "[t]he court did not . . . offer any theory as to who if anyone authorizes a Member of Congress to speak to reporters."   However, as this Court recognized, applying the Restatement, an "employer need not specifically authorize the precise action the employee took." *See Bowles*, 685 F. App'x at 25.  Moreover, inasmuch as there is no specific person who authorizes a member of Congress to do *anything*, it is difficult to imagine what allegedly tortious conduct would ever be covered by the Westfall Act.  Yet Congress specifically extended the Westfall Act's protections to the "legislative branch" (*supra* Section II. D) and courts have repeatedly applied it

43

to members of Congress (*supra* Section III. A).[18]

Second, the District Court took issue with the *Ballenger* court's reasoning that a Congressperson's statement about his personal life could be the type of statement that he was employed to perform, because "[t]he job description of a *congressperson* does not include transparency about one's personal life." (SPA-51.) By so holding, the District Court was erroneously examining the content, not the context, of the relevant conduct -- speaking to the press. *See supra* Section III. A.

Thus, courts have repeatedly found, for example, that an assault may fall within the scope of employment notwithstanding the fact that the "job description" does not include assault. *See, e.g.*, *Harbury*, 522 F.3d at 422 (CIA officers allegedly responsible for torture acted within scope of employment); *Hechinger Co. v. Johnson*, 761 A.2d 15, 24-25 (D.C. 2000) (retail store employee who struck customer acted within the scope of employment); *Johnson v. Weinberg*, 434 A.2d 404, 409 (D.C. 1981) (laundromat employee acted within scope of employment in shooting customer during dispute over removing clothes from washing machine).

Even if the content of the statement were relevant, however -- and it is not -- the statements still fall within the President's official duties. While the District

---

[18] This also improperly imports an element of the "master-servant relationship" test that is irrelevant to scope of employment. *See infra* Section III. C. 1.

Court narrowly construed a Congressperson's "job description," the President's job description is not so narrow. *See Mazars*, 140 S. Ct. at 2034 ("[t]he President is the only person who alone composes a branch of government[,] . . . there is not always a clear line between his personal and official affairs." ).

In any event, the statements themselves were not simply about the President's "personal . . . affairs," but involved highly political issues, including Justice Kavanaugh's confirmation hearing and the role of the media in politics. *See supra* p. 6. And the President's statements were made in the context of wide-ranging interviews at the White House, spanning issues including the Federal Reserve to foreign affairs, and by the White House Deputy Press Secretary to the White House press pool, all in response to reporter inquiries.

Moreover, as the District Court acknowledged (SPA-54), the President's failing to address these accusations could affect the President's ability to govern. *See Ballenger*, 444 F.3d at 665-66 ("A [Congressperson's] ability to do his job as a legislator effectively is tied, as in this case to the [Congressperson's] relationship with the public and in particular his constituents and colleagues in the Congress.").

The District Court rejected this argument on the ground that while it is "not entirely without merit, it goes much too far." (SPA-54.) The District Court found that this "would mean that a president is free to defame anyone who criticizes his conduct or impugns his character -- without adverse consequences to that

45

president." (*Id.*)  However, while the District Court may not have liked the

consequences of the properly applied test, that is not grounds to disregard it.  That

is exactly the nature of sovereign immunity and effect of Congress's clear decision

not to waive the Government's immunity for defamation claims.  *See* 28 U.S.C.

§ 2680(h).

This Court has recognized the fact it "was the intention of Congress" in

enacting the Westfall Act to leave the plaintiff who brings a defamation claim

without a remedy.  *See B & A Marine*, 23 F.3d at 715.  While the District Court

may not have liked the result, "courts aren't free to rewrite clear statutes under the

banner of [their] own policy concerns."  *Azar v. Alina Health Servs.*, 139 S. Ct.

1804, 1815 (2019).

The Supreme Court has also resolved this policy concern in the context of an

executive official's absolute immunity, observing:

> [O]n the one hand, the protection of the individual citizen against
> pecuniary damage caused by oppressive or malicious action on
> the part of officials of the Federal Government; and on the other,
> the protection of the public interest by shielding responsible
> governmental officers against the harassment and inevitable
> hazards of vindictive or illfounded [*sic*] damage suits brought on
> account of action taken in the exercise of their official
> responsibilities.

*Barr*, 360 U.S. at 565.  The Supreme Court ultimately determined it "better to

leave unredressed the wrongs doen [*sic*] by dishonest officers than to subject those

who try to do their duty to the constant dread of retaliation." *Id.* at 572.  The

Supreme Court acknowledged:

> [A]s with any rule of law which attempts to reconcile
> fundamentally antagonistic social policies, there may be
> occasional instances of actual injustice which will go
> unredressed, but we think that price a necessary one to pay for
> the greater good. And there are of course other sanctions than
> civil tort suits available to deter the executive official who may
> be prone to exercise his functions in an unworthy and
> irresponsible manner.

*Id.* at 576 (holding federal official not liable for allegedly libelous statements made

in a press release about former employees).

### C.   The Master-Servant Test is Irrelevant But Satisfied.

The District Court also applied an incorrect test for scope of employment by

importing an element of the state law *respondeat superior* test -- whether there is a

master-servant relationship -- that is irrelevant to scope of employment under the

Westfall Act. (SPA-35, 42-43.)  In any event, while it is inappropriate to ask

whether the President is in master-servant relationship with the Government, he is.

### 1.   The Master-Servant Test is Irrelevant Here.

The District Court correctly noted that, in determining whether a defendant

is acting within the scope of employment, courts look to the state law of

*respondeat superior*.  However, instead of just looking to just that portion of state

law concerning scope of employment, the District Court examined whether: (1) a

master-servant relationship exists and (2) whether the defendant was acting within

the scope of employment.  (SPA-42-43.)

That circular reasoning is erroneous.  Although courts look to the state law *respondeat superior* test to determine scope of employment, they do not "apply the entire body of *respondeat superior* law, but only that portion of the law that resolves the scope of employment issue."  *See, e.g.*, *Palmer v. Flaggman*, 93 F.3d 196, 202 (5th Cir. 1996) (rejecting contention that master/servant test is relevant to scope of employment inquiry); *Bradley v. Nat'l Collegiate Athletic Ass'n*, 249 F. Supp. 3d 149, 164 (D.D.C. 2017) ("District of Columbia law does not include the additional element of control over the tortfeasor's actions in determining the scope of employment.").

Whether there is a master-servant relationship is irrelevant, because the Westfall Act replaces that inquiry with whether the defendant is an "employee of the Government."  For purposes of the Westfall Act, courts look to the master-servant test, under federal common law, solely to determine whether the defendant is a "contractor with the United States" -- falling within the single exclusion to the Westfall Act's coverage -- instead of "any employee of the Government."  28 U.S.C. §§ 2671, 2675.  *See B & A Marine.*, 23 F.3d at 713 ("For purposes of the FTCA, the common law of torts and agency defines the distinction between an independent contractor (for whose torts the Government is not responsible) and an *employee, servant or agent* (for whose torts the Government is responsible.")

48

(emphasis added).  Neither plaintiff-appellee nor the District Court went so far as to contend that the President is an "independent contractor" for the Government.

When, as here, the defendant is not claimed to be an independent contractor, courts have held that the master-servant or "control" test is irrelevant to determining whether a defendant is an "employee of the Government."  For example, in *Sullivan v. United States*, 21 F.3d 198, 203 (7th Cir. 1994), *abrogation on other grounds recognized in Glade ex rel. Lundskow v. United States*, 692 F.3d 718, 723 (7th Cir. 2012), the plaintiff urged the court to apply the control test to determine whether a federal public defender was covered under the Westfall Act as "any employee of the Government."  The court refused, because "the plain language of the Act must trump any 'control test' in the context of judicial branch employees.  In a sense, [plaintiff] is asking that we create a 'federal public defender exception' to the amended scope of the FTCA."  *Id.*  Similarly, the Eighth Circuit rejected an analogous argument that "the independence of the federal judiciary was said to obviate that element of governmental control necessary to bring a federal officer or employee within the coverage of the Act."  *LePatourel*, 571 F.2d at 410.  The court found that "neither the Act nor its legislative history gives any indication that employee control answers the question of governmental liability outside the independent contractor context."  *Id.*

So too here, because the President constitutes an "employee of the

Government" (*see supra* Section II. A), it is inappropriate to apply the control test relevant only to whether the President is an independent contractor.   *See supra* p. 51.

Finally, even assuming the master-servant test was somehow relevant, and it is not, the District Court erred by relying on the Restatement.  (SPA-43-44.)  The Restatement contains an express disclaimer that "it does not state the special rules applicable to public officers . . . ."  Restatement (Second) of Agency Scope Note. *See also* 1 Restatement (Third) of Agency 6 (2006) (noting that the Restatement "deals at points, but not comprehensively, with the application of common-law doctrine to agents of governmental subdivisions and entities created by government").

### 2.    A Master-Servant Relationship Exists.

Although the District Court erred in applying the Restatement's master-servant test to the scope of employment inquiry in the first place, the President nonetheless satisfies it.

Under the Restatement, the definition of servant "is one not capable of exact definition" and "cannot . . . be defined in general terms with substantial accuracy." § 220 cmt. c. Relevant, but non-exclusive, factors include, among others, whether the employment is "full time," whether the employer "supplies the instrumentalities, tools, and the place of work for the person doing the work," and

the manner of pay.  *Id.* and cmt. h.

The President, who takes an oath of office, has full time or even ceaseless

duties that are set forth in the Constitution, works from the White House, and takes

a salary, satisfies this test. U.S. Const. art. II § 1, cl 8 (oath of office); art. II, § 1,

cl. 7 ("The President shall, at stated Times, receive for his Services, a

Compensation . . . .); 3 U.S.C. § 102 (setting Presidential compensation including

expense allowance to defray costs of performing "official duties" and entitling the

President "to the use of the furniture and other effects belonging to the United

States and kept in the Executive Residence at the White House."); *Clinton v. Jones*,

520 U.S. at 713, 717 (Breyer, J., concurring) (noting the President "is the sole

branch which the constitution requires to be always in function" and "the President

never adjourns" (citation omitted)).

The District Court made much of the purported lack of control over the

President in assessing whether the President is in a master-servant relationship.

(SPA-45-47.)[19]  In holding that the President is not subject to "control," the District

Court adopted an overly restrictive definition of the master-servant relationship

that is not supported by the Restatement.  While control is a key factor in

traditional analyses of the master-servant relationship, the Restatement recognizes

---

[19] As shown (*supra* Section III. C. 1), the existence of a master/servant relationship is irrelevant
to the scope of employment issue, which presumes the existence of an employment relationship.

that the right of a master to control the servant "may be very attenuated."

Restatement § 220 cmt. d. Thus, the term servant does not imply menial service,

but includes, for example, "the officers of a corporation or a ship, [and] the interne

in a hospital, all of whom give their time to their employers." *Id.* § 2 cmt. c. The

President qualifies under this definition of control. As officers of corporations

"give their time to their employer," so Presidents "give their time" to the

Government. *See Clinton v. Jones*, 520 U.S. at 698 (noting the President must be

available "at all times" to perform his duties (citation omitted)).

Further, while the District Court held that any "control is absent whenever

the President discharges his duties" (SPA-46-47), the Supreme Court has rejected

this precise assertion. In *Clinton v. Jones*, 520 U.S. 681, 703 (1997), the Supreme

Court held that that that separation of powers doctrine does not mean that the

branches "ought to have no *partial agency in*, or no *controul* over the acts of each

other"; to the contrary, the judiciary could "review[] the legality of the President's

official conduct, . . . direct appropriate process to the President . . ., [and]

determine the legality of his unofficial conduct." *Id.* Thus, the President is in fact

confined by the Constitution and may be controlled by coequal branches. *See*

*Youngstown Sheet & Tube*, 343 U.S. at 585 (President's powers are limited to

those provided "from an act of Congress or from the Constitution itself.").

Nor is it true, as the District Court claimed, that the "president is no one's

52

servant," (SPA-47), as the Supreme Court has recognized, both Congress and the President are "servants of the people." *See Ex parte Milligan*, 71 U.S. (4 Wall.) 2, 139 (1866) (noting that Congress and the President are both "servants of the people"); *see also Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 513 (2010) ("The Constitution . . . makes the President accountable to the people for executing the laws . . . .").

Indeed, under the District Court's definition, members of Congress or of the federal judiciary, who are not controlled, also would not constitute servants and none of their acts could fall within the scope of employment. Yet courts routinely recognize that they are covered by the Westfall Act. *See, e.g. Haaland*, 973 F.3d at 598; *Operation Rescue Nat'l*, 147 F.3d at 70-71; *Williams*, 71 F.3d at 507; *LePatourel*, 571 F.2d at 408 (under pre-Westfall Act FTCA).

## CONCLUSION

President Trump respectfully requests that this Court reverse the District Court's Order denying the motion to substitute the United States as defendant.

Dated:      New York, New York.        Respectfully submitted,
            January 15, 2020
                                        KASOWITZ BENSON TORRES LLP


                                        By:    /s/ Marc E. Kasowitz

                                               Marc E. Kasowitz
                                               Christine A. Montenegro
                                               Paul J. Burgo

                                               1633 Broadway
                                               New York, New York 10019
                                               T: (212) 506-1700
                                               E: mkasowitz@kasowitz.com
                                                  cmontenegro@kasowitz.com
                                                  pburgo@kasowitz.com

                                               *Attorneys for Defendant-Appellant,
                                               President Donald J. Trump*

**Federal Rules of Appellate Procedure Form 6.**
**Certificate of Compliance With Rule 32(a)**

**Certificate of Compliance With Type-Volume Limitation,**
**Typeface Requirements and Type Style Requirements**

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

This brief contains 13,164 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirement of Fed. R. App. P. 32(a)(5) and the type style required of Fed. R. App. P. 32(a)(6) because:

This brief has been prepared in a proportionally spaced typeface using Microsoft® Office Word, in 14 pt. font size, Times New Roman.

*/s/ Marc E. Kasowitz*