# EXHIBIT D

**APPEAL NO. 22-SP-745**

*In The*

# District of Columbia

### Court of Appeals



Clerk of the Court
Received 11/09/2022 04:02 PM
Filed 11/09/2022 04:02 PM

## DONALD J. TRUMP and UNITED STATES,

*Appellants,*

**v.**

## E. JEAN CARROLL,

*Appellee.*

### CERTIFIED QUESTION FROM THE
### UNTIED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

———————

### BRIEF OF APPELLANT DONALD J. TRUMP

———————

**Alina Habba**
**Michael T. Madaio**
**HABBA MADAIO & ASSOCIATES LLP**
**1430 U.S. Highway 206**
**Bedminster, New Jersey  07921**
**(908) 869-1188**
**ahabba@habbalaw.com**
**mmadaio@habbalaw.com**

**Jason C. Greaves**
**BINNALL LAW GROUP**
**717 King Street, Suite 200**
**Alexandria, Virginia  22314**
**(703) 888-1973**
**jason@binnall.com**

*Counsel for Appellant Donald J. Trump*

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ..................................................................... ii

NATURE OF THE APPEAL .....................................................................1

STATEMENT OF THE ISSUES PRESENTED FOR APPEAL ...........................1

STATEMENT OF THE CASE .....................................................................2

STATEMENT OF FACTS ...........................................................................4

SUMMARY OF ARGUMENT ......................................................................7

LEGAL ARGUMENT .................................................................................8

I.     APPELLANT WAS ACTING WITHIN THE SCOPE OF HIS AUTHORITY AS PRESIDENT WHEN HE DENIED PLAINTIFF'S PUBLIC ALLEGATIONS OF MISCONDUCT .......10

     A.     This Court Should Expressly Adopt the Holdings of *Ballenger* and its Progeny in Finding that the Appellant Acted Within the Scope of His Employment as President .......12

     B.     Appellant's Conduct Satisfies All Applicable Prongs of the "Restatement Test" .............................................................17

CONCLUSION ..........................................................................................26

CERTIFICATE OF SERVICE .....................................................................27

## <u>TABLE OF AUTHORITIES</u>

**<u>Page(s)</u>**

## <u>CASES</u>

*Allaithi v. Rumsfeld,*
    753 F.3d 1327 (D.C. Cir. 2014)...............................................11, 18, 21, 22, 23

*Blair v. Dist. of Columbia,*
    190 A.3d 212 (D.C. 2018) ...............................................................................25

*Bowles v. United States,*
    685 F. App'x 21 (2d Cir. 2017)......................................................................18

*Carroll v. Trump,*
    49 F.4th 759 (2d Cir. 2022) ...................................................................1, 9, 10

*Council on American Islamic Relations v. Ballenger,*
    370 U.S. App. 314,
    444 F.3d 659 (D.C. Cir. 2006).......1, 3-4, 7, 12, 13, 14, 15, 16, 17, 18, 19, 23

*District of Columbia v. Jones,*
    919 A.2d 604 (D.C. 2007) ...............................................................................15

*Does 1-10 v. v. Haaland,*
    973 F.3d 591, 2020 WL 5242402 (6th Cir. 2020)........................................23

*Ferri v. Ackerman,*
    444 U.S. 193 (1979)........................................................................................16

*Freiman v. Lazur,*
    925 F. Supp. 14 (D.D.C. 1996)......................................................................23

*Haddon v. United States,*
    68 F.3d 1420 (D.C. Cir. 1995)......................................................................18

*Hechinger Co. v. Johnson,*
    761 A.2d 15 (D.C. 2000) .....................................................................21, 24, 25

*Howard Univ. v. Best*,
    484 A.2d 958 (D.C. 1984) ...............................................................................25

*In re Grand Jury Proceedings*,
    5 F. Supp. 2d 21 (D.D.C. 1998)......................................................................20

*In re Iraq & Afghanistan Detainees Litig.*,
    479 F. Supp. 2d 85 (D.D.C. 2007)...................................................................25

*In re Lindsey*,
    148 F.3d 1100 (D.C. Cir.), *aff'd in part, rev'd in part on other grounds*,
    158 F.3d 1263 (D.C. Cir. 1998).......................................................................20

*\*Jacobs v. Vrobel*,
    406 U.S. App. D.C. 286,
    724 F.3d 217 (D.C. Cir. 2013)..................... 7, 9, 11, 14 15, 18, 19, 20, 21, 22

*Johnson v. Weinberg*,
    434 A.2d 404 (D.C. 1981) ...............................................................................25

*Kelley v. Fed. Bureau of Investigation*,
    67 F. Supp. 3d 240 (D.D.C. 2014)...................................................................21

*Klayman v. Obama*,
    125 F. Supp. 3d 67 (D.D.C. 2015)..............................................................21, 24

*Knight First Amendment Inst. at Columbia Univ. v. Trump*,
    928 F.3d 226 (2d Cir. 2019) ............................................................................19

*Local 1814, Int'l Longshoremen's Ass'n v. Nat'l Lab. Rels. Bd.*,
    735 F.2d 1384 (D.C. Cir. 1984).......................................................................23

*Magowan v. Lowery*,
    166 F. Supp. 3d 39 (D.D.C. 2016)............................................................. 23-24

*\*Nixon v. Fitzgerald*,
    457 U.S. 731 (1982)............................................................................8, 16, 17

*Operation Rescue Nat'l v. United States*,
    147 F.3d 68 (1st Cir. 1998).............................................................................20

*Osborn v. Haley*,
   549 U.S. 225 (2007)................................................................................8, 26

*Rasul v. Myers*,
   512 F.3d 644,
   379 U.S. App. D.C. 210 (D.C. Cir. 2008), *vacated and remanded*,
   555 U.S. 1083, 129 S. Ct. 763,
   172 L. Ed. 2d 753 (2008), *reinstated in relevant part*,
   563 F.3d 527, 385 U.S. App. D.C. 318 (D.C. Cir. 2009).......................15, 22

*Schecter v. Merchants Home Delivery, Inc.*,
   892 A.2d 415 (D.C. 2006) .......................................................................21, 24

*Smith v. Clinton*,
   886 F.3d 122 (D.C. Cir. 2018).......................................................................24

*Steele v. Meyer*,
   964 F. Supp. 2d 9 (D.D.C. 2013).....................................................................24

*Trump v. Hawaii*,
   138 S. Ct. 2392 (2018)...................................................................................19

*Trump v. Mazars USA, LLP*,
   140 S. Ct. 2019 (2020)...................................................................................20

*Trump v. Vance*,
   140 S. Ct. 2412 (2020)...................................................................................20

*Wemberg v. Johnson*,
   518 A.2d 985 ( D.C. 1986) ...............................................................19, 21, 22

*\*Wilson v. Libby*,
   498 F. Supp. 2d 74 (D.D.C. 2007)...................................................7, 13, 15, 16

*\*Wilson v. Libby*,
   535 F.3d 697 (D.C. Cir. 2008)...................................................18, 20, 22, 24

*\*Wuterich v. Murtha*,
   385 U.S. App. D.C. 222, 562 F.3d 375 (2009).......................7, 14, 15, 16, 23

## <u>STATUTES</u>

D.C. Code § 11-723 ..................................................................................1

28 U.S.C. § 1346(b)(1)...........................................................................9

28 U.S.C. § 2679(b) ...............................................................................9

28 U.S.C. § 2679(d)(1).........................................................................8, 9

## <u>OTHER AUTHORITIES</u>

Restatement (Second) of Agency § 228 (1958)..........................................11, 20, 21

Restatement (Second) of Agency § 231 (1958)....................................................22

## <u>NATURE OF THE APPEAL</u>

This appeal is not from a final order of judgment that disposes of all parties' claims in this litigation.

In a Decision from the United States Court of Appeals for the Second Circuit, *Carroll v. Trump*, 49 F.4th 759 (2d Cir. 2022) dated September 27, 2022, (the "Decision"), the Second Circuit certified an issue before this Court, stating: "[u]nder the laws of the District, were the allegedly libelous statements made, during his term in office, by the President of the United States, denying allegations of misconduct, with regards to the events prior to that term of office, within the scope of his employment as President of the United States?" [*See* Decision, at 56–57][1].

## <u>STATEMENT OF THE ISSUES PRESENTED FOR APPEAL</u>

1.  Should this Court follow the precedent established in *Ballenger* and its progeny and conclude that a public official's statements to the press definitively fall within the scope of employment?

---

[1] In connection with the Decision, the United States Court of Appeals for the Second Circuit directed the Clerk of the Court to transmit all relevant briefs and excerpts of the Record pursuant to D.C. Code § 11-723.  As such, all citations to the Record will be from the Record transmitted, as referenced in the Decision [Decision, at 57].

2.      Should this Court determine that Appellant's conduct satisfy the traditional

*respondeat superior* test established in the District of Columbia in finding that

his conduct falls squarely within the scope of his employment, thus entitling

Appellant to immunity under the Westfall Act?

## STATEMENT OF THE CASE

This case involves a defamation claim commenced by the appellee, E. Jean

Carroll ("Appellee"), against the appellant, Donald J. Trump ("Appellant") arising

out of denials in June 2019 of allegations of sexual assault occurring in Bergdorf

Goodman in New York City that purportedly took place nearly thirty years ago.

On September 8, 2020, Director James G. Touhey, Jr. of the Torts Branch of

the U.S. Department of Justice's Civil Division intervened in the suit and certified

on behalf of the Attorney General that Appellant had acted "within the scope of his

office as President of the United States" at the time that he made the challenged

statements.  Based on this certification, the Government removed the case to the

Southern District of New York. Subsequently thereafter, the Government moved,

pursuant to the Westfall Act, to substitute the United States as the sole defendant in

this matter.

On October 27, 2020, the Honorable Lewis A. Kaplan, U.S.D.J., denied the

motion to substitute filed by the United States, holding that the President is not an

employee of the government pursuant to the Westfall Act. In the alternative, the

lower court held that even if the President is considered to be an employee that he acted outside the scope of him employment when he allegedly defamed Appellee.

Both Appellant and the United States timely appealed Judge Kaplan's decision to the United States Court of Appeals for the Second Circuit, arguing that the President is a covered government employee for the purposes of the Westfall Act and because the Appellant acted within the scope of his employment when he made the purportedly defamatory statements denying Appellee's sexual assault allegations. In the Decision, the Second Circuit reversed the District Court's holding that the President of the United States is not an employee of the government, in conjunction with the Westfall Act. The Court also vacated the District Court's judgment that Appellant did not act within the scope of his employment.

Specifically, the Second Circuit held that the President of the United States "fits comfortably within the statutory description's plain language and also held that "the President is a government employee in the most basic sense of the term. . . ." [Decision, at 28]. As such, the Court concluded in the Decision that "the President is an employee of the government under the Westfall Act." [Decision, at 33].

The Second Circuit further emphasized that it was uncertain how this Court would rule on whether Appellant was acting within the scope of employment under the Westfall Act. [Decision, at 55]. Notably, with respect to this issue, the Second Circuit acknowledged that a relevant line of D.C. Circuit cases—*Council on*

*American Islamic Relations v. Ballenger*, 444 F.3d 659 (D.C. Cir. 2006) and its progeny—were "directly on point," but looked towards this Court to confirm that the holdings in those cases were adopted under D.C. law. [Decision, at 53–54].

Consequently, the Second Circuit certified the scope of employment question to this Court. [Decision, at 57–58].

## STATEMENT OF FACTS

The allegations set forth in the Complaint arise out of an incident that purportedly happened nearly thirty years ago. Appellee alleges that she was sexually assaulted by the Appellant in a Bergdorf Goodman dressing area at that time [Special App'x at 12–14].

Approximately twenty-five years later, Appellee decided to reveal these allegations publicly against Appellant for the first time with the release of the book entitled: "What Do You Need Men For?" in or around May of 2019. Following these public allegations set forth in Appellee's book, Appellee's defamation claim arises out of three statements in June 2019 made directly in response to Plaintiff's allegations:

(1) On June 21, 2019, a statement circulated by the Deputy White House Press Secretary to the press denied the accusation and Appellant stated:

> Regarding the 'story' by E. Jean Carroll, claiming she once encountered me at Bergdorf Goodman 23 years ago, I've never met this person in my life. She is trying to sell a new book—that should indicate her motivation. It should be sold in the fiction section.

Shame on those people who make up false stories of assault to try to get publicly for themselves, or sell a book, or carry out a political agenda—like Julie Swetnick who falsely accused Justice Brett Kavanaugh. It's just as bad for people to believe it, particularly when there is zero evidence. Worse still for a dying publication to try to prop itself up by peddling fake news—it's an epidemic.

Ms. Carroll & New York Magazine. No pictures? No surveillance? No video? No reports? No sales attendants around?? I would like to thank Bergdorf Goodman for confirming that they have no video footage of any such incident, because it never happened.

False accusations diminish the severity of real assault. All should condemn false accusations and any actual assault in the strongest possible terms.

If anyone has information that the Democratic Party is working with Ms. Carroll or New York Magazine, please notify us as soon as possible. The world should know what's really going on. It is a disgrace and people should pay dearly for such false accusations.

[Special App'x, at 12–13].

(2)  On June 22, 2019, Appellant made the following statement to the White

House press:

"[Reporter]: [Y]ou had said earlier that you never met E. Jean Carroll. There was a photograph of you and her in the late 1980's—

[Trump]: I have no idea who this woman is. This is a woman who has also accused other men of things, as you know. It is a totally false accusation. I think she was married—as I read; I have no idea who she is—but she was married to a, actually, nice guy, Johnson—a newscaster.

[Reporter]: You were in a photograph with her.

[Trump]: Standing with coat on in a line—give me a break—with my back to the camera. I have no idea who she is. What she did is—it's

terrible, what's going on. So it's a total false accusation and I don't
know anything about her. And she's made this charge against others.

And, you know, people have to be careful because they're playing with
very dangerous territory. And when they do that—and it's happening
more and more. When you look at what happened to Justice Kavanaugh
and you look at what's happening to others, you can't do that for the
sake of publicity.

New York Magazine is a failing magazine. It's ready to go out of
business, from what I hear. They'll do anything they can. But this was
about many men, and I was one of the many men that she wrote about.
It's a totally false accusation. I have absolutely no idea who she is.
There's some picture where we're shaking hands. It looks like at some
kind of event. I have my coat on. I have my wife standing next to me.
And I didn't know her husband, but he was a newscaster. But I have no
idea who she is—none whatsoever.

It's a false accusation and it's a disgrace that a magazine like New
York—which is one of the reasons it's failing. People don't read it
anymore, so they're trying to get readership by using me. It's not good.

You know, there were cases that the mainstream media didn't pick up.
And I don't know if you've seen them. And they were put on Fox. But
there were numerous cases where women were paid money to say bad
things about me. You can't do that. You can't do that. And those
women did wrong things—that women were actually paid money to say
bad things about me.

But here's a case, it's an absolute disgrace that she's allowed to do that.

[Special App'x, at 13–14].

(3)  On June 24, 2019, Appellant made the following statement in response

to Appellee's allegations against him:

I'll say with great respect: Number one, she's not my type. Number two, It never happened. It never happened, OK?

[Special App'x, at 14].

In or around November of 2019, Appellee averred that Appellant's statements were defamatory and filed the underlying Complaint shortly thereafter.

## SUMMARY OF ARGUMENT

The issue presented before this Court, as certified by the Second Circuit, is whether Appellant was acting within the scope of his employment as President of the United States when he made the alleged defamatory statements.

As set forth more fully below, it is respectfully submitted, that the "scope of employment" issue before this Court, as applied to the Westfall Act, has been well-established under D.C. law. As set forth in the D.C. Circuit's holding in *Council on Am. Islamic Relations v. Ballenger*, 444 F.3d 659, 664 (D.C. Cir. 2006), and the line of cases which follow, it has been uniformly held that speaking to the press is within the scope of employment of high-ranking public officials. *See*, *e.g.*, *Wuterich v. Murtha*, 385 U.S. App. D.C. 222, 562 F.3d 375 (2009); *Wilson v. Libby*, 498 F. Supp. 2d 74 (D.D.C. 2007); *Jacobs v. Vrobel*, 406 U.S. App. D.C. 286, 724 F.3d 217 (2013). Considering the "singular importance of the President's duties," coupled with the fact that he is an "easily identifiable target for suits for civil damages," it is axiomatic that Westfall Act immunity should be applied with equal force to the

office of the presidency in this context. *Nixon v. Fitzgerald*, 457 U.S. 731, 752–53 (1982).

Further, more than any other public official, the President is expected to respond to questions from the media that affect his ability to maintain the trust of the American people and effectively carry out his official duties. Pursuant to the case law in this jurisdiction, responding to accusations involving personal matters that may affect his ability to perform his job duties is clearly within the scope of such employment. Additionally, as set forth more fully below, Appellant clearly complied with the applicable prongs of the test set forth for *respondeat superior* by the Restatement (Second) of Agency. Thus, in accordance with authoritative D.C. precedent on this issue, Appellant clearly acted within the "scope of employment" while making the statements at issue and is entitled to immunity under the Westfall Act.

## LEGAL ARGUMENT

The Westfall Act "accords federal employees absolute immunity from common-law tort claims arising out of acts they undertake in the course of their official duties." *Osborn v. Haley*, 549 U.S. 225, 229 (2007). To invoke the Westfall Act, the Attorney General must certify that the employee "was acting within the scope of his office or employment at the time of the incident out of which the claim arose." 28 U.S.C. § 2679(d)(1). Thereon, the statute expressly dictates that "any civil

action or proceeding commenced upon such claim in a United States district court shall be deemed an action against the United States under the provisions of this title and all references thereto, and the United States shall be substituted as the party defendant." *Id*. (emphasis added).

Such certification constitutes "*prima facie evidence of the fact*" that Appellant was acting within the scope of his office as President of the United States at the time that the challenged statements were made during his term. *Jacobs v. Vrobel*, 724 F.3d 217, 220 (D.C. Cir. 2013). "To rebut the certification, the plaintiff[s] must allege, in either the complaint or a subsequent filing, specific facts that, taken as true, would establish that the defendant's actions exceeded the scope of" his office. *Id*. (internal quotation and alteration marks omitted).

At the outset, the Second Circuit has conclusively held that the Westfall Act— which covers "any employee of the Government," 28 U.S.C. §§ 1346(b)(1), 2679(b)—applies to the President of the United States. *Carroll v. Trump*, 49 F.4th 759 (2d Cir. 2022). Indeed, the Second Circuit affirmed this finding in no uncertain terms:

> It follows that the President of the United States fits comfortably within the statutory description's plain language. For, as Trump points out in his brief, the President is a government employee in the most basic sense of the term: He renders service to his employer, the United States government, in exchange for a salary and other job-related benefits.

*Id*. at 26.

9

Thus, the sole remaining question before this Court is whether Appellant was acting within the scope of his employment as President of the United States when he made the statements at issue. For the reasons set forth herein, the Court should find that Appellant's conduct was well within the purview of his official responsibilities.

## I.   APPELLANT WAS ACTING WITHIN THE SCOPE OF HIS AUTHORITY AS PRESIDENT WHEN HE DENIED PLAINTIFF'S PUBLIC ALLEGATIONS OF MISCONDUCT.

The Second Circuit, in analyzing whether President Trump's conduct falls within the scope of his employment, properly framed the question that this Court is now asked to consider: whether the District of Columbia should apply "a narrow view of scope of employment that requires evidence of that an intentional tort benefit—or be for the purpose of benefitting the employer, [or] a more modern, broader view of scope of employment that would hold that any intentional tort that is a part of the risks of an employer's activity fall within the scope of employment." *Carroll*, 49 F.4th 759 (2d Cir. 2022). The Second Circuit recognized that determining the scope of employment applicable here is "a question of extreme importance" which "touches upon the *duties of the President of the United States* and the personal tort liability *he and his successors* may (or may not) face under the Westfall Act." *Id.* (internal citations omitted).

Given the procedural mechanics of the Westfall Act—which is automatically removed to federal court upon the Attorney General's certification—practically all

relevant holdings applying District of Columbia law to the Westfall Act are derived from federal court. In assessing whether a federal employee was acting within the scope of his employment, the D.C. Circuit looks towards the state's *respondeat superior* law, which entails an assessment of whether the employee's conduct is: (i) "of the kind [the employee] is employed to perform"; (ii) "occurs substantially within the authorized time and space limits"; and (iii) "is actuated, at least in part, by a purpose to serve" the employer. *Jacobs*, 724 F.3d at 221 (quoting Restatement (Second) of Agency § 228 (1958)). The D.C. Circuit "appl[ies] [this] test 'very expansively,' and in essence ask[s] 'whether the defendant merely was on duty or on the job when committing the alleged tort.'" *Allaithi v. Rumsfeld*, 753 F.3d 1327, 1330 (D.C. Cir. 2014) (internal citations omitted); *see also Jacobs*, 724 F.3d at 221 ("[T]he District [of Columbia] has broadly interpreted the test.").

For the reasons outlined below, this Court should adopt the D.C. Circuit's expansive view of the scope of employment test when applying its *respondeat superior* principles to a federal employee under the Westfall Act. Notwithstanding, it is respectfully submitted that Appellant's conduct satisfies either application— broad or narrow—of the test, and the challenged statements comfortably fall within the scope of his official responsibilities as President of the United States.

**A.** **This Court Should Expressly Adopt the Holdings of *Ballenger* and its Progeny in Finding that the Appellant Acted Within the Scope of His Employment as President**

The seminal case which defines the scope of employment for high-ranking public officials when addressing matters of public concern, in the context of the Westfall Act, is *Council on American Islamic Relations v. Ballenger*, 370 U.S. App. D.C. 314, 444 F.3d 659 (2006). This Court should adopt the holding in *Ballenger*, and the line of cases following it, to confirm that, in the context of the Westfall Act, the President's communications and dealings with the press fall within the scope of his employment.

In *Ballenger*, the plaintiff, a member of Congress, had made statements to a reporter that were intended to "defuse an issue that could affect [his] representational responsibilities" and were therefore "motivated—at least in part—by a legitimate desire to discharge his duty as a congressman." *Ballenger*, 444 F.3d at 665. In applying D.C.'s *respondeat superior* test, the D.C. Circuit found that the Congressman was acting within the scope of his employment when he made the statements, the court noted that there was a "clear nexus between the congressman answering a reporter's question . . . and the congressman's ability to carry out his representative responsibilities effectively." *Id.* at 665–66. The D.C. Circuit reasoned that a congressman's comments to a reporter about his personal life were within the scope of his duties because his "ability to do his job as a legislator effectively is tied

. . . to the Member's relationship with the public and in particular his constituents and colleagues in the Congress." *Id.* at 665. The appropriate question, the D.C. Circuit noted, is "whether that [] conversation [with the reporter]—not the alleged defamatory sentence—was the kind of conduct Ballenger was employed to perform." *Id.* at 664. In finding in the affirmative, the D.C. Circuit established the hardline rule that "*[s]peaking to the press during regular work hours in response to a reporter's inquiry falls within the scope of a congressman's 'authorized duties.'*" *Id*. at 664 (emphasis added).

Following the *Ballenger* case, the D.C. Circuit has uniformly held that speaking to the press is within the scope of employment of high-ranking public officials. In *Wilson v. Libby*, 498 F. Supp. 2d 74 (D.D.C. 2007), the D.C. Circuit extended the reasoning in *Ballenger* to Executive Branch officials when it held that then-Vice President Cheney and several other Executive Branch officials were acting within the scope of their employment under the Westfall Act when they revealed Valerie Plame Wilson's identity as a CIA operative to the press: "there can be no serious dispute that the act of rebutting public criticism, such as that levied by Mr. Wilson against the Bush Administration's handling of prewar foreign intelligence, by speaking with members of the press is within the scope of defendants' duties as high-level Executive Branch officials." *Id.* at 66. The Circuit

13

further held that "attempts by high-ranking officials to discredit a critic of the Executive Branch's policies satisfy the Restatement's purpose requirement."

Likewise, in *Wuterich v. Murtha*, the plaintiff, a U.S. Marine, sued the defendant, a congressman, over allegedly defamatory statements the defendant had made to the media regarding the plaintiff's military activities in Iraq. *See generally* 562 F.3d 375 (D.C. Cir. 2009). The D.C. Circuit relied upon *Ballenger* in finding that the subject statements were within the scope of the congressman's employment and noted that "where comments made in the course of a conversation on as private a matter as marital status are within the scope of a congressman's official duties, it is hard to fathom how [the *Wuterich* defendant's] discussion of grave public policy concerns relating to the War in Iraq could ever fall outside the scope of employment." In other words, "the underlying conduct—interviews with the media about the pressures on American troops in the ongoing Iraq war—is unquestionably of the kind that [the defendant] was employed to perform as a Member of Congress." *Id.* at 384–85.

Similarly, in *Jacobs*, the Court of Appeals upheld the substitution of the United States as a defendant for a manager at the General Services Administration who allegedly defamed the plaintiff when he received a call for an employment reference from the plaintiff's prospective employer. 724 F.3d at 222. The Court of Appeals, relying on *Ballenger*, focused on the type of act—"responding to a

prospective employer's request for a reference"—and concluded that it was "plainly 'the type of conduct [the defendant] was employed to perform'" as a supervisor. *Id*. (quoting *Ballenger*, 444 F.3d at 664).

*Ballenger*, *Wuterich*, *Libby*, and *Jacobs* fall in line with other circuit precedent on whether senior Executive Branch officials were acting within the scope of their employment. *See Rasul v. Myers*, 512 F.3d 644, 656–60, 379 U.S. App. D.C. 210 (D.C. Cir. 2008) (holding that the alleged "authorization, implementation and supervision of torture" was within the scope of employment of military officers who interrogated defendants at the United States Naval Base at Guantanamo Bay, Cuba, because "the detention and interrogation of suspected enemy combatants [was] a central part of the [employees'] duties as military officers charged with winning the war on terror," even notwithstanding "allegations of serious criminality"), *vacated and remanded*, 555 U.S. 1083, 129 S. Ct. 763, 172 L. Ed. 2d 753 (2008), *reinstated in relevant part*, 563 F.3d 527, 385 U.S. App. D.C. 318 (D.C. Cir. 2009). In addition, this Court has approvingly cited to *Ballenger* on at least one occasion. *See District of Columbia v. Jones*, 919 A.2d 604, 608–09 (D.C. 2007).

In the matter *sub judice*, and as further discussed below, it is clear that Appellant's conduct was well within the scope of his employment as President. Critically, the Second Circuit noted that the D.C. Circuit's holding in *Ballenger* is "***directly on point***" to the facts at hand. [*See* Decision, at 49] (emphasis added).  As

established in *Ballenger* and its progeny, Appellant's was acting within the scope of his employment as President when he spoke to the press and responded to inquiries that weighed on his "ability to carry out his [] responsibilities" and "maintain the continued trust and respect of [his] constituents" were within the scope of his duties as President. *Id.* at 666. The subject statements were precisely the type that Appellant was expected to—even obligated to—make in connection with his role as President.

Since the D.C. Circuit established that this conduct is within the scope of employment of a congressman, *Ballenger*, *supra; Wuterich*, *supra*, and of an Executive Branch official, *Wilson*, *supra*, there is no question that they are similarly among the official responsibilities of the President. *Id*. The President is regularly expected to respond to questions from the media that directly impact his ability to effectively execute his duties as President of the United States. The President's ability to effectively deal with personal accusations (which typically affect any President) was part and parcel of his position as Chief Executive of the United States.

Further, important policy considerations weigh in favor of applying the *Ballenger* holding to the President. The Supreme Court has acknowledged that "there exists the greatest public interest in providing [the President] 'the maximum ability to deal fearlessly and impartially with' the duties of his office." *Nixon v. Fitzgerald*, 457 U.S. 731, 752 (1982) (citing *Ferri v. Ackerman*, 444 U.S. 193, 203 (1979). Indeed, the President is obligated to "make the most sensitive and far-

reaching decisions entrusted to any official under our constitutional system" and "[i]n view of the visibility of his office and the effect of his actions on countless people, the President would be an easily identifiable target for suits for civil damages." *Id.* "Because of the singular importance of the President's duties, diversion of his energies by concern with private lawsuits would raise unique risks to the effective functioning of government." *Id.* at 749. Thus, failure to apply the protections afforded under the Westfall Act would not only risk "distract[ing] President from his public duties," but also would ultimately be "to the detriment of . . . the Nation that the Presidency was designed to serve." *Id.* Therefore, there is a sizeable public interest in assuring that the President is extended the same Westfall Act protections that are afforded to congressmen and other Executive Branch officials in his dealings with the press.

Based on the foregoing, this Court should expressly adopt the principle set forth in *Ballenger* and the line of subsequent D.C. Circuit cases in confirming that Appellant was acting within the scope of his employment as President when he made the subject statements in response to inquiries from the press.

### B. Appellant's Conduct Satisfies All Applicable Prongs of the "Restatement Test"

Notwithstanding the above, even under a traditional analysis of the Restatement test, Appellant's statements when speaking to the press regarding the allegations in question plainly satisfy each element of this test.

17

*First*, "[t]o qualify as conduct of the kind an employee was to perform, his or her actions must have either been of the same general nature as that authorized or incidental to the conduct authorized." *Allaithi v. Rumsfeld*, 753 F.3d 1327, 1332 (D.C. Cir. 2014) (internal quotation and alteration marks omitted, emphasis omitted). "Conduct is 'incidental' so long as it is 'foreseeable'—that is, it must be a 'direct outgrowth of the employee's instructions or job assignment.'" *Id.* (quoting *Haddon v. United States*, 68 F.3d 1420, 1424 (D.C. Cir. 1995)). Under this inquiry, a court must look broadly to "the type of act" the defendant undertook, rather than its alleged "wrongful character." *Jacobs*, 724 F.3d at 221-22; *see also Wilson v. Libby*, 535 F.3d 697, 711–12 (D.C. Cir. 2008) (explaining that courts must "look beyond alleged intentional torts themselves to the underlying conduct," and therefore, an "employee's scope of employment is broad enough to embrace any intentional tort arising out of a dispute that was originally undertaken on the employer's behalf") (internal quotation marks omitted); *Bowles v. United States*, 685 F. App'x 21, 23 (2d Cir. 2017) (regarding purported defamatory statements, the test is whether the alleged statements were made 'on duty at the time and place of an "incident" alleged in a complaint.'").

With respect to the first prong of the three-prong test, *Ballenger* is again directly on point. To determine whether the subject actions are "of the kind" the defendant is entitled to perform, courts examine the context of the purported

conduct—not the content of the conduct. *See Ballenger*, 444 F.3d at 664 ("The appropriate question . . . is whether that telephone conversation [with the reporter]—not the allegedly defamatory sentence—was the kind of conduct Ballenger was employed to perform."); *see also*, *e.g.*, *Jacobs v. Vrobel*, 724 F.3d 217, 222 (D.C. Cir. 2013) (applying District of Columbia law, a supervisor was acting within the scope of employment when he fielded requests from prospective employers about one of his employees. Allegations that the supervisor acted maliciously and deliberately lied to potential employers did not place the conduct outside the scope.) The applicable standard for this prong "focuses on the underlying dispute or controversy, not on the nature of the tort, and is broad enough to embrace any intentional tort arising out of a dispute that was originally undertaken on the employee's behalf." *Weinberg*, 518 A.2d at 992.

Accordingly, speaking to the press and communicating with the public is unquestionably conduct "of the kind [a President] is employed to perform. That is particularly true here, given the gravity of Appellee's accusations and the public concern that arose as a result. *See Trump v. Hawaii*, 138 S. Ct. 2392, 2417–18 (2018) ("The President of the United States possesses an extraordinary power to speak to his fellow citizens.") *Knight First Amendment Inst. at Columbia Univ. v. Trump*, 928 F.3d 226, 235 (2d Cir. 2019) (President "acts in an official capacity when he tweets"). The Supreme Court expressly found that, because "[t]he President is the

only person who alone composes a branch of government[,] . . . there is not always a clear line between his personal and official affairs." *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2034 (2020); *In re Grand Jury Proceedings*, 5 F. Supp. 2d 21, 25–26 (D.D.C. 1998) (President Clinton's communications concerning how to respond to Monica Lewinsky affair were "in the President's performance of his official duties," because "the President does need to address personal matters in the context of his official decisions"), aff'd sub nom. *In re Lindsey*, 148 F.3d 1100 (D.C. Cir.), *aff'd in part, rev'd in part on other grounds*, 158 F.3d 1263 (D.C. Cir.).

*Second*, there is no serious dispute that the Appellant's allegedly defamatory statements—issued in a White House press release and in response to reporters' questions at the White House—did not occur "within the authorized time and space limits." *Jacobs*, 724 F.3d at 221 (quoting Restatement (Second) of Agency § 228). Unlike other public officials, the President must "be always in function," so the time limits are not applicable. *See Trump v. Vance*, 140 S. Ct. 2412, 2423 (2020). Further, speaking to the press during regular hours in response to a reporter's inquiry falls within the scope of a congressman's "authorized duties." *See*, *e.g.*, *Operation Rescue Nat'l v. United States*, 147 F.3d 68 (1st Cir. 1998). High-level officials, particularly the President of the United States, do not "punch[] out of work at the end of the day or when [they] leave[]" government property. *Wilson*, 535 F.3d at 712 n.2.

20

*Third*, the employee's conduct should be "actuated, at least in part, by a purpose to serve the master. . . ." *Jacobs*, 724 F.3d at 221 (quoting Restatement (Second) of Agency § 228). To be outside of scope, District of Columbia law "requires [that] an employee be solely motivated by his own purposes for consequent conduct to fall outside the scope of employment." *Allaithi*, 753 F.3d at 1333 (D.C. Cir. 2014) (emphasis and citation omitted). "[T]he fact that an agent may be motivated by self-interest, or interests other than those of its principal, is not dispositive. The issue instead is whether there is a complete absence of a desire to serve the principal's interests . . ." *Klayman v. Obama*, 125 F. Supp. 3d 67, 84 (D.D.C. 2015); *see also Kelley*, 67 F. Supp. 3d at 286 ("[D]efendant Joyce—in directing an investigation—acted with at least a partial desire to serve the FBI, even if, according to the plaintiffs, he did so in a manner that was insufficiently solicitous of their privacy or their rights as complainants; *Schecter v. Merchants Home Delivery, Inc.*, 892 A.2d 415, 428 (D.C. 2006) (deliverymen stealing belongings from home where they delivered washing machine were acting within the scope of employment); *Hechinger Co. v. Johnson*, 761 A.2d 15, 24 (D.C. 2000) ("if the employee acts in part to serve his employer's interest, the employer will be held liable for the intentional torts of his employee even if prompted partially by personal motives, such as revenge."); *Johnson*, 518 A.2d at 992 (using the "furthering the interest of the employer" test, the court found that laundromat employee who shot a

21

patron was acting within the scope of his employment). As explained by the D.C. Circuit in *Jacobs*, "the test 'is broad enough to embrace any intentional tort arising out of a dispute that was originally undertaken on the employer's behalf.'" 724 F.3d at 222 (quoting *Johnson*).

This test "is not a particularly rigorous one." *Allaithi*, 753 F.3d at 1332. Even criminal conduct can fall within the scope of a defendant's employment. *See generally* Restatement (Second) of Agency § 231 ("An act may be within the scope of employment although consciously criminal or tortious."); *See also Rasul v. Myers*, 512 F.3d 644, 660 (D.C. Cir.), *vacated*, 555 U.S. 1083 (2008), *aff'd after remand*, 563 F.3d 527 (D.C. Cir. 2009) (holding that allegations of "serious criminality" did not alter the conclusion that the defendants' conduct fell within the scope of employment). Indeed, the District of Columbia Circuit has repeatedly affirmed Westfall Act substitution in cases involving allegations of wrongful conduct. *See e.g.*, *Jacobs*, 724 F.3d at 219 (defamation and interference with prospective employment); *Wilson*, 535 F.3d at 711–12 (public disclosure of covert CIA agent's identity).

Here, Appellant's statements squarely fall within the third prong because they were motivated, at least in part, by a purpose to serve the United States. That is particularly true here, where Appellee made her accusations a matter of public concern by publishing a magazine article and book, to which the Appellant is

undoubtedly obligated to respond.  Under applicable law, conduct is outside the scope of employment only if it was done *solely* for the accomplishment of a personal goal. *Allaithi*, 753 F.3d at 1333. The Appellant's public statements to the press regarding Plaintiff's allegations were made at "least in part" to serve the Government, because they addressed a matter of serious public concern. *Council on American Islamic Relations v. Ballenger*, 444 F.3d 659. 665 (D.C. Cir. 2006) (under scope-of-employment test, which is "objective," "even a *partial* desire to serve the master is sufficient" (emphasis in original))); *Wuterich v. Murtha*, 562 F.3d 375, 384–85 (D.C. Cir. 2009) (statements made during a series of interviews to the media within scope) *Does 1-10 v. v. Haaland*, 973 F.3d 591, 601, 2020 WL 5242402, at *6, *8 (6th Cir. 2020) ("unsolicited comments by elected officials on an event of widespread public interest" within scope).

Furthermore, the contention that Appellant's purportedly defamatory statements were motivated by self-interest or malice is of no consequence so long as they were made, *even in part* to serve the master. *Freiman v. Lazur*, 925 F. Supp. 14, 19 (D.D.C. 1996) (conduct within the scope of employment "even where self-interest is the predominant motive . . . so long as the agent is actuated by the principal's business purposes 'to any appreciable extent.'") (emphasis added) (quoting *Local 1814, Int'l Longshoremen's Ass'n v. Nat'l Lab. Rels. Bd.*, 735 F.2d 1384, 1395 (D.C. Cir. 1984)) *Magowan v. Lowery*, 166 F. Supp. 3d 39, 62 (D.D.C.

2016) (in defamation case, "relevant inquiry is whether the defendant was motivated at least in part by a desire to serve her employer"); *Klayman v. Obama*, 125 F. Supp. 3d 67, 83–84 (D.D.C. 2015) (under applicable test—whether there is a "*complete absence* of a desire to serve the principal's interests"—President Obama acted within the scope of his employment when he allegedly funded a designated foreign terrorist organization (Hamas) "because [it] benefit[ed] [him] in various ways") (emphasis added); *Schecter v. Merch. Home Delivery, Inc.*, 892 A.2d 415, 428 (D.C. 2006) (test asks whether the agent acted "only to further his own interest" (citation omitted)); *Hechinger Co. v. Johnson*, 761 A.2d 15, 24 (D.C. 2000) (conduct falls within scope of employment "if the employee acts in part to serve his employer's interest . . . even if prompted partially by personal motives, such as revenge").

Nor does the purported "wrongful character" of the Appellant's conduct preclude him from satisfying the third prong of the test. Indeed, a litany of cases found defendants to be acting within the scope of employment when committing egregious acts. *See, e.g., Smith v. Clinton*, 886 F.3d 122, 126–27 (D.C. Cir. 2018) (diplomat allegedly killed by terrorists because Secretary of State used private email server); *Wilson v. Libby*, 535 F.3d 697, 711 (D.C. Cir. 2008) ("disclosure of a covert agent's identity" was within the scope of employment even though it was allegedly "unlawful and threaten[ed] the security of the nation"); *Steele v. Meyer*, 964 F. Supp. 2d 9, 17 (D.D.C. 2013) ("District of Columbia courts have found 'sexual harassment,

a shooting, armed assault, and rape' within the scope of a defendant's employment.")
(citation omitted)); *In re Iraq & Afghanistan Detainees Litig.*, 479 F. Supp. 2d 85,
113–14 (D.D.C. 2007) (alleged torture and abuse of military detainees).

In addition to the cases cited above, this Court has frequently applied the
doctrine of *respondeat superior* in determining that the employer is vicariously
liable for the acts of its employee, irrespective of its character.  *See*, *e.g.*, *Blair v.
Dist. of Columbia*, 190 A.3d 212, 225 (D.C. 2018) (finding a material question of
fact existed as to whether a police officer's behavior was within the scope of his
employment for the purpose of *respondeat superior* liability, regardless of the fact
that he was undisputedly off scheduled duty); *Hechinger Co. v. Johnson*, 761 A.2d
15, 24–25 (D.C. 2000) (whereby the court held that a retail store employee who
struck a customer acted within the scope of employment); *Johnson v. Weinberg*, 434
A.2d 404, 409 (D.C. 1981) (where the court found that a laundromat employee acted
within the scope of employment when a customer was shot over a dispute over
removing clothes from a washing machine); *Howard Univ. v. Best*, 484 A.2d 958,
987 (D.C. 1984) (finding that sexual harassment was arguably within scope of
employment despite not furthering the employer's interests because it "occurred
during faculty, administrative or other professional meetings").

Thus, all three of the applicable prongs of the Restatement test have been satisfied and Appellant was clearly acting within the scope of his employment in repudiating Appellee's public allegations.

Since Appellant was acting within the scope of his employment, then it is respectfully submitted that Appellant should automatically be dismissed from this action and the United States should be substituted as defendant in place of Appellant. *See Osborn v. Haley*, 549 U.S. 225, 230 (2007).

## **CONCLUSION**

Based upon the foregoing facts and law, Appellant, Donald J. Trump, respectfully requests that this Court resolve the present dispute by finding, pursuant to applicable legal authority, that Appellant acted within the scope of his employment as President when making the alleged defamatory statements.

/s/ Alina Habba
Alina Habba
Michael Madaio
HABBA MADAIO & ASSOCIATES LLP
1430 US Highway 206
Bedminster, NJ 07921
(908) 869-1188
ahabba@habbalaw.com
mmadaio@habbalaw.com

/s/ Jason C. Greaves
Jason C. Greaves
BINNALL LAW GROUP
717 King Street, Suite 200
Alexandria, VA 22314
(703) 888-1973
jason@binnall.com

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on the 9th day of November, 2022, a copy of the foregoing Brief of Appellant Donald J. Trump was served via the D.C. Court of Appeals' electronic filing system on all counsel of record as registered users.

/s/ Jason C. Greaves
Counsel for Appellant
