## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

PRESIDENT DONALD J. TRUMP, 45th President
of the United States of America, in his individual
capacity,

> Plaintiff,

v.                                                          3:23-cv-06883- PGG

SIMON & SCHUSTER, INC., a New York
corporation, ROBERT WOODWARD p.k.a. BOB
WOODWARD, an individual, and PARAMOUNT
GLOBAL, a Delaware corporation, f/k/a Viacom
Inc., successor by merger to CBS Corporation, a
Pennsylvania corporation f/k/a Westinghouse
Electric Corporation,

> Defendants.

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' RULE 12(B)(6) MOTION TO DISMISS PLAINTIFF PRESIDENT TRUMP'S AMENDED COMPLAINT

**WILLIAMS & CONNOLLY\***
Kevin T. Baine
Thomas G. Hentoff (*pro hac vice
application forthcoming*)
680 Maine Avenue SW
Washington, DC 20024
Phone: (202) 434-5804
Email: kbaine@wc.com
         thentoff@wc.com

*\*Of counsel to Robert Woodward*

**DAVIS WRIGHT TREMAINE LLP**
Elizabeth A. McNamara
Linda J. Steinman
John M. Browning
Leena Charlton
1251 Avenue of the Americas, 21st Floor
New York, NY 10020
Phone: (212) 489-8230
Email: lizmcnamara@dwt.com
         lindasteinman@dwt.com
         jackbrowning@dwt.com
         leenacharlton@dwt.com

*Counsel for Defendants*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................. 1

FACTUAL BACKGROUND ................................................................... 3

    A.    Woodward Interviews President Trump and Publishes *Rage* ..................... 3

    B.    Woodward Creates the Work Using His Raw Interviews and Extensive Supplemental Material ............................................................... 7

    C.    The Complaint ............................................................................ 9

ARGUMENT ......................................................................................... 9

I.    THE COPYRIGHT CLAIMS FAIL BECAUSE PRESIDENT TRUMP LACKS A COPYRIGHT REGISTRATION ..................................................... 10

II.    PRESIDENT TRUMP DOES NOT OWN A COPYRIGHT IN WOODWARD'S INTERVIEWS OR WORK ............................................................ 10

    A.    Woodward Is the Copyright Owner, Not President Trump ..................... 11

    B.    President Trump Cannot Own His Interview Responses Because They Are Government Works under Copyright Law ............................................ 16

III.    THE PUBLICATION OF THE WORK WAS FAIR USE ............................. 21

IV.    THE STATE LAW CLAIMS ARE PREEMPTED BY THE COPYRIGHT ACT ......... 23

    A.    The State Law Claims Are Barred by Conflict Preemption ..................... 24

    B.    The State Law Claims Are Expressly Preempted by 17 U.S.C. § 301 .......... 26

        1.    Section 301 Preempts the Unfair Competition and FDUPTA Claims ........... 26

        2.    Section 301 Preempts the Contract Claims ................................... 27

V.    THE STATE LAW CLAIMS MUST BE DISMISSED FOR FAILURE TO STATE A VALID CAUSE OF ACTION ............................................................ 28

    A.    The Contract Claims Are Meritless ................................................ 28

    B.    The FDUPTA and Unjust Enrichment Claims Are Meritless .................... 30

VI.    NO ACTIONABLE CONDUCT WAS PLED AGAINST PARAMOUNT .................. 31

CONCLUSION ..................................................................................... 32

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*16 Casa Duse v. Merkin*,
   791 F.3d 247 (2d Cir. 2015) ........................................................... *passim*

*Am. Geophysical Union v. Texaco*,
   60 F.3d 913 (2d Cir. 1994) ........................................................... 23

*Andy Warhol Found. for Visual Arts v. Goldsmith*,
   143 S. Ct. 1258 (2023) ........................................................... 22

*Baiul v. NBC Sports*,
   708 F. App'x. 710 (2d Cir. 2017) ........................................................... 28

*Belcastro v. Burberry Ltd.*,
   2017 WL 744596 (S.D.N.Y. Feb. 23, 2017) ........................................................... 31

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 554 (2007) ........................................................... 28

*Bongino v. Daily Beast*,
   477 F. Supp. 3d 1310 (S.D. Fla. 2020) ........................................................... 30

*Bonito Boats v. Thunder Craft Boats*,
   489 U.S. 141 (1989) ........................................................... 24

*Briarpatch Ltd. v. Phoenix Pictures*,
   373 F.3d 296 (2d Cir. 2004) ........................................................... 27

*Brooks v. Dash*,
   454 F. Supp. 3d 331 (S.D.N.Y. 2020), *aff'd* 852 F. App'x. 40 (2d Cir. 2021) ........................................................... 13

*Catala v. Joombas Co.*,
   2019 WL 4803990 (S.D.N.Y. Sept. 23, 2019) ........................................................... 17

*Childress v. Taylor*,
   945 F.2d 500 (2d Cir. 1991) ........................................................... 12

*Cmty. For Creative Non-Violence v. Reid*,
   490 U.S. 730 (1989) ........................................................... 11, 13, 14

*Cohen v. Capital One Funding, LLC*,
   489 F. Supp. 3d 33 (E.D.N.Y. 2020) ........................................................... 23

*Compco v. Day-Brite Lighting*,
   376 U.S. 234 (1964) ........................................................................................................24

*Computer Assocs. Int'l v. Altai, Inc.*,
   982 F.2d 693 (2d Cir. 1992) ...........................................................................................26

*Council on Am. Islamic Rels. v. Ballenger*,
   444 F.3d 659 (D.C. Cir. 2006) .......................................................................................20

*Current Audio v. RCA*,
   71 Misc. 2d 831 (Sup. Ct. N.Y. Cnty. 1972) ..................................................................12

*Estate of Hemingway v. Random House*,
   23 N.Y.2d 341 (1968) .....................................................................................................14

*Fourth Estate Pub. Ben. Corp. v. Wall-Street.com*,
   139 S. Ct. 881 (2019) ......................................................................................................10

*Garcia v. Google*,
   786 F.3d 733 (9th Cir. 2014) (en banc) .........................................................................14

*Gary Friedrich Enter. v. Marvel Enter.*,
   713 F. Supp. 2d 215 (S.D.N.Y. 2009)........................................................................28, 30

*Georgia v. Public.Resource.Org*,
   140 S. Ct. 1498 (2020) ...............................................................................................15, 16

*Gharib v. Wolf*,
   518 F. Supp. 2d 50 (D.D.C. 2007) ..................................................................................30

*Goldstein v. California*,
   412 U.S. 546 (1973) ........................................................................................................24

*Google v. Oracle*,
   141 S. Ct. 1183 (2021) ....................................................................................................23

*Gorran v. Atkins Nutritionals, Inc.*,
   464 F. Supp. 2d 315 (S.D.N.Y. 2006), *aff'd,* 279 F. App'x 40 (2d Cir. 2008) .................30, 31

*Harper & Row v. Nation Enter.*,
   471 U.S. 539 (1985) ........................................................................................................18

*Hello I am Elliot, Inc. v. Sine*,
   2020 WL 3619505 (S.D.N.Y. July 2, 2020) ...................................................................10

*Herbert v. U.S.*,
   36 Fed. Cl. 299 (Ct. Claims 1996) ..................................................................................18

*In re Digital Music Antitrust Litig.*,
   812 F. Supp. 2d 390 (S.D.N.Y. 2011) ............................................................31, 32

*Jackson v. Roberts (in re Jackson)*,
   972 F.3d 25 (2d Cir. 2020) ..........................................................................23, 24, 25

*Kauffman v. Int'l. Bhd. of Teamsters*,
   950 A.2d 44 (D.C. 2008) .......................................................................................30

*Klauber Bros. v. M.J.C.L.K.*,
   2022 WL 5108902 (S.D.N.Y. Oct. 4, 2022) ...........................................................3

*Lombardo v. Dr. Seuss Enters., L.P.*,
   729 F. App'x 131 (2d Cir. 2018) ..........................................................................23

*Millennium Travel & Promotions v. Classic Promotions & Premiums*,
   2008 WL 2275555 (M.D. Fla. June 2, 2008) .......................................................27

*ML Genius Holdings LLC v. Google LLC*,
   2022 WL 710744 (2d Cir. Mar. 10, 2022), *cert. denied,* 143 S. Ct. 2658 (2023) ..................27

*Myers v. Fabrics*,
   101 A.D.2d 777 (1st Dep't 1984), *aff'd in relevant part*, 65 N.Y.2d 75 (1985) ....................29

*Nixon v. Richey*,
   513 F.2d 430 (D.C. Cir. 1975) ..............................................................................21

*Nixon v. Sampson*,
   389 F. Supp. 107 (D.D.C. 1975) ...........................................................................20

*O'Grady v. BlueCrest Capital Mgmt. LLP*,
   111 F. Supp. 3d 494 (S.D.N.Y. 2015) ...................................................................30

*Oyewole v. Ora*,
   776 F. App'x. 42 (2d Cir. 2019) ............................................................................23

*Pac. and South. Co., v. Duncan*,
   792 F.2d 1013 (11th Cir. 1986) .............................................................................12

*Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*,
   602 F.3d 57 (2d Cir. 2010) ....................................................................................17

*Pictometry Int'l Corp. v. Air Am. Flight Ctr., LLC*,
   394 F. Supp. 3d 320 (W.D.N.Y. 2019) ..................................................................30

*Public Affairs Assocs. v. Rickover*,
   268 F. Supp. 444 (D.D.C. 1967) ......................................................................18, 19

*Public Affairs Assocs. v. Rickover*,
  369 U.S. 111 (1962)............................................................................18

*Ricci v. Teamsters Union Local 456*,
  781 F.3d 25 (2d Cir. 2015)................................................................23

*Sears Roebuck & Co v. Stiffel Co.*,
  376 U.S. 225 (1964)............................................................................25

*Sonders v. Roosevelt*,
  64 N.Y.2d 869 (1985) ........................................................................30

*Strauss v. NewMarket Global Consult. Gp.*,
  5 A.3d 1027 (D.C. 2010) ...................................................................28

*Stripteaser. v. Strike Point Tackle*,
  2014 WL 866396 (S.D. Fla. Mar. 5, 2014).......................................27

*Suid v. Newsweek*,
  503 F. Supp. 146 (D.D.C. 1980) .......................................................14

*Swatch Group Mgmt. Serv. v. Bloomberg L.P.*,
  756 F.3d 73 (2d Cir. 2014)...........................................................22, 23

*Taggart v. WMAQ Channel 5 Chicago*,
  2000 WL 1923322 (S.D. Ill. Oct. 30, 2000) .....................................11

*Toretto v. Donnelley Fin. Sols., Inc.*,
  583 F. Supp. 3d 570 (S.D.N.Y. 2022)...............................................30

*Truman v. Brown*,
  434 F. Supp. 3d 100 (S.D.N.Y. 2020)...............................................30

*United States v. Bestfoods*,
  524 U.S. 51 (1998).............................................................................31

*United States v. Navarro*,
  2023 WL 2424625 (D.D.C. Mar. 9, 2023)........................................20

*Universal Instruments Corp. v. Micro Sys. Eng'g, Inc.*,
  924 F.3d 32 (2d Cir. 2019)................................................................27

*Vault Corp. v. Quaid Software*,
  847 F.2d 255 (5th Cir. 1988) ............................................................24

*Walkie Check Prods., LLC v. ViacomCBS Inc.*,
  2022 WL 2306943 (S.D.N.Y. June 27, 2022) ...................................29

*Webber v. Dash*,
   2019 WL 1213008 (S.D.N.Y. Feb.25, 2019) ..................................................29

*Wrench Ltd. Liab. Co. v. Taco Bell Corp.*,
   256 F.3d 446 (6th Cir. 2001) .........................................................................28

**Statutes**

17 U.S.C. §§
   101 ........................................................................................................12, 16
   102, *et seq* ....................................................................................................26
   105, *et seq* ...............................................................................16, 24, 25, 26
   107 ................................................................................................................21
   201(a) ..........................................................................................................11
   301 ....................................................................................................23, 26, 27

28 U.S.C. §§
   1498 ..............................................................................................................18
   2679 *et seq.* ................................................................................................19

44 U.S.C. §§
   2201, *et seq* ................................................................................................20
   2202 ..............................................................................................................20

D.C. Code Ann. § 28-3502 ..............................................................................28, 29

**Other Authorities**

Melville Nimmer & David Nimmer, *1 Nimmer on Copyright* § 1.01[B][1][a] (1997) ................28

Melville Nimmer & David Nimmer, 5 *Nimmer on Copyright* § 19D.03[C][2][b] (1997) ...........27

Fed. R. Evid. 201(b) ..............................................................................................3

H.R. Rep. No. 94-1476 (1976) ..................................................................16, 18, 25

M.C. Amerine, *Wrestling Over Republication Rights:*
   *Who Owns the Copyright of Interview?*, 21 Marq. Intell. Prop. L. Rev. 159 (2017)..........14

U.S. Const. Art. I., § 8, cl. 8 .............................................................................24

## PRELIMINARY STATEMENT

For 250 years, Presidents of the United States have entrusted their words to journalists in order to keep the American people informed about their views.  On May 4, 1789, *The Hartford Courant* published President Washington's inaugural speech to Congress.  During the Civil War, an interview with President Lincoln was published to explain why Black troops should be permitted to fight for the Union.  *An Interview with the President*, N.Y. TIMES (Sept. 8, 1864). With modern technology, audiences now hear their leaders directly via radio, television, online news, and social media.  Presidents from Kennedy to Biden have spoken to the nation through interviews conducted by reporters like Walter Cronkite, Barbara Walters, and Bob Woodward. Far from being passive bystanders in these conversations, journalists frame the agenda, ask tough questions, and contextualize Presidents' responses.  This long tradition of candid reporting depends on an axiomatic principle—reflected in copyright law's prohibition on private ownership of government works—that the words a sitting President speaks about the discharge of his office belong to the People.

No President before Donald Trump has ever claimed to own a copyright in presidential interviews or demanded royalties for their republication.  Yet President Trump has filed a copyright lawsuit against Bob Woodward ("Woodward"), Simon & Schuster ("S&S"), and Paramount Global ("Paramount") (collectively "Defendants") for publishing *The Trump Tapes* (the "Work").  In the final year of the Trump Administration, Woodward, one of this country's most prominent journalists, conducted a series of nineteen interviews with President Trump (the "Interviews").  Woodward was the sole architect and true author of the Interviews—it was he who devised the questions, decided when to press President Trump (or when to let him speak unchallenged), and ultimately preserved the Interviews for posterity by tape recording them.

As Woodward notes in the Work, he relistened to the Interviews after President Trump left office and decided "to put as much of Trump's voice, his own words, out there for the historical record," including the then-President's views on a range of the key political issues. But Woodward did not simply publish the raw Interviews.  Rather, to achieve his historical purpose, Woodward edited the Interviews for clarity, succinctness, and sound quality, and authored original content, including 227 "commentaries" offering critical context, and an Introduction and Epilogue that seek to define President Trump's place in the pantheon of Presidents.  The Work was published as an audiobook and as a substantively identical text edition (subtitled *The Historical Record*).  As Woodward concluded in the Work, "Trump's view of the presidency that comes across over and over again in our interviews" is that "'[e]verything is mine.'…The presidency is mine.  It is *still* mine.  The only view that matters is mine."  *See* Declaration of Elizabeth A. McNamara dated August 23, 2023 ("McNamara Declaration") Ex. A, 414.[1]

As if on a mission to prove this "everything is mine" thesis correct, Donald Trump, "in his individual capacity," asserts that he owns Woodward's entire Work because it features words spoken by "President Trump, 45th President of the United States of America."  And President Trump seeks to profit from public service by demanding nearly $50 million.  But Woodward is the author of both the Interviews and the Work.  Further, the Copyright Act clearly bars government officials like President Trump from asserting any copyright in an interview conducted as part of his official duties.

For these basic reasons, and others, the Amended Complaint (Dkt. 32, "Complaint" or "Compl.") has no legal merit.  Counts I and II (the "Copyright Claims") fail because President

[1] Hereafter citations to the McNamara Declaration will be in the form "Ex. __, __."

Trump failed to obtain a copyright registration prior to filing suit. *See* POINT I. The Copyright Claims also fail on their merits for the reasons stated above. *See* POINT II. Further, as a matter of law, it was a fair use to quote the President in the Work. *See* POINT III. As for Counts III through IX (the "State Law Claims"), the common thread is that Woodward allegedly violated a promise that he would use his recordings exclusively for his book *Rage*, published two years before the Work. But the Interviews themselves make clear that no such promise was made and that Woodward was under no obligation to mothball his Interviews. Further, the State Law Claims are preempted by the Copyright Act and fail to state a cognizable cause of action (*see* POINTS IV-V). Finally, the claims against Paramount fail because no facts are alleged to support a finding that it played an actionable role in the Work's publication. *See* POINT VI.

President Trump's unprecedented effort to extract private benefit from his public duties should be dismissed in its entirety.

## FACTUAL BACKGROUND

### A.   Woodward Interviews President Trump and Publishes *Rage*

For more than 50 years, Woodward has covered Presidents and politics for *The Washington Post*. Woodward—who has shared two Pulitzer Prizes—came to prominence by publishing groundbreaking reporting about President Nixon's role in Watergate with his *Post* colleague, Carl Bernstein, which served as the basis for their 1974 classic *All the President's Men*. Woodward has "written books about 10 presidents from Nixon to Biden" and "interviewed Presidents Carter, Clinton, George W. Bush, and Obama" in the Oval Office. *See* Ex. A, 417.[2]

---

[2] The Work is incorporated by reference and can be properly considered on a Rule 12(b)(6) motion. *Klauber Bros. v. M.J.C.L.K.*, 2022 WL 5108902, at *2 (S.D.N.Y. Oct. 4, 2022) (citing *Di Folco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010)). This Court can take judicial notice of Woodward's bibliography because it is "not subject to reasonable dispute." Fed. R. Evid. 201(b).

In September 2018, Woodward published *Fear: Trump in the White House*, which chronicled the first year of the Trump Presidency through scores of interviews with Administration officials. President Trump declined to be interviewed.  Compl. ¶35.

After Woodward announced he would write a follow-up to *Fear*, President Trump agreed to be interviewed because he "wish[ed] he met with [Woodward] for the last book."  Ex. A, 47. Woodward conducted his first presidential interview with President Trump on December 5, 2019 in the Oval Office.  *Id.* 45.  As Woodward explained:

> Our interviews took place during one of the most consequential years in American history.  Trump was impeached, the COVID-19 pandemic erupted, and the murder of George Floyd sparked the largest racial justice protests in the United States since the civil rights movement.  I pressed Trump on these topics as well as foreign policy.

*Id.* 2.  At the December 5 interview, Woodward emphasized that "policy is what matters" for "the public, for history."  *Id.* 49.  In subsequent Interviews, Woodward repeated 23 times his intention to memorialize President Trump's views on important subjects, in his own words, "for history."  *Id.* 119; *see, e.g., id.* 139 ("But help me, for the history, Mr. President."); *id.* 275 ("But what I want to ask you—for the history …"); *passim.*

Each of the Interviews was "on the record"—anything that President Trump said could be attributed to him freely—and openly tape-recorded by Woodward.  *Id.* 47, 137.  Woodward "tried to do [his] homework" before each interview and "asked questions directly."  *Id.* 417.  As Woodward recognized, "Trump could take you on a freeway to nowhere in an instant," *id.* 85, and Woodward often used his experience as an interviewer to steer the conversation to important matters of policy.  *See, e.g.*, *id.* 49-50, 118.

Between December 5, 2019 and August 14, 2020, Woodward interviewed President Trump nineteen times while he was the sitting President.  The first three Interviews were in person (two in the Oval Office, the third at Mar-a-Lago), and Woodward's tape recorder was

visible throughout.  *Id.* 45, 47, 86, 136-137.  The remaining Interviews took place over the telephone, especially during COVID lockdowns.  *See* Ex. A 175-294, 311-419.  President Trump was apparently located in the White House for all of the calls, except one call he received on Air Force One.  *Id.* 212-22.  Woodward frequently reminded President Trump that the calls were being recorded noting, for example, that he was "turning [his] recorder on for our history."  *Id.* 376; *see also id.* 361 ("BW:  I've got—as I always do, I have my tape recorder on.  TRUMP: That's okay.  I don't mind.").  At no point did President Trump object to being recorded, claim to own the Interviews, or state that Woodward was prohibited from using them after publishing his next book.

Government officials in the Trump Administration attended the Interviews and provided commentary.  The December 5 interview included "Senator Lindsey Graham, Senior Political Counselor Kellyanne Conway, and two of Trump's aides, Deputy Press Secretary Hogan Gidley and Chief of Staff Mick Mulvaney," with Vice President Pence joining towards the end.  *Id.* 45, 78.  Gidley also joined the December 30, 2019 interview at Mar-a-Lago, interjecting comments.  *Id.* 136; Compl. ¶50.  Senior Advisor Jared Kushner and Deputy Chief of Staff for Communications Dan Scavino joined other Interviews.  Ex. A, 86, 112, 169, 173, 221.

During the Interviews, President Trump made over a dozen statements admitting that he had no control over how or when Woodward would use the Interviews.  Towards the end of the first interview, while seated with Woodward and Administration officials in the Oval Office, President Trump recognized Woodward would write what he wanted:

> AIDE: We've got about five minutes, gentlemen…
> TRUMP: Okay, well—I love this guy.
> CONWAY: He'll come back.  Soon.
> TRUMP: Even though he writes shit about me.  That's okay.

Ex. A, 76.  Then, in the middle of the April 13, 2020 telephone interview, President Trump abruptly segued from Woodward's questions about COVID to ask (again) when he planned to publish his book:

> TRUMP: All right.  What's your time, what's your timing?
>
> BW: My timing is I want to come out in September or October [2020]–
>
> TRUMP: Now think of it: if it's a bad book, you're right in front of my election. That's a beauty.

*Id*. 289.  During the June 22, 2020 interview, both President Trump and First Lady Melania Trump made statements demonstrating a lack of control over the Work's content and release date:

> TRUMP: And you know this man is one of the great legends of all time?  He's doing a book on me. It'll probably be atrocious, but that's okay.
>
> MELANIA: When [is] it coming out?
>
> BW: It's coming out in September [2020].
>
> MELANIA: Okay.

*Id*. 359.  In the same vein, President Trump at one point observed that President Bush came "out terribly" from his interviews with Woodward.  *Id.* 285.  When Woodward responded that President Bush "had his say [and] didn't object," President Trump sighed:  "Ugh.  And in the end you'll probably write a lousy book."  *Id.*  He even acknowledged that he could not tell Woodward what to write and could only "hope" that he "write[s his] answer[s]" fairly.  *Id.* 55; *see also id.* 323-24 ("TRUMP:  You're probably going to screw me."); *id*. 377 ("TRUMP: All I ask for is fairness.  And, you know, I'm sure I won't get it, but that's okay.").

The *only* restriction placed on the Interviews was Woodward's acknowledgement that they would not be used in contemporaneous news articles.  Accordingly, Woodward told President Trump, repeatedly, that "this [interview] is for next year, for the book."  Ex. A 84, 237, 289-90.  This was the understanding expressly stated in the third interview.  There, Woodward

repeated that the Interviews were for "the book to come out before the election."  *Id.* 237, 289-90.  President Trump agreed that they were "[f]or the book only" and Deputy Press Secretary Gidley clarified that this meant "[n]o stories coming out, no nothing" prior to the book's proposed publication in the fall of 2020.  *Id.* 137; Compl. ¶50.

These Interviews became the core of *Rage*, Woodward's follow-up book to *Fear* published by S&S on September 15, 2020.[3]  Compl. ¶36.  President Trump continued to speak to Woodward after *Rage* was substantially complete—three Interviews occurred after Woodward had submitted initial manuscripts and a fourth after "the book was done."  Ex. A, 338, 376, 389, 408.  Approximately "20 percent of" *Rage* derived from the Trump Interviews, *id.* 411, and Woodward published 38 audio clips from the Interviews when *Rage* was published via news organizations, including *The Washington Post*, which played them on air and online.  *See* Compl. ¶40.[4]  The Complaint asserts no claim based on Woodward's prior release of Interview recordings in conjunction with the publication of *Rage*.

### B.   Woodward Creates the Work Using His Raw Interviews and Extensive Supplemental Material

Woodward relistened to the Interviews in early 2022 and "decided to take the unusual step of releasing these recordings" because, as he says 23 times in the Work, the Interviews are a "historical record" of a critical year for our Nation.  Ex. A, 1-2.

"[F]or the most part the interviews [in the audiobook] proceed uninterrupted, fulfilling Woodward's goal of presenting Trump's voice and words for the historical record, and offering

---

[3] Despite claims that *Rage* was a "total failure," *see* Compl. ¶39, it debuted at No. 1 on *The New York Times* non-fiction best-seller list.  *See* Best Sellers – Books, *The New York Times* (Oct. 4, 2020), https://www.nytimes.com/ books/best-sellers/2020/10/04/.

[4]   *See* R. Costa & P. Rucker, *Woodward Book*, WAPO (Sept. 9, 2020), https://www.washingtonpost.com/politics/bob-woodward-rage-book-trump/2020/09/09/0368fe3c-efd2-11ea-b4bc-3a2098fc73d4_story.html.

listeners the chance to hear and judge and make their own assessments." *Id.* 2. Woodward also interspersed the Interviews with copious original content. The Work contains an Introduction and Epilogue, which place the Interviews—and the Trump Administration—into a broader historical and political context. For instance, the Epilogue sums up President Trump with the credo, "Everything is mine." *Id.* 419. Woodward drew this conclusion from an interview where President Trump took credit for a speech that his aides wrote because "[t]he ideas are mine … Everything is mine." *Id.* 331, 414.

The Work also includes "227 new commentaries" written by Woodward and interwoven into the Interviews in order "to provide essential context or clarification." *Id.* vii, 2. Each interview opens with Woodward setting the scene—for example, the first interview started "[a] few hours after Pelosi's press conference [announcing President Trump's first impeachment]." *Id.* 45. The Work also provides factual background. *See, e.g.*, *id.* 181.

The commentaries frequently "break frame from the interviews," *id.* 2, to point out when President Trump said something inaccurate or misleading. For example, President Trump claimed that he "banned people coming in from China [at the outset of the pandemic]. Fauci was against it. So was everyone else…." *Id.* 287. Immediately after this statement, Woodward's commentary states: "Again, this is not true at all…" *Id.*; *see also id.* 113-14, 356 (clarifying that "[t]he Mueller report cited ten instances of possible obstruction of justice"). Elsewhere, Woodward contrasts President Trump's words with his previous statements or statements from other government officials. *See, e.g.*, *id.* 260; 405-07.

Woodward devotes an entire chapter of the Work to "one of the most important interviews for…*Rage*," which "wasn't with Trump" but "with National Security Adviser Robert O'Brien and Deputy National Security Advisor Matthew Pottinger." *Id.* 295. Those interviews

revealed that O'Brien and Pottinger gave a "stark, dramatic warning" early in the pandemic about the dangers of the coronavirus.  Woodward documents how President Trump largely ignored these warnings—at great cost to human life—by reviewing inculpatory statements President Trump made in the Interviews and elsewhere.  *Id.* 295-310.

On a technical level, Woodward oversaw the editing of raw interview tapes to remove "excessive repetition, irrelevant material, background noise and unintelligible audio."  *Id.* 2; Compl. ¶¶40, 59.  S&S engaged an audio producer to record Woodward's commentaries and splice them into the interview tapes and ensure "sound production quality."  *Id.* vii, 137. President Trump does not claim to have contributed to the audio-editing process, or any of the other work Woodward performed to transform the Interviews into the Work.

S&S published the Work as an audiobook on October 25, 2022.  Compl. ¶40.  A few months later, S&S published print editions, which transcribe the audiobook content.  *Id.* ¶46.

### C.    The Complaint

The Complaint alleges that Woodward's publication of the Interviews and Work infringed President Trump's exclusive "copyright interests."  Compl. ¶¶65-72.  It demands "a declaratory judgment that [President Trump] owns [the Work and the Interviews] in full and therefore is entitled to" recover "at least $49,980,000, exclusive of punitive damages."  *Id.* ¶72(d).  In the alternative, President Trump requests a judgment that he "owns the copyright in his responses" to Woodward's Interview questions and is "therefore entitled to…pro rata revenues...."  *Id.* ¶71.  The Complaint also includes State Law Claims seeking millions of dollars in damages.  *Id.* ¶¶81-136.

## ARGUMENT

For the reasons set forth below, the Complaint should be dismissed for failure to state a valid cause of action.

## I.     THE COPYRIGHT CLAIMS FAIL BECAUSE PRESIDENT TRUMP LACKS A COPYRIGHT REGISTRATION

President Trump's Copyright Claims (Counts I-II) fail because he does not allege that he obtained the required copyright registration prior to instituting suit.  Plaintiffs "must comply with [17 U.S.C.] §411(a)'s requirement that 'registration … has been made'" before filing suit. *Fourth Estate Pub. Ben. Corp. v. Wall-Street.com,* 139 S. Ct. 881, 887 (2019). "[A]lthough an owner's rights exist apart from registration,…registration is akin to an administrative exhaustion requirement that the owner must satisfy before suing to enforce ownership rights." *Id.*  A plaintiff must "receive the Copyright Office's decision on [an] application before instituting suit." *Id. at* 891.

Whether President Trump frames his Copyright Claims as an infringement action or as "Declaratory Relief Regarding Ownership of Copyrights" and "Accounting" under "the Copyright Laws of the United States," Compl. ¶¶65-80, he must still obtain a registration.  Just as with infringement claims, a registration is required before a declaratory-judgment plaintiff may sue to establish copyright ownership or recoup damages.  *Hello I am Elliot, Inc. v. Sine*, 2020 WL 3619505, at *11 (S.D.N.Y. July 2, 2020) (dismissing declaratory judgment claim based on claims arising out of the Copyright Act because "Plaintiffs have not registered their copyright").

## II.    PRESIDENT TRUMP DOES NOT OWN A COPYRIGHT IN WOODWARD'S INTERVIEWS OR WORK

The Copyright Claims fail because (A) Woodward is the "dominant" author of the Interviews—and the Work—and thus their copyright owner, and (B) President Trump's contributions, taken alone, are government works that reside in the public domain.

10

### A.  Woodward Is the Copyright Owner, Not President Trump

Woodward authored the Interviews and Work and President Trump has no copyright interest in those materials.[5]  President Trump disclaims joint authorship (Compl. ¶¶47, 53), and asserts instead that he "owns [the Work and Interviews] in full" or, alternatively, "owns the copyright in his [interview] responses" (as opposed to Woodward's questions).  *Id*. ¶¶70-71.  Both propositions fail.

Copyright ownership "vests initially in the author or authors of the work."  17 U.S.C. §201(a).  The "general rule" recognized by the Supreme Court dictates that "the author is the party who *actually creates the work*, that is, the person who *translates an idea* into a *fixed, tangible expression* entitled to copyright protection."  *Cmty. For Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (1989) (emphasis added) (citing 17 U.S.C. §102).  In cases where "multiple individuals lay claim to [sole ownership of] the copyright in a single work, the dispositive inquiry is which of the putative authors is the 'dominant author.'"  *16 Casa Duse v. Merkin*, 791 F.3d 247, 260 (2d Cir. 2015) (quoting *Childress v. Taylor*, 945 F.2d 500, 508 (2d Cir. 1991)).  To determine the "dominant author" courts consider "decision making authority, billing [*i.e.*, who is credited as the author on the work], and written agreements with third parties."  *16 Casa Duse*, 791 F.3d at 260.

Defendants are not aware of any decisions applying this framework to determine the dominant author of an interview.  Only a few courts have had the opportunity to apply general principles to decide who owns interviews—perhaps because it is so obvious that ownership vests in the journalist, particularly when interviewing government officials—but several courts have held journalists own their interviews outright.  *See, e.g.*, *Taggart v. WMAQ Channel 5 Chicago*,

---

[5] S&S owns a copyright in the Work's sound recording by agreement with Woodward and because of its role in creating the audio edition.

2000 WL 1923322, at *3-5 (S.D. Ill. Oct. 30, 2000) (journalist owned jailhouse interview because, *inter alia*, prisoner had not fixed his oral expression in any tangible medium of expression); *Current Audio v. RCA*, 71 Misc. 2d 831, 834-35 (Sup. Ct. N.Y. Cnty. 1972) (holding Elvis Presley had no "property right" in press conference responses "which supersedes the right of its free dissemination").  One circuit court has indicated that news organizations most likely hold the copyright in interviews with government officials because they "make [the] audio, filming and editing choices in the presentation of [the] material."  *Pac. and South. Co., v. Duncan*, 792 F.2d 1013, 1014 n.1 (11th Cir. 1986).  The thrust of these decisions is that the reporter should own the copyright in interviews outright to ensure the "free dissemination of thoughts [and] ideas [on] newsworthy events and matters of public interest."  *Current Audio*, 71 Misc. 2d at 834-35.

The same general principles and application of Second Circuit precedent require the Court to hold, based on the allegations of the Complaint and incorporated Work alone, that Woodward is the dominant author of the Interviews and hence their copyright owner.  Often, contests over authorship raise questions of fact—particularly when there is a dispute over whether the litigants are "joint authors"—which turns on the inherently subjective question of "whether the putative co-authors ever shared an intent to be co-authors…."[6] *See Childress*, 945 F.2d at 508 ("[I]t is only where the dominant author intends to be sharing authorship that joint authorship will result.").  But the issue of joint authorship is not presented here because the Complaint conclusively disavows joint authorship by stating "President Trump never sought to create a work of joint authorship, and in the hours of the Interviews, there is neither allusion to nor confirmation of such."  Compl. ¶53.

---

[6] A "joint work" is "prepared by two or more authors with the intention that their contributions be merged into inseparable…parts of a unitary whole."  17 U.S.C. §101.

"When the Second Circuit finds that there is no mutual intent to be co-authors, it holds that whoever was the 'dominant author' is the sole author." *Brooks v. Dash*, 454 F. Supp. 3d 331, 338 (S.D.N.Y. 2020), *aff'd* 852 F. App'x. 40 (2d Cir. 2021) (citations omitted).   Unlike other cases involving songwriters or moviemakers that raise factual questions over who masterminded a joint project, Woodward's dominant role as author and President Trump's auxiliary role as source is apparent from the Complaint and Work.   On the first factor, Woodward had sole "decision making authority" because he initiated the project (*see* Compl. ¶36), "actually creat[ed]" the Interviews by crafting and taping them (*Reid*, 490 U.S. at 737), and masterminded the Interviews by deciding what topics to cover, what questions to ask, when to press President Trump, or when to let him keep talking, all while steering President Trump back to matters of policy whenever he strayed.   *See, e.g.*, Ex. A, 118; *supra*, 4-7.   President Trump, by contrast, cannot possibly show "decision making authority" because he made multiple on-the-record admissions during the Interviews that he had no control over what Woodward would write.   *See, e.g.*, Ex. A, 323-24; *supra* 5-6.   *Next*, the "billing" factor favors Woodward because the front cover and copyright page of the Work list him as the sole author.   Ex. A.[7]   *Finally*, as to "written agreements," the Complaint makes clear that the publishing agreements regarding the Interviews were between S&S and Woodward, and President Trump was not a party.   Compl. ¶¶25-43. Since Woodward "executed *all* of the relevant third-party agreements," all three factors favor

---

[7] The Complaint identifies a third-party vendor's webpage that inaccurately states that the audio version of the Work is "by Bob Woodward, Donald J. Trump."   Compl. ¶45.   Even assuming that is the case, the *very* most that President Trump could possibly establish is that the billing factor is "essentially neutral."   But this weak evidence does not preclude a finding that Woodward is the dominant author based on the strength of his showing on the other factors.   *16 Casa Duse*, 791 F.3d 247 at 260-61 (movie producer is "dominant author" of a film even though he intended to share credit with director).

Woodward and he must be deemed the "dominant author" of the Interviews.  *16 Casa Duse*, 791

F.3d at 261.

Woodward's sole authorship of the Interviews is buttressed by decisions involving other

types of works requiring creative input from multiple contributors, like movies.  In those cases,

the Second Circuit observed, a single copyright vests in the dominant author(s) of the work but

"non-freestanding contributions [to that work] are not ordinarily themselves works of

authorship."  *Id.* at 258-59.  Actors and directors, who contribute more than raw source material

but are not the dominant author, do not obtain a copyright interest in these projects.  *See Garcia*

*v. Google,* 786 F.3d 733, 743-44 (9th Cir. 2014) (en banc) (holding that actress had no

copyrightable interest in her performance in a film).  *See also 16 Casa Duse*, 791 F.3d at 259

("[A] director's contribution to an integrated 'work of authorship' such as a film is not *itself* a

'work of authorship' subject to its own copyright protection.").  The concept of vesting sole

copyright ownership to the dominant author, and not according any copyright interest to

contributors, should apply equally to journalists' interviews.  *See* M.C. Amerine, *Wrestling Over*

*Republication Rights:  Who Owns the Copyright of Interview?*, 21 MARQ. INTELL. PROP. L. REV.

159 at 181-84 (2017) (arguing that copyright rests with journalists who "mastermind," "shape,"

and "control" interviews by "performing … initial research, devising a theme, tailoring

questions, [and] developing a rapport").[8]  Here, the Complaint alleges that President Trump's

role in the Interviews was to provide raw material for Woodward's book.  *See* Compl. ¶¶36-37.

---

[8] The decisions reaching a contrary result are generally based on outdated rationales or defunct
doctrines.  Several were decided under common law copyright principles superseded by Section
102 of the 1976 Copyright Act.  *See, e.g., Estate of Hemingway v. Random House*, 23 N.Y.2d
341 (1968).  Others were decided before *16 Casa Duse or Reid*, 490 U.S. at 737, and relied on
now-improper understandings of Section 102's definition of authorship.  Some arose in different
factual settings involving private citizens, not government officials, and contain limited
reasoning.  *See, e.g., Suid v. Newsweek*, 503 F. Supp. 146 (D.D.C. 1980).

Since Woodward initiated the Interviews (Compl. ¶36), and the President was acting exclusively as a source for Woodward's newsgathering, rather than contributing a separate and independent work of authorship, President Trump's contributions to the Interviews do not give rise to authorship or copyright ownership.

Even more untenable than President Trump's assertion that he authored the Interviews (or at least his responses) is his claim to own Woodward's Work "in full."  Compl. ¶70.  This argument ignores Woodward's editorial role and authorship of *all* the original content that transformed the raw Interviews into a coherent "historical record," including the original Introduction, Epilogue, and "227 commentaries."  Woodward also incorporated the interviews of executive branch officials other than President Trump, including a whole chapter devoted to two Administration officials, and edited the Interviews for clarity, succinctness, and sound quality. *See* Ex. A, 295-310.  Because Woodward is the true and dominant author of his Work derived from his on-the-record Interviews of a sitting president, copyright law and public policy dictate that Woodward is the author and original copyright owner—not President Trump. *See 16 Casa Duse*, 791 F.3d at 256-59.

Finally, President Trump's reliance on the Copyright Office's Compendium of Practices to establish copyright ownership of his interview responses is misguided.  The Compendium includes a default administrative rule, without any case citations, permitting interviewers and interviewees to register separate copyrights in their respective questions and responses.  *See* Compl. n.1.  But "the Compendium is a non-binding administrative manual," and courts are required to "follow it only to the extent it has the power to persuade."  *Georgia v. Public.Resource.Org*, 140 S. Ct. 1498, 1510 (2020) (rejecting unpersuasive Compendium guidance in light of contrary precedent).  *See also 16 Casa Duse*, 791 F.3d at 258 ("We need not

defer to the Copyright Office's interpretation as a general matter."). Here, the Copyright Office's suggestion that this Court should splinter Woodward's interviews of a sitting President into a "Swiss cheese of copyrights" is unpersuasive and contravenes Second Circuit precedent. *Id*. at 258. For "collaborative" works like the Interviews, copyright does not "subsist[] separately in each of [the participant's] contributions" because the "copyright in the [work] itself…could be undermined by any number of individual claims." *Id*.; *see also id*. at 259 ("We doubt that Congress intended for contributors who are not joint authors to have greater rights enabling them to hamstring authors' use of copyrighted works."). This authority leads to an inescapable conclusion—Woodward is the sole author of the Interviews and Work and Trump's answers to Woodward's questions do not qualify as a separate and independent work of authorship accorded stand-alone copyright protection.

### B. President Trump Cannot Own His Interview Responses Because They Are Government Works under Copyright Law

The Copyright Act's prohibition on private ownership of Government Works is a further bar to President Trump's Copyright claim because President Trump's contributions to the Interviews fall squarely within that statutory exception. Dismissal is warranted for this independent reason.

The Copyright Act states that "copyright protection…is not available for any work of the United States Government," which is defined as any "work prepared by [1] an officer or employee of the United States Government [2] as part of that person's official duties" ("Government Works" or "Government Works doctrine"). 17 U.S.C. §§101, 105. "The basic premise of [S]ection 105…[is] that works produced for the U.S. Government by its officers and employees should not be subject to copyright" and fall "in the public domain." H.R. Rep. No. 94-1476 at 58 (1976); *see also Public.Resource.Org*, 140 S. Ct. at 1509-10 (discussing the

Government Works doctrine).   In other words, the work product of government representatives—including the President—is common property that exists to benefit the public, not an opportunity for exclusive, private gain.  President Trump's claims run head-on into this doctrine.

In an effort to circumvent the Government Works doctrine, the Complaint alleges that the "Interviews were not conducted or performed in the scope of government employment."  Compl. ¶38.[9]  But "allegations that 'are no more than conclusions are not entitled to the assumption of the truth.'"  *Catala v. Joombas Co.*, 2019 WL 4803990, at *6 (S.D.N.Y. Sept. 23, 2019) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).   "While legal conclusions 'can provide the framework of a complaint, they must be supported by factual allegations'" and the Complaint's "naked assertion" that President Trump was not acting in a government capacity is "devoid of 'further factual enhancement,' offers a 'formulaic recitation' of [an element of his] cause of action" and fails to give fair notice of the grounds upon which his claim rests.  *Id.* (quoting *Iqbal*, 556 U.S. at 678-79).   On a Rule 12(b)(6) motion, courts   "may consider…documents incorporated by reference in the complaint."  *Id.* at *7.  And, in "copyright infringement actions, the works themselves supersede and control contrary descriptions of them…including any contrary allegations, conclusions or descriptions of the works contained in the pleadings."  *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 64 (2d Cir. 2010) (citations omitted) (granting motion to dismiss copyright action).

There are no well-pleaded factual allegations in the Complaint to support the threadbare conclusion that President Trump was acting outside the scope of his official duties when

---

[9] The Complaint does not (and cannot) dispute that President Trump was an "employee of the United States Government" for the purposes of satisfying the first prong of the Government Works test.

participating in the Interviews—nor could there be since the Complaint and the Work conclusively demonstrate that all the indicia of a Government Work are present.  The relevant inquiry looks at the "nature and scope of [the government official's] duties," including "the use by him of government facilities and government personnel" in connection with the work at issue.  *Public Affairs Assocs. v. Rickover*, 369 U.S. 111, 113 (1962).  "In this context the duties of a high Government official should not be narrowly interpreted" and do not turn on a formal job description.  *Public Affairs Assocs. v. Rickover*, 268 F. Supp. 444, 448-49 (D.D.C. 1967).  Other key factors in a Government Works analysis include: the subject matter of the contested work, whether the government employee prepared the work on his private time, and whether the work (such as a speech) was delivered after working hours or at gatherings of a private organization.  *Id.* at 449-50.[10]  *See also Herbert v. U.S.*, 36 Fed. Cl. 299, 305-06 (Ct. Claims 1996) (holding under similar provisions of 28 U.S.C. §1498 that a work is prepared as part of the official functions of a government employee where it falls within his general job area, "even where he was not specifically required to perform the work at issue").[11]

Here, all of the Interviews occurred when President Trump was in office and related to his conduct as President.  Compl. ¶37.  The first three Interviews took place in the Oval Office, the epicenter of executive authority, and Mar-a-Lago, the "Winter White House."  Dkt. 37-2 (summary of Interview locations and attendance).  The remaining phone Interviews occurred while President Trump was on federal property, during which President Trump often made clear that he was "on duty."  *See, e.g.,* Ex. A, 256 ("TRUMP: A little pressed [for time]. I've got about

[10] Although the *Rickover* cases were decided under the 1909 Copyright Act, the legislative history of the current 1976 Copyright Act makes clear that "the basic premise of [S]ection 105" of the 1976 Copyright Act is "the same as that of [the 1909 Act]."  H.R. Rep. No. 94-1476 at 58.

[11] For obvious reasons, memoirs written *after* a President leaves office are not written in the course of his duties and thus are outside the scope of Section 105.  *Harper & Row v. Nation Enter.*, 471 U.S. 539, 557 n.6 (1985).

18

12 generals downstairs waiting for me."). The subject matter of the Interviews focused on the weightiest issues facing the Trump Administration and the American public—such as President Trump's impeachment, his handling of COVID-19, and foreign relations with North Korea and China. *See, e.g., id.*, 50-51, 132-34, 137-42, 259-272. President Trump also provided Woodward with special access to government documents, such as his official correspondence with Kim Jong Un. Ex. A, 423-54. Further, executive branch staffers monitored and participated in the Interviews—including the Deputy Chief of Staff for Communications and Deputy Press Secretary, whose jobs are focused on the Administration's public messaging. *See, e.g.*, Compl. ¶50; Ex. A, 45, 169-73. President Trump repeatedly told Woodward to follow up on certain subjects with other administration officials, like National Security Advisors O'Brien and Pottinger—who Woodward also interviewed. *See, e.g.*, Ex. A, 121, 176, 191, 295-310. These undisputed facts conclusively demonstrate that President Trump was conducting official business when he was interviewed by Woodward.

The Court need not take Defendants' word for it. President Trump himself has stated in court filings that the "President, who must 'be always in function,'…is authorized, indeed required, to carry out his or her duties no matter where he is or when." Ex. C, 11. He further stated that "more than any other public official, the President is expected to respond to questions from the media that affect his ability to maintain the trust of the American people and effectively carry out his official duties…. [S]peaking to the press and communicating with the public is clearly conduct 'of the kind [a President] is employed to perform.'" Ex. D, 8, 19.[12] Thus,

---

[12] President Trump made these statements while arguing that he was entitled to immunity from a defamation lawsuit under the *respondeat superior* principles of the Westfall Act (28 U.S.C. §2679 *et seq.*). *See Trump v. Carroll*, 292 A.3d 220 (D.C. Apr. 13, 2023). While "[t]he definition of 'official duties' contained in that line of cases ruling on the question of executive immunity from suit is not controlling [in Government Works cases]" (*Public Affairs Assocs.*, 268

President Trump's own description of his former position confirms that the Interviews were "part of [his] official duties."  Nowhere in the Complaint does President Trump make a single factual allegation that would call this common-sense conclusion into question.

The principle that Presidents cannot own and profit from materials created in the course of their official duties is underscored by the Presidential Records Act of 1978 ("PRA"), 44 U.S.C. §§2201-2209, which provides that, "[t]he United States shall reserve and retain complete ownership, possession and control of Presidential records."  *Id.* § 2202.[13]  While copyright is a distinct legal concept from the ownership of physical materials, it is illustrative that Congress enacted the PRA in response to President Nixon's claim (ultimately upheld) of private ownership over his presidential papers.  President Nixon was the last President to enjoy this privilege because "[t]he passage of the PRA in 1978 changed the ownership of Presidential records, converting them from being the personal property of the President into the personal property of the United States."  *United States v. Navarro*, 2023 WL 2424625, at *11 (D.D.C. Mar. 9, 2023). Moreover, even pre-PRA decisions recognized that presidents should not profit from their government service.  As one court underscored, "it was the intent of the framers of the Constitution to prevent the Office of the President from being a position of both power and profit" and a president's "claim of ownership" of government materials is "repugnant to the very

---

F. Supp. at 448 n.2), President Trump's admissions remain highly relevant here and give rise to his appeal of the decision denying him immunity in *Carroll*.  *See Carroll v. Trump*, 23-1045, 23-1046 (2d Cir.).  Further, while Westfall Act cases are not binding, several decisions hold unequivocally that an officeholder's statements "in response to a reporter's inquiries" fall "within the scope of employment."  *See, e.g.*, *Council on Am. Islamic Rels. v. Ballenger*, 444 F.3d 659, 664-65 (D.C. Cir. 2006).

[13]  The PRA broadly defines "Presidential records" to include "any documentary materials…created or received by the President [or his staff]…in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory or other official or ceremonial duties of the President."  44 U.S.C. §§ 2201(2), 2202.  "Personal records" are defined very narrowly, such as "purely private" diaries not utilized for Government business.  *Id.* § 2201(3).

nature of the Office of the President." *Nixon v. Sampson*, 389 F. Supp. 107, 133-137 (D.D.C. 1975), *stayed by Nixon v. Richey*, 513 F.2d 430 (D.C. Cir. 1975).

Finally, the Copyright Office Compendium does not affect the application of the Government Works doctrine.  The Compendium addresses interviews generally and cannot overrule Section 105's statutory prohibition on private ownership of Government Works. Moreover, any result granting President Trump a copyright in his Interview responses would not only clash with the Government Works doctrine, it would undermine the free press.  A copyright owner controls the dissemination of content and giving interview subjects automatic copyright protection over what they say to journalists would grant government officials the ability to withhold or censor public information as a precondition for access.  Any decision granting President Trump private ownership of his statements to the press as President would also contradict the long tradition leaving a President's words open to public scrutiny.

### III.    THE PUBLICATION OF THE WORK WAS FAIR USE

Even assuming President Trump owns a copyright in the Interviews, the Copyright Claims should be dismissed because Woodward's incorporation of that material into the Work is a fair use.  The Copyright Act provides that "the fair use of a copyrighted work" for "purposes such as criticism, comment [or] news reporting…is not an infringement of copyright."  17 U.S.C. § 107.

Woodward's use of the Interviews is classic news reporting, using President Trump's actual words and tone as the foundation for the Work's extensive comments.  In a leading decision, the Second Circuit held that *Bloomberg*'s unauthorized publication of an entire recorded earnings telephone call led by Swatch executives was fair use based on the rationale that, "in news reporting," the "need to convey information to the public accurately may in some instances make it desirable and consonant with copyright law for a defendant to faithfully

reproduce an original work without alteration." *Swatch Group Mgmt. Serv. v. Bloomberg L.P.*, 756 F.3d 73, 84 (2d Cir. 2014). "[A] speaker's demeanor, tone and cadence can often elucidate his or her true beliefs far beyond what a stale transcript or summary can show." *Id.*

If there were ever a case that called out for summary application of the *Swatch* principle, this is it. Woodward's use of the Interviews in the Work is a paradigmatic example of the "need to convey information to the public accurately." *Id*. As the Work states, Woodward "publish[ed] long excerpts" from the Interviews because he "wanted to put as much of [President] Trump's voice, his own words, out there for the historical record and so people could hear and judge and make their own assessment." Ex. A, 2. *See also* Ex. B, CD Back Cover ("[L]isteners will hear Trump as Woodward did: profane, incautious, divisive, and deceptive, but also engaging and entertaining…").

Section 107's four fair use factors strongly favor dismissal. The first factor looks to the purpose and character of the use. Adding extensive supplemental materials, the Work uses the Interviews for the transformative and presumptively fair purpose of "commenting" upon and "criticizing" statements Trump made during the Interviews and his Administration more broadly. *Andy Warhol Found. for Visual Arts v. Goldsmith*, 143 S.Ct. 1258, 1274 (2023) ("criticism" and "news reporting" are "the sorts of copying that courts and Congress most commonly have found to be fair uses").

As for the second factor—the nature of the original work—a President's off-the-cuff, oral responses to an interviewer's questions have a "manifestly factual character" that deserves "thin" copyright protection at best. *Swatch*, 756 F.3d at 89.

On the third factor—amount and substantiality of the use—the amount was commensurate with the Work's purpose to capture the "historical record" and allow the audience

to experience President Trump in his own words.  *Id.* at 90 ("[C]opying the entirety of a work is sometimes necessary for a fair use").

The fourth factor examines the effect on the potential market for the original and weighs strongly in favor of fair use.  There is no traditional market or likely-to-be-developed market for Presidents to exploit press interviews conducted during their presidency.  *Am. Geophysical Union v. Texaco*, 60 F.3d 913, 930 (2d Cir. 1994).  It would be perverse to recognize such a market, and contrary to public policy to enable public officials to profit from speaking to the press while in office.  *See Google v. Oracle*, 141 S. Ct. 1183, 1206 (2021) (assessing "public benefits" as part of fourth factor analysis).

Just as in *Swatch*, which was decided without discovery and on the pleadings, fair use is evident from the face of the Complaint and immediate dismissal is appropriate.  *Swatch*, 756 F.3d at 86-87; *see also Oyewole v. Ora*, 776 F. App'x. 42, 44 (2d Cir. 2019) (affirming 12(b)(6) dismissal on fair use grounds); *Lombardo v. Dr. Seuss Enters., L.P.*, 729 F. App'x 131, 133 (2d Cir. 2018) (same).

## IV.   THE STATE LAW CLAIMS ARE PREEMPTED BY THE COPYRIGHT ACT

The State Law Claims (Counts III-IX) should be dismissed because they are preempted by the Copyright Act under the doctrines of (A) "conflict preemption" and (B) "explicit preemption" under 17 U.S.C. §301.  These two doctrines are independently applicable, and either one provides a basis for dismissal.  *Jackson v. Roberts (in re Jackson)*, 972 F.3d 25, 33 (2d Cir. 2020).  Courts can dismiss preempted claims at the pleading stage "if the statute's barrier to suit is evident from the face of the Complaint."  *Ricci v. Teamsters Union Local 456*, 781 F.3d 25, 28 (2d Cir. 2015); *see also Cohen v. Capital One Funding, LLC*, 489 F. Supp.3d 33, 50 (E.D.N.Y. 2020) (granting motion to dismiss preempted state law claims).

### A.     The State Law Claims Are Barred by Conflict Preemption

Conflict preemption bars the State Law Claims because each one requires this Court to violate the Copyright Act's clear directive that "[c]opyright protection…is not available for any work of the United States Government."  17 U.S.C. § 105(a) ("Section 105").

Conflict preemption arises when state law "actually conflicts with federal law" and "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Jackson*, 972 F.3d at 34, n.4. "[W]hen an article is unprotected by a patent or a copyright, state law may not forbid others to copy that article."  *Compco v. Day-Brite Lighting*, 376 U.S. 234, 237 (1964).  To do so "would interfere with the federal policy, found in Art. I., § 8, cl. 8 of the Constitution and in the implementing federal statutes, of allowing free access to copy whatever the federal patent and copyright laws leave in the public domain."  *Id.*; *see also Goldstein v. California*, 412 U.S. 546, 559 (1973) ("[w]here the need for free and unrestricted distribution of a writing is thought to be required by the national interest,…a State [cannot] protect that which Congress intended to be free from restraint…"); *Bonito Boats v. Thunder Craft Boats*, 489 U.S. 141, 167 (1989) (preempting Florida law that "restrict[ed] the public's ability to exploit ideas that the patent system mandates shall be free for all to use"); *Vault Corp. v. Quaid Software*,  847 F.2d 255, 270 (5th Cir. 1988) (conflict preemption bars breach of contract claims that conflict with the Copyright Act).

The Complaint establishes that President Trump's particular State Law Claims do not "seek to vindicate any substantial state interests distinct from those furthered by the copyright law" because the "predominant focus" of each Claim is Woodward's alleged "unauthorized use of a copyrighted [Work] that [President Trump] has no legal right to control" given the Government Works doctrine. *Jackson*, 972 F.3d at 39.  In other words, the State Law Claims are

"little more than a thinly disguised effort to exert control over" the Interviews and Work and thus fall within the ambit of conflict preemption. *Id.*

Likewise, the State Law Claims conflict with the Copyright Act because they attempt to thwart Congressional will by permitting President Trump to "block off from the public something which federal law said belongs to the public." *Sears Roebuck & Co v. Stiffel Co.*, 376 U.S. 225, 231-32 (1964). A state claim is preempted when it "would 'interfere with the federal policy of allowing free access to copy whatever the federal copyright laws leave in the public domain. . . .'" *Jackson*, 972 F.3d at 40 (quoting *Compco*, 376 U.S. at 237). The express purpose of Section 105 is to ensure that "the individual Government official or employee who prepared the work could not secure copyright in it or restrain its dissemination by the Government or anyone else." H.R. Rep. No. 94-1476 at 59. But President Trump's contract-based claims (the "Contract Claims") rest on the erroneous assumption that he granted Woodward a "limited license" to use the Interviews and "retaine[ed] for himself the commercialization and all other rights"—precisely what Section 105 prohibits. *See* Compl. ¶¶48, 108-112, 124-131. The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") claim similarly alleges that Defendants engaged in unfair practices through "Publication of the Interview[s]…*with knowledge of President Trump's rights to the ownership of the same*" and "to capitalize and benefit from President Trump's voice to the detriment of President Trump's ability to publish his own voice *given his position as author*." Compl. ¶120. And the remaining Claims rely on a theory that "unauthorized" publication of the Interviews constituted unjust enrichment because President Trump deserves to be "compensate[ed]" for the "benefit" of granting interviews to Woodward, again seeking a private benefit for public works. *E.g.*, Compl. ¶¶85, 88; *see id.* ¶¶81-89.

Simply put, the State Law Claims threaten to eviscerate Section 105 by permitting public officials to convert government work product into private property at will.  Since the President speaks for the People, his words belong to the People.  The State Law Claims, by contrast, improperly seek to privatize the federal historical record and are preempted.

### B.      The State Law Claims Are Expressly Preempted by 17 U.S.C. § 301

The State Law Claims are independently barred by 17 U.S.C. § 301, which expressly preempts the application of any state laws that (1) fall within the "subject matter of copyright" and (2) are "equivalent to" the exclusive rights established in the Copyright Act.  17 U.S.C. § 301.  Here, the State Law Claims arise out of Defendants' use of the Interviews in the Work, which falls squarely within copyright's subject matter.  *See* 17 U.S.C. §102(a)(1, 7).

As for the second element, the Second Circuit applies the "extra element" test:

> [I]f an extra element is required instead of or in addition to the acts of reproduction, performance, distribution or display, in order to constitute a state-created cause of action, then the right does not lie within the general scope of copyright and there is no preemption.

*Computer Assocs. Int'l v. Altai, Inc.*, 982 F.2d 693, 716 (2d Cir. 1992) (citation omitted).  "A state law claim is not preempted if the 'extra element' changes the 'nature of the action so that it is *qualitatively* different from a copyright infringement claim.'" *Id.*  (citation omitted).  None of the State Law Claims meet this test.

### 1.      Section 301 Preempts the Unfair Competition and FDUPTA Claims

President Trump's Unfair Competition Claims (Counts III-V) turn on his allegation that he "conferred a benefit" on Defendants by participating in the Interviews, which Defendants "accepted" and then improperly enriched themselves by publishing the Work "without accounting to and compensating President Trump…."  Compl. ¶103.  Numerous courts have found such claims preempted under Section 301 because "enrichment" is not an extra element.

"While enrichment is not required for copyright infringement," it does not "go[] far enough to make the unjust enrichment claim qualitatively different from a copyright infringement claim." *Briarpatch Ltd. v. Phoenix Pictures*, 373 F.3d 296, 306-07 (2d Cir. 2004). Plaintiff's quasi-contractual claims of promissory estoppel and breach of the covenant of good faith and fair dealing should be preempted for the same reason. *Id.*

The gist of President Trump's FDUTPA claim is that Defendants engaged in an unfair act and deprived him of his rights as a "consumer" by publishing a Work in contravention of his "rights to ownership" and "position as an author"—again, concepts identical to his Copyright Claims. Compl. ¶¶113-123. The Complaint's "reiteration of the elements of an FDUTPA claim is not enough to save its…copyright infringement claims from preemption." *Millennium Travel & Promotions v. Classic Promotions & Premiums,* 2008 WL 2275555, at *3 (M.D. Fla. June 2, 2008). *See also Stripteaser. v. Strike Point Tackle,* 2014 WL 866396, at *5 (S.D. Fla. Mar. 5, 2014). Nor can President Trump evade preemption by offering as an extra-element conclusory allegations that Woodward harmed his reputation by editing the Interviews deceptively (Compl. ¶120(iii)), especially since the one example (*id.* ¶59) shows innocuous edits for clarity.

### 2.    Section 301 Preempts the Contract Claims

The Contract Claims (Counts VI, VIII-IX) allege that Trump retained ownership of the Interviews and gave Woodward a narrow license to use them to "write a single book." Compl. ¶¶47-48. In the Second Circuit, "a contract that 'does not purport to give [the plaintiff] any protection beyond that provided...by copyright law itself' would be preempted." *Universal Instruments Corp. v. Micro Sys. Eng'g, Inc.*, 924 F.3d 32, 49 (2d Cir. 2019) (citing 5 *Nimmer on Copyright* § 19D.03[C][2][b] (1997)). Allegations of "mutual assent and valid consideration" are not sufficient to avoid preemption. *ML Genius Holdings LLC v. Google LLC*, 2022 WL 710744, at *4 (2d Cir. Mar. 10, 2022), *cert. denied,* 143 S. Ct. 2658 (2023); *see also Wrench Ltd.*

*Liab. Co. v. Taco Bell Corp.*, 256 F.3d 446, 457–58 (6th Cir. 2001).  President Trump's Contract

Claims are preempted because they merely restate his Copyright Claims of unauthorized use in

contractual terms.  *See 1 Nimmer on Copyright* § 1.01[B][1][a] at 1–22 ("[P]reemption should

continue to strike down claims that, though denominated 'contract,' nonetheless complain

directly about the reproduction of expressive materials").[14]

### V.     THE STATE LAW CLAIMS MUST BE DISMISSED FOR FAILURE TO STATE A VALID CAUSE OF ACTION

The State Law Claims should be dismissed for failure to allege "enough facts to state a

claim to relief that is plausible on its face" and "nudge[] [President Trump's] claims across the

line from conceivable to plausible."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007).

### A.     The Contract Claims Are Meritless

"The party asserting the existence of [an] oral contract has the burden of proving that an

enforceable agreement exists" (*Strauss v. NewMarket Global Consult. Gp.,* 5 A.3d 1027, 1033

(D.C. 2010)), but the Complaint contains no plausible allegations that Woodward entered into a

binding agreement not to use the Interviews in the Work.[15]

President Trump alleges that "he made Woodward aware on multiple occasions, both on

and off the record, of the nature of the limited license to any recordings"—*i.e.*, that the

Interviews were "for the sole purpose of accurately quoting President Trump for…*Rage*."

Compl. ¶52.  President Trump cherry-picks two excerpts from the Work where Woodward

agreed that the Interviews would be "for the book."  *Id.* ¶¶50, 51.  But their context makes clear

---

[14] "Accounting claims based primarily on copyright infringement [also] do not satisfy the 'extra element' test and are preempted."  *Gary Friedrich Enter. v. Marvel Enter.,* 713 F. Supp. 2d 215, 233 (S.D.N.Y. 2009); *Baiul v. NBC Sports*, 708 F. App'x. 710, 712-13 (2d Cir. 2017).

[15] Since the purported oral agreement was made in Washington D.C. (*see* Compl. ¶47), District of Columbia law applies on this point and is supplemented with consistent New York decisions.

that Woodward, a veteran *Washington Post* reporter, merely agreed not to publish newspaper "stories" based on the Interviews before *Rage* was released in fall 2020.  *See, e.g.*, Ex. A, 137.

The Complaint alleges no facts capable of establishing the existence of an agreement whereby President Trump owned the Interviews and Woodward agreed never to use them for any purpose other than providing quotations for *Rage*.  To the contrary, President Trump repeatedly indicated that he had no control over how Woodward used the Interviews when writing about him.  *See supra*, 5-6.  And the Interviews continued after Woodward had submitted his manuscript for *Rage*, contradicting the notion that the Interviews were for the limited purpose of quotation in the book.  *See supra*, 7.  And there are no plausible allegations that there was a meeting of the minds where Woodward agreed President Trump "owned" the Interviews and granted Woodward a "limited license" to use Interview quotations in *Rage*.  No experienced journalist would agree to such onerous terms—particularly with respect to materials of historical significance.  *See Walkie Check Prods., LLC v. ViacomCBS Inc.*, 2022 WL 2306943, at *10-11 (S.D.N.Y. June 27, 2022) (dismissing "implausible" contract claim).

The statute of frauds provides independent grounds for dismissal.  "[A]n action may not be brought…upon an agreement that is not to be performed within one year from the making thereof, unless the agreement [is in writing]."   D.C. Code Ann. § 28-3502.  The purported agreement prohibiting Woodward from reusing the Interviews extended into perpetuity and, as a services contract that cannot be performed within one year, it is subject to the stringent writing and signature requirement.  *Myers v. Fabrics*, 101 A.D.2d 777, 778 (1st Dep't 1984), *aff'd in relevant part*, 65 N.Y.2d 75 (1985); *Webber v. Dash*, 2019 WL 1213008, at *6-7 (S.D.N.Y. Feb.25, 2019).  Here, it is uncontested there is no signed "writing set[ting] forth the essential terms of the agreement" and the Contract Claims should be dismissed.  *Gharib v. Wolf*, 518 F.

Supp.2d 50, 54-55 (D.D.C. 2007); *Sonders v. Roosevelt*, 64 N.Y.2d 869, 871 (1985) (tape recordings did not satisfy Statute of Frauds); *Truman v. Brown*, 434 F. Supp.3d 100, 114 (S.D.N.Y. 2020) ("motley communications" including "phone call transcripts…do not satisfy the Statute of Frauds").

President Trump's duplicative claims for promissory estoppel and breach of the covenant of good faith and fair dealing should be dismissed because they "merely…restate his breach of contract claim in other dress." *Kauffman v. Int'l. Bhd. of Teamsters*, 950 A.2d 44, 49 (D.C. 2008); *O'Grady v. BlueCrest Capital Mgmt. LLP*, 111 F. Supp. 3d 494, 504 (S.D.N.Y. 2015) (same). To the extent President Trump pleads a standalone accounting claim, it fails because the Complaint does not allege a "fiduciary relationship between the parties." *Gary Friedrich*, 713 F. Supp. 2d at 233.

### B.    The FDUPTA and Unjust Enrichment Claims Are Meritless

The Complaint fails to state a FDUPTA claim. First, the claims should be dismissed because publication of "editorial" content—*i.e.*, non-commercial speech like the Work—is categorically exempt from FDUTPA liability. *Bongino v. Daily Beast*, 477 F. Supp. 3d 1310, 1321 (S.D. Fla. 2020); *Gorran v. Atkins Nutritionals, Inc.*, 464 F. Supp. 2d 315 (S.D.N.Y. 2006), *aff'd,* 279 F. App'x 40, 41 (2d Cir. 2008).

Second, "FDUPTA applies only to actions that occurred within the state of Florida," and President Trump has not alleged any relevant conduct there. *Toretto v. Donnelley Fin. Sols., Inc.*, 583 F. Supp.3d 570, 606 (S.D.N.Y. 2022) (citing cases).

Finally, President Trump does not show that the alleged deceptive actions "pose a risk of injury or harm to consumers." *Pictometry Int'l Corp. v. Air Am. Flight Ctr., LLC*, 394 F. Supp.3d 320, 340-41 (W.D.N.Y. 2019) (citing *B&D Nutritional Ingredients, Inc. v. Unique Bio Ingredients, LLC*, 2017 WL 8751753 (S.D. Fla. Feb. 10, 2017)). Instead, he cites boilerplate

language about "mislead[ing] and deceiv[ing] other customers into viewing him in a poor light" (Compl. ¶120(iii)), but readers' unflattering opinions of President Trump cannot amount to consumer injury. *Gorran*, 464 F. Supp. 2d at 329 (FDUTPA claim dismissed because plaintiff had "not alleged facts sufficient to show that defendants' alleged unfair or deceptive practices caused a diminution in the value of the products that he purchased."). President Trump's duplicative unjust enrichment claim "must be dismissed because it suffers from the same deficiencies" as his FDUPTA claim. *Belcastro v. Burberry Ltd.*, 2017 WL 744596, at *7 (S.D.N.Y. Feb. 23, 2017).

## VI.   NO ACTIONABLE CONDUCT WAS PLED AGAINST PARAMOUNT

All claims against Paramount should be dismissed because there are no plausible allegations that Paramount engaged in unlawful conduct. "[A] parent corporation...is not liable for the acts of its subsidiaries," unless the corporate veil may be pierced. *United States v. Bestfoods*, 524 U.S. 51, 61 (1998); *see also In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 417–19 (S.D.N.Y. 2011). "[T]he issue of whether the corporate veil may be pierced is determined under the law of the state of incorporation." *Id.* at 418 (citing *Spagnola v. Chubb Corp.*, 264 F.R.D. 76, 85 n. 10 (S.D.N.Y.2010)). Paramount is a Delaware corporation, and Simon & Schuster is a New York corporation. *See* Compl. ¶¶2-5. Delaware law permits piercing the corporate veil "where there is fraud or where a subsidiary is in fact a mere instrumentality or alter ego of its owner." *Digital Music*, 812 F. Supp.2d at 418 (citing *Geyer v. Ingersoll Publ'ns Co.*, 621 A.2d 784, 793 (Del.Ch.1992)). In New York, owners must (1) "exercise[] complete domination of the corporation in respect to the transaction attacked; and (2) … [use] such domination … to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury." *Id.* (citing *Morris v. N.Y. State Dep't of Taxation & Fin.*, 82 N.Y.2d 135, 141 (1993)). Plaintiff made no such showing. The only allegation of Paramount's involvement is

that its "assets include [S&S]" and it "exerts direct control over the executive leadership" thereof.  Compl. ¶17.  But this observation that Paramount owns S&S is not enough to establish liability.  *See Digital Music*, 812 F Supp. 2d at 417 (dismissing parent companies with "no direct involvement in or ownership of the relevant…licenses").

## CONCLUSION

Defendants respectfully request that this Court dismiss the Complaint with prejudice and award such other relief it deems just and proper.

Dated:  August 23, 2023

**DAVIS WRIGHT TREMAINE LLP**

*/s/ Elizabeth A. McNamara*
_____

Elizabeth A. McNamara
Linda J. Steinman
John M. Browning
Leena M. Charlton
1251 Avenue of the Americas, 21st Floor
New York, NY 10020
Phone: (212) 489-8230
Email: lizmcnamara@dwt.com
        lindasteinman@dwt.com
        jackbrowning@dwt.com
        leenacharlton@dwt.com

*Attorneys for Robert Woodward, Simon & Schuster, Inc. and Paramount Global*

**WILLIAMS & CONNOLLY***

Kevin T. Baine
Thomas G. Hentoff (*pro hac vice* appplication forthcoming)

680 Maine Avenue SW
Washington, DC 20024
Phone: (202) 434-5804

Email: kbaine@wc.com
        thentoff@wc.com

*Of counsel to Robert Woodward*

**CERTIFICATION OF WORD COUNT**

I hereby certify that this Memorandum of Law in Support of Defendants Rule 12(b)(6) Motion to Dismiss complies with the Order granting permission to file an oversized document, not to exceed 10,000 words.  Dkt. 54.

According to the word-processing system used to prepare this Motion to Dismiss for Failure to State a Claim the total word count for all printed text exclusive of the material omitted under Rule 7.1 is 9,996 words.

Dated: August 23, 2023                                        _/s/ Elizabeth A. McNamara_
                                                                              Elizabeth A. McNamara

**CERTIFICATE OF SERVICE**

I hereby certify that on August 23, 2023, I caused copies of the foregoing to be sent to

counsel of record via electronic mail, which was stipulated by the parties to be sufficient service.

*/s/ Elizabeth A. McNamara*
Attorney