Exhibit C
part 2

First, statutory rules of construction established by the Supreme Court establish that the definition is not limited to the specific categories of "employees of the Government" set forth in Section 2671. *See supra* Section II. A, B.

Second, the District Court's reading runs contrary to the governing definition of "department" in 28 U.S.C. § 451, as "describ[ing] the executive, legislative, or judicial *branches* of the government" where "the context shows that such term was intended."[11]  As numerous courts have concluded, the "context" of the Westfall Act and its predecessor FTCA makes clear its definitions were intended to be expansive and include "the entire Federal workforce," including the executive branch.  *See supra* Section II. A.  Indeed, in *McNamara v. United States*, Judge Holtzoff, who, as a member of the Justice Department assisted with drafting the final version of the original FTCA,[12] held not only that "the phraseology of the statute . . . is not limited to the *Executive Branch*," but that "the statute applies to *all three branches* of the Government."  199 F. Supp. at 880-81.  And in *Wilson v.*

---

[11] Act of June 25, 1948, ch. 646, § 451, 62 Stat. 869, 907 (emphasis added) (current version at 28 U.S.C. § 451), *available at* https://www.loc.gov/law/help/statutes-at-large/80th-congress/session-2/c80s2ch646.pdf.  The 1948 version of Title 28, which the District Court cites (SPA-16 n.42), provided that "the term- 'Federal agency' includes the executive departments and independent establishment of the United States . . . but does not include any contractor with the United States."

[12] *See, e.g.*, *Tort Claims Against the United States: Hearings on S. 2690 Before a Subcomm. of the Senate Comm. on the Judiciary*, 76th Cong., 3d Sess. 9, at 11-13 (1940) (memorandum to the Att'y Gen. from Special Ass't Alexander Holtzoff dated June 7, 1939); *id.* at 33-53 (statement of Alexander Holtzoff).

*Libby*, 535 F.3d 697, 712 (D.C. Cir. 2008), the D.C. Circuit Court of Appeals upheld Westfall Act certification for the Vice President and three senior executive officials related to claims arising out of their purported invasion of privacy by disclosing the identity of a cover agent.

Other contemporaneous judicial decisions also confirm that the term "department" would have applied to the "Executive Branch." For example, in *Shaughnessy v. United States ex rel. Mezei*, the Supreme Court referred to "the Government's political *departments*" to mean "Congress" and "the President." 345 U.S. 206, 210 (1953) (emphasis added). Accordingly, "executive department" as used in the Westfall Act does mean the executive branch.

Third, it is irrelevant that the White House website "draw[s] a clear distinction between 'the executive branch,' 'the executive departments,' and 'federal agencies,'" as the District Court noted. (SPA-24.) The relevant inquiry is the intent of Congress when it enacted the Westfall Act, not the drafters of the White House website.

Fourth, the legislative history shows that Congress repeatedly referred to the Act as applying to the "Executive Branch," notwithstanding the use of the term "departments" carried over from the original enactment of the FTCA. Congress enacted the Westfall Act in response to the Supreme Court's decision in *Westfall v. Erwin*, 484 U.S. 292 (1988) -- which limited federal employees' ability to assert

25

immunity to actions arising out of their discretionary conduct -- intending to "remedy[] an immediate crisis involving the prospect of personal liability and the threat of protracted personal tort litigation for the *entire Federal workforce*." § 2(a)(5), 102 Stat. 4563 (emphasis added).

Congress recognized that "[t]he potential increase in liability from the Westfall decision affects officers and employees of *all three branches* of government."  H.R. Rep. No. 100-700, at 3, *as reprinted in* 1988 U.S.C.C.A.N. 5945, 5947 (emphasis added); *see also id.* at 5 ("[t]he FTCA currently covers employees of the *Executive Branch* only." (emphasis added)).  Congress increased the scope of the FTCA "by inserting after 'executive departments,'" the phrase "'the judicial and legislative branches.'"  Westfall Act, Pub. L. No. 100-694 (HR 4612) at § 3.  In this way, Congress intended "*to make explicit* that employees of the judicial and legislative branches are included within the coverage of the [FTCA] . . . in the same way as employees of the *Executive Branch*."  H.R. Rep. 100-700, at 8, *as reprinted in* 1988 U.S.C.C.A.N. 5945, 5952 (emphasis added); *see also id.* at 11 ("Judicial and Legislative Branch employees, as well as *Executive Branch* employees, are covered by the FTCA." (cost estimate statement of James Blum, Cong. Budget Office Acting Director) (emphasis added)).

Accordingly, it is irrelevant, as the District Court noted, that the Westfall Act refers to the "executive *departments*" and the "legislative and judicial

branches," where Congress had understood "executive departments" to refer to the Executive Branch when it enacted the Westfall Act and was merely tacking on an additional phrase some forty years after the FTCA's enactment.

The District Court, however, misread the legislative history, focusing on the Supreme Court's statement that Congress had "one purpose firmly in mind" when enacting the Westfall Act, which was "to return Federal employees to the status they held prior to the *Westfall* decision." (SPA-27-28 (citing *Gutierrez de Martinez*, 515 U.S. at 425).) The District Court noted that, at the time of *Westfall v. Erwin*, the President already had immunity from suit for conduct falling within the outer perimeter of his or her official duties as a result of the Supreme Court's decision in *Nixon v. Fitzgerald*, 457 U.S. 731 (1982). Accordingly, the District Court reasoned that: (1) because the President has immunity from *Nixon v. Fitzgerald* that *Westfall v. Erwin* did not alter, (2) the Westfall Act did not need to "return" the President to any pre-*Westfall* status and, therefore, (3) the President was not encompassed by the "one purpose" of the Westfall Act. (SPA-27.)

That conclusion does not follow. The District Court places undue emphasis on an out-of-context statement by the Supreme Court. Congress had several purposes in mind, including explicitly expanding the scope of the Westfall Act to include the other branches of Government and creating a certification mechanism and a removal process. *See Operation Rescue Nat'l*, 147 F.3d at 69 (not only did

the Westfall Act remove the discretionary requirement, but it also increased "increased the scope of the FTCA by adding employees of the judicial and legislative branches to those of the *executive branch*." (emphasis added)).[13]

Indeed, in *Smith*, the Supreme Court expressly rejected this very argument that the Westfall Act "was meant to apply solely to those Government employees not already protected from tort liability . . . by a pre-existing federal immunity." 499 U.S. at 172. The Supreme Court noted that Congress was clearly aware of "pre-Act immunity" and its "enactment of . . . express limitations of immunity . . . indicates that if it intended to limit the Act's protection to employees not covered under . . . pre-Act immunity . . ., it would have said this expressly." *Id.* at 173.

Finally, as shown (*supra* Section II. C), Congress expressly intended that the United States would be able to "continue" to assert pre-existing immunities, including "Presidential," under 28 U.S.C. § 2674.

---

[13] In the portion of *Gutierrez de Martinez* quoted by the District Court, the Supreme Court was merely addressing whether the Attorney General's certification was conclusive on the issue of scope of employment. (SPA-27 (citing *Gutierrez de Martinez*, 515 U.S. at 425).) The Supreme Court reasoned that by returning Federal employees to their pre-*Westfall* status, Congress was not making the Attorney General the sole arbiter of scope-of-employment, but returning to a scheme in which the courts would make that determination. *Gutierrez de Martinez*, 515 U.S. at 425-26. Thus, the Supreme Court's focus was simply on Congress's purpose of returning federal employees to their pre-*Westfall* immunity.

E.     **The Administrative Requirements in the Westfall Act Do Not Preclude it From Applying to the President.**

The District Court also erroneously concluded that the Westfall Act cannot apply to the President based on the phrasing of certain administrative claim submission requirements clearly intended to apply to the vast majority of the entire federal workforce that routinely avails itself of the Westfall Act.  Those administrative requirements do not provide a basis to prevent the President from availing him or herself from the Westfall Act's important protections.

First, the District Court found it significant that, under 28 U.S.C. § 2672 of the Westfall Act, a defendant must seek the "prior written approval of the Attorney General" to settle claims "in excess of $25,000," because the court could not "imagine that Congress intended . . . to require the president to seek the approval of the Attorney General."  (SPA-22.)  However, the Attorney General and the Department of Justice have presumptive responsibility for all litigation involving the United States and its agencies.  *See* 28 U.S.C. §§ 516, 519.  Furthermore, the Attorney General is specifically charged by the Westfall Act with defending "any civil action or proceeding . . . against any employee of the Government . . . for any such damage or injury" 28 U.S.C. § 2679(c), "arising or resulting from the . . . wrongful act . . . of any employee of the Government while acting within the scope of his office or employment," *id.* § 2679(b)(1).  It is therefore entirely conceivable

that the Westfall Act requires settlement of all claims, including against the President, to be submitted to the Attorney General.

Moreover, any claims for damages brought against the United States are permitted solely by virtue of Congress's waiver of sovereign immunity for certain claims in the FTCA. *See B & A Marine*, 23 F.3d at 712 ("The FTCA is a limited waiver of sovereign immunity . . . ."); *West v. Trump*, 2020 WL 4721291, at *3 ("The basic rule of federal sovereign immunity is that the United States cannot be sued at all without the consent of Congress." (quoting *Block v. N.D. ex rel. Bd. of Univ. & Sch. Lands*, 461 U.S. 273, 287 (1983)). It is thus entirely appropriate for Congress to have delegated authority to make settlement determinations for payment of funds for which it waived sovereign immunity to anyone it pleased, including the Attorney General.

Second, the District Court found that, because the President has not submitted any claims to Congress, which heads of agencies are required to do under 28 U.S.C. § 2673 of the Westfall Act, the President cannot be the head of an agency, and therefore does not fall within the definition of "officers or employees of any federal agency," 28 U.S.C. § 2671. However, as shown, the President is covered by the more expansive definition of "any Government employee" as well as the definition of "executive departments" and need not be the head of a "federal agency."

Third, the District Court was concerned that the requirement, under 28

U.S.C. § 2675 of the Westfall Act, that a plaintiff who wishes to sue under the

FTCA shall "first present a claim to the appropriate Federal agency," would not

make sense if a claimant had to present a claim to the President.  (SPA-23.)

However, this claim makes no less sense than when applied to Members of

Congress, who are also at the apex of their branch.[14]  In any event, courts have

recognized that if a claim is brought against the President, the claimant may simply

"first submit notice of a claim to the Department of Justice or other appropriate

agency."  *See, e.g.*, *Littlejohn v. South Carolina*, No. CA6:100940RBHWMC,

2010 WL 1791419, at *3 (D.S.C. Apr. 16, 2010) ("Since the complaint does not

show that the plaintiff has submitted a Standard Form 95 to the appropriate federal

agency or to the United States Department of Justice, this case should be dismissed

for failure to exhaust federal administrative remedies."), *report and*

*recommendation adopted*, No. 6:10-CV-00940-RBH, 2010 WL 1791416 (D.S.C.

May 4, 2010).

---

[14] The Senate has in fact promulgated rules that "the Sergeant at Arms of the Senate, in accordance with regulations prescribed by the Attorney General . . . may consider and ascertain and . . . determine, compromise, adjust and settle" claims against any Senator under the FTCA. *See* S. Res. 492, 97th Cong. (1982), *as reprinted in* S. Manual § 109, 113th Cong., *available at* https://www.govinfo.gov/content/pkg/SMAN-113/pdf/SMAN-113.pdf (last visited Jan. 10, 2021).  Notably, this resolution passed before *Westfall,* and before Congress amended the definitions provision to make "explicit" the "legislative branch," further underscoring the expansive meaning of "employee of the Government" under the Westfall Act and the FTCA.  In other words, prior to the Westfall Act, Congress understood the FTCA to apply to it based on the definition of "any employee of the Government."

31

Therefore, based on the plain language of the statute, the legislative history, and the "common understanding" of numerous courts, it is clear that the President is an "employee of the Government" for purposes of the Westfall Act.

## III. THE PRESIDENT'S STATEMENTS AT THE WHITE HOUSE WERE MADE "WITHIN THE SCOPE OF HIS OFFICE OR EMPLOYMENT"

The District Court erred in holding that the statements at issue were not made within the scope of the President's office or employment.[15]

### A. The President's Statements to The Press At The White House Were Made "Within the Scope of His Office or Employment"

Courts, including this Court, "apply the scope-of-employment test very expansively," to ask "whether the defendant merely was on duty or on the job when committing the alleged tort.'" *Harbury*, 522 F.3d at 422 n.4 (Kavanaugh, J.); *see also Ballenger*, 444 F.3d at 664 (noting the duties test is to be "liberally construe[d]"); *Bowles*, 685 F. App'x at 23 ("[T]he scope of employment inquiry addresses whether [the employee's] allegedly defamatory statements were made

---

[15] The District Court properly "agreed with the Government" that the alleged tort occurred in the District of Columbia.  (SPA-36); *see also Richards v. United States*, 369 U.S. 1, 9 (1962) (under the FTCA, the Court applies "the law of the place where the act or omission occurred" not the law of the state where the alleged tort had its operative effect").  As a result, D.C. law applies, including its choice of law principles.  *Id.* at 11.  While the District Court questioned whether the substantive law or the choice of law principles of District of Columbia would apply (SPA-37), that inquiry is irrelevant.  Under those choice of law principles, courts look to "the substantive law of the jurisdiction where the employment relationship exists," *Vrobel*, 724 F.3d at 221, which here is the District of Columbia; *Conyers v Westphal*, 235 F. Supp. 3d 72, 77 (D.D.C 2017).

'on duty at the time and place of an "incident" alleged in a complaint.'") (quoting *Osborn*, 549 U.S. at 247).

Until this case, the courts uniformly have held that speaking to the press is within the scope of employment of public officials and, therefore, *a fortiori* of the President. *See, e.g.*, *Does 1-10*, 973 F.3d at 600 ("unsolicited comments by elected officials on an event of widespread public interest" within the scope); *Wuterich*, 562 F.3d at 384 (holding that a Congressman's statement, at his campaign office, that a Marine committed atrocities were within the scope of his office); *Libby*, 535 F.3d at 712 (upholding Westfall Act certification for Vice President and three senior executive officials because "[o]f course, the defendants may discredit public critics of the Executive Branch"); *Ballenger*, 444 F.3d at 664-66 (holding allegedly defamatory comments made by Congressman, at his office, during telephone interview with reporter about his marital status, were within scope of office); *Williams v. United States*, 71 F.3d 502, 505 (5th Cir. 1995) (statements in press interview within scope of employment); *see also Rahall*, 399 F. Supp. 2d at 713-15 (holding Congressman was acting within the scope of office under West Virginia law when he allegedly defamed a commentator by calling him a "bigoted, right wing, redneck, racist wacko").

This is so because a "primary obligation of" elected officials "in a representative democracy is to serve and respond to his or her constituents." *See*

*Wuterich*, 562 F.3d at 385 (quoting *Williams*, 71 F.3d at 507) (referring to Members of Congress).  Moreover, an elected official's "ability to do his job" or to govern "effectively is tied . . . to the [official's] relationship with the public and in particular his constituents and colleagues . . . ." *Ballenger*, 444 F.3d at 665; *see also Barr*, 360 U.S. at 575 ("[i]t would be an unduly restrictive view of the scope of the duties of a policymaking executive official to hold that that a public statement of agency policy in respect to matters of wide public interest and concern is not action in the line of duty.").

     *Council on Am. Islamic Relations v. Ballenger*, 444 F.3d 659 (D.C. Cir. 2006) is dispositive.  *Ballenger* involved a defamation claim against a Congressman arising out of statements made during a telephone interview, from his office, with a reporter.  In response to a question about his separation from his wife, the Congressman stated that his wife had moved because she did not want to live across the street from the offices of the plaintiff, the Council on American Islamic Relations, which, he stated, was the "fund-raising arm for Hezbollah."  *Id.* at 662.  The D.C. Circuit Court of Appeals found that the conduct fell within the scope of employment noting that "[t]he appropriate question . . . is whether that telephone conversation [with the reporter] -- not the allegedly defamatory sentence -- was the kind of conduct Ballenger was employed to perform," and that

"[s]peaking to the press during regular work hours in response to a reporter's inquiry falls within the scope of a congressman's 'authorized duties.'" *Id.* at 664.

Similarly, in *Wilson v. Libby*, the D.C. Circuit extended *Ballenger* to Executive Branch officials. 535 F.3d at 712. *Libby* concerned an invasion of privacy suit against Vice President Cheney and President George W. Bush's senior advisors for allegedly revealing to the media the identity of a covert CIA agent critical of the administration. The court upheld the Westfall Act certification because "[o]f course, the defendants may discredit public critics of the Executive Branch." *Id*. In so holding, the D.C. Circuit also reaffirmed that "D.C. scope-of-employment law (not to mention the plain text of the Westfall Act)" requires courts "'to look beyond alleged intentional torts themselves' to the underlying conduct in determining whether that conduct was within the scope of employment." *Id.* at 711 (quoting *Ballenger*, 444 F.3d at 664). *See also Bowles*, 685 F. App'x at 25 (conduct is not "outside the scope of employment simply because, if proved, it would constitute an intentional tort."); Restatement § 231 ("An act may be within the scope of employment although consciously criminal or tortious.")).

Under each of the factors examined by D.C. Courts, the President's conduct falls within the scope of employment. Courts look to the Restatement (Second) of Agency, which examines whether the conduct: (a) is "of the kind" an employee is "employed to perform;" (b) occurs substantially within the authorized time and

space limits;" and (c) is "actuated, at least in part, by a purpose to serve the master." *See Wuterich*, 562 F.3d at 383 (citing Restatement § 228(1)). The President speaking to the press here plainly satisfies each element.

### 1. Speaking to the Press is "Of the Kind" a President is Employed to Perform.

Speaking to the press and communicating with the public is clearly conduct "of the kind [a President] is employed to perform." Restatement § 228(1).

Under D.C. law, "this prong is 'liberally construe[d].'" *Ballenger*, 444 F.3d at 664 (citation omitted). In determining whether the conduct is "of the kind" the defendant is employed to perform, courts examine the context of the allegedly actionable conduct, not the content of the conduct. *See id.* ("The appropriate question . . . is whether that telephone conversation [with the reporter] -- not the allegedly defamatory sentence -- was the kind of conduct Ballenger was employed to perform."); *see also*, *e.g.*, *Smith v. Clinton*, 886 F.3d 122, 126-27 (D.C. Cir. 2018) (wrongful death action allegedly arising from Secretary of State Hillary Clinton's use of a private email server was subject to the Westfall Act because her use of emails concerning government operations was within the context of her office); *Vrobel*, 724 F.3d at, 222 (examining whether "responding to a prospective employer's request for a reference" is the "*type of act*" that defendant was employed to perform in defamation claim arising out of that conversation (emphasis in original)); *Ali v. Rumsfeld*, 649 F.3d 762, 774-75 (D.C. Cir. 2011)

(plaintiffs' alleged torture and illegal detention by Secretary of Defense Donald Rumsfeld and high-ranking Army officers were within the scope of their offices under the Westfall Act).

Here, because speaking and responding to the media is of the "type of act," *Vrobel*, 724 F.3d at 222, that the President is expected to perform, this prong is satisfied.

As in *Ballenger* and *Libby*, here, when making the statements, the President was fulfilling his duties to address the press and respond to critics on matters of public concern. *See Trump v. Hawaii*, 138 S. Ct. 2392, 2417-18 (2018) ("The President of the United States possesses an extraordinary power to speak to his fellow citizens."); *Knight First Amendment Inst. at Columbia Univ. v. Trump*, 928 F.3d 226, 235 (2d Cir. 2019) (President "acts in an official capacity when he tweets"). Indeed, as the Supreme Court has explicitly found, because "[t]he President is the only person who alone composes a branch of government[,] . . . there is not always a clear line between his personal and official affairs." *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2034 (2020). Rather, "'[t]he interest of the man' is often 'connected with the constitutional rights of the place.'" *Id.* (quoting THE FEDERALIST No. 51).

That the conduct is within the President's scope of employment is also supported by the Supreme Court's holding in *Clinton v. Jones*. There, the plaintiff,

Paula Jones sued President Clinton for alleged sexual misconduct prior to the President taking office. President Clinton asserted that he was immune from suit in federal court for that unofficial conduct. One of Jones's claims, however, was that President Clinton defamed her while he was in office by denying her accusations. The Supreme Court expressly noted that this defamation claim "arguably may involve conduct within the outer perimeter of the President's official responsibilities," qualifying the President for immunity under *Nixon v. Fitzgerald. Clinton v. Jones*, 520 U.S. at 686. Thus, the Supreme Court recognized that responding to accusations of misconduct are at least "arguably" within the President's official responsibilities.[16] *Id.*

### 2. The Statements Were Substantially Within An Authorized Time and Place.

The statements at issue also satisfy the second prong of the Restatement test because they occurred "substantially within the authorized time and space limits." Restatement § 228(1); *see also Ballenger*, 444 F.3d at 317 (noting Congressman

---

[16] The District Court erroneously read this *dicta* as supporting the premise that President Trump's conduct here falls *outside* the scope of employment, reasoning that the Supreme Court meant that "at most" the President's conduct fell within the "outer perimeter" of the President's official duties. (SPA-55-56.) However, the Supreme Court was not addressing where on a spectrum between "outer perimeter" and "scope of employment" the President's conduct fell, as the District Court interpreted that statement, because the Supreme Court was not addressing the Westfall Act. The Supreme Court's assertion concerned only whether the President's conduct was within the "outer perimeter of the President's official responsibilities" – the immunity test set forth by the Supreme Court in *Nixon v. Fitzgerald*. That the Court found that the President's conduct "arguably" did, only supports that the conduct is also within the scope of employment.

called a reporter "from his congressional office during regular business hours").

The statements were all made at the White House.  *See supra* Section III. A.

Moreover, because the President must "be always in function," the "authorized

time" limits do not apply.  *Trump v. Vance*, 140 S. Ct. at 2423 (citation omitted);

*Clinton v. Jones*, 520 U.S. at 717 (Breyer, J., concurring) (same).  However, in fact

the statements all were within "regular business hours."  *See supra* Section III. A.

Finally, the first two statements were published by the "Office of the Federal

Register, National Archives and Records Administration" in the "Compilation of

Presidential Documents" under "Budget and Presidential Materials."[17]  *Cf. Knight*,

928 F.3d at 239 ("[T]he President's initial tweets (meaning those that he produces

himself) are government speech.").

### 3.    The Statements Were Actuated in Part by a Purpose to Serve the Master.

Finally, the President's statements satisfy the third prong of the Restatement

test because they were "actuated, at least in part, by a purpose to serve the master."

Restatement § 228(1).  As the Court in *Ballenger* noted, "even a *partial* desire to

serve the master is sufficient."  *Ballenger*, 444 F.3d at 665.  Thus, speaking to the

press to "maintain the 'continued trust and respect of . . . constituents' in order to

preserve [the] 'ability to carry out' governmental duties" is sufficient, because an

---

[17] *See* JA-327; JA-403 (citing DCPD-201900410 - Statement on the Assault Allegation by E. Jean Carroll, *available at*  https://www.govinfo.gov/app/details/DCPD-201900410.)

elected official's "ability to do his job . . . effectively is tied . . . to the [official's] relationship with the public and in particular his constituents and colleagues." *Id.*

The District Court asserted that *Ballenger* misstated D.C. law, because, the District Court claimed, "a slight purpose to serve the master is not enough." (SPA-48 (citing *Blair v. District of Columbia,* 190 A.3d 212, 226 (D.C. 2018); *District of Columbia v. Bamidele*, 103 A.3d 516, 525 (D.C. 2014); *Brown v. Argenbright Sec., Inc.*, 782 A.2d 752, 758 (D.C. 2001).) To the contrary, the D.C. Circuit's decision in *Ballenger* faithfully apply the longstanding law of the District of Columbia.

As the District of Columbia Court of Appeals in *Blair*, cited by the District Court, recently reaffirmed, "an employee's conduct will be outside th[e] scope [of employment] *only if* the employee's actions are *entirely disconnected* from the work of the master, or the actions . . . were done *solely* for the accomplishment of the independent . . . mischievous purpose of the servant." *Blair*, 190 A.3d at 228 (emphasis added).

*Blair* involved an off-duty police officer who was alleged to have assaulted a patron at the bar. The District of Columbia argued that it was not vicariously liable, because the officer had been motivated by a "personal vendetta," inasmuch as he had been hit in the back of the head before entering the fight. *Id.* at 228. The Court of Appeals disagreed, reversing summary judgment and finding that the officer's "professional and personal motives for his actions . . . were significantly

40

intertwined," because, he "didn't enter the altercation[,] the altercation was thrust upon him," and he "began to react to an assault on fellow officers, as well as bouncers . . . as was his duty." *Id.* at 227-28.

By contrast, in *Balmidele*, also cited by the District Court, police "officers were off-duty, they were not in uniform, and they were at the restaurant for purely personal reasons," when one officer "beg[a]n beating [plaintiff]," another patron, in response to a harmless comment by plaintiff that did not affect any police interest. 103 A.3d at 526. As the District of Columbia Court of Appeals noted in *Blair*, the officer's conduct was thus "***in no way*** connected to, or in furtherance of, their duties as police officers." *Blair*, 190 A.3d at 227 (emphasis added). In fact, the court in *Balmidele* also recognized that "if the employee acts in part to serve his employer's interests, the employer will be held liable for the intentional torts of his employee even if prompted partially by personal motives, such as revenge." 103 A.3d at 525.

Similarly, in *Brown*, the D.C. Court of Appeals found that there was a jury question as to whether an employee who was alleged to have sexually assaulted a customer whom he suspected of shoplifting while performing a search was motivated in part to serve his master. 782 A.2d at 758-59. The relevant question, the court noted was "whether his conduct, if proven, was motivated to ***any extent***

by his desire to serve his employer or was ***entirely*** his own personal adventure . . .

." *Id.* (emphasis added).

Thus, none of the cases cited by the District Court support the proposition that a slight purpose to serve the master is insufficient. Further, in all of these cases, it was clear that the courts were examining not the content of the conduct – i.e., the assault -- but its context, i.e., intervening in a fight, as in *Blair*, or searching a shoplifter, as in *Brown*. Indeed, D.C. Courts have long treated even intentional torts as falling within the scope of employment so long as the tort was performed in the context of the employee's performance of his duties. *See, e.g.*, *Weinberg v. Johnson*, 518 A.2d 985, 991-92 (D.C. 1986) (upholding verdict that imposed respondent superior liability when laundromat employee shot customer during dispute).

Here, it is clear that the context of President Trump's conduct -- speaking to the press at the White House -- was "actuated, at least in part, by a desire to serve the [Government's] interest," particularly because it was in response to a widely reported accusation that, as in *Blair*, was "thrust upon him." Ms. Carroll herself stated that expected her article to lead to a "media storm" of attention including from "leading news sources" "around the world." (JA-350 (emphasis added); JA-74, 79, 82, 90 ¶¶ 62, 84, 98, 142 & nn.10, 14.) *See Ballenger*, 444 F.3d at 665 (elected official's "remarks, made to the media to ensure his effectiveness as a

42

legislator, can 'fairly and reasonably be deemed to be an ordinary and natural incident or attribute' of his job as a legislator" (quoting *Rahall*, 399 F. Supp. 2d at 715)). Moreover, as in *Ballenger*, it is irrelevant that the specific statements at issue involved the President's personal life, because the relevant inquiry concerns the context of the President speaking with the press, not the content of specific statement at issue. *See Ballenger*, 444 F.3d at 666.

## B. The District Court's Complaints with Ballenger Are Unfounded.

The District Court, while recognizing that *Ballenger* compels upholding certification, found its "reasoning is wanting." (SPA-51.) None of its criticisms, however, withstand scrutiny.

First, the District Court took issue that the court found that speaking to the press fell within "the scope of a congressman's 'authorized duties'" because "[t]he court did not . . . offer any theory as to who if anyone authorizes a Member of Congress to speak to reporters." However, as this Court recognized, applying the Restatement, an "employer need not specifically authorize the precise action the employee took." *See Bowles*, 685 F. App'x at 25. Moreover, inasmuch as there is no specific person who authorizes a member of Congress to do *anything*, it is difficult to imagine what allegedly tortious conduct would ever be covered by the Westfall Act. Yet Congress specifically extended the Westfall Act's protections to the "legislative branch" (*supra* Section II. D) and courts have repeatedly applied it

to members of Congress (*supra* Section III. A).[18]

Second, the District Court took issue with the *Ballenger* court's reasoning that a Congressperson's statement about his personal life could be the type of statement that he was employed to perform, because "[t]he job description of a *congressperson* does not include transparency about one's personal life." (SPA-51.) By so holding, the District Court was erroneously examining the content, not the context, of the relevant conduct -- speaking to the press. *See supra* Section III. A.

Thus, courts have repeatedly found, for example, that an assault may fall within the scope of employment notwithstanding the fact that the "job description" does not include assault. *See, e.g.*, *Harbury*, 522 F.3d at 422 (CIA officers allegedly responsible for torture acted within scope of employment); *Hechinger Co. v. Johnson*, 761 A.2d 15, 24-25 (D.C. 2000) (retail store employee who struck customer acted within the scope of employment); *Johnson v. Weinberg*, 434 A.2d 404, 409 (D.C. 1981) (laundromat employee acted within scope of employment in shooting customer during dispute over removing clothes from washing machine).

Even if the content of the statement were relevant, however -- and it is not -- the statements still fall within the President's official duties. While the District

---

[18] This also improperly imports an element of the "master-servant relationship" test that is irrelevant to scope of employment. *See infra* Section III. C. 1.

Court narrowly construed a Congressperson's "job description," the President's job description is not so narrow.  *See Mazars*, 140 S. Ct. at 2034 ("[t]he President is the only person who alone composes a branch of government[,] . . . there is not always a clear line between his personal and official affairs." ).

In any event, the statements themselves were not simply about the President's "personal . . . affairs," but involved highly political issues, including Justice Kavanaugh's confirmation hearing and the role of the media in politics. *See supra* p. 6.  And the President's statements were made in the context of wide-ranging interviews at the White House, spanning issues including the Federal Reserve to foreign affairs, and by the White House Deputy Press Secretary to the White House press pool, all in response to reporter inquiries.

Moreover, as the District Court acknowledged (SPA-54), the President's failing to address these accusations could affect the President's ability to govern. *See Ballenger*, 444 F.3d at 665-66 ("A [Congressperson's] ability to do his job as a legislator effectively is tied, as in this case to the [Congressperson's] relationship with the public and in particular his constituents and colleagues in the Congress.").

The District Court rejected this argument on the ground that while it is "not entirely without merit, it goes much too far."  (SPA-54.)  The District Court found that this "would mean that a president is free to defame anyone who criticizes his conduct or impugns his character -- without adverse consequences to that

45

president." (*Id.*)  However, while the District Court may not have liked the consequences of the properly applied test, that is not grounds to disregard it.  That is exactly the nature of sovereign immunity and effect of Congress's clear decision not to waive the Government's immunity for defamation claims.  *See* 28 U.S.C. § 2680(h).

This Court has recognized the fact it "was the intention of Congress" in enacting the Westfall Act to leave the plaintiff who brings a defamation claim without a remedy.  *See B & A Marine*, 23 F.3d at 715.  While the District Court may not have liked the result, "courts aren't free to rewrite clear statutes under the banner of [their] own policy concerns."  *Azar v. Alina Health Servs.*, 139 S. Ct. 1804, 1815 (2019).

The Supreme Court has also resolved this policy concern in the context of an executive official's absolute immunity, observing:

> [O]n the one hand, the protection of the individual citizen against pecuniary damage caused by oppressive or malicious action on the part of officials of the Federal Government; and on the other, the protection of the public interest by shielding responsible governmental officers against the harassment and inevitable hazards of vindictive or illfounded [*sic*] damage suits brought on account of action taken in the exercise of their official responsibilities.

*Barr*, 360 U.S. at 565.  The Supreme Court ultimately determined it "better to leave unredressed the wrongs doen [*sic*] by dishonest officers than to subject those

who try to do their duty to the constant dread of retaliation." *Id.* at 572. The

Supreme Court acknowledged:

> [A]s with any rule of law which attempts to reconcile
> fundamentally antagonistic social policies, there may be
> occasional instances of actual injustice which will go
> unredressed, but we think that price a necessary one to pay for
> the greater good. And there are of course other sanctions than
> civil tort suits available to deter the executive official who may
> be prone to exercise his functions in an unworthy and
> irresponsible manner.

*Id.* at 576 (holding federal official not liable for allegedly libelous statements made

in a press release about former employees).

### C. The Master-Servant Test is Irrelevant But Satisfied.

The District Court also applied an incorrect test for scope of employment by

importing an element of the state law *respondeat superior* test -- whether there is a

master-servant relationship -- that is irrelevant to scope of employment under the

Westfall Act. (SPA-35, 42-43.) In any event, while it is inappropriate to ask

whether the President is in master-servant relationship with the Government, he is.

### 1. The Master-Servant Test is Irrelevant Here.

The District Court correctly noted that, in determining whether a defendant

is acting within the scope of employment, courts look to the state law of

*respondeat superior*. However, instead of just looking to just that portion of state

law concerning scope of employment, the District Court examined whether: (1) a

master-servant relationship exists and (2) whether the defendant was acting within

47

the scope of employment.  (SPA-42-43.)

That circular reasoning is erroneous.  Although courts look to the state law *respondeat superior* test to determine scope of employment, they do not "apply the entire body of *respondeat superior* law, but only that portion of the law that resolves the scope of employment issue."  *See, e.g.*, *Palmer v. Flaggman*, 93 F.3d 196, 202 (5th Cir. 1996) (rejecting contention that master/servant test is relevant to scope of employment inquiry); *Bradley v. Nat'l Collegiate Athletic Ass'n*, 249 F. Supp. 3d 149, 164 (D.D.C. 2017) ("District of Columbia law does not include the additional element of control over the tortfeasor's actions in determining the scope of employment.").

Whether there is a master-servant relationship is irrelevant, because the Westfall Act replaces that inquiry with whether the defendant is an "employee of the Government."  For purposes of the Westfall Act, courts look to the master-servant test, under federal common law, solely to determine whether the defendant is a "contractor with the United States" -- falling within the single exclusion to the Westfall Act's coverage -- instead of "any employee of the Government."  28 U.S.C. §§ 2671, 2675.  *See B & A Marine.*, 23 F.3d at 713 ("For purposes of the FTCA, the common law of torts and agency defines the distinction between an independent contractor (for whose torts the Government is not responsible) and an *employee, servant or agent* (for whose torts the Government is responsible.")

48

(emphasis added). Neither plaintiff-appellee nor the District Court went so far as to contend that the President is an "independent contractor" for the Government.

When, as here, the defendant is not claimed to be an independent contractor, courts have held that the master-servant or "control" test is irrelevant to determining whether a defendant is an "employee of the Government." For example, in *Sullivan v. United States*, 21 F.3d 198, 203 (7th Cir. 1994), *abrogation on other grounds recognized in Glade ex rel. Lundskow v. United States*, 692 F.3d 718, 723 (7th Cir. 2012), the plaintiff urged the court to apply the control test to determine whether a federal public defender was covered under the Westfall Act as "any employee of the Government." The court refused, because "the plain language of the Act must trump any 'control test' in the context of judicial branch employees. In a sense, [plaintiff] is asking that we create a 'federal public defender exception' to the amended scope of the FTCA." *Id.* Similarly, the Eighth Circuit rejected an analogous argument that "the independence of the federal judiciary was said to obviate that element of governmental control necessary to bring a federal officer or employee within the coverage of the Act." *LePatourel*, 571 F.2d at 410. The court found that "neither the Act nor its legislative history gives any indication that employee control answers the question of governmental liability outside the independent contractor context." *Id.*

So too here, because the President constitutes an "employee of the

Government" (*see supra* Section II. A), it is inappropriate to apply the control test relevant only to whether the President is an independent contractor.   *See supra* p. 51.

Finally, even assuming the master-servant test was somehow relevant, and it is not, the District Court erred by relying on the Restatement.  (SPA-43-44.)  The Restatement contains an express disclaimer that "it does not state the special rules applicable to public officers . . . ."  Restatement (Second) of Agency Scope Note. *See also* 1 Restatement (Third) of Agency 6 (2006) (noting that the Restatement "deals at points, but not comprehensively, with the application of common-law doctrine to agents of governmental subdivisions and entities created by government").

## 2.    A Master-Servant Relationship Exists.

Although the District Court erred in applying the Restatement's master-servant test to the scope of employment inquiry in the first place, the President nonetheless satisfies it.

Under the Restatement, the definition of servant "is one not capable of exact definition" and "cannot . . . be defined in general terms with substantial accuracy." § 220 cmt. c. Relevant, but non-exclusive, factors include, among others, whether the employment is "full time," whether the employer "supplies the instrumentalities, tools, and the place of work for the person doing the work," and

the manner of pay. *Id.* and cmt. h.

The President, who takes an oath of office, has full time or even ceaseless duties that are set forth in the Constitution, works from the White House, and takes a salary, satisfies this test. U.S. Const. art. II § 1, cl 8 (oath of office); art. II, § 1, cl. 7 ("The President shall, at stated Times, receive for his Services, a Compensation . . . .); 3 U.S.C. § 102 (setting Presidential compensation including expense allowance to defray costs of performing "official duties" and entitling the President "to the use of the furniture and other effects belonging to the United States and kept in the Executive Residence at the White House."); *Clinton v. Jones*, 520 U.S. at 713, 717 (Breyer, J., concurring) (noting the President "is the sole branch which the constitution requires to be always in function" and "the President never adjourns" (citation omitted)).

The District Court made much of the purported lack of control over the President in assessing whether the President is in a master-servant relationship. (SPA-45-47.)[19]  In holding that the President is not subject to "control," the District Court adopted an overly restrictive definition of the master-servant relationship that is not supported by the Restatement.  While control is a key factor in traditional analyses of the master-servant relationship, the Restatement recognizes

---

[19] As shown (*supra* Section III. C. 1), the existence of a master/servant relationship is irrelevant to the scope of employment issue, which presumes the existence of an employment relationship.

that the right of a master to control the servant "may be very attenuated."

Restatement § 220 cmt. d.  Thus, the term servant does not imply menial service,

but includes, for example, "the officers of a corporation or a ship, [and] the interne

in a hospital, all of whom give their time to their employers."  *Id.*  § 2 cmt. c.  The

President qualifies under this definition of control.  As officers of corporations

"give their time to their employer," so Presidents "give their time" to the

Government.  *See Clinton v. Jones*, 520 U.S. at 698 (noting the President must be

available "at all times" to perform his duties (citation omitted)).

Further, while the District Court held that any "control is absent whenever

the President discharges his duties" (SPA-46-47), the Supreme Court has rejected

this precise assertion.  In *Clinton v. Jones*, 520 U.S. 681, 703 (1997), the Supreme

Court held that that that separation of powers doctrine does not mean that the

branches "ought to have no *partial agency in*, or no *controul* over the acts of each

other"; to the contrary, the judiciary could "review[] the legality of the President's

official conduct, . . .  direct appropriate process to the President . . ., [and]

determine the legality of his unofficial conduct."  *Id.*  Thus, the President is in fact

confined by the Constitution and may be controlled by coequal branches.  *See*

*Youngstown Sheet & Tube*, 343 U.S. at 585 (President's powers are limited to

those provided "from an act of Congress or from the Constitution itself.").

Nor is it true, as the District Court claimed, that the "president is no one's

servant," (SPA-47), as the Supreme Court has recognized, both Congress and the President are "servants of the people." *See Ex parte Milligan*, 71 U.S. (4 Wall.) 2, 139 (1866) (noting that Congress and the President are both "servants of the people"); *see also Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 513 (2010) ("The Constitution . . . makes the President accountable to the people for executing the laws . . . .").

Indeed, under the District Court's definition, members of Congress or of the federal judiciary, who are not controlled, also would not constitute servants and none of their acts could fall within the scope of employment. Yet courts routinely recognize that they are covered by the Westfall Act. *See, e.g. Haaland*, 973 F.3d at 598; *Operation Rescue Nat'l*, 147 F.3d at 70-71; *Williams*, 71 F.3d at 507; *LePatourel*, 571 F.2d at 408 (under pre-Westfall Act FTCA).

## CONCLUSION

President Trump respectfully requests that this Court reverse the District Court's Order denying the motion to substitute the United States as defendant.

Dated:     New York, New York.          Respectfully submitted,
           January 15, 2020
                                        KASOWITZ BENSON TORRES LLP


                                        By:     /s/ Marc E. Kasowitz
                                             Marc E. Kasowitz
                                             Christine A. Montenegro
                                             Paul J. Burgo

                                           1633 Broadway
                                           New York, New York 10019
                                           T: (212) 506-1700
                                           E: mkasowitz@kasowitz.com
                                              cmontenegro@kasowitz.com
                                              pburgo@kasowitz.com

                                           *Attorneys for Defendant-Appellant,*
                                           *President Donald J. Trump*

**Federal Rules of Appellate Procedure Form 6.**
**Certificate of Compliance With Rule 32(a)**

**Certificate of Compliance With Type-Volume Limitation,**
**Typeface Requirements and Type Style Requirements**

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

This brief contains 13,164 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirement of Fed. R. App. P. 32(a)(5) and the type style required of Fed. R. App. P. 32(a)(6) because:

This brief has been prepared in a proportionally spaced typeface using Microsoft® Office Word, in 14 pt. font size, Times New Roman.

*/s/ Marc E. Kasowitz*