## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

1:23-cv-06883-PGG

PRESIDENT DONALD J. TRUMP, 45th President of the United States of America, in his individual capacity,

Plaintiff,

v.

SIMON & SCHUSTER, INC., a New York corporation, ROBERT WOODWARD p.k.a. BOB WOODWARD, an individual, and PARAMOUNT GLOBAL, a Delaware corporation, f/k/a Viacom Inc., successor by merger to CBS Corporation, a Pennsylvania corporation f/k/a Westinghouse Electric Corporation,

Defendants.

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' RULE 12(B)(6) MOTION TO DISMISS AMENDED COMPLAINT

**GS2 LAW PLLC**
Robert Garson
Yanina Zilberman (*pro hac vice application forthcoming*)
20803 Biscayne Blvd., #405
Aventura, Florida 33180
(305) 780-5212
E-mail: rg@gs2law.com
        yz@gs2law.com

*Attorneys for Plaintiff*

**TABLE OF CONTENTS**

TABLE OF CONTENTS...........................................................................................................i

TABLE OF AUTHORITIES ..............................................................................................iii

ARGUMENT .......................................................................................................................1

I. The status of President Trump's copyright registration at commencement of this lawsuit does not mandate dismissal. ............................................................................................1

A. Status of registration. ...................................................................................................1

B. Amendment may be in order, but dismissal is not warranted. ....................................3

II. Woodward is not the original author and copyright owner of the totality of the Interviews and the Work. ...............................................................................................................4

A. Plaintiff's argument is undermined by the Copyright Office's policies and findings. ........4

B. Defendants belittle the importance of the Copyright Office and its Compendium. .................5

III. The statutory preclusion against copyright of government works does not apply here. .........7

A. Contrary to the Defendants' argument, the Interviews, Audiobook and the Derivative Works are not uncopyrightable government works............................................................7

B. While the government works exclusion does not apply, the Presidential Records Act does, and confirms the copyrightability of the Interviews and the Work...............................11

C. Defendants' "Dominant Author" Analysis.................................................................13

D. Defendants' use of the Interviews in the Audiobook and the Derivative Works militates against fair use..................................................................................................17

Factor 1: Purpose and Character of Use (Commercial Nature or Nonprofit Education?) ...........17

Factor 2: Nature of Copyrighted Work .................................................................................20

Factor 3: Amount and Substantiality of the Portion Used in Relation to the Copyrighted work as a Whole. ............................................................................................................21

Factor 4: Effect of Use upon Potential Market for or Value of Copyrighted Work.....................22

IV. President Trump's claims against the Defendants are not subject to preemption. ..............25

A. President Trump's claims are not barred by preemption via the government works doctrine. ....................................................................................................................25

B. President Trump's state claims are not barred by 17 U.S.C. § 301.........................................26

V. President Trump's state law claims are sufficient to state a cause of action. .........................28

A. Breach of Contract.................................................................................................................28

(i) For the book............................................................................................................28

(ii) Statute of Frauds and breach of contract...............................................................29

(iii) Claims for promissory estoppel............................................................................29

B. Unfair competition and FDUPTA .............................................................................30

(i) Fallacy regarding non-commercial speech............ ..................................................30

(ii)  Claim duplication....................................................................................................31


VI. Claims against Paramount Global. ..............................................................................31


Conclusion..........................................................................................................................33

CERTIFICATE OF SERVICE ............................................................................................34

CERTIFICATION OF WORD COUNT ..............................................................................35

**TABLE OF AUTHORITIES**

**Cases**

*Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith*, 143 S. Ct. 1258 (2023)............18

*Associated Press v. Meltwater U.S. Holdings, Inc.,* 931 F.Supp.2d 537, 558 (S.D.N.Y. 2013) . 21, 23

*Banff Ltd. v. Limited, Inc.*, 869 F.Supp. 1103 (S.D.N.Y. 1994).......................................................32

*Bennett v. Tu-Cows, Inc.,* 2007 U.S. Dist. LEXIS 54816, 2007 WL 2178317 (E.D. Mich. July 27, 2007)...............................................................................................................................................32

*Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 613 (2d Cir. 2006) ....................21

Blockchain Min. Supply & Servs. v Super Crypto Min., Inc., 2022 US Dist LEXIS 140831 (S.D.N.Y 2022)..............................................................................................................................................29

*Bongino v. Daily Beast Co., LLC*, 477 F. Supp. 3d 1310 (S.D. Fla. 2020).......................................30

*Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.*, 373 F.3d 296 (2d Cir. 2004))..................................27

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994).................................................. 21, 22, 23

*Central Hudson Gas & Elec. Corp. v. Pub Serv. Comm'n of N.Y.*, 447 U.S. 557, 561, 100 S. Ct. 2343, 65 L. Ed. 2d 341 (1980) ......................................................................................................30

*Computer Assocs. Int'l v. Altai, Inc.*, 982 F.2d 693 (2d Cir. 1992)..................................................26

*Dr. Seuss Enters, L.P. v. Penguin Books USA, Inc.,*109 F. 3d 1394 (9th Cir. 1997)........................20

*Gattoni v. Tibi, LLC*, 254 F. Supp. 3d 659 (S.D.N.Y. 2017)...............................................................3

*Greer v. Media*, 2023 U.S. App. Lexis 7407 (2d Cir. 2023) ...........................................................27

*Harper & Row, Publishers, Inc.* v. *Nation Enters.*, 723 F.2d 195 (2d Cir. 1983), *rev'd on other grounds*, 471 U.S. 539, 105 S. Ct. 2218, 85 L. Ed. 2d 588 (1985) ........................................9, 21

*Hello I am Elliot, Inc. v. Sine*, 2020 U.S. Dist. LEXIS 116681(N.Y.S.D. 2020)...................................2

*Infinity Broad Corp v. Kirkwood*, 150 F. 3d 104 (2d Cir. 1998). ......................................................21

*Iowa State Univ. Research Found. V. ABC*, 621 F.2d 57 (2d Cir. 1980)..........................................19

*Janik v. Mediapost Communications, Inc.*, 2017 U.S. Dist. LEXIS 98390 (S.D.N.Y. 2017)...............4

*Khmaladze v. Vorotyntsev*, 2019 US Dist LEXIS 66375 (S.D.N.Y 2019)..........................................30

*Kieselstein-Cord v. Accessories by Pearl, Inc.*, 632 F.2d 989 (2d Cir. 1980) ...................................5

*Meeropol v. Nizer*, 560 F.2d 1061, 1068 (2d Cir. 1977), cert. denied, 434 U.S. 1013, 98 S. Ct. 727, 54 L. Ed. 2d 756 (1978) ...................................................................................................19

*Melendez v. Sirius XM Radio, Inc.*, 50 F. 4th 294 (2d Cir. 2022) ...............................................26, 27

*Membler.com LLC v. Barber*, 2013 U.S. Dist. LEXIS 135862 (E.D.N.Y. 2013) ..................................3

*Monge v. Maya Magazines, Inc.*, 688 F.3d 1164 (9th Cir. 2012) ....................................................19

*P&G Auditors & Consultants, LLC v. Mega Intl. Commer. Bank Co.*, 2019 US Dist LEXIS 169750 (S.D.N.Y. 2019) .............................................................................................................30

*Patchak v. Zinke*, 138 S. Ct. 897 (2018) ........................................................................................4

*Personal Watercraft Prod. SARL v. Robinson*, 2017 U.S. Dist. LEXIS 143336 (S.D.N.Y. 2017).......30

*Santos-Zacaria v. Garland*, 215 L. Ed. 2d 375 (2023).....................................................................4

*Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984)..........................................22

*Swatch Group Mgmt. Servs. v. Bloomberg L.P.*, 756 F. 3d 73 (2d Cir. 2014)................................17

*Tobinick v. Novella*, 848 F.3d 935 (11th Cir. 2017) ......................................................................30

*Urban Textile, Inc. v. Rue 21, Inc.*, 2017 U.S. District. Lexis 49573 (C.D. Cal. 2017) ......................5

*Varsity Brands, Inc. v. Star Athletica, LLC*, 799 F.3d 468 (6th Cir. 2015) .........................................5

*Whistleblower Prods., LLC v. St8cked Media LLC*, 2019 U.S. Dist. Lexis 117396 (E.D.N.Y 2019).....4

iv

**Statutes**

17 U.S.C. § 101 ........................................................................................................8

17 U.S.C. § 101. .......................................................................................................8

17 U.S.C. § 105 ........................................................................................................8

17 U.S.C. § 107(4) ..................................................................................................22

17 U.S.C. § 410 .........................................................................................................2

Fla. Stat. §§ 501.203(8), 501.204(1). .....................................................................30

**Other Authorities**

Compendium of U.S. Copyright Offices Practices, Third Addition .........................2, 5, 6, 9, 10, 24

Neuenschwander, John A.. A Guide to Oral History and the Law (Oxford Oral History Series)
    Second Edition (2014) (p. 132). ...................................................................... 24

1 Nimmer on Copyright § 5.13 ................................................................................8

Nimmer on Copyright, § 13.05[A][3] at 13-178 (1997)). ......................................21

Patry on Copyright § 19:4 (2013) ...........................................................................3

*Talking Donald Trump: A Sociolinguistic Study of Style, Metadiscourse, and Political Identity*....20

Raymond J. Dowd, Copyright Litigation Handbook § 7:1 (2d ed. 2012) ........................................3

Plaintiff, President Donald J. Trump, 45th President of the United States of America, in his individual capacity ("Plaintiff" or "President Trump"), respectfully submits this response in opposition to the Rule 12(b)(6) Motion to Dismiss Amended Complaint ("Motion") and the corresponding Memorandum of Law ("Defendant's Mem.") served by the Defendants, Simon & Schuster, Inc. ("SSI"); Robert Woodward ("Woodward"); and Paramount Global ("Defendants") in this matter, and requests that this Court deny the Motion in its entirety for the reasons set forth below. In further support of this response in opposition, the Plaintiff hereby incorporates the facts pled in his Amended Complaint [D.E. 32, "Complaint" or "Compl."] and further submits the Declaration of his attorney, Robert Garson ("Garson Declaration").[1]

**ARGUMENT**

**I.   The status of President Trump's copyright registration at commencement of this lawsuit does not mandate dismissal.**

**A.  Status of registration.**

As set forth in the Garson Declaration, concomitantly with the filing of this lawsuit, President Trump applied for registration of the copyright to the Work based upon sole authorship.[2] *See* Garson Dec. at ¶13. The Copyright Office has since expressed its willingness to

---

[1] *See* Exhibit 1 filed in conjunction with Plaintiff's response in opposition.

[2] Which presented unique difficulties as Defendants have refused to release to Plaintiff a copy of the original recordings. This has precluded Plaintiff's ability to register the work as a sole owner.  *See* Garson Declaration at ¶ 14.

"Work" is a term employed by the Defendants. Plaintiff interprets this term to include the Interviews a/k/a Interview Sound Recordings, Audiobook, and the Derivative Works, as referred to and defined in the Complaint. *See generally* Compl. [D.E. 32]; Defendant' Mem. at p. 3. However, both the Plaintiff and the Defendants make arguments concerning the copyrightability of the Interviews themselves.

grant copyright protection to President Trump as a joint author of the Work but has denied registration thus far on the basis of sole authorship. *See* Garson Dec. at ¶¶ 16, 17, 21, 22. And, on September 1, 2023, the Copyright Office confirmed it would proceed with registering the Work on the basis of joint authorship. *See id.* at ¶ 22. Plaintiff has thus received express notice from the Copyright Office that it is refusing registration of the work Plaintiff deposited with the Copyright Office based on sole authorship because purportedly it is what it considers to be a "bona fide copy." *See* 17 U.S.C. § 410. *See* Garson Dec. at ¶¶ 16, 17, 21, 22.

Regardless of whether this Court treats Plaintiff's copyright claim as copyright infringement or as an action for declaratory relief of copyright ownership, or a combination of both, the requisite of copyright registration has been satisfied via the Copyright Office's rejection notice, and the Plaintiff respectfully requests that this Court take judicial notice of the same or permit an amendment to reflect the same.

Defendants cite *Hello I am Elliot, Inc. v. Sine*, 2020 U.S. Dist. LEXIS 116681 (N.Y.S.D. 2020) for the proposition that, even if this action is treated as an action for declaratory relief, Plaintiff is barred from pursuing it by virtue of a lack of registration. *See* Defendants' Mem. at p. 10. However, as set forth above, the registration element has been satisfied via the rejection notice. In any event, the *Hello I am Elliot* court "assume[d]" that the plaintiffs' declaratory claim for copyright ownership was based on the Copyright Act. *Hello I am Elliot, Inc.*, 2020 U.S. Dist. LEXIS 116681, at *228-29. But here, Plaintiff's declaratory relief claim is not entirely based upon the Copyright Act; rather, the Plaintiff is asking this court to declare, in pertinent part and as a matter of law, that in accordance with the *Compendium* authored by the Copyright Office, the

Plaintiff owns copyright to at least his responses during the Interviews. *See* Compl. at pp. 22-23. The declaratory judgment claim thus rises and falls, at least in part, not on aspect of the Copyright Act but on the rules set by the Copyright Office which the Defendants consider inapplicable, which reflects a bona fide dispute and actual controversy. *See* Defendants' Mem. at p. 15. Now, this Court "need not defer to the Copyright Office's interpretation as a general matter," but it *could do so*, and it could find the Copyright Office's analysis "persuasive nonetheless," as the Second Circuit did in *16 Casa Duse, LLC v. Merkin*, 791 F. 3d 247, 258 (2d Cir. 2015) (hereinafter, *16 Casa Duse*); *see also infra.*

**B. Amendment may be in order, but dismissal is not warranted.**

The lack of copyright registration at the commencement of a lawsuit does not preclude later amendment of the complaint to reflect the registration. *See* Patry on Copyright § 19:4 (2013) ("Where plaintiff has received registrations subsequent to the filing of the complaint, the complaint should be amended."); Raymond J. Dowd, Copyright Litigation Handbook § 7:1 (2d ed. 2012) ("[I]f a plaintiff registers copyrights after the filing of a complaint but does not supplement the complaint pursuant to Rule 15(d) of the Federal Rules of Civil Procedure, the court may dismiss the case.").  Therefore, the law envisages a case such as this where registration is pending. *See Gattoni v. Tibi, LLC*, 254 F. Supp. 3d 659, 659 (S.D.N.Y. 2017) (dismissing action without prejudice but granting plaintiff leave to amend complaint within sixty (60) days showing either a valid registration or a rejection of the registration application); *Membler.com LLC v. Barber*, 2013 U.S. Dist. LEXIS 135862 at *9 (E.D.N.Y. 2013) (dismissing copyright infringement claims based upon a lack of registration prior to filing a claim but allowing the party plaintiff to amend because the party obtain registered after filing the

lawsuit); *Janik v. Mediapost Communications, Inc.*, 2017 U.S. Dist. LEXIS 98390 at *8-9 (S.D.N.Y. 2017) (allowing plaintiff to amend complaint consistent with the opinion dismissing complaint for lack of copyright registration). The courts, instead of elevating form over substance, sensibly build in the backstop of amendment, which could also transpire while any given motion is pending. *See also Whistleblower Prods., LLC v. St8cked Media LLC*, 2019 U.S. Dist. Lexis 117396 at *17 (E.D.N.Y 2019) (dismissing copyright infringement claim *without* prejudice).

The Supreme Court recently confirmed its treatment as non-jurisdictional of the threshold requirements that claimants must complete, or exhaust, before filing a lawsuit, because jurisdictional treatment could "undo the benefits of exhaustion, the purpose of which is supposed to be efficiency." *See Santos-Zacaria v. Garland*, 215 L. Ed. 2d 375 (2023); *Patchak v. Zinke*, 138 S. Ct. 897 (2018). *See also* 2 Nimmer on Copyright § 7.16 (2023). Here, it is highly anticipated that by the time the Defendants' Rule 12(b)(6) motion is fully submitted, the Plaintiff will have in hand a copyright registration certificate reflecting his joint ownership of the Work, including but not limited to the Interviews themselves. Meanwhile, the Plaintiff already has a rejection notice which means he has satisfied the registration requirement. No purpose whatsoever would be served by dismissal of this action here and now, after months of pendency. It would be grossly inefficient.  Even if the Court is inclined to an enter an order of dismissal, the Plaintiff respectfully requests for the opportunity to amend to include what has transpired since commencement of this lawsuit.

**II.  Woodward is not the original author and copyright owner of the totality of the Interviews and the Work.**

**A.  Plaintiff's argument is undermined by the Copyright Office's policies and findings.**

Woodward's claim that he is the original and sole author and copyright owner of the Work is belied by the Copyright Office's entrenched policies and determination in this matter.

**B. Defendants belittle the importance of the Copyright Office and its Compendium.**

The "Compendium of U.S. Copyright Offices Practices, Third Addition" ("Compendium") is more than just a secondary authority. *See Urban Textile, Inc. v. Rue 21, Inc.*, 2017 U.S. District. Lexis 49573 at *1, n1 (C.D. Cal. 2017). It "is an internal manual" published by The Copyright Office "that instructs its employees who are tasked with reviewing and registering copyrights how to **apply the relevant provisions of the Copyright Act uniformly**." *Varsity Brands, Inc. v. Star Athletica, LLC*, 799 F.3d 468, 480 (6th Cir. 2015) (citing the Compendium at §§ 903.1, 924-924.3(D) (emphasis added)). *See also* Compendium at pp. 1, 2; *Kieselstein-Cord v. Accessories by Pearl, Inc.*, 632 F.2d 989, 994 (2d Cir. 1980) ("The Copyright Office continually engages in the drawing of lines between that which may be and that which may not be copyrighted."). *See* Compendium at p. 2 (itemizing various copyright cases in which courts have cited the Compendium).

Section 719 of the Compendium specifically covers the subject of interviews, defined as a "written or recorded account of a conversation between two or more individuals [whereby] typically, the interviewer poses a series of questions that elicit a response from the interviewee(s)." *See* Compendium at § 719, p. 33. The Copyright Office thus confirms that an interview may be the object of copyright registration. *Id.* Here, the Interviews are most certainly fixed in a tangible medium of expression, as they were recorded. Moreover, the Interviews are replete with creative expression in the form of questions and certainly Plaintiff's

responses, conceded by Woodward as being the catalyst for publication. *See* Garson Dec. (citing Woodward's various statements).

As set forth in the Compendium, in pertinent part,

The U.S. Copyright Office will assume that the interviewer and the interviewee own the copyright in their respective questions and responses unless **(i) the work is claimed as a joint work, (ii) the applicant provides a transfer statement indicating that the interviewer or the interviewee transferred his or her rights to the copyright claimant, or (iii) the applicant indicates that the interview was created or commissioned as a work made for hire.**

*Id.* at § 719, p. 33 (emphasis added).

In this case, the Copyright Office concluded, in its specialized experience and investigation,[3] that subsection (i) applies, and has construed his submission of *The Trump Tapes* as a joint work but has rejected it as a work authored solely by him. *See supra.* Therefore, presumptively, at the very minimum, President Trump has such rights as a matter of law, and it is undoubtedly the burden of Defendants to shoulder the burden in rebutting the presumption.

With this presumption in place as a matter of law, the argument that Woodward is the sole author and owner is legally tenuous but also disputed. Given the evidence of Woodward's agreement limiting his use of the Interviews, *see* Compl. at ¶¶ 47-54, and his admission that the publication of an interview in this matter was completely new territory for him,[4] *see* Garson Declaration at ¶10, whether Woodward is the sole author/owner is a factual matter that may not be disposed of at this early stage of litigation, without further discovery. Because of factual

---

[3] As stated previously, the Copyright Office is precluded from applying its regular presumptions of individual ownership of responses as, in order to do that, Plaintiff would have to submit an original recording of the responses. *See* Garson Declaration at ¶14.

[4] None of the defendants are relying upon an "advice of counsel" defense, as discussed counsel-to-counsel.

questions that are still pending a response from the Defendants, it cannot be decided as a matter of law that Woodward, as opposed to President Trump, has full authorship and copyrights to the Interviews and the Work. These factual questions include the following: (i) what discussions did Woodward and the Plaintiff have beyond the text featured in the Interviews?; (ii) what edits did Woodward and others actually make to the raw recordings of Plaintiff in incorporating them into the Audiobook and the Derivative Works? (iii) what did Woodward mean by referring to "for the history" in conversations with President Trump; (iv) what does Woodward mean by "historical record," and is his meaning of that different now, post-litigation, different than it was in conversation with President Trump. All of these questions affect the outcome of this litigation and of findings of ownership, and the Defendants' failure to answer them requires denial of this motion and commencement of the discovery process.

Defendants rely heavily upon *Georgia v. Pub.Resource.Org, Inc.*, 140 S. Ct. 1498, 1510 (2020), but that case has nothing to do with interviews or the rights afforded to an interviewee as opposed to the interviewer. *Georgia*, 140 S. Ct. at 1501. Neither *Georgia* nor *16 Case Duse* has anything to do with interviews or journalism, and any reference to "swiss cheese" in the latter has no impact upon the claims brought by the Plaintiff. *See* Defendants' Mem. at p. 16. The Defendants are simply invoking catchy phrases from inapposite cases to distract from the merits of this case.

**III.  The statutory preclusion against copyright of government works does not apply here.**

**A.  Contrary to the Defendants' argument, the Interviews, Audiobook and the Derivative Works are not uncopyrightable government works.**

17 U.S.C. § 105 of the Copyright Act provides:

Copyright protection under this title is not available for any work of the United States Government, but the United States Government is not precluded from receiving and holding copyrights transferred to it by assignment, bequest, or otherwise.

A "work of the United States government" is "a work prepared by an officer or employee of the United States government as part of that person's official duties."  17 U.S.C. § 101. The Defendants have had a tunnel vision approach to this provision from the outset. In their view, the exclusion automatically applies here based upon President Trump's service as president. That is an incorrect application of the government works doctrine.

As a starting point, for the government works exclusion to apply, the underlying works would not only have to be prepared by an officer or employee of the United States, but also prepared as part of that person's official duties. 17 U.S.C. § 101. Defendants try to satisfy these two separate elements by repeatedly harping on President Trump's status as an officer or employee of the United States by way of his presidency; however, case law confirms that presidential status, or indeed governmental status, is not an automatic trigger for application of the government works doctrine. *See, e.g.*, *Pub. Affs. Assocs. v. Rickover*, 109 U.S. App. D.C. 128, 284 F.2d 262, 269 (D.C. Cir. 1960) ("It cannot be properly said . . . that a government official who speaks or writes of matters with which he is concerned as an official is by the very fact of being such an official barred from copyright on his productions.'"); 1 Nimmer on Copyright § 5.13 (quoting H.Rep., p. 58 for the proposition that "'a Government official or employee would not be prevented from securing copyright in a work written at that person's own volition and outside his or her duties, even though the subject matter involves the Government work or professional field of the official or employee.'"); *Harper & Row, Publishers, Inc.* v. *Nation*

*Enters.*, 723 F.2d 195 (2d Cir. 1983), *rev'd on other grounds*, 471 U.S. 539, 105 S. Ct. 2218, 85 L. Ed. 2d 588 (1985) (refusing to go so far as to find that the words Ford spoke when he was in office may not be copyrighted by him as works of the United States government, for the reason that "[t]he conversations originated with Ford, and unlike the testimony before the Hungate Committee, were neither fixed as writings nor publicly delivered as part of any person's official duties . . . the phrasing of the sentence itself may be copyrighted by that official if and when it is later written down.") To be sure, if presidential status was synonymous with uncopyrightable," the subject exclusion would be an express "presidential works" exclusion, and there would be no case law affording a president or other government figure the benefit of copyright protection. But there is no such narrowly-tailored exception, and such case law does exist. *See supra.* Thus, one can be a presidential or other government figure and still benefit from the protections of the Copyright Act. *See also* Compendium at section 313.6©(1), at p. 35 (citing H.R. REP. NO. 94-1476, at 58 (1976), reprinted in 1976 U.S.C.C.A.N. at 5671) (one of the Compendium-recognized exceptions to the government works exclusion is that "[a] work prepared by an officer or employee of the U.S. government may be registered if the work was prepared at that person's own volition and outside his or her official duties, even if the subject matter focuses on the author's work for the government.").

Even if President Trump was an officer or employee of the United States, the Defendants must still show that the Interviews were prepared in the course of his official duties. Defendants fail to establish this element. Short of saying who was present during the interviews, the Defendants offer no such evidence. Indeed, the evidenced adduced to date establishes that the Interviews were prepared at his own volition and outside of his official

duties. *See* Garson Dec. at ¶ 20. The mere fact that President Trump was in office during the interviews is not tantamount to the interviews being in the course of official duties. Defendants go from "if" to "then" without consideration of the in-between and without consideration of the fact that being a President is both a temporal role and a duty, fulfilled at home, in an office (which are both in the same building) and offsite; one can be a president and play golf, be an equestrian, and also be a parent. Under these facts, and as a matter of case law, whether any works were prepared in the course of official duties entails a factual determination, and that cannot be made at this stage. *See Pub. Affs. Assocs. v. Rickover*, 268 F. Supp. 444, 450 (D.D.C. 1967) (holding that "the circumstances of the preparation and delivery of the speeches and the speeches themselves must be examined to determine whether the Admiral was acting in his public or his private capacity.").

If the Defendants wish to invoke the government works exclusion, they are tasked with sufficiently alleging with why it applies. President Trump is not required to plead it for them.

Finally, Defendants concede that the Compendium speaks to interviews generally, without distinction or difference. *See* Defendants' Mem. at p. 21. That generality is precisely why no distinction is required to be made between the Interviews and other interviews, the law applied with equanimity.

Additionally, one cannot help but notice the hypocrisy here. Woodward argues the Work, including the Interviews, are purportedly a work of government copyright, but he has unabashedly asserted sole copyright to the Work.  Garson Dec. at ¶¶11-12. He could have

donated his copyright in the Interviews to the United States government, as other journalists—

indeed, oral historians, have done[5]—but there is no trace here of any such donation.

**B. While the government works exclusion does not apply, the Presidential Records Act does, and confirms the copyrightability of the Interviews and the Work.**

The Presidential Records Act ("PRA") shows why Defendants' government works

argument is fraught with frailty. The government works preclusion cannot be dispositive of

President Trump's rights with respect to the Work—in particular, the Interviews—because

these works are personal records, not presidential records, under the PRA. *See* 45 U.S.C. §§

2201-2207 (1988).[6] The PRA was enacted to "prevent a repeat of Watergate's legal drama

surrounding ownership of presidential records by asserting public ownership of such records

and to ensure the preservation and public availability of presidential records by imposing

certain specified procedures." *Presidential Records Act: The President And Judicial Review*

*Under The Records Acts.*, 60 Geo. Wash. L. Rev. 1477, 1483 (1992) (citing *See* H.R. REP. NO.

1487, [9]5th Cong., 2d Sess. 2 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5732, 5733). Defendants

incorrectly argue that the point of the PRA is to prevent a "profit" situation; rather, the PRA

contemplates the parameters and limitations of public access to a former President's records.

To that end, it distinguishes between "Presidential records" and "personal records." 44 U.S.C.S.

§ 2201 (LexisNexis, Lexis Advance through Public Law 118-3, approved April 10, 2023).

---

[5]

https://www.nixonlibrary.gov/sites/default/files/forresearchers/find/histories/Richard_Hauser.pdf

[6] There is no interplay, as a matter of law, between the PRA and the Copyright Act. There are two possible lines of reasoning: (i) the Copyright Act does not apply to the President at all. If it did then the entirety of the PRA would be otiose; or (ii) the PRA is a predicate for applicability to the CA, in that if the PRA bites on any given work, any government works doctrine would flow from that primary determination.

Pursuant to the PRA, the United States "reserve[s] and retain[s] complete, ownership, possession, and control of *Presidential records*." 44 U.S.C.S § 2201(2) (emphasis added). There is no designated provision to *personal records*, confirming the United States *does not* reserve or retain complete ownership, possession, and control of Presidential records.  At issue in this action are not Presidential records, but rather personal records in the nature of "diaries, journals, or other personal notes serving as the functional equivalent of a diary or journal which are not prepared or utilized for, or circulated or communicated in the course of, transacting Government business." 44 U.S.C.S. § 2201(3) (category of PRA-recognized personal records).

In this case, Woodward acting as author rather than journalist has made an approach to President Trump for his personal impressions on a range of topics for a biographical book, during which, Woodward made the request that the interviews be recorded, as an aide memoire for that book and which President Trump made clear that any such recordings were for "the book." Woodward agreed to proceed on that basis, as alleged in the Amended Complaint and evident on the face of the recordings. *See* Compl. at ¶¶47-53. The Interviews as memorialized by the Work were not conducted in the form of official press conferences, not prepared or utilized for, or circulated or communicated in the course of, transacting government business. Further, the SSI website concedes that the Trump Tapes and Rage both fall under the category of Biography & Memoirs,[7] a functional equivalent of a diary or journal.

President Trump submits that the Work falls within the PRA, which, on one hand, functions independent of and as a functional exception to the Copyright Act and its government works provision, and on the other hand, informs the Copyright Act provision relating to

---

[7]      https://www.simonandschuster.com/search/books/Author-Bob-Woodward/Category-Biography-Autobiography/Available-For-Sale-Now/_/N-1z13w6gZhr0Zpgz/Ne-pgt

copyrightability of government works.  It does so by first defining the nature of a presidential work that is subject to government ownership and providing that if the work is deemed a personal record, there can be no government ownership and thus no government copyright. The Defendants incorrectly have considered the PRA and the Copyright Act in their respective vacuums, without considering the impact of the PRA upon the government works doctrine. That failure defeats the instant motion.

### C.  Defendants' "Dominant Author" Analysis.

Defendants contend President Trump does not own a copyright either in the Interviews or the Work because Woodward is purportedly the "dominant author" of the Interviews and the Work.  *See* Defendants' Mem. at p. 20.

For the "dominant author" analysis, the Defendants again cite *16 Casa Duse*, which suggests that when "multiple individuals lay claim to the copyright in a single work, the dispositive inquiry is which of the putative authors is the "dominant author." *16 Casa Duse, LLC*, 791 F.3d at 260. 16 *Casa Duse* further suggests that determining which of multiple authors is "dominant" involves consideration of certain elements, including decisionmaking authority, billing and written agreements with third parties. *Id.* at 260.  Defendants' "dominant author" approach must be applied to not only the Audiobook and the Derivative Works, but also the Interviews themselves. Applying that here, the argument fails on both fronts.

<u>The Interviews</u>

To conduct the Interviews, Woodward had to seek the Plaintiff's consent to be recorded and to speak to him. *See* Compl. at ¶ 36.  But for Plaintiff's consent, Woodward would not have had access to any of the information conveyed to him via the Interviews; there would be no

Interviews to publish. It was the Plaintiff's decision to be interviewed and to allow Woodward to question him that enabled the Interviews to materialize. Defendants argue Plaintiff admitted "he had no control over what Woodward would write," *see* Defendants' Mem. at p. 29, but Defendants miss the point: Woodward had no control over what the Plaintiff would say, and the raw Interviews which were turned into the Audiobook and the Derivative Works were about what President Trump said, and how he said it. The hallmark of the Interviews are Plaintiff's stream-of-consciousness, his articulation, and the uniqueness of his voice—indeed, President Trump's unique voice is, on Woodward's own admission, is what prompted Woodward to publish the Interviews for the world to hear—and to see on paper. *See* D.E. 37-1, Woodward Dec. at ¶ 17. Woodward's role, on the other hand, was, on many occasions, to press the "record button" when President Trump talked and listen to the President speak. Pushing the "record button" is not tantamount to dominance of authorship; to the contrary, it is secretarial, and confirms the value of the Plaintiff's voice and words. Woodward may have come up with questions of his own, but the Interviews were clearly not a traditional question and answer format, as President Trump apparently "could take [him] on a freeway to nowhere in an instant," *see* Exh A. at 85; Defendants' Mem. at p. 4. Further, this is not a situation where only Woodward contacted President Trump to pose questions to him; as Woodward notes in his Declaration, "on some occasions, President Trump called me at my home in Washington D.C." *See* D.E. 37-1, Woodward Dec. at 12. As such, the Defendants cannot simply rely upon other sources that discuss a journalist's copyrights; they must take into consider nuanced, unusual nature of the Interviews. They fail to do that here.

As to the elements of billing and relevant third-party agreements, Defendants make absolutely no argument as it pertains to the Interviews, instead focusing solely on the Audiobook and the Derivative Works. *See* Defendants' Mem. at pp. 11-13. The Interviews, in the context of the Work, are not credited or billed as the *Woodward Tapes* featuring President Trump but rather *The Trump Tapes*. Thus, the billing factor also favors Plaintiff. As to "third party agreements," there are none in the context of the Interviews, making this element neutral. As such, as it relates to the Interviews, President Trump is the "dominant author."

<u>The Audiobook and Derivative Works</u>

The Defendants claim Woodward had "decision making authority" as to the Audiobook and Derivative Works, but this argument fails to consider the extent to which both are the direct byproduct of the Interviews. The claim Woodward edited the Interviews and somehow made it "his own," *see* Defendants' Mem. at p. 15, is self-serving where the Defendants have withheld the original Interview recordings and thus precluded President Trump as well as this Court from reconciling the original Interviews and the materials that have been deposited with this Court. By Woodward's own admission, he *incorporated edited versions* of the Interviews in the Work, but the question remains what he edited and what remained the same. *See* Woodward Dec. at ¶ 18 (emphasis supplied). As long as that question remains unanswered, and the Defendants have repeatedly failed to answer it, relief under Rule 12(b)(6) is not proper.

As to "billing," Defendants' allusion to the fact that the "front cover and copyright page of the Work list [Woodward] as the sole author" is incredibly self-serving. *See* Defendants' Mem. at p. 13. After all, Woodward and the other Defendants were directly involved in the placement of that language there. *See* Woodward Dec. at pp. 5-6. As the Defendants

acknowledge, a website shows that the audio version of the Word is "by Bob Woodward, Donald J. Trump," and even if the subject website is a third-party vendor, that billing raises a genuine issue of fact that precludes relief under Rule 12(b)(6). *Id.* at at p. 13, n.7.   Multiple advertisements for sale of the Audiobook and Derivative Works refer to President Trump as a "reader" and as a "narrator," all of which credits the President Trump. *See* Garson Dec. at p. 3; Compl. at ¶ 57.Woodward argues this is "weak," *see* Defendants' Mem. at p. 13, n.7, but that is only because the objective facts are not in favor of the Defendants. Moreover, a Rule 12(b)(6) motion is not the proper mechanism to argue what is "weak" or "strong." Drawing all inferences in favor of the Plaintiff, this element favors the Plaintiff. Finally, Defendants conclude, without explanation, that Woodward "executed all of the relevant third-party agreements." Defendants' Mem. at p. 13. What agreements? This statement is so devoid of explanation and of evidentiary support that it cannot lean in favor of Woodward and is, at best, neutral.

Defendants suggest that Woodward must be the sole author of the Interviews and the Work because the Interviews are "collaborative" in nature, again citing *16 Case Duse, LLC*. *See* Defendants' Mem. at p. 16. However, the "collaborative" activity that is the subject of *16 Casa Duse, LLC* is *filmmaking, not interviews. See 16 Casa Duse, LLC*, 791 F. 3d at 258 (emphasis supplied). It is filmmaking that is a

> collaborative process typically involving artistic contributions from large numbers of people, including—in addition to producers, directors and screenwriters—actors, designers, cinematographers, camera operators, and a host of skilled technical contributors. If copyright subsisted separately in each of their contributions to the completed film, the copyright in the film itself, which is recognized by statute as a work of authorship, could be undermined by any number of individual claims.

16

*Id.* at 258. Here, we have just two people, and a unique set of interviews between them, with one seeking copyright to, at minimum, his responses to those interviews. That is not what *16 Casa Duse* is about. Further, the Defendants cannot claim that the interviews were "collaborative" where they also claim that the Interviews were sole work of Woodward. *See supra.* Defendants cannot have their cake and eat President Trump's as well.

**D. Defendants' use of the Interviews in the Audiobook and the Derivative Works militates against fair use.**

In determining whether a defendant's use of a copyrighted work constitutes fair use, courts look at four factors, discussed below. *See Harper & Row, Publrs. v. Nation Enters.*, 471 U.S. 539, 561 (1985) (noting that fair use, as codified in the Copyright Act, functions "as an affirmative defense requiring a case-by-case analysis). Further, because it is "designed to accommodate First Amendment Concerns, [it] is notoriously fact sensitive and often cannot be resolved without a trial." *Georgia*, 140 S. Ct. at 1513.

Defendants cited to *Swatch Group Mgmt. Servs. v. Bloomberg L.P.*, 756 F. 3d 73, 86-87 (2d Cir. 2014) to suggest discovery is not necessary in the fair use context, but that case is inapplicable. First, it deals with a motion for summary judgment, not a motion to dismiss; further, there, the Second Circuit simply noted that the discovery sought would not alter its analysis. There may have been no need for discovery there, based on the facts of that case, but that is not the case here. *See supra,* at p. 7. Further, *Swatch* was not decided "on the pleadings" as the Defendants claim. *See* Defendants' Mem. at p. 23. Moreover, that decision is inapposite here because of the completely different nature of the interview.

**(a) Factor 1: Purpose and Character of Use (Commercial Nature or Nonprofit Education?)**

Central to Defendants' argument as to why the first factor favors the Defendants is the claim that the Work "add[ed] extensive supplemental materials." *See* Defendant's Mem. at p. 7, 22. This is a self-serving statement which cannot be relied upon at the motion to dismiss stage because there is nothing before this Court to suggest the Defendants added anything of the sort. Defendants have not provided the raw, unedited recordings to which, according to the testimony of Woodward and no one else, purportedly added "extensive materials." *See* Defendant's Mem. at p. 7, 22. Defendants have produced a copy of the Work as published but have failed to present to the court the *original* recordings and interviews between President Trump and Woodward.[8] Having failed to show the "before and after," the Defendants have not shown, as a matter of fact or law, that they somehow transformed the original work. The allegation of transformation is, in fact, highly specious based upon Woodward's characterization own statement about the Work.[9] *See* Garson Declaration at ¶ 9. It cannot be taken for granted[10]. Defendants' references to "at times break[ing] frame" but also to the addition of "extensive supplemental materials," and an overall inability to get their story straight, necessitates discovery proceedings. *Compare* Garson Declaration at ¶ 9 *with* Defendant's Mem. at p. 7, 22.

---

[8] *Arguendo*, Woodward's own admissions of the main selling point of the Work, hearing the words of President Trump, minimizes the value of the alleged materials and further many of the "commentaries" lend little to the value of the Work, which is a fact intensive question to the defense of fair use. *See* Garson Declaration quoting Woodward.

[9] https://www.bobwoodward.com/books/trump-tapes

[10] Especially given the recent case law on what constitutes transformative, which erodes Defendants' contentions. See *Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith*, 143 S. Ct. 1258 (2023).

Defendants claim the Work qualifies as fair use because criticism and news reporting constitute fair use. But "[a]lthough news reporting is an example of fair use, it is not sufficient itself to sustain a *per se* finding of fair use." *Monge v. Maya Magazines, Inc.*, 688 F.3d 1164, 1173 (9th Cir. 2012). *See also Iowa State Univ. Research Found. v. ABC*, 621 F.2d 57, 60 (2d Cir. 1980) (noting that resolution of a fair use claim "depends on an examination of the facts in each case (and) cannot be determined by resort to any arbitrary rules or fixed criteria," and citing to *Meeropol v. Nizer,* 560 F.2d 1061, 1068 (2d Cir. 1977), cert. denied, 434 U.S. 1013, 98 S. Ct. 727, 54 L. Ed. 2d 756 (1978)).

Even if there was an element of newsworthiness, "newsworthiness itself does not lead to transformation." *Monge*, 688 F. 3d at 1176. "Wholesale copying sprinkled with written commentary . . . [is] at best minimally transformative. *Id.* Plaintiff submits that the Work is, at best, wholesale copying sprinkled with written commentary–which is at best minimally transformative. *Id.*

Notably, the Defendants never address the commercial use and educational/non-profit dichotomy and have waived this argument. In any event, President Trump submits the Work is emblematic of commercial use. The Audiobook and the Derivative Works have been sold for a profit to the Defendants. Despite claiming that this is somehow other than commercial use by invoking use of the "historical record" (a self-serving, contrived defense unknown to law), the Defendants have all profited from sales, as reflected in sales data produced by the Defendants. Woodwards' own writings confirm he perceived publication of President Trump's quotations as a money-maker. *See* Garson Declaration at ¶¶ 9, 10, 12.  This factor thus weighs heavily in favor of Plaintiff.

**(b) Factor 2: Nature of Copyrighted Work**

The third factor looks at the "nature of the work." This factor "recognizes that creative works are 'closer to the core of intended copyright protection' than informational and functional works, 'with the consequence that fair use is more difficult to establish when the former works are copied." *Dr. Seuss Enters, L.P. v. Penguin Books USA, Inc.*,109 F. 3d 1394, 1402 (9th Cir. 1997). Here, the creativity, imagination and originality of the Sound Recordings tilts the scale against fair use. *Id.* at 1190. The Interviews were not information or functional, but rather a creative work. Woodward himself concedes the critical nature of the creativity imbued by hearing and reading President Trump's words as articulated by the speaker rather than the biographer. Modulation is the key in that the power, pitch, pause, pace and overall tone color of President Trump's narrative, as spoken by him in his unique style, was the motivating factor in its publication. President Trump is currently one of the most mimicked, and often lampooned, public figures, which is largely due to his stream-of-consciousness style of speaking with repetition and emphasis of certain words but is undoubtedly unique in its creativity.[11] To academics of linguistics this is known as his "idiolect," the idiosyncratic form of language that is unique to an individual and there have been publication on this specific subject such as *Talking Donald Trump: A Sociolinguistic Study of Style, Metadiscourse, and Political Identity* by Jennifer Sclafani (Routledge 2018).

Part of this analysis is whether the copied work is unpublished. *Dr. Seuss Enters, L.P.*, 983 F. 3d 443 (noting that the unpublished nature of a work is a key, though not necessarily determinative, factor, tending to negate a defense of fair use.) "Under ordinary circumstances,

---

[11] https://www.vox.com/policy-and-politics/2017/1/11/14238274/trumps-speaking-style-press-conference-linguists-explain

the author's right to control the first public appearance of his undisseminated expression will outweigh a claim of fair use." *Harper & Row,* 471 U.S. at 553. The Interview Sound Recordings was a creative work, interviews, that President Trump could publish. He had a right to do so. This factor weighs heavily in favor of Plaintiff.

**(c)** **Factor 3: Amount and Substantiality of the Portion Used in Relation to the Copyrighted work as a Whole.**

This factor asks whether "the amount and substantiality of the portion used in relation to the copyrighted work as a whole" "are reasonable in relation to the purpose of the copying." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 587 (1994). Part of the analysis is the quantity and value of the materials used; "this factor calls for thought not only about the quantity of the materials used, but about their quality and importance." *Id.* The Supreme Court has agreed that whether a substantial portion of the infringing work was copied verbatim from the copyrighted work is a relevant question. *See id.* "The more of a copyrighted work that is taken, the less likely the use is to be fair [and] even a less substantial taking may be unfair if it captures the essence of the copyrighted work." *See Infinity Broad Corp v. Kirkwood*, 150 F. 3d 104 (2d Cir. 1998) (citing *Harper & Row*). "Generally, it may not constitute a fair use if the entire work is reproduced." *Id.* (citing Nimmer on Copyright, § 13.05[A][3] at 13-178 (1997)).

Here, Defendants have taken the Interview Sound Recordings in their entirety to publish the Audiobook and the Derivative Works. That does not coalesce with the fair use doctrine. *See Associated Press v. Meltwater U.S. Holdings, Inc.,* 931 F.Supp.2d 537, 558 (S.D.N.Y. 2013). ("appropriation of a copyrighted work in its entirety weighs against a finding of fair use")*; Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 613 (2d Cir. 2006) ("[n]either our

court nor any of our sister circuits has ever ruled that the copying of an entire work favors fair use.")

The Audiobook and Derivative Works are entirely predicated upon the Interviews; the interviews were reproduced wholesale; to the extent the Defendants claim the reproduction is not wholesale, the Defendants were tasked with producing the Interviews, but they have not done so. The admitted wholesale copying of the interviews was not necessary to newsreport, comment, or critique.

**(d)  Factor 4: Effect of Use upon Potential Market for or Value of Copyrighted Work.**

The fourth fair use factor considers the effect of use upon a potential market for or value of the copyrighted work. 17 U.S.C. § 107(4). This factor "requires courts to consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also "whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market" for the original." *Campbell*, 510 U.S. at 590. Market harm may be presumed here. *See Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 450 (1984) (holding that "every commercial use of copyrighted material is presumptively an unfair exploitation of the monopoly privilege that belongs to the owner of the copyright"). "A presumption of market harm "makes common sense[ ] when a commercial use amounts to mere duplication of the entirety of an original." *Campbell*, 510 U.S. at 591. Because the Defendants' use constituted a mere duplication of the original Interview Sound Recordings, market harm may be presumed here.

Defendants' use impairs the actual market for the Interview Sound Recordings because the Work serves the very same purpose as the Interview Sound Recordings. *See Associated*

*Press*, 931 F.Supp.2d at 559.  The publication of the Interview Sound Recordings rendered it unlikely that the market would purchase the Interview sound Recordings from Plaintiff and diminished any licensing value of the copyright. Defendant's use therefore supplanted the normal market in which President Trump had a reasonable expectation to earn licensing revenue.  Moreover, Defendants' use impairs the potential market for the Interview Sound Recordings because "unrestricted and widespread conduct of the sort engaged in by the defendant ... would result in the substantially adverse impact on the potential market for [licensing of] the original." *Campbell*, 510 U.S. at 590 (internal quotation omitted). Here, the wholesale copying of the Interviews means that any authorized market for the original work was severely reduced or even eradicated. The Defendants' conduct undermined President Trump's opportunity to exploit the value of his copyright during its peak demand in the marketplace. For the foregoing reasons, the fourth fair use factor should weigh heavily in Plaintiff's favor.

Defendants do not delve into an analysis of these elements, and instead focus entirely upon the impossibility of a market for Presidents for interviews conducted during the presidency. Defendants assert a bright line rule against a former president's copyright protection which, as set forth above, does not exist.[12]

---

[12] One aspect which the fair use analysis does not consider fully is the nature of releases and the voice over market as a whole in which written releases fare the bedrock of the industry. For a major publisher to publish a voice work without the written release of the narrator or artist would be outrageous in the normal course of events, as it denudes the narrator of control of the use of his or her voice and the nature of the publication. Moreover, the nature of the publication often dictates the nature of the read, in that the manner of articulation and word choice is different if the narrator knows it is for dissemination in the recorded form.

Defendants seem to conflate the phrase "historical record" with "fair use," but the former is not part of the analysis. The claim that the Work was published for the "historical record" is not only a later contrived defense but one that it unknown at law. *See* Defendants' Mem. at pp. 2, 7, 15, 22, 26. Simply stating that an infringement or violation is justified because it is for the "historical record" is completely and utterly meaningless and would justify all matter of infringements. There is a question of fact as to what it means, thus making any reliance upon it a matter not suitable for discussion at the motion to dismiss stage.  Secondly, the Compendium *prima facie* disagrees; otherwise, it would not give a presumptive copyright for an interviewee. *See supra.* Thirdly, oral historians as a matter of best practices require releases in advance of publication. *See* Neuenschwander, John A. A Guide to Oral History and the Law (Oxford Oral History Series) Second Edition (2014) (p. 132). Oxford University Press. Kindle Edition. "Interviewees hold the copyright to their interviews until and unless they transfer those rights to an individual or institution. This is done by the interviewee signing a release form or in exceptional circumstances recording an oral statement to the same effect."[13] According to oral historians, their role does not give carte blanche to ride roughshod over copyright.

The "historical record" defense is also belied by the fact that publication of the Interview Audio Recordings "was an unusual step," for profit, not contemporaneous with the

---

[13] The Oral History Association's 2009 statement on "Principles and Best Practices" fully expects oral history participants to sign over their rights as part of the standard procedure for conducting interviews: "The interviewer should secure a release form, by which the narrator transfers his or her rights to the interview to the repository or designated body, signed after each recording session or at the end of the last interview with the narrator." https://oralhistory.org/about/principles-and-practices-revised-2009/

statements made, after publication of the originally intended work, which contained the relevant information. *See* Garson Dec. at ¶ 10.  If Presidents have no rights whatsoever in their interviews, there would be nothing unusual about the publication. However, the Audio Recordings were clearly special and unique - unique enough for the Defendants to push their publication in various media. *See id.*

Ultimately, the Defendants ask this Court to dismiss this matter because of a contrived and ephemeral concept of "historical record."  Woodward claims that the Work represents his release of Plaintiff's language "for the historical record," but the problem is that Woodward is not using this term as professional historians do. And, significantly, Woodward does not describe himself as a historian. *See* Woodward Dec. at D.E. 37-1 at ¶ 2.

**IV.    President Trump's claims against the Defendants are not subject to preemption.**

**A. President Trump's claims are not barred by preemption via the government works doctrine.**

Defendants argue that the government works doctrine preempts President Trump's claims.  However, for the reasons already set forth above, the government works doctrine is irrelevant here. The preemption argument is entirely premised on the incorrect assumption that President Trump cannot be an author and cannot hold copyright. The two are not mutually exclusive. The state claims stand independently of the copyright claims and this case would not fall with an adverse determination on copyright.

Modelling this out, if the Court were to rule that either there was a government works exception which removed copyright protection for Plaintiff and diluted Woodward's copyright interests, or even that Woodward was the sole owner, the contract, unjust enrichment and other claims in equity and law stand nevertheless. The recordings themselves and the

25

representations contained therein give rise to a *prima facie case* that Woodward obtained the recordings based on certain representations and circumscribed his use of the recordings, accordingly. To give an example, a voiceover artist agrees to lend her voice to an audio project for certain markets; the publisher uses the recording in other markets, outside of the agreed-to scope. While the copyright may be determined to lie with the publisher, the artists would still have claims in contract, unjust enrichment and the like. The difference is how damages, disgorgement and the like are proved and calculated.

**B. President Trump's state claims are not barred by 17 U.S.C. § 301.**

Section 301 of the Copyright Act "preempts only those state law rights that 'may be abridged by an act which, in and of itself, would infringe one of the exclusive rights' provided by federal copyright law.'" *Computer Assocs. Int'l v. Altai, Inc.*, 982 F.2d 693, 716 (2d Cir. 1992) (citing *Harper & Row, Publishers, Inc. v. Nation Enters.,* 723 F.2d 195, 200 (2d Cir. 1983), *rev'd on other grounds,* 471 U.S. 539, 85 L. Ed. 2d 588, 105 S. Ct. 2218 (1985)). "[B]ut if an 'extra element is required instead of or in addition to the acts of reproduction, performance, distribution or display, in order to constitute a state-created cause of action.'" *Computer Assocs.*, 982 F. 2d at 716 (citing 1 Nimmer § 1.01[B], at 1-14-15.

"Courts in the [Second] Circuit apply a two-part test, both parts of which must be satisfied for preemption to apply." *Melendez v. Sirius XM Radio, Inc.*, 50 F. 4th 294, 300-01 (2d Cir. 2022). The first prong, the subject matter requirement,

> is satisfied when the plaintiff's "claim applies to a work of authorship fixed in a tangible medium of expression and falling within the ambit of one of the categories of copyrightable works."

*Melendez*, 50 F.4th at 301 (citing *Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.*, 373 F.3d 296, 305

(2d Cir. 2004)).   The second prong, the general scope requirement, is satisfied when

> the state-created right may be abridged by an act that would, by itself, infringe one of
> the exclusive rights provided by federal copyright law." *Id.* In evaluating the application
> of this prong, a court "looks at the right being asserted (over a work that comes within
> the 'subject matter of copyright') and requires (for preemption to apply) that the right
> be '*equivalent* to any of the exclusive rights within the *general scope of copyright* as
> specified by section 106 [of the Copyright Act].'" *Jackson*, 972 F.3d at 43 (quoting 17
> U.S.C. § 301(a)).

*Melendez*, 50 F.4th at 301-02. *See also Greer v. Media*, 2023 U.S. App. Lexis 7407, at *2-3 (2d

Cir. 2023). The inquiry requires a "holistic evaluation of the nature of the 'rights sought to be

enforced" and a determination of qualitative difference between the state law action and the

copyright infringement action. *See Melendez*, 50 F. 4th at 301.

There does not appear to be any dispute here that the subject matter at issue is

copyrightable, especially given that Woodward has asserted his own copyright in the Work. *See*

Garson Dec. at ¶ 12. As to the general scope requirement, neither the unjust enrichment claim

or the breach of contract claims falls within the general scope of copyright because the unjust

enrichment claim because both are premised upon specific representations made by

Woodward to President Trump and the agreement they reached with each other irrespective of

copyright law. Woodward promised to President Trump that he would not publish the work

outside of the book *Rage*. Regardless of the copyright protection afforded to the work, he made

an oral promise to President Trump that the balance would not be released in the form of a

book. But he breached that promise and went on to post the whole thing. The promise here

was not to refrain from reproducing, performing or displaying a work; it was related to the

manner in which President Trump's oral recordings could be presented to the outside world. At

issue here is a contract that does purport to give President Trump protection beyond that provided by copyright law. Accordingly, the breach of contract claim, and by extension the claim of unjust enrichment, is not within the general scope of copyright.

The unjust enrichment claims are permissibly pled in the alternative to President Trump's contract claims and seek relief should the Court find no contract exists.  *See infra.* As the claims meet the extra element, and a different analysis is required, they are not preempted. These claims center on the oral representations made by Woodward, the understanding of each of the participants when agreeing to being recorded, the legitimate expectations of the participants when the recording was made, the subsequent behavior of the defendants, whether they come to equity with clean hands, whether disgorgement is appropriate, whether the defendants have the right to any offset in quantum meruit. For the purposes of quantum meruit, many of the above factors would also be considered, in addition, the Court would also consider the time commitment by the Plaintiff, the "going rate" for a narrator of his standard, quality and notoriety, analysis of industry standards in order to be able to determine liability in the absence of a release and quantum of damages.

**V.       President Trump's state law claims are sufficient to state a cause of action.**

    **A. Breach of Contract**

Defendants' argument against the Plaintiff's breach of contract claims suffers from several defects.

(i)       "For the book"

First, the evidence before this Court is that Woodward materially averred and promised President Trump that the Interviews would be used only for the book *Rage. See* Compl. at ¶¶

43-52. If Woodward has a different account of events and of context, that gives rise to a factual dispute not amenable to resolution via a Rule 12(b)(6) motion.

(ii)     Statute of Frauds and breach of contract.

Defendant's statute of frauds claim is devoid of any merit. It is premised on the fallacy that the asserted agreement "prohibit[ing] [Woodward's] reuse of the Interviews extended into perpetuity. *See* Defendants' Mem. at p. 29. The predicate of the agreement is not a prohibition, but rather an allowance.  The agreement was to permit Woodward to use President Trump's interview for the purpose of a single book, i.e. *Rage*, not to prohibit him from publishing indefinitely. That book could have been, and was in fact, published within a year. *See* Woodward Dec. at ¶ 16. D.E. 37-1.   Whereas allowance contemplates being able to do something that a person otherwise does not have a right to do, prohibition refers to having a right to do something and being precluded from doing it. The former applies here, while the latter has nothing to do with this case. The Defendants' analysis on this point is emblematic of looking at the horse from the wrong end.

(iii)     Claims for promissory estoppel.

Defendants' argument for dismissal of Plaintiff's promissory estoppel claim is as febrile as it is short.  Under New York law, a claim for promissory estoppel can co-exist with a breach of contract claim. *See Blockchain Min. Supply & Servs. v Super Crypto Min., Inc.*, 2022 US Dist LEXIS 140831, at *12 [SDNY Aug. 8, 2022, No. 18-CV-11099(ALC)(BCM)]) (in New York, relief on quasi-contract theories such as promissory estoppel is barred when a plaintiff alleges a breach of contract claim; however, "the law bars simultaneous recovery for both breach of contract and a quasi-contract theory, not recovery in the alternative"). *Accord P&G Auditors & Consultants,*

*LLC v. Mega Intl. Commer. Bank Co.*, 2019 US Dist LEXIS 169750, at *15-16 (S.D.N.Y. 2019); *Khmaladze v. Vorotyntsev*, 2019 US Dist LEXIS 66375, at *9-10 (S.D.N.Y 2019); *Personal Watercraft Prod. SARL v. Robinson*, 2017 U.S. Dist. LEXIS 143336, 2017 WL 4329790, at *11 (S.D.N.Y. 2017).

Because Plaintiff is permitted to plead breach of contract and promissory estoppel in the alternative as a matter of law, and further because there is disagreement regarding the validity, enforceability, and scope of the subject contact, the inclusion of both claims is not fatally inconsistent, and dismissal is not appropriate.[14]

**Unfair competition and FDUPTA**

(i)      Fallacy regarding non-commercial speech.

For the FDUTPA to apply, the alleged violation must have taken place "in the conduct of any trade or commerce," which is defined as "the advertising, soliciting, providing, offering, or distributing" of goods, services, property, "or any other article, commodity, or thing of value." Fla. Stat. §§ 501.203(8), 501.204(1). Where the allegedly violative action is the publication of information, the statute applies only to commercial speech—or, "expression related solely to the economic interests of the speaker and its audience." *Tobinick v. Novella*, 848 F.3d 935, 950 (11th Cir. 2017) (quoting *Central Hudson Gas & Elec. Corp. v. Pub Serv. Comm'n of N.Y.*, 447 U.S. 557, 561, 100 S. Ct. 2343, 65 L. Ed. 2d 341 (1980)).

---

[14] Plaintiff acknowledges that, under New York law, there is no "separate cause of action for breach of the implied covenant of good faith and fair dealing where breach of contract, based upon the same facts, is also pled." *See P&G*, 2019 U.S. Dist LEXIS 169750, at *17. Accordingly, Plaintiff has dispensed with argument regarding its claim for implied covenant of good faith and fair dealing.

Defendants' argument against the FDUPTA claim is premised on non-commercial speech being categorically exempt from FDUPTA liability; however, this argument presupposes that the works at issue are non-commercial speech. Despite Defendants' ubiquitous invocation of the dubious, later-contrived "historical record" defense, the Defendants fail to show that the subject work is anything short of commercial.

    (ii)    Claim duplication.

Defendant's duplication claim fails. President Trump is permitted to argue in the alternative. Moreover, the Defendants' perception that there has been no injustice cannot be dispositive of the Plaintiffs' claims. The Defendants are essentially contradicting President Trump's allegations regarding the purpose, scope and limitations of the Interviews. By creating that conflict, the Defendants are demonstrating why they are not entitled to relief under Rule 12(b)(6). Importantly, if the Defendants claim that the title of the work reflects President Trump's contributions to the Work, the question arises why the Defendants have not remitted any payment to President Trump for that contribution, and why they are contesting President Trump's rights to the Works. Discovery is clearly a necessary precursor to any attempt by the Defendants to dismiss the Plaintiff's claims.

**VI.    Claims against Paramount Global.**

The Defendants claim in elementary fashion that the allegation that Paramount exerts direct control over the executive leadership is insufficient. *See* Defendants' Mem. at pp. 31-32; Compl. at ¶ 17.  First and foremost, the Plaintiff's pleading on this point is, as required, a short and plain statement of the facts. Secondly, this claim of insufficiency is belied by public record

showing that, over the past two years, Paramount has attempted to sell off SSI on a number of occasions. *See* 10-Q filing, attached as and referenced in Exhibit D to the Garson Declaration.

It is thus clear from public filings that Paramount was exercising its right and ability to supervise beyond the parent-subsidiary relationship and trespassed into day-fto-day control. *Bennett v. Tu-Cows, Inc.,* 2007 U.S. Dist. LEXIS 54816, 2007 WL 2178317, at *6 (E.D. Mich. July 27, 2007) (citations omitted). Close scrutiny was being applied by Paramount particularly as, despite being presented as a discontinued operation, for the purposes of Paramount's credit facility, it was in fact treated as a continuing operation for the purposes of calculating Consolidated EBITDA until its disposition. *See* 10-Q filing at p. 16.  This treatment allowed Paramount as a whole meet to principal financial covenant of its leverage ratio. Failure to meet such a covenant would have been perilous for Paramount. These publicly available documents show that for the purposes of Paramount's liquidity, the projected sale of SSI was a key consideration for liquidity and capital resources; the sale was necessary for increased investment in streaming services. *See* 10-Q filing at p. 41. In effect, the publicly available evidence demonstrates direct control by Paramount over the finances of SSI.  Moreover, Woodward is indisputably one of SSI'S championed authors, and the publication of a high-profile title during sale of the company (i.e., the Work) is something which Paramount would have undoubtedly been aware of and directly involved with.

In effect, to the extent Defendants are seeking "indicia beyond the mere legal relationship showing that the parent is actually involved with the decisions, processes, or personnel directly responsible for the infringing activity," *Banff Ltd. v. Limited, Inc.*, 869 F.Supp. 1103, 1109 (S.D.N.Y. 1994), that indicia is before the court, and will be solidified through the

discovery process. Moreover, to the extent any elements required under New York law—as opposed to Florida law—are missing from Plaintiff's assertion of this cause of action, the Plaintiff respectfully requests the opportunity to amend its pleading to incorporate the same.

**VII.    Conclusion**

For the reasons set forth herein, the Motion should be denied.

Dated: September 1, 2023
Aventura, Florida

**GS2 LAW PLLC**
By: /s/ <u>Robert Garson</u>
Robert Garson, Bar No. 1034548
Yanina Zilberman, Bar No. 105665
20803 Biscayne Blvd., #405
Aventura, Florida 33180
(305) 780-5212
rg@gs2law.com; yz@gs2law.com
*Attorneys for Plaintiff*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on September 1, 2023, I served the foregoing Memorandum of Law in

Opposition upon counsel of record.

/s/ Robert Garson

<u>**Service List**</u>

**GUNSTER, YOAKLEY & STEWART, P.A.**
Kenneth B. Bell (FBN 347035)
Lauren v. Purdy (FBN 93943)
One Independent Dr., Suite 2300
Jacksonville, FL 32202
Phone: (904) 354-1980
Email: kbell@gunster.com
          lpurdy@gunster.com

**DAVIS WRIGHT TREMAINE LLP**
Elizabeth A. McNamara (NYBN 1930643)
Linda J. Steinman (NYBN 2137305)
John M. Browning (NYBN 5213038)
Leena Charlton (NYBN 5622147)
1251 Avenue of the Americas, 21st Floor
New York, NY 10020
Phone: (212) 489-8230
Email: lizmcnamara@dwt.com

34

lindasteinman@dwt.com
jackbrowning@dwt.com
leenacharlton@dwt.com

*Attorneys for Robert Woodward,*
*Simon & Schuster, Inc. and Paramount Global*

**CERTIFICATION OF WORD COUNT**

I hereby certify that this Memorandum in Opposition complies with the Order granting

permission to file an oversized document, not to exceed 10,000 words. D.E. 54.

According to the word-processing system used to prepare this Memorandum in Opposition, the

total word count for all printed text exclusive of the material omitted under Rule 7.1 is 9977.

By: /s/ Robert Garson _____