## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------

PRESIDENT DONALD J. TRUMP, 45th President
of the United States of America, in his individual
capacity,

                                        Plaintiff,

                v.                                                           3:23-cv-06883- PGG

SIMON & SCHUSTER, INC., a New York
corporation, ROBERT WOODWARD p.k.a. BOB
WOODWARD, an individual, and PARAMOUNT
GLOBAL, a Delaware corporation, f/k/a Viacom
Inc., successor by merger to CBS Corporation, a
Pennsylvania corporation f/k/a Westinghouse
Electric Corporation,

                                        Defendants.

--------------------------------------------------------------

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' RULE 12(B)(6) MOTION TO DISMISS PLAINTIFF PRESIDENT TRUMP'S SECOND AMENDED COMPLAINT

**WILLIAMS & CONNOLLY***
Kevin T. Baine
Thomas G. Hentoff (*pro hac vice application forthcoming*)
680 Maine Avenue SW
Washington, DC 20024
Phone: (202) 434-5804
Email: kbaine@wc.com
           thentoff@wc.com

*\*Of counsel to Robert Woodward*

**DAVIS WRIGHT TREMAINE LLP**
Elizabeth A. McNamara
Linda J. Steinman
John M. Browning
Leena Charlton
1251 Avenue of the Americas, 21st Floor
New York, NY 10020
Phone: (212) 489-8230
Email: lizmcnamara@dwt.com
           lindasteinman@dwt.com
           jackbrowning@dwt.com
           leenacharlton@dwt.com

*Counsel for Defendants*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................... 1

FACTUAL BACKGROUND ...................................................................................... 3

    A.    Woodward Interviews President Trump and Publishes *Rage* ..................................... 3

    B.    Woodward Creates the Work Using His Raw Interviews and Extensive Supplemental Material ....................................................................................... 7

    C.    The SAC ................................................................................................ 9

ARGUMENT .......................................................................................................... 9

I.    THE GOVERNMENT WORKS DOCTRINE BARS PRESIDENT TRUMP'S COPYRIGHT CLAIMS ...................................................................................... 9

II.    PRESIDENT TRUMP IS NEITHER A JOINT AUTHOR OF THE WORK NOR THE OWNER OF HIS INTERVIEW RESPONSES ....................................................... 15

    A.    President Trump Is Not a Joint Author ..................................................... 15

    B.    President Trump Does Not Own His Answers to Interview Questions ................ 19

III.    THE PUBLICATION OF TRUMP'S RESPONSES WAS FAIR USE ........................... 23

IV.    THE STATE LAW CLAIMS ARE PREEMPTED ................................................... 25

    A.    The State Law Claims Are Barred by Conflict Preemption ........................... 25

    B.    17 U.S.C. §301 Expressly Preempts The State Law Claims ........................... 27

    1.    Section 301 Preempts the Unjust Enrichment Claims ................................... 28

    2.    Section 301 Preempts the Contract Claims ................................................ 28

V.    THE CONTRACT CLAIMS MUST BE DISMISSED FOR FAILURE TO STATE A VALID CAUSE OF ACTION ........................................................................... 29

VI.    NO ACTIONABLE CONDUCT WAS PLED AGAINST PARAMOUNT ...................... 31

CONCLUSION ..................................................................................................... 32

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*16 Casa Duse v. Merkin*,
   791 F.3d 247 (2d Cir. 2015) ....................................................................... *passim*

*Am. Geophysical Union v. Texaco*,
   60 F.3d 913 (2d Cir. 1994) ........................................................................... 24

*Andy Warhol Found. for Visual Arts v. Goldsmith*,
   143 S. Ct. 1258 (2023) .................................................................................. 24

*Baiul v. NBC Sports*,
   708 F. App'x. 710 (2d Cir. 2017) ................................................................. 29

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 554 (2007) ...................................................................................... 29

*Bonito Boats v. Thunder Craft Boats*,
   489 U.S. 141 (1989) ...................................................................................... 26

*Briarpatch Ltd. v. Phoenix Pictures*,
   373 F.3d 296 (2d Cir. 2004) ......................................................................... 28

*Brooks v. Dash*,
   454 F. Supp.3d 331 (S.D.N.Y. 2020), *aff'd* 852 F. App'x. 40 (2d Cir. 2021) ........................ 21

*by Nixon v. Richey*,
   513 F.2d 430 (D.C. Cir. 1975) ...................................................................... 10

*Carroll v. Trump*,
   23-1045, 23-1046 (2d Cir.) ........................................................................... 13

*Catala v. Joombas Co.*,
   2019 WL 4803990 (S.D.N.Y. Sept. 23, 2019) ...................................... 10, 11

*Childress v. Taylor*,
   945 F.2d 500 (2d Cir. 1991) ............................................................. 13, 16, 18

*Cmty. For Creative Non-Violence v. Reid*,
   490 U.S. 730 (1989) ................................................................................ 20, 21

*Cohen v. Capital One Funding*,
   489 F. Supp.3d 33 (E.D.N.Y. 2020) ............................................................ 25

*Colliton v. Cravath, Swaine & Moore*,
  2008 WL 4386764 (S.D.N.Y. Sept. 24, 2008), *aff'd* 356 F. App'x 535 (2d Cir. 2009)..........16

*Compco v. Day-Brite Lighting*,
  376 U.S. 234 (1964)..........................................................................................................25

*Computer Assocs. Int'l v. Altai, Inc.*,
  982 F.2d 693 (2d Cir. 1992)........................................................................................27, 28

*Council on Am. Islamic Rels. v. Ballenger*,
  444 F.3d 659 (D.C. Cir. 2006) ........................................................................................13

*Current Audio v. RCA*,
  71 Misc. 2d 831 (Sup. Ct. N.Y. Cnty. 1972) ..................................................................20

*Durham Indus., Inc. v. Tomy Corp.*,
  630 F.2d 905 (2d Cir. 1980)............................................................................................18

*Est. of Burne Hogarth v. Edgar Rice Burroughs, Inc.*,
  342 F.3d 149 (2d Cir. 2003).............................................................................................14

*Estate of Hemingway v. Random House*,
  23 N.Y.2d 341 (1968) ......................................................................................................20

*Garcia v. Google*,
  786 F.3d 733 (9th Cir. 2014) (en banc) .........................................................................22

*Gary Friedrich Enter. v. Marvel Enter.*,
  713 F. Supp.2d 215 (S.D.N.Y. 2009).........................................................................29, 31

*Georgia v. Public.Resource.Org*,
  140 S. Ct. 1498 (2020)................................................................................................10, 14

*Gharib v. Wolf*,
  518 F. Supp.2d 50 (D.D.C. 2007) ...................................................................................30

*Goldstein v. California*,
  412 U.S. 546 (1973).........................................................................................................26

*Google v. Oracle*,
  141 S. Ct. 1183 (2021).....................................................................................................25

*Harper & Row v. Nation Enter.*,
  471 U.S. 539 (1985).........................................................................................................12

*Hello I am Elliot, Inc. v. Sine*,
  2020 WL 3619505 (S.D.N.Y. July 2, 2020) ...................................................................18

*Herbert v. U.S.*,
    36 Fed. Cl. 299 (Ct. Claims 1996) ..................................................................11

*In re Digital Music Antitrust Litig.*,
    812 F. Supp.2d 390 (S.D.N.Y. 2011)..............................................................31

*In re Jackson*,
    972 F.3d 25 (2d Cir. 2020)........................................................................25, 26

*Kauffman v. Int'l. Bhd. of Teamsters*,
    950 A.2d 44 (D.C. 2008) ...............................................................................30

*Kilkenny v. L. Off. of Cushner & Garvey*,
    2012 WL 1638326 (S.D.N.Y. May 8, 2012) ..................................................17

*Klauber Bros. v. M.J.C.L.K.*,
    2022 WL 5108902 (S.D.N.Y. Oct. 4, 2022) .....................................................3

*Lombardo v. Dr. Seuss Enters., L.P.*,
    729 F. App'x 131 (2d Cir. 2018) ...................................................................25

*McLaren v. Chicos FAS Inc.*,
    2010 WL 4615772 (S.D.N.Y. Nov. 9, 2010) .................................................19

*ML Genius Holdings LLC v. Google*,
    2022 WL 710744 (2d Cir. Mar. 10, 2022), *cert. denied,* 143 S. Ct. 2658 (2023) .................28

*Myers v. Fabrics*,
    101 A.D.2d 777 (1st Dep't 1984), *aff'd in relevant part*, 65 N.Y.2d 75 (1985) ...................30

*Nixon v. Sampson*,
    389 F. Supp.107 (D.D.C. 1975)......................................................................10

*O'Grady v. BlueCrest Capital Mgmt.*,
    111 F. Supp.3d 494 (S.D.N.Y. 2015)..............................................................31

*Oyewole v. Ora*,
    776 F. App'x. 42 (2d Cir. 2019) .....................................................................25

*Pac. and South. Co., v. Duncan*,
    792 F.2d 1013 (11th Cir. 1986) .....................................................................20

*Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*,
    602 F.3d 57 (2d Cir. 2010)..............................................................................11

*Public Affairs Assocs. v. Rickover*,
    268 F. Supp.444 (D.D.C. 1967) ................................................................11, 13

*Public Affairs Assocs. v. Rickover*,
    369 U.S. 111 (1962).......................................................................................11

*Ricci v. Teamsters Union Local 456*,
    781 F.3d 25 (2d Cir. 2015).............................................................................25

*Sears Roebuck & Co v. Stiffel Co.*,
    376 U.S. 225 (1964).......................................................................................26

*Sonders v. Roosevelt*,
    64 N.Y.2d 869 (1985) ....................................................................................30

*Strauss v. NewMarket Global Consult. Gp.*,
    5 A.3d 1027 (D.C. 2010) ...............................................................................29

*Suid v. Newsweek*,
    503 F. Supp.146 (D.D.C. 1980)......................................................................20

*Swatch Group Mgmt. Serv. v. Bloomberg L.P.*,
    756 F.3d 73 (2d Cir. 2014)...............................................................23, 24, 25

*Taggart v. WMAQ Channel 5 Chicago*,
    2000 WL 1923322 (S.D. Ill. Oct. 30, 2000) .................................................20

*Thomson v. Larson*,
    147 F.3d 195 (2d Cir. 1998)....................................................................13, 16

*Truman v. Brown*,
    434 F. Supp.3d 100 (S.D.N.Y. 2020).............................................................30

*Trump v. Carroll*,
    292 A.3d 220 (D.C. Apr. 13, 2023) ...............................................................13

*U.S. v. McKeon*,
    738 F.2d 26 (2d Cir. 1984).............................................................................16

*United States v. Bestfoods*,
    524 U.S. 51 (1998).........................................................................................31

*Universal Instruments Corp. v. Micro Sys. Eng'g*,
    924 F.3d 32 (2d Cir. 2019).............................................................................28

*Vault Corp. v. Quaid Software*,
    847 F.2d 255 (5th Cir. 1988) .........................................................................26

*Walkie Check Prods. v. ViacomCBS Inc.*,
    2022 WL 2306943 (S.D.N.Y. June 27, 2022) ...............................................30

*Webber v. Dash*,
    2019 WL 1213008 (S.D.N.Y. Feb. 25, 2019) ........................................................30

*Wheeler v. Slanovec*,
    2019 WL 2994193 (S.D.N.Y. July 9, 2019) ........................................................16

*Wrench LLC v. Taco Bell Corp.*,
    256 F.3d 446 (6th Cir. 2001) ........................................................28

*Wright v. Warner Books*,
    953 F.2d 731 (2d Cir. 1991) ........................................................19

**Statutes**

17 U.S.C. §§
    101 ........................................................10, 15, 18
    102, *et seq* ........................................................27
    105 *et seq* ........................................................10, 25
    107 ........................................................23
    301 ........................................................25, 27, 28

28 U.S.C. §2679 *et seq.* ........................................................13

D.C. Code Ann. § 28-3502 ........................................................30

**Other Authorities**

*1 Nimmer on Copyright* § 1.01[B][1][a] (1997) ........................................................28

Federal Rule of Evidence 201(b) ........................................................3

H.R. Rep. No. 94-1476 (1976) ........................................................10, 11, 27

M.C. Amerine, *Wrestling Over Republication Rights: Who Owns the Copyright of Interview?*, 21 MARQ. INTELL. PROP. L. REV. 159 (2017) ........................................................22

U.S. Const. Art. I., § 8, cl. 8 ........................................................25, 26

**PRELIMINARY STATEMENT**

For 250 years, presidents of the United States have entrusted their words to journalists in order to keep the American people informed about their views.  On May 4, 1789, *The Hartford Courant* published President Washington's inaugural speech to Congress.  During the Civil War, an interview with President Lincoln was published to explain why Black troops should be permitted to fight for the Union.  *An Interview with the President*, N.Y. TIMES (Sept. 8, 1864). With modern technology, audiences now hear their leaders directly via radio, television, online news, and social media.  Presidents from Kennedy to Biden have spoken to the nation through interviews conducted by reporters like Walter Cronkite, Barbara Walters, and Bob Woodward. Far from being passive bystanders in these conversations, journalists frame the agenda, ask tough questions, and contextualize presidents' responses.  This long tradition of candid reporting depends on an axiomatic principle—reflected in copyright law's prohibition on private ownership of government works—that the words a sitting president speaks about the discharge of his office belong to the People.

No president before Donald Trump ever claimed to own a copyright in presidential interviews or demanded royalties for their republication.  Yet President Trump sued Bob Woodward ("Woodward"), Simon & Schuster, LLP ("S&S"), and Paramount Global ("Paramount") (collectively "Defendants") for publishing *The Trump Tapes* (the "Work").  In the final year of the Trump Administration, Woodward, one of this country's most prominent journalists, conducted a series of nineteen interviews with President Trump (the "Interviews"). Woodward was the sole architect and true author of the Interviews—it was he who devised the questions, decided when to press President Trump (or when to let him speak unchallenged), and ultimately preserved the Interviews for posterity by tape recording them.

As Woodward notes in the Work, he relistened to the Interviews after President Trump left office and decided "to put as much of Trump's voice, his own words, out there for the historical record," including the then-President's views on a range of the key political issues. But Woodward did not simply publish the raw Interviews.  Rather, to achieve his historical purpose, Woodward edited the Interviews for clarity, succinctness, and sound quality, and authored original content, including 227 "commentaries" offering critical context, and an Introduction and Epilogue that seek to define President Trump's place in the pantheon of presidents.  The Work was published as an audiobook and as a substantively identical text edition (subtitled *The Historical Record*).  As Woodward concluded in the Work, "Trump's view of the presidency that comes across over and over again in our interviews" is that "'[e]verything is mine.'…The presidency is mine.  It is *still* mine.  The only view that matters is mine."  *See* Declaration of Elizabeth A. McNamara dated August 23, 2023 ("McNamara Declaration") Ex. A, 414.[1]

As if on a mission to prove this "everything is mine" thesis correct, Donald Trump filed suit "in his individual capacity" to claim a copyright interest over the entirety of Woodward's Work simply because it features words spoken by "President Trump, 45th President of the United States of America."  In effect, President Trump seeks to profit from public service by demanding nearly $50 million.  But the Copyright Act bars government officials like President Trump from asserting any copyright in an interview conducted as part of their official duties. Further, he fails to state a claim for joint authorship or any other form of ownership.

For these basic reasons, and others, the Second Amended Complaint (Dkt. 70, the "SAC") has no legal merit.  Counts I and II (the "Copyright Claims") fail under the government

---

[1] Hereafter citations to the McNamara Declaration are noted as "Ex. __, __."

works doctrine (POINT I) and because President Trump lacks a viable copyright interest. POINT II.  It was also fair use to quote the President in the Work.  POINT III.  As for Counts III through VII (the "State Law Claims"), the common thread is that Woodward allegedly violated a promise that he would use his recordings exclusively for his book *Rage*.  But the Interviews themselves make clear that no such promise was made and that Woodward was not obligated to mothball his Interviews after publishing *Rage*.  In any event, the Copyright Act preempts the State Law Claims, and President Trump failed to state a cause of action (POINTS IV-V).  All claims against Paramount must be dismissed because President Trump failed to allege that Paramount played an actionable role in the Work's publication.  POINT VI.

President Trump's unprecedented effort to extract private benefit from public duty should be dismissed in its entirety.

## FACTUAL BACKGROUND

### A.    Woodward Interviews President Trump and Publishes *Rage*

For more than 50 years, Woodward has covered presidents and politics for *The Washington Post*.  Woodward—who has shared two Pulitzer Prizes—came to prominence by publishing groundbreaking reporting about President Nixon's role in Watergate with his *Post* colleague, Carl Bernstein, which served as the basis for their 1974 classic, *All the President's Men*.  Woodward has "written books about 10 presidents from Nixon to Biden" and "interviewed Presidents Carter, Clinton, George W. Bush, and Obama" in the Oval Office.  *See* Ex. A, 417.[2] In September 2018, Woodward published *Fear: Trump in the White House*, which chronicled the

---

[2] The Work is incorporated by reference and can be considered on a Rule 12(b)(6) motion. *Klauber Bros. v. M.J.C.L.K.*, 2022 WL 5108902, at *2 (S.D.N.Y. Oct. 4, 2022) (citing *Di Folco v. MSNBC Cable*, 622 F.3d 104, 111 (2d Cir. 2010)).

first year of the Trump Presidency through scores of interviews with Administration officials. President Trump declined to be interviewed.  SAC ¶36.

After Woodward announced he would write a follow-up to *Fear*, President Trump agreed to be interviewed because he "wish[ed] he met with [Woodward] for the last book."  Ex. A, 47. Woodward conducted his first presidential interview with President Trump on December 5, 2019 in the Oval Office.  *Id.* 45.  As Woodward explained:

> Our interviews took place during one of the most consequential years in American history.  Trump was impeached, the COVID-19 pandemic erupted, and the murder of George Floyd sparked the largest racial justice protests in the United States since the civil rights movement.  I pressed Trump on these topics as well as foreign policy.

*Id.* 2.  At the December 5 interview, Woodward emphasized that "policy is what matters" for "the public, for history."  *Id.* 49.  In subsequent Interviews, Woodward repeated 23 times his intention to memorialize President Trump's views on important subjects, in his own words, "for history."  *Id.* 119; *see, e.g., id.* 139 ("But help me, for the history, Mr. President."); *id.* 275 ("But what I want to ask you—for the history…"); *passim.*

Each of the Interviews was "on the record"—anything that President Trump said could be attributed to him freely—and openly tape-recorded by Woodward.  *Id.* 47, 137.  Woodward "tried to do [his] homework" before each interview and "asked questions directly."  *Id.* 417.  As Woodward recognized, "Trump could take you on a freeway to nowhere in an instant," *id.* 85, but Woodward used his experience as an interviewer to steer the conversation to important matters of policy.  *See, e.g.*, *id.* 49-50, 118.

Between December 5, 2019 and August 14, 2020, Woodward interviewed President Trump nineteen times as the sitting president.  The first three Interviews were in person (two in the Oval Office, the third at Mar-a-Lago), and Woodward's tape recorder was visible throughout. *Id.* 45, 47, 86, 136-137.  The remaining Interviews took place over the telephone, especially

4

during COVID lockdowns.  *See* Ex. A 175-294, 311-419.  President Trump was apparently located in the White House for all of the calls, except one call he received on Air Force One.  *Id.* 212-22.  Woodward frequently reminded President Trump that the calls were being recorded noting, for example, that he was "turning [his] recorder on for our history."  *Id.* 376; *see also id.* 361 ("BW:  I've got—as I always do, I have my tape recorder on.  TRUMP: That's okay.  I don't mind.").  At no point did President Trump object to being recorded, claim to own the Interviews, or state that Woodward was prohibited from using them after publishing *Rage*.

Government officials in the Trump Administration attended the Interviews and provided commentary.  The December 5 interview included "Senator Lindsey Graham, Senior Political Counselor Kellyanne Conway, and two of Trump's aides, Deputy Press Secretary Hogan Gidley and Chief of Staff Mick Mulvaney," with Vice President Pence joining towards the end.  *Id.* 45, 78.  Gidley also joined the December 30, 2019 interview at Mar-a-Lago, interjecting comments. *Id.* 136; SAC ¶49.  Senior Advisor Jared Kushner and Deputy Chief of Staff for Communications Dan Scavino joined other Interviews.  Ex. A, 86, 112, 169, 173, 221.

During the Interviews, President Trump made over a dozen statements admitting that he had no control over how or when Woodward would use the Interviews.  Towards the end of the first interview, while seated with Woodward and Administration officials in the Oval Office, President Trump recognized Woodward would write what he wanted:

> AIDE: We've got about five minutes, gentlemen…
> TRUMP: Okay, well—I love this guy.
> CONWAY: He'll come back.  Soon.
> TRUMP: Even though he writes shit about me.  That's okay.

Ex. A, 76.   Then, in the middle of the April 13, 2020 telephone interview, President Trump abruptly segued from Woodward's questions about COVID to ask (again) when he planned to publish his book:

> TRUMP: All right.  What's your time, what's your timing?
> BW: My timing is I want to come out in September or October [2020]–
> TRUMP: Now think of it: if it's a bad book, you're right in front of my election. That's a beauty.

*Id*. 289.   During the June 22, 2020 interview, both President Trump and First Lady Melania Trump made statements demonstrating a lack of control over the book's content and release date:

> TRUMP: And you know this man is one of the great legends of all time?  He's doing a book on me. It'll probably be atrocious, but that's okay.
> MELANIA: When [is] it coming out?
> BW: It's coming out in September [2020].
> MELANIA: Okay.

*Id*. 359.   In the same vein, President Trump observed that President Bush came "out terribly" from his interviews with Woodward.  *Id*. 285.   When Woodward responded that President Bush "had his say [and] didn't object," President Trump sighed:  "Ugh.  And in the end you'll probably write a lousy book."  *Id*.  He even acknowledged that he could not tell Woodward what to write and could only "hope" that he "write[s his] answer[s]" fairly.  *Id*. 55; *see also id*. 323-24 ("TRUMP:  You're probably going to screw me."); *id*. 377 ("TRUMP: All I ask for is fairness. And, you know, I'm sure I won't get it, but that's okay.").

The *only* restriction placed on the Interviews was Woodward's acknowledgement that they would not be used in contemporaneous news articles.  Accordingly, Woodward told President Trump, repeatedly, that "this [interview] is for next year, for the book."  Ex. A 84, 237, 289-90.  This was the understanding expressly stated in the third interview.  There, Woodward repeated that the Interviews were for "the book to come out before the election."  *Id*. 237, 289-

6

90.  President Trump agreed that they were "[f]or the book only" and Deputy Press Secretary Gidley clarified that this meant "[n]o stories coming out, no nothing" prior to the book's proposed publication in the fall of 2020.  *Id.* 137; SAC ¶¶49-50.

These Interviews became the core of *Rage*, the follow-up to *Fear*, which S&S published on September 15, 2020.  SAC ¶35.  President Trump continued to speak to Woodward after *Rage* was substantially complete—three Interviews occurred after Woodward had submitted initial manuscripts and a fourth after "the book was done."  Ex. A, 338, 376, 389, 408.  Approximately "20 percent of" *Rage* derived from the Trump Interviews, *id.* 411, and Woodward published 38 audio clips from the Interviews when *Rage* was published via news organizations, including *The Washington Post*.  *See* SAC ¶36.[3]  The SAC asserts no claim based on Woodward's prior release of Interview recordings in conjunction with the publication of *Rage*.

### B.  Woodward Creates the Work Using His Raw Interviews and Extensive Supplemental Material

Woodward relistened to the Interviews in early 2022 and "decided to take the unusual step of releasing these recordings" because, as he says 23 times in the Work, the Interviews are a "historical record" of a critical year for our Nation.  Ex. A, 1-2.

"[F]or the most part the interviews [in the audiobook] proceed uninterrupted, fulfilling Woodward's goal of presenting Trump's voice and words for the historical record, and offering listeners the chance to hear and judge and make their own assessments."  *Id*. 2.  Woodward also interspersed the Interviews with copious original content.  The Work contains an Introduction and Epilogue, which place the Interviews—and the Trump Administration—into a broader historical and political context.  For instance, the Epilogue sums up President Trump with the

---

[3]  *See* R. Costa & P. Rucker, *Woodward Book*, WAPO (Sept. 9, 2020), https://www.washingtonpost.com/politics/bob-woodward-rage-book-trump/2020/09/09/0368fe3c-efd2-11ea-b4bc-3a2098fc73d4_story.html.

credo, "Everything is mine." *Id.* 419.  Woodward drew this conclusion from an interview where President Trump took credit for a speech that his aides wrote because "[t]he ideas are mine … Everything is mine." *Id.* 331, 414.

The Work also includes "227 new commentaries" written by Woodward and interwoven into the Interviews in order "to provide essential context or clarification." *Id.* vii, 2.  Each Interview opens with Woodward setting the scene: the first one begins "[a] few hours after Pelosi's press conference [announcing President Trump's first impeachment]." *Id.* 45.  The Work also provides factual background.  *See, e.g.*, *id*. 181.

The commentaries frequently "break frame from the interviews," *id.* 2, to point out when President Trump said something inaccurate or misleading.   For example, President Trump claimed that he "banned people coming in from China [at the outset of the pandemic].  Fauci was against it.  So was everyone else…." *Id.* 287.  Immediately after this statement, Woodward's commentary states:  "Again, this is not true at all…." *Id*.; *see also id.* 113-14, 356 (clarifying that "[t]he Mueller report cited ten instances of possible obstruction of justice").  Elsewhere, Woodward contrasts President Trump's words with his previous statements or statements from other government officials.  *See, e.g.*, *id.* 260; 405-07.

Woodward devotes an entire chapter of the Work to "one of the most important interviews for…*Rage*," which "wasn't with Trump" but "with National Security Adviser Robert O'Brien and Deputy National Security Advisor Matthew Pottinger." *Id.* 295.  Those interviews revealed that O'Brien and Pottinger gave a "stark, dramatic warning" early in the pandemic about the dangers of the coronavirus.  Woodward documents how President Trump largely ignored these warnings—at great cost to human life—by reviewing inculpatory statements President Trump made in the Interviews and elsewhere.  *Id.* 295-310.

On a technical level, Woodward oversaw the editing of raw interview tapes to remove "excessive repetition, irrelevant material, background noise and unintelligible audio." *Id.* 2; SAC ¶¶39, 112(c).  S&S engaged an audio producer to record Woodward's commentaries and splice them into the interview tapes and ensure "sound production quality." *Id.* vii, 137. President Trump does not claim to have contributed to the audio-editing process, or any other work Woodward performed to transform the Interviews into the Work.

S&S published the Work as an audiobook on October 25, 2022.  SAC ¶39.  A few months later, S&S published print editions that transcribed the audiobook content. *Id.* ¶45.

## C.    The SAC

The SAC demands "declaratory judgment adjudging that President Trump is, at minimum, the joint author and copyright owner" in the Interviews and Work or, in the alternative, declaratory judgment that he has an exclusive "copyright interest in his responses" to Woodward's questions.  SAC ¶¶58-73.  President Trump further alleges that Woodward published the Work in violation of his copyrights and demands "compensatory, punitive damages and disgorgement of...., at minimum, $49,980,000.00" *Id.* ¶65(c).  President Trump premises these Copyright Claims on a registration he obtained months after filing suit, which names President Trump and Woodward as authors of the "sound recording and text" of the Work.  SAC ¶57.  The SAC also includes State Law Claims seeking millions of dollars in damages. *Id.* ¶¶74-113.

## ARGUMENT

## I.    THE GOVERNMENT WORKS DOCTRINE BARS PRESIDENT TRUMP'S COPYRIGHT CLAIMS

President Trump's contributions to the Interviews are government works that the Copyright Act categorically exempts from private ownership.  President Trump cannot own a

copyright interest in government works as a matter of law, and his Copyright Claims should be dismissed across the board, regardless of whether he claims joint authorship of the Work or exclusive ownership of his Interview responses.

"[C]opyright protection…is not available for any work of the United States Government," which is defined as any "work prepared by [1] an officer or employee of the United States Government [2] as part of that person's official duties."  17 U.S.C. §§101, 105. "The basic premise of [S]ection 105…[is] that works produced for the U.S. Government by its officers and employees should not be subject to copyright" and fall "in the public domain." H.R. Rep. No. 94-1476 at 58 (1976); *see also Georgia v. Public.Resource.Org*, 140 S. Ct. 1498, 1509-10 (2020).  The government works principle is central to our democracy: the work product of government representatives—including the president—is common property that exists to benefit the public, not an opportunity for exclusive, private gain.[4]  President Trump's claims run head-on into this doctrine.

In an effort to circumvent the government works doctrine, the SAC alleges that the "Interviews were not provided in the scope of President Trump's employment by the federal government" and were "prepared…outside of his official duties."  SAC ¶37.[5]  But "allegations that 'are no more than conclusions are not entitled to the assumption of the truth.'"  *Catala v. Joombas Co.*, 2019 WL 4803990, at *6 (S.D.N.Y. Sept. 23, 2019) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).  "While legal conclusions 'can provide the framework of a complaint,

---

[4] As one court underscored in a different context, "it was the intent of the framers of the Constitution to prevent the Office of the President from being a position of both power and profit" and a president's "claim of ownership" of government materials is "repugnant to the very nature of the Office of the President."  *Nixon v. Sampson*, 389 F. Supp.107, 133-137 (D.D.C. 1975), *stayed by Nixon v. Richey*, 513 F.2d 430 (D.C. Cir. 1975).

[5] The SAC does not dispute that President Trump was an "employee of the United States Government" for the purposes of satisfying the first prong of the government works test.

they must be supported by factual allegations'" and the SAC's "naked assertion" that President Trump was not acting in a government capacity is "devoid of 'further factual enhancement,' [and] offers a 'formulaic recitation' of [an element of his] cause of action." *Id.* (quoting *Iqbal*, 556 U.S. at 678-79).  In "copyright infringement actions, the works themselves supersede and control contrary descriptions of them…including any contrary allegations, conclusions or descriptions of the works contained in the pleadings." *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 64 (2d Cir. 2010) (citations omitted).

After three attempts, the SAC fails to include a single factual allegation to support the legal conclusion that President Trump acted outside the scope of his official duties during the Interviews.  The reason is simple: the SAC and the Work conclusively demonstrate that President Trump's contributions were government works.  The relevant inquiry examines the "nature and scope of [the government official's] duties," including "the use…of government facilities and government personnel" in connection with the work at issue. *Public Affairs Assocs. v. Rickover*, 369 U.S. 111, 113 (1962).  "In this context the duties of a high Government official should not be narrowly interpreted" and do not turn on formal job descriptions. *Public Affairs Assocs. v. Rickover*, 268 F. Supp.444, 448-49 (D.D.C. 1967).  Other key factors include: the subject matter of the contested work, whether the government employee prepared the work on his private time, and whether works such as speeches were delivered after working hours or at gatherings of a private organization. *Id.* at 449-50.[6]  *See also Herbert v. U.S.*, 36 Fed. Cl. 299, 305-06 (Ct. Claims 1996) (holding under similar provisions of 28 U.S.C. §1498 that a work is

---

[6] Although the *Rickover* cases were decided under the 1909 Copyright Act, the legislative history of the current Copyright Act makes clear that "the basic premise of [the current S]ection 105" is "the same as that of [the 1909 Act]."  H.R. Rep. No. 94-1476 at 58.

prepared as part of the official functions of a government employee where it falls within his general job area, "even where he was not specifically required to perform the work at issue").[7]

Here, the Interviews all occurred when President Trump was in office, related exclusively to his conduct as president and required the expenditure of considerable federal resources.  SAC ¶36.   The first three Interviews took place in the Oval Office, the epicenter of executive authority, and Mar-a-Lago, the "Winter White House."  *Id.*.   The remaining phone Interviews occurred while President Trump was on federal property, and President Trump often made clear that he was "on duty."  *See, e.g.,* Ex. A, 256 ("TRUMP: A little pressed [for time]. I've got about 12 generals downstairs waiting for me.").   The subject matter of the Interviews focused on the weightiest issues facing the Trump Administration and the American public—such as President Trump's impeachment, his handling of COVID-19, and foreign relations with North Korea and China.  *See, e.g.*, *id.*, 50-51, 132-34, 137-42, 259-272.   To support the Interviews, President Trump provided Woodward with special access to government documents, such as his official correspondence with Kim Jong Un.  *Id.*, 423-54.   Executive branch staffers monitored and participated in the Interviews—including the Deputy Chief of Staff for Communications and Deputy Press Secretary, whose jobs focused on the Administration's public messaging.  *See, e.g.*, SAC ¶49; Ex. A, 45, 169-73.   President Trump repeatedly told Woodward to follow up on certain subjects with other administration officials, like National Security Advisors O'Brien and Pottinger—who Woodward also interviewed.  *See, e.g.*, Ex. A, 121, 176, 191, 295-310.   These undisputed facts conclusively demonstrate that, by giving these Interviews to a journalist while sitting in the White House, President Trump was acting in his official capacity.

---

[7] For obvious reasons, memoirs written *after* presidents leave office are not written in the course of their duties and thus are outside the scope of Section 105.  *Harper & Row v. Nation Enter.*, 471 U.S. 539, 557 n.6 (1985).

This common-sense conclusion is bolstered by statements President Trump made to other courts.  In court filings, he observed that the "President, who must 'be always in function,'…is authorized, indeed required, to carry out his or her duties no matter where he is or when."  Ex. C, 11.  As he further stated, "more than any other public official, the President is expected to respond to questions from the media that affect his ability to maintain the trust of the American people and effectively carry out his official duties…. [S]peaking to the press and communicating with the public is clearly conduct 'of the kind [a President] is employed to perform.'"  Ex. D, 8, 19.[8]  Nowhere in the SAC does President Trump make a single contrary factual allegation.  And his belated effort to frame the Work as a "joint work" is equally doomed by the government works doctrine because the Second Circuit requires "copyrightable contributions by all putative joint authors" in order to create a joint work.  *Childress*, 945 F.2d at 506; *see also Thomson v. Larson*, 147 F.3d 195, 200 (2d Cir. 1998) ("[C]ollaboration alone is not sufficient to establish joint ownership" because "the contribution of each joint author must be independently copyrightable.").

Finally, neither President Trump's copyright registration nor the Copyright Office Compendium (the "Compendium") precludes the application of the government works doctrine.  While copyright registrations are subject to a rebuttable presumption of validity (*see* 18-19, *infra*), President Trump's registration carries no weight in the government works analysis.  As

---

[8] President Trump made these statements while arguing that he was entitled to immunity from a defamation lawsuit under the *respondeat superior* principles of the Westfall Act (28 U.S.C. §2679 *et seq.*). *Trump v. Carroll*, 292 A.3d 220 (D.C. Apr. 13, 2023).  While "[t]he definition of 'official duties' contained in that line of cases ruling on the question of executive immunity from suit is not controlling [in government works cases]" (*Public Affairs Assocs.*, 268 F. Supp.at 448 n.2), President Trump's admissions in *Carroll* remain highly relevant here.  *See Carroll v. Trump*, 23-1045, 23-1046 (2d Cir.).  Further, while Westfall Act cases are not binding, several such decisions hold unequivocally that an officeholder's statements "in response to a reporter's inquiries" fall "within the scope of employment."  *See, e.g.*, *Council on Am. Islamic Rels. v. Ballenger*, 444 F.3d 659, 664-65 (D.C. Cir. 2006).

the Compendium states, "a registration does not extend to uncopyrightable material that appears in a work of authorship, even if the registration does not contain an annotation or even if it contains ambiguous language that may refer to uncopyrightable material."  Compendium §504.1. Further, "the Copyright Office's examination of copyright applications is necessarily limited" as it does not adjudicate legal issues (such as the presence of government works) or conflicting claims, and routinely registers "adverse claims by more than one party."  *Est. of Burne Hogarth v. Edgar Rice Burroughs, Inc.*, 342 F.3d 149, 166-67 (2d Cir. 2003).  As the Compendium makes clear, "the Office does not adjudicate factual or legal disputes involving claims to copyright.  If there is a dispute between two or more parties, it is the responsibility of each party to pursue their claims in an appropriate court."  Compendium §1808.  It is thus the role of this Court to decide the government works issue and dismiss the Copyright Claims.

Nor are Compendium guidelines on registering interviews binding on this Court.  The general guidelines President Trump cites (*see* SAC n.2) do not address or overrule Congress' statutory prohibition on the ownership of government works under section 105.  "[T]he Compendium is a non-binding administrative manual," and courts are required to "follow it only to the extent it has the power to persuade" and, of course, only to the extent it does not contradict the Copyright Act.  *Public.Resource.Org*, 140 S. Ct. at 1510 (rejecting unpersuasive Compendium guidance).  *See also 16 Casa Duse v. Merkin*, 791 F.3d 247, 258 (2d Cir. 2015) ("We need not defer to the Copyright Office's interpretation as a general matter.").

Granting President Trump a copyright in the Interviews or Work not only conflicts with the government works doctrine, but more fundamentally, it would undermine the independence of the free press and the right to know.  Copyright ownership comes with control.  Ceding government officials—including the president—automatic copyright ownership in their

responses to press inquiries would enable government officials to withhold or censor public information.   It would upend the free press and subvert the long tradition of ensuring the president's words are available to public scrutiny.   The Work encapsulates these very principles as Woodward made the decision to publish the Interviews to create a "historical record" documenting the President's thinking during a critical year for our Nation.   Ex. A, vii, 2.

In sum, President Trump's contributions to the Interviews are government works and, no matter how he denominates his ownership interest, they are not copyrightable according to Congress.   They reside in the public domain, and his Copyright Claims fail as a matter of law.

## II.   PRESIDENT TRUMP IS NEITHER A JOINT AUTHOR OF THE WORK NOR THE OWNER OF HIS INTERVIEW RESPONSES

Even if this Court concluded that the government works doctrine did not apply, President Trump's Copyright Claims fail as a matter of law for the independent reasons that he cannot state a claim for joint authorship of the Work or ownership of his responses in the Interviews.

### A.   President Trump Is Not a Joint Author

In an about-face from the prior complaints, the SAC asserts for the first time that President Trump is "the joint author and copyright owner in [the Interviews and Work]."  SAC ¶65(a).  But the SAC fails to include a single allegation of fact, plausible or otherwise, to support this conclusory (and thus untenable) statement.   Rather, President Trump's pleadings conclusively demonstrate that he was never a joint author and his belated claim to co-own Woodward's work product fails as a matter of law.

A "joint work" is "prepared by two or more authors with the intention that their contributions be merged into inseparable…parts of a unitary whole."  17 U.S.C. §101.  A crucial inquiry is "whether the putative joint authors regarded themselves as joint authors."  *Childress*,

945 F.2d at 507-09 ("[I]t is only where the dominant author intends to be sharing authorship that joint authorship will result."). Further, the parties must have intended to be joint authors at the time each created his or her contribution. *Id.*; *see also id.* at 505; *Thomson v. Larson*, 147 F.3d 195, 202 (2d Cir. 1998) ("[A] specific finding of mutual intent [is] necessary" for joint authorship). The SAC conspicuously fails to plead that either President Trump or Woodward ever had the requisite intent to be co-authors and thus lacks this critical factual predicate to any claim of a joint work. Indeed, President Trump expressly concedes that Woodward, his putative co-author, "consistently claimed, and still maintains, that he is the original and sole author…" SAC ¶63. Nor does President Trump include a single allegation that he ever intended to be a joint author with Woodward. Failure to support his legal conclusion of joint authorship with plausible factual allegations requires dismissal without more.

President Trump's fatal omission of the factual support needed to find joint authorship is not an accident. President Trump's original and first amended complaints expressly disavowed joint authorship by representing to the Court that "President Trump never sought to create a work of joint authorship, and in the hours of the Interviews, there is neither allusion to nor confirmation of such." Dkt. 1, ¶47; Dkt. 32, ¶53. But President Trump "cannot advance one version of the facts in [his] pleadings, conclude that [his] interests would be better suited by a different version, and amend [his] pleadings to incorporate that version…." *U.S. v. McKeon*, 738 F.2d 26, 31 (2d Cir. 1984). "Where a plaintiff blatantly changes his statement of facts…and directly contradicts the facts set forth in his original complaint, a court is authorized to accept the facts described in the original complaint as true." *Colliton v. Cravath, Swaine & Moore*, 2008 WL 4386764, at *6 (S.D.N.Y. Sept. 24, 2008), *aff'd* 356 F. App'x 535 (2d Cir. 2009). *See also Wheeler v. Slanovec*, 2019 WL 2994193, at *6 (S.D.N.Y. July 9, 2019) ("[W]here allegations in

an amended pleading directly contradict pleadings in the original complaint, courts have disregarded the amended pleading."); *Kilkenny v. L. Off. of Cushner & Garvey*, 2012 WL 1638326, at *5 (S.D.N.Y. May 8, 2012) ("[A] court may disregard amended pleadings when they directly contradict facts that have been alleged in prior pleadings."). President Trump's prior pleadings alleging that there was no intent to be joint authors nor any indication of joint authorship in the Interviews blatantly contradict and preclude his subsequent claim of joint authorship.

It seems clear that President Trump omitted these devastating admissions to retrofit his Copyright Claims to align with the registration he obtained. This is not a case, moreover, where inconsistent pleadings can be tolerated because the plaintiff legitimately discovered new facts that were previously outside his personal knowledge. Plaintiff Trump's own intent at the time the Interviews were conducted is a fact that was, by definition, known to him at the time he filed his previous complaints and cannot possibly have changed since then. Even now, the SAC contains multiple allegations reflecting President Trump's true intent *not* to create a joint work— including the dispositive admission that he "intended that the copyright of any recordings would remain with President Trump" alone. SAC ¶49. *See also id.* at ¶47 ("President Trump…retain[ed] for himself the commercialization and all other rights to the narration"); *id*. at ¶52 ("President Trump never conveyed any copyright in his material, nor did he ever expand the scope of the license given."). Having consistently and repeatedly disavowed any intent to be a joint author, President Trump cannot claim joint authorship as a matter of law.

The SAC's allegations about how the Interviews and Work were created further underscore the absence of joint authorship. President Trump alleges that Woodward "had no intention to release an audiobook" when he conducted the Interviews and that "the Interviews

17

were to be used by Woodward—and Woodward only—for the sole purpose of accurately quoting President Trump for…*Rage*." SAC ¶¶51-52. Assuming *arguendo* this is true, President Trump has admitted that his role was to provide raw material for a book (*i.e.*, *Rage*) that Woodward would write under his own name—the antithesis of a joint work "prepared by two or more authors." 17 U.S.C. §101. Even less plausible is President Trump's claim that he co-authored *The Trump Tapes*, given his admissions that he played no role in the creation of *The Trump Tapes* and that it was prepared exclusively by Woodward "[w]ithout [his] permission." SAC ¶39. Indeed, the allegation that neither Woodward nor President Trump had an audiobook in mind at the time of the Interviews necessarily means that President Trump could not have shared an intent with Woodward to be joint authors of the Work when he answered Woodward's questions—the critical time period. *Childress*, 945 F.2d at 507-09. To permit joint authorship in such a situation—and to give President Trump an undivided interest in the entire Work, including Woodward's original content—would automatically render all books joint works if they contain previously unpublished quotations from author interviews. This is untenable. As the Second Circuit has made clear, an author "does not so easily acquire a co-author." *Id.* at 509.

Nor does President Trump's copyright registration naming him and Woodward as co-authors of the Work change this conclusion.[9] While a registration is prima facie evidence of a valid copyright, "[i]t is clear…that a certificate of registration creates no irrebuttable presumption of copyright validity" and "[w]here other evidence in the record casts doubt on the question, validity will not be assumed." *Durham Indus., Inc. v. Tomy Corp.*, 630 F.2d 905, 908

---

[9] Any claim that President Trump co-owns the Interviews independent of the Work should be dismissed for the independent reason that he lacks the registration necessary to file suit, since his registration extends only to *The Trump Tapes*. SAC Ex. A; *Hello I am Elliot, Inc. v. Sine*, 2020 WL 3619505, at *11 (S.D.N.Y. July 2, 2020) (dismissing declaratory judgment claim based on claims arising out of the Copyright Act because "Plaintiffs have not registered their copyright").

(2d Cir. 1980). *See also Wright v. Warner Books*, 953 F.2d 731, 742 (2d Cir. 1991) (Van Graafeiland J., concurring) (noting that, "because a claim to copyright is not examined for basic validity before a certificate is issued," the presumption of validity "is not binding on the judiciary, which may make its own unfettered decision whether the [material at issue is] copyrightable"). When he filed this lawsuit, President Trump represented to the Court that he had no intent to be a joint author and that the Interviews contained no evidence of joint authorship. Dkt. 1, ¶47; Dkt. 32, ¶53. Even now, the SAC conspicuously fails to allege that President Trump and Woodward each intended to create a joint work. Since President Trump's own pleadings conclusively establish the absence of joint authorship, President Trump's joint authorship claim should be dismissed regardless of any registration. *See, e.g.*, *McLaren v. Chicos FAS Inc.*, 2010 WL 4615772, at *4 (S.D.N.Y. Nov. 9, 2010) (granting motion to dismiss copyright claim and rejecting presumption of validity from issuance of copyright registration because plaintiff could not substantiate grounds for registration).

For all these independent reasons, President Trump's joint authorship claim should be dismissed.

### B.     President Trump Does Not Own His Answers to Interview Questions

President Trump alternatively argues that he owns a "copyright interest in his responses" to Woodward's questions (SAC ¶65(b)), but this argument also fails. Copyright law does not permit collaborative works like the Interviews to be stripped down into constituent parts so that multiple copyrights can be doled out to every contributor. The law is clear that there is a unitary copyright in the Interviews and Work, which vests exclusively in Woodward as the "dominant author."

The "general rule" recognized by the Supreme Court dictates that "the author is the party who *actually creates the work*, that is, the person who *translates an idea* into a *fixed, tangible*

*expression* entitled to copyright protection." *Cmty. For Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (1989) (emphasis added) (citing 17 U.S.C. §102). This common-sense concept infuses decisions attributing the entire copyright in news interviews to the journalists who conducted them. One circuit court indicated, for instance, that news organizations most likely hold the copyright in interviews with government officials because they "make [the] audio, filming and editing choices in the presentation of [the] material." *Pac. and South. Co., v. Duncan*, 792 F.2d 1013, 1014 n.1 (11th Cir. 1986). *See also Taggart v. WMAQ Channel 5 Chicago*, 2000 WL 1923322, at *3-5 (S.D. Ill. Oct. 30, 2000) (journalist owned jailhouse interview because, *inter alia*, prisoner had not fixed his oral expression in tangible medium of expression); *Current Audio v. RCA*, 71 Misc. 2d 831, 834-35 (Sup. Ct. N.Y. Cnty. 1972) (holding Elvis Presley had no "property right" in press conference responses "which supersedes the right of its free dissemination"). The thrust of these decisions is that reporters outright own copyrights in their interviews to ensure the "free dissemination of thoughts [and] ideas [on] newsworthy events and matters of public interest." *Id.* at 835.[10]

These interview cases are buttressed by a stout body of copyright law regarding other collaborative works that prohibits President Trump from carving out an exclusive copyright for himself by segregating his responses from the rest of the Interviews and Work. For "collaborative" works like the Interviews, copyright does not "subsist[] separately in each of [the participant's] contributions" because the "copyright in the [work] itself…could be undermined

---

[10] Caselaw in this area is scarce, perhaps because it is obvious that journalists own the copyrights in their work product. The few decisions reaching contrary results are generally based on outdated rationales or defunct doctrines. Several were decided under common law copyright principles superseded by Section 102 of the 1976 Copyright Act. *See, e.g., Estate of Hemingway v. Random House*, 23 N.Y.2d 341 (1968). Others were decided before *16 Casa Duse*, 791 F.3d at 258-60, *or Reid*, 490 U.S. at 737, and relied on superseded interpretations of authorship. Some arose in different factual settings involving private citizens, not government officials, and contain limited reasoning. *See, e.g., Suid v. Newsweek*, 503 F. Supp.146 (D.D.C. 1980).

by any number of individual claims." *16 Casa Duse*, 791 F.3d at 258.  When "multiple individuals lay claim to the copyright in a single [non-joint] work, the dispositive inquiry is which of the putative authors is the 'dominant author.'" *Id.* at 260 (quoting *Childress*, 945 F.2d at 508).  In this setting, "whoever was the 'dominant author' is the sole author." *Brooks v. Dash*, 454 F. Supp.3d 331, 338 (S.D.N.Y. 2020), *aff'd* 852 F. App'x. 40 (2d Cir. 2021) (citations omitted).  To identify the "dominant author," courts consider "decision making authority, billing [*i.e.*, who is credited as the author on the work], and written agreements with third parties." *16 Casa Duse*, 791 F.3d at 260.

Woodward's role as the dominant author and President Trump's auxiliary role as source is apparent from the SAC and Work.  Woodward had sole "decision making authority" because he initiated the project (*see* SAC ¶¶35-36), "actually creat[ed]" the Interviews by crafting and taping them (*Reid*, 490 U.S. at 737), and masterminded the Interviews by deciding what topics to cover, what questions to ask, when to press President Trump, or when to let him keep talking, all while steering President Trump back to matters of policy whenever he strayed.  *See, e.g.*, Ex. A, 118; *supra*, 4-7.  President Trump, by contrast, had no "decision making authority," as acknowledged by multiple on-the-record admissions that he had no control over what Woodward would write.  *See, e.g.*, Ex. A, 323-24; *supra* 5-6.  *Next*, the "billing" factor favors Woodward because the front cover and copyright page of the Work list him as the sole author.  Ex. A.[11] *Finally*, as to "written agreements," the SAC makes clear that the publishing agreements regarding the Interviews were between S&S and Woodward, and President Trump was not a

---

[11] The SAC identifies a third-party vendor's webpage that inaccurately states that the audio version of the Work is "by Bob Woodward, Donald J. Trump." SAC ¶44.  This weak evidence does not preclude a finding that Woodward is the dominant author based on the strength of his showing on the other factors.  *16 Casa Duse*, 791 F.3d at 260-61 (movie producer is "dominant author" of a film even though he shared credit with director).

party.  SAC ¶¶25-43.  Since Woodward "executed *all* of the relevant third-party agreements," all three factors favor Woodward and he must be deemed the "dominant author" of the Interviews. *16 Casa Duse*, 791 F.3d at 261.

Woodward's sole authorship is consistent with decisions involving other types of works requiring creative input from multiple contributors like movies.  In these cases, the Second Circuit observed, a single copyright vests in the dominant author(s) of the work and "non-freestanding contributions [to that work] are not ordinarily themselves works of authorship." *Id*. at 257-58.  Actors and directors, who contribute more than raw source material but are not the dominant author, do not obtain a copyright interest in these projects.  *See Garcia v. Google,* 786 F.3d 733, 743-44 (9th Cir. 2014) (en banc) (holding that actress had no copyrightable interest in her performance in a film); s*ee also 16 Casa Duse*, 791 F.3d at 259 ("[A] director's contribution to an integrated 'work of authorship' such as a film is not *itself* a 'work of authorship' subject to its own copyright protection.").  The well-established concept of vesting sole copyright ownership to the dominant author, and not according separate copyright interest to contributors of non-freestanding material, should apply equally to journalists' interviews.  *See* M.C. Amerine, *Wrestling Over Republication Rights:  Who Owns the Copyright of Interview?*, 21 MARQ. INTELL. PROP. L. REV. 159 at 181-84 (2017) (arguing that copyright rests with journalists who "mastermind," "shape," and "control" interviews by "performing … initial research, devising a theme, tailoring questions, [and] developing a rapport").

Finally, President Trump is not saved by the Compendium's default administrative rule permitting separate registrations for interview questions and answers.  *See* SAC n.2.  The Compendium's suggestion that this Court should splinter Interviews of a sitting president into a "Swiss cheese of copyrights" is unpersuasive as a matter of common sense and contradicts the

Second Circuit's clear mandate that the dominant author owns the copyright in a collaborative work. *16 Casa Duse*, 791 F.3d at 258. *See also id*. at 259 ("We doubt that Congress intended for contributors who are not joint authors to have greater rights enabling them to hamstring authors' use of copyrighted works."). The binding caselaw leads to an inescapable conclusion—Woodward is the sole author of the Interviews and Work, and President Trump's answers to Woodward's questions do not qualify as a discrete work of authorship accorded stand-alone copyright protection.

### III.   THE PUBLICATION OF TRUMP'S RESPONSES WAS FAIR USE

Even assuming President Trump owns a copyright in the Interviews, Woodward's incorporation of that material into the Work is a non-actionable fair use. The Copyright Act provides that "the fair use of a copyrighted work" for "purposes such as criticism, comment [or] news reporting…is not an infringement of copyright." 17 U.S.C. §107.

Woodward's use of the Interviews is classic news reporting, using President Trump's actual words and tone as the foundation for the Work's extensive commentary. In a leading decision, the Second Circuit held that *Bloomberg*'s unauthorized publication of an entire recorded earnings call led by Swatch executives was fair use because, "in news reporting," the "need to convey information to the public accurately may in some instances make it desirable and consonant with copyright law for a defendant to faithfully reproduce an original work without alteration." *Swatch Group Mgmt. Serv. v. Bloomberg L.P.*, 756 F.3d 73, 84 (2d Cir. 2014). "[A] speaker's demeanor, tone, and cadence can often elucidate his or her true beliefs far beyond what a stale transcript or summary can show." *Id.*

If there were ever a case that called out for summary application of the *Swatch* principle, this is it. Woodward's use of the Interviews in the Work is a paradigmatic example of the "need to convey information to the public accurately." *Id.* As the Work states, Woodward

"publish[ed] long excerpts" from the Interviews because he "wanted to put as much of [President] Trump's voice, his own words, out there for the historical record and so people could hear and judge and make their own assessment."  Ex. A, 2.  *See also* Ex. B, CD Back Cover ("[L]isteners will hear Trump as Woodward did:  profane, incautious, divisive, and deceptive, but also engaging and entertaining…").

The four fair use factors strongly favor dismissal.  The first factor looks to the purpose and character of the use.  Adding extensive supplemental materials, the Work uses the Interviews for the transformative and presumptively fair purpose of "commenting" upon and "criticizing" statements Trump made during the Interviews and his Administration more broadly.  *Andy Warhol Found. for Visual Arts v. Goldsmith*, 143 S. Ct. 1258, 1274 (2023) ("criticism" and "news reporting" are "the sorts of copying that courts and Congress most commonly have found to be fair uses").

As for the second factor—the nature of the original work—a president's off-the-cuff, oral responses to an interviewer's questions have a "manifestly factual character" that deserves "thin" copyright protection at best.  *Swatch*, 756 F.3d at 89.

On the third factor, the amount and substantiality of the use was commensurate with the Work's purpose to capture the "historical record" and allow audiences to experience President Trump in his own words.  *Id.* at 90 ("[C]opying the entirety of a work is sometimes necessary for a fair use").

The fourth factor examines the effect on the potential market for the original and weighs strongly in favor of fair use.  There is no traditional market or likely-to-be-developed market for presidents to exploit press interviews conducted during their presidency.  *Am. Geophysical Union v. Texaco*, 60 F.3d 913, 930 (2d Cir. 1994).  It would be perverse to recognize such a

market, and contrary to public policy to enable public officials to profit from speaking to the press while in office.  *Google v. Oracle*, 141 S. Ct. 1183, 1206 (2021) (assessing "public benefits" as part of fourth factor analysis).

Just as in *Swatch*, which was decided without discovery and on the pleadings, fair use is evident from the face of the SAC and immediate dismissal is appropriate.  *Swatch*, 756 F.3d at 86-87; *see also Oyewole v. Ora*, 776 F. App'x. 42, 44 (2d Cir. 2019); *Lombardo v. Dr. Seuss Enters., L.P.*, 729 F. App'x 131, 133 (2d Cir. 2018).

## IV.    THE STATE LAW CLAIMS ARE PREEMPTED

The State Law Claims (Counts III-VII) should be dismissed because they are preempted by the Copyright Act under the doctrines of (A) "conflict preemption" and (B) "explicit preemption" under 17 U.S.C. §301.  These two doctrines apply independently and either one provides a basis for dismissal.  *In re Jackson*, 972 F.3d 25, 33 (2d Cir. 2020).  Courts can dismiss preempted claims at the pleading stage "if the statute's barrier to suit is evident from the face of the complaint."  *Ricci v. Teamsters Union Local 456*, 781 F.3d 25, 28 (2d Cir. 2015); *see also Cohen v. Capital One Funding,* 489 F. Supp.3d 33, 50 (E.D.N.Y. 2020).

### A.    The State Law Claims Are Barred by Conflict Preemption

Conflict preemption bars the State Law Claims because each one requires this Court to violate the Copyright Act's clear directive that "[c]opyright protection…is not available for any work of the United States Government."  17 U.S.C. §105(a) ("Section 105").

Conflict preemption arises when state law "actually conflicts with federal law" and "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Jackson*, 972 F.3d at 34, n.4. "[W]hen an article is unprotected by a patent or a copyright, state law may not forbid others to copy that article."  *Compco v. Day-Brite Lighting*, 376 U.S. 234, 237 (1964).  To do so "would interfere with the federal policy, found in Art. I., §8,

cl. 8 of the Constitution and in the implementing federal statutes, of allowing free access to copy whatever the federal patent and copyright laws leave in the public domain." *Id.*; *see also Goldstein v. California*, 412 U.S. 546, 559 (1973) ("Where the need for free and unrestricted distribution of a writing is thought to be required by the national interest,…a State [cannot] protect that which Congress intended to be free from restraint…"); *Bonito Boats v. Thunder Craft Boats*, 489 U.S. 141, 167 (1989) (preempting state law that "restrict[ed] the public's ability to exploit ideas that the patent system mandates shall be free for all to use"); *Vault Corp. v. Quaid Software*, 847 F.2d 255, 270 (5th Cir. 1988) (conflict preemption bars breach of contract claims conflicting with the Copyright Act).

The SAC establishes that President Trump's State Law Claims do not "seek to vindicate any substantial state interests distinct from those furthered by the copyright law" because their "predominant focus" is Woodward's alleged "unauthorized use of a copyrighted [Work] that [President Trump] has no legal right to control" under the government works doctrine. *Jackson*, 972 F.3d at 39. In other words, the State Law Claims are "little more than a thinly disguised effort to exert control over" government works and thus fall within the ambit of conflict preemption. *Id.*

Furthermore, the State Law Claims conflict with the Copyright Act because they attempt to thwart Congressional will by permitting President Trump to "block off from the public something which federal law said belongs to the public." *Sears Roebuck & Co v. Stiffel Co.*, 376 U.S. 225, 231-32 (1964). State claims are preempted when it "would 'interfere with the federal policy of allowing free access to copy whatever the federal copyright laws leave in the public domain....'" *Jackson*, 972 F.3d at 40 (quoting *Compco*, 376 U.S. at 237). The express purpose of Section 105 is to ensure that "the individual Government official or employee who prepared the

work could not secure copyright in it or restrain its dissemination by the Government or anyone else."  H.R. Rep. No. 94-1476 at 59.  But President Trump's contract-based claims (Counts VI-VII, the "Contract Claims") rest on the erroneous assumption that he granted Woodward a "limited license" to use the Interviews and "retaine[ed] for himself the commercialization and all other rights"—precisely what Section 105 prohibits.  SAC ¶¶48, 101-113.  Similarly, the unjust enrichment claims rely on a theory that Woodward was unjustly enriched by "unauthorized" publication of the Work and President Trump deserves to be "compensate[ed]" for the "benefit" of granting interviews to Woodward.  *E.g.*, SAC ¶¶75, 78; *see id*. ¶¶74-82.  In both cases, the State Law Claims threaten to eviscerate Section 105 by permitting public officials to convert government work product into private property.

The State Law Claims improperly seek to privatize the historical record and are thus preempted.  Simply put, the President speaks for the People and his words belong to the People.

**B.      17 U.S.C. §301 Expressly Preempts The State Law Claims**

The State Law Claims are independently barred by 17 U.S.C. §301, which preempts the application of any state laws that (1) fall within the "subject matter of copyright" and (2) are "equivalent to" the exclusive rights established in the Copyright Act.  17 U.S.C. §301.  Here, the State Law Claims arise from Defendants' use of the Interviews in the Work, which falls squarely within copyright's subject matter.  17 U.S.C. §102(a)(1, 7).

As for the second element, the Second Circuit applies the "extra element" test:

[I]f an extra element is required instead of or in addition to the acts of reproduction, performance, distribution or display, in order to constitute a state-created cause of action, then the right does not lie within the general scope of copyright and there is no preemption.

*Computer Assocs. Int'l v. Altai, Inc.*, 982 F.2d 693, 716 (2d Cir. 1992) (citation omitted).  "A state law claim is not preempted if the 'extra element' changes the 'nature of the action so that it

is *qualitatively* different from a copyright infringement claim.'" *Id.* (citation omitted). None of the State Law Claims meet this test.

### 1. Section 301 Preempts the Unjust Enrichment Claims

President Trump's unjust enrichment claims (Counts III-V) turn on his allegation that he "conferred a benefit" on Defendants by participating in the Interviews, which Defendants "accepted" and then improperly enriched themselves by publishing the Work "without accounting to and compensating President Trump…." SAC ¶87. Numerous courts have found such claims preempted under Section 301 because "enrichment" is not an extra element. "While enrichment is not required for copyright infringement," it does not "go[] far enough to make the unjust enrichment claim qualitatively different from a copyright infringement claim." *Briarpatch Ltd. v. Phoenix Pictures*, 373 F.3d 296, 306-07 (2d Cir. 2004). Plaintiff's quasi-contractual claims of promissory estoppel and breach of the covenant of good faith and fair dealing are preempted for the same reason. *Id.*

### 2. Section 301 Preempts the Contract Claims

The Contract Claims allege that Trump retained ownership of the Interviews and gave Woodward a narrow license to use them to "write a single book." SAC ¶¶46-47. In the Second Circuit, "a contract that 'does not purport to give [the plaintiff] any protection beyond that provided…by copyright law itself' would be preempted." *Universal Instruments Corp. v. Micro Sys. Eng'g,* 924 F.3d 32, 49 (2d Cir. 2019) (citing 5 *Nimmer on Copyright* §19D.03[C][2][b] (1997)). Allegations of "mutual assent and valid consideration" are not sufficient to avoid preemption. *ML Genius Holdings LLC v. Google*, 2022 WL 710744, at *4 (2d Cir. Mar. 10, 2022), *cert. denied,* 143 S. Ct. 2658 (2023); *see also Wrench LLC  v. Taco Bell Corp.*, 256 F.3d 446, 457–58 (6th Cir. 2001). President Trump's Contract Claims are preempted because they merely restate his Copyright Claims of unauthorized use in contractual terms. *1 Nimmer on*

*Copyright* §1.01[B][1][a] at 1–22 (1997) ("[P]reemption should continue to strike down claims that, though denominated 'contract,' nonetheless complain directly about the reproduction of expressive materials").[12]

## V.   THE CONTRACT CLAIMS MUST BE DISMISSED FOR FAILURE TO STATE A VALID CAUSE OF ACTION

The Contract Claims also should be dismissed for failure to allege "enough facts to state a claim to relief that is plausible on its face" and "nudge[] [President Trump's] claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007). "The party asserting the existence of [an] oral contract has the burden of proving that an enforceable agreement exists" (*Strauss v. NewMarket Global Consult. Gp.*, 5 A.3d 1027, 1033 (D.C. 2010)), but the SAC contains no plausible allegations that Woodward entered a binding agreement not to use the Interviews in the Work.[13]

President Trump alleges that "he made Woodward aware on multiple occasions, both on and off the record, of the nature of the limited license to any recordings"—*i.e.*, that the Interviews were "for the sole purpose of accurately quoting President Trump for…*Rage*." SAC ¶51.   As factual support for this claim, President Trump cherry-picks two excerpts from the Work where Woodward agreed that the Interviews would be "for the book." *Id.* ¶¶49, 50.   But their context makes clear that Woodward, a veteran *Washington Post* reporter, merely agreed not to publish newspaper "stories" based on the Interviews before *Rage* was released in fall 2020. *See, e.g.*, Ex. A, 137.   Furthermore, President Trump repeatedly confirmed he had no control over how Woodward used the Interviews when writing about him.   *See supra*, 5-6.   And the

---

[12] "Accounting claims based primarily on copyright infringement [also] do not satisfy the 'extra element' test and are preempted."   *Gary Friedrich Enter. v. Marvel Enter.*, 713 F. Supp.2d 215, 233 (S.D.N.Y. 2009); *Baiul v. NBC Sports*, 708 F. App'x. 710, 712-13 (2d Cir. 2017).

[13] Since the purported oral agreement was made in Washington D.C. (SAC ¶46), D.C. law applies on this point and is supplemented with New York decisions.

Interviews continued after Woodward had submitted his manuscript for *Rage*, contradicting the notion that they were for the limited purpose of quotation in the book. *See supra*, 7. Further, there are no plausible allegations that there was a meeting of the minds where Woodward agreed President Trump "owned" the Interviews and granted Woodward a "limited license" to use Interview quotations in *Rage*. No experienced journalist would agree to such onerous terms— particularly for materials of historical significance. *See Walkie Check Prods. v. ViacomCBS Inc.*, 2022 WL 2306943, at *10-11 (S.D.N.Y. June 27, 2022) (dismissing "implausible" contract claim).

The statute of frauds provides independent grounds for dismissal. "[A]n action may not be brought…upon an agreement that is not to be performed within one year from the making thereof, unless the agreement [is in writing]." D.C. Code Ann. §28-3502. The purported agreement prohibiting Woodward from reusing the Interviews extended into perpetuity and, as a services contract that cannot be performed within one year, it is subject to the stringent writing and signature requirement. *Myers v. Fabrics*, 101 A.D.2d 777, 778 (1st Dep't 1984), *aff'd in relevant part*, 65 N.Y.2d 75 (1985); *Webber v. Dash*, 2019 WL 1213008, at *6-7 (S.D.N.Y. Feb. 25, 2019). Here, it is uncontested there is no signed "writing set[ting] forth the essential terms of the agreement," and the Contract Claims should be dismissed. *Gharib v. Wolf*, 518 F. Supp.2d 50, 54-55 (D.D.C. 2007); *Sonders v. Roosevelt*, 64 N.Y.2d 869, 871 (1985) (tape recordings did not satisfy Statute of Frauds); *Truman v. Brown*, 434 F. Supp.3d 100, 114 (S.D.N.Y. 2020) ("motley communications" including "phone call transcripts…do not satisfy the Statute of Frauds").

President Trump's duplicative claim for breach of the covenant of good faith and fair dealing "merely…restate[s] his breach of contract claim in other dress." *Kauffman v. Int'l. Bhd.*

*of Teamsters*, 950 A.2d 44, 49 (D.C. 2008); *O'Grady v. BlueCrest Capital Mgmt.*, 111 F. Supp.3d 494, 504 (S.D.N.Y. 2015) (same).   Any standalone accounting claim fails because the SAC does not allege a "fiduciary relationship between the parties."   *Gary Friedrich*, 713 F. Supp. 2d at 233.

## VI.   NO ACTIONABLE CONDUCT WAS PLED AGAINST PARAMOUNT

All claims against Paramount should be dismissed because there are no plausible allegations that Paramount engaged in unlawful conduct.   "[A] parent corporation...is not liable for the acts of its subsidiaries," unless the corporate veil may be pierced.   *United States v. Bestfoods*, 524 U.S. 51, 61 (1998).   "[T]he issue of whether the corporate veil may be pierced is determined under the law of the state of incorporation."   *In re Digital Music Antitrust Litig.*, 812 F. Supp.2d 390, 418 (S.D.N.Y. 2011).   Paramount is a Delaware corporation, and Simon & Schuster is a New York corporation.   *See* SAC ¶¶2, 5.   Delaware law permits piercing the corporate veil "where there is fraud or where a subsidiary is in fact a mere instrumentality or alter ego of its owner."   *Digital Music*, 812 F. Supp.2d at 418 (citing *Geyer v. Ingersoll Publ'ns Co.,* 621 A.2d 784, 793 (Del. Ch.1992)).   In New York, owners must (1) "exercise[] complete domination of the corporation in respect to the transaction attacked; and (2) … [use] such domination … to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury."   *Id.* (citing *Morris v. N.Y. State Dep't of Taxation & Fin.,* 82 N.Y.2d 135, 141 (1993)). The only allegation of Paramount's involvement is that its "assets include [S&S]" and it "exerts direct control over the executive leadership" thereof.   SAC ¶16.   These allegations are insufficient to establish liability.   *Digital Music*, 812 F. Supp.2d at 417 (dismissing parent companies with "no direct involvement").

## CONCLUSION

Defendants respectfully request that this Court dismiss the SAC with prejudice and award other relief deemed just and proper.

Dated:  November 22, 2023

**DAVIS WRIGHT TREMAINE LLP**

*/s/ Elizabeth A. McNamara*

Elizabeth A. McNamara
Linda J. Steinman
John M. Browning
Leena M. Charlton
1251 Avenue of the Americas, 21st Floor
New York, NY 10020
Phone: (212) 489-8230
Email: lizmcnamara@dwt.com
        lindasteinman@dwt.com
        jackbrowning@dwt.com
        leenacharlton@dwt.com

*Attorneys for Robert Woodward, Simon & Schuster, Inc. and Paramount Global*

**WILLIAMS & CONNOLLY\***

Kevin T. Baine
Thomas G. Hentoff (*pro hac vice* application forthcoming)

680 Maine Avenue SW
Washington, DC 20024
Phone: (202) 434-5804

Email: kbaine@wc.com
        thentoff@wc.com

*\*Of counsel to Robert Woodward*

**CERTIFICATION OF WORD COUNT**

I hereby certify that this Memorandum of Law in Support of Defendants Rule 12(b)(6) Motion to Dismiss complies with the Order granting permission to file an oversized document, not to exceed 10,000 words.  Dkt. 54.

According to the word-processing system used to prepare this Motion to Dismiss for Failure to State a Claim the total word count for all printed text exclusive of the material omitted under Rule 7.1 is 9,991 words.

Dated: November 22, 2023                                  */s/ Elizabeth A. McNamara*
                                                                                  Elizabeth A. McNamara

## CERTIFICATE OF SERVICE

I hereby certify that on November 22, 2023, I caused copies of the foregoing to be sent to

counsel of record via electronic mail, which was stipulated by the parties to be sufficient service.

*/s/ Elizabeth A. McNamara*
Attorney