# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

## 1:23-cv-06883-PGG

PRESIDENT DONALD J. TRUMP, 45th President of the United States of America, in his individual capacity,

Plaintiff,

v.

SIMON & SCHUSTER, INC., a New York corporation, ROBERT WOODWARD p.k.a. BOB WOODWARD, an individual, and PARAMOUNT GLOBAL, a Delaware corporation, f/k/a Viacom Inc., successor by merger to CBS Corporation, a Pennsylvania corporation f/k/a Westinghouse Electric Corporation,

Defendants.

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' RULE 12(B)(6) MOTION TO DISMISS SECOND AMENDED COMPLAINT

GS2 LAW PLLC
Robert Garson (RG-1521)
Yanina   Zilberman   (*pro   hac   vice application forthcoming*)
20803 Biscayne Blvd., #405
Aventura, Florida 33180
(305) 780-5212
E-mail: rg@gs2law.com
        yz@gs2law.com

*Attorneys for Plaintiff*

## TABLE OF CONTENTS

TABLE OF CONTENTS....................................................................................................................II

TABLE OF AUTHORITIES ..............................................................................................................IV

ARGUMENT ................................................................................................................................. 1

I. DEFENDANTS HAVE WAIVED THE ARGUMENTS THEY NOW MAKE RELATED TO LACK OF COPYRIGHT REGISTRATION AT INCEPTION OF THIS LAWSUIT. ................................................. 1

II. THE STATUTORY PRECLUSION AGAINST COPYRIGHT OF GOVERNMENT WORKS DOES NOT APPLY HERE................................................................................................................................ 2
A. THE INTERVIEWS, AUDIOBOOK AND THE DERIVATIVE WORKS ARE NOT UNCOPYRIGHTABLE GOVERNMENT WORKS. ................................................................................................................ 2
B. DEFENDANTS BELITTLE THE IMPORTANCE OF THE COPYRIGHT OFFICE AND ITS COMPENDIUM........................................................................................................................... 6
C. WHILE THE GOVERNMENT WORKS EXCLUSION DOES NOT APPLY, THE PRESIDENTIAL RECORDS ACT DOES, AND CONFIRMS THE COPYRIGHTABILITY OF THE INTERVIEWS AND THE WORK. ....................................................................................................................................... 7

III. PRESIDENT TRUMP HAS SUFFICIENTLY PLED HIS JOINT AUTHORSHIP OF THE WORK. ......... 9
A. THE COPYRIGHT OFFICE HAS ALREADY DETERMINED PRESIDENT TRUMP IS A JOINT AUTHOR. ................................................................................................................................................ 9
B. THE SAC SUPERSEDES ANY PRIOR ITERATIONS OF THE COMPLAINT................................. 10

IV. PRESIDENT TRUMP HAS SUFFICIENTLY PLED HIS CLAIM OF COPYRIGHT INTEREST IN THE RESPONSES TO WOODWARD'S QUESTIONS. ....................................................................... 13
A. COMPENDIUM ...................................................................................................................... 13
B. DEFENDANTS' "DOMINANT AUTHOR" ANALYSIS. ............................................................. 15

V. DEFENDANTS' FAIR USE CLAIM FAILS. ............................................................................... 18
FACTOR 1: PURPOSE AND CHARACTER OF USE (COMMERCIAL NATURE OR NONPROFIT EDUCATION?) ........................................................................................................................... 19
FACTOR 2 NATURE OF COPYRIGHTED WORK ....................................................................... 21
FACTOR 3: AMOUNT AND SUBSTANTIALITY OF THE PORTION USED IN RELATION TO THE COPYRIGHTED WORK AS A WHOLE. ....................................................................................... 22
FACTOR 4: EFFECT OF USE UPON POTENTIAL MARKET FOR OR VALUE OF COPYRIGHTED WORK. ................................................................................................................................... 23

VI. PRESIDENT TRUMP'S CLAIMS AGAINST THE DEFENDANTS ARE NOT SUBJECT TO PREEMPTION. ........................................................................................................................... 26
A. PRESIDENT TRUMP'S CLAIMS ARE NOT BARRED BY PREEMPTION VIA THE GOVERNMENT

**WORKS DOCTRINE.** ................................................................................................ **26**

**VII. PRESIDENT TRUMP'S STATE CLAIMS ARE NOT BARRED BY 17 U.S.C. § 301.** ..................... **27**

**VIII. PRESIDENT TRUMP'S STATE LAW CLAIMS ARE SUFFICIENT TO STATE A CAUSE OF ACTION** ............................................................................................................... **29**
**A. BREACH OF CONTRACT/UNJUST ENRICHMENT.** ................................................. **29**

**IX. CLAIMS AGAINST PARAMOUNT GLOBAL.** ......................................................... **31**

**CONCLUSION** ..................................................................................................... **33**

**CERTIFICATE OF SERVICE** ..................................................................................... **34**

**CERTIFICATION OF WORD COUNT** ........................................................................ **35**

## TABLE OF AUTHORITIES

**Cases**

*16 Casa Duse, LLC v. Merkin*, 791 F. 3d 247 (2d Cir. 2015) ........................................................... 19

*2002 Lawrence R. Buchalter Alaska Tr. v. Phila. Fin. Life Assurance Co.*, 96 F. Supp. 3d 182 (S.D.N.Y. 2015) ..................................................................................................................... 14

*Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith*, 143 S. Ct. 1258 (2023). ............ 24

*Arce v. Walker*, 139 F.3d 329 (2d Cir. 1998) ................................................................................ 13

*Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) ............................ 5

*Associated Press v. Meltwater U.S. Holdings, Inc.,* 931 F.Supp.2d 537 (S.D.N.Y. 2013) ............... 28

*Banff Ltd. v. Limited, Inc.*, 869 F.Supp. 1103(S.D.N.Y. 1994) ........................................................ 39

*Barris v. Hamilton*, No. 96-CV-9541, 1999 U.S. Dist. LEXIS 7225, 1999 WL 311813 (S.D.N.Y. 1999) ................................................................................................................................... 14

*Bennett v. Tu-Cows, Inc.,* 2007 U.S. Dist. LEXIS 54816, 2007 WL 2178317 (E.D. Mich. July 27, 2007) ................................................................................................................................... 38

*Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605 (2d Cir. 2006) ........................ 28

*Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.*, 373 F.3d 296 (2d Cir. 2004) .................................. 33

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 587 (1994) ..................................................... 27

*Childress v. Taylor*, 945 F.2d 500 (2d Cir. 1991) ......................................................................... 11

*Computer Assocs. Int'l v. Altai, Inc.*, 982 F.2d 693, 716 (2d Cir. 1992) ......................................... 32

*Dluhos v. Floating & Abandoned Vessel, Known as N.Y.*, 162 F.3d 63 (2d Cir. 1998) ................... 12

*Dr. Seuss Enters, L.P. v. Penguin Books USA, Inc.,*109 F. 3d 1394 (9th Cir. 1997) ................... 25, 26

*Durham Indus., Inc. v. Tomy Corp.*, 630 F.2d 905, 908 (2d Cir. 1980) .......................................... 11

iv

*Georgia v. Pub. Resource.Org, Inc.*, 140 S. Ct. 1498, 1510 (2020) .......................................... 18, 22

*Goldrich v. Masco Corp.*, 2023 U.S. Dist. LEXIS 52095 (S.D.N.Y. 2023) ......................................... 13

*Greer v. Media*, 2023 U.S. App. Lexis 7407 (2d Cir. 2023) ............................................................. 33

*Harper & Row, Publishers, Inc.* v. *Nation Enters.*, 723 F.2d 195 (2d Cir. 1983) ................ 3, 32

*Harper & Row, Publrs. v. Nation Enters.*, 471 U.S. 539, 561 (1985) ........................................... 22

*In re Crysen/Montenay Energy Co.*, 226 F.3d 160 (2d Cir. 2000)................................................... 12

*Infinity Broad Corp v. Kirkwood*, 150 F. 3d 104 (2d Cir. 1998)...................................................... 27

*Iowa State Univ. Research Found. v. ABC*, 621 F.2d 57 (2d Cir. 1980).......................................... 24

*Kermanshah v. Kermanshah*, 580 F. Supp. 2d 247 (S.D.N.Y. 2008). .............................................. 15

*Khmaladze v. Vorotyntsev*, 2019 US Dist LEXIS 66375 (S.D.N.Y 2019) ......................................... 37

*Kieselstein-Cord v. Accessories by Pearl, Inc.*, 632 F.2d 989 (2d Cir. 1980) ................................... 8

*P&G Auditors & Consultants, LLC v. Mega Intl. Commer. Bank Co.*, 2019 US Dist LEXIS 169750

(S.D.N.Y. 2019)......................................................................................................................... 36

*McLaren v. Chicos FAS Inc.*, 2010 WL 4615772 (S.D.N.Y. 2010).................................................... 12

*Meeropol v. Nizer,* 560 F.2d 1061 (2d Cir. 1977) ...................................................................... 24

*Melendez v. Sirius XM Radio, Inc.*, 50 F. 4th 294 (2d Cir. 2022)............................................... 33, 34

*Monge v. Maya Magazines, Inc.*, 688 F.3d 1164 (9th Cir. 2012) ............................................. 24, 25

*Monterey Bay Mil. Hous., LLC v. Ambac Assurance Corp.*, 531 F. Supp. 3d 673(S.D.N.Y. 2021) .. 13

*Palm Beach Strategic Income*, 2011 U.S. Dist. LEXIS 46867, 2011 WL 1655575  (E.D.N.Y. 2011) 15

*Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv.*

*Mgmt. Inc.*, 712 F. 3d 705 (2d Cir. 2013) ...................................................................................... 5

*Personal Watercraft Prod. SARL v. Robinson*, 2017 U.S. Dist. LEXIS 143336 (S.D.N.Y. 2017)....... 37

*Pratt v. City of N.Y.*, 929 F. Supp. 2d 314, 319 n.3 (S.D.N.Y. 2013). ............................................. 13

*Pub. Affs. Assocs. v. Rickover*, 109 U.S. App. D.C. 128, 284 F.2d 262 (D.C. Cir. 1960) ................... 3

*Pub. Affs. Assocs. v. Rickover*, 268 F. Supp. 444 (D.D.C. 1967) .................................................. 4, 5

*Roman v. City of Mount Vernon*, 1022 US Dist Lexis 128074  (S.D. 2022) ................................... 16

*Russell v. Hollister Corp.*, No. 13-CV-5273, 2014 U.S. Dist. LEXIS 82360 (S.D.N.Y. June 2014) ..... 15

*Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 450 (1984) ................................ 28

*Swatch Group Mgmt. Servs. v. Bloomberg L.P.*, 756 F. 3d 73, 86-87 (2d Cir. 2014) .................... 22

*Thomson v. Larson*, 147 F. 3d 195, 197 (2d Cir. 1998) ................................................................. 12

*Urban Textile, Inc. v. Rue 21, Inc.*, 2017 U.S. District. Lexis 49573 (C.D. Cal. 2017) ...................... 7

*Varsity Brands, Inc. v. Star Athletica, LLC*, 799 F.3d 468, 480 (6th Cir. 2015) ................................ 7

*Xie v. JPMorgan Chase Short-Term Disability Plan*, 2016 U.S. Dist. LEXIS 95200, 2016 WL 3963113 (S.D.N.Y. July 20, 2016) ............................................................................................................ 13

**Other Authorities**

1 Nimmer on Copyright § 5.13 ....................................................................................................... 3

Compendium of U.S. Copyright Offices Practices, Third Addition ..................6, 7, 13, 16, 18, 25, 30

Nimmer on Copyright, § 13.05[A][3] at 13-178 (1997)). .............................................................. 27

H.R. REP. NO. 1487, 5th Cong., 2d Sess. 2 (1978) ......................................................................... 9

Neuenschwander, John A. A Guide to Oral History and the Law (Oxford Oral History Series) Second Edition (2014) (p. 132). ................................................................................................ 30

*Presidential Records Act: The President And Judicial Review  Under The Records Acts.*, 60 Geo. Wash. L. Rev. 1477, 1483 (1992) ............................................................................................... 9

*Talking Donald Trump: A Sociolinguistic Study of Style, Metadiscourse, and Political Identity* by

Jennifer Sclafani (Routledge 2018). ..................................................................... 26

**Rules**

Fla. R. Civ. P. 12(b)(6) ......................................................................................... 5, 21

Fed. R. Civ. P. 8(e) ................................................................................................. 15

**Statutes**

17 U.S.C. § 101. ....................................................................................................... 2

17 U.S.C. § 105 ......................................................................................................... 2

17 U.S.C. § 107(4).................................................................................................. 28

17 U.S.C § 403 .......................................................................................................... 6

44 U.S.C.S § 2201(2) ................................................................................................ 9

44 U.S.C.S. § 2201 ................................................................................................... 9

44 U.S.C.S. § 2201(3) ............................................................................................. 10

45 U.S.C. §§ 2201-2207 (1988) ............................................................................... 8

Plaintiff, President Donald J. Trump, 45th President of the United States of America, in his individual capacity ("Plaintiff" or "President Trump"), respectfully submits this response in opposition to the Rule 12(b)(6) Motion to Dismiss Second Amended Complaint ("Motion") and the corresponding Memorandum of Law ("Defendant's Mem.") served by the Defendants, Simon & Schuster, Inc. ("SSI"); Robert Woodward ("Woodward"); and Paramount Global ("Defendants") in this matter, and requests that this Court deny the Motion in its entirety for the reasons set forth below. In further support of this response in opposition, the Plaintiff hereby incorporates the facts pled in his Second Amended Complaint [D.E. 70] ("Complaint" or "Compl. or "SAC") and further submits the Declaration of his attorney, Robert Garson ("Garson Decl.")[1].

## ARGUMENT

**I.   Defendants have waived the arguments they now make related to lack of copyright registration at inception of this lawsuit.**

In a letter to the Court on November 2, 2023, the Defendants indicated that they "hereby withdraw the argument in their pending Rule 12(b)(6) motion that the Amended Complaint should be dismissed for failure to register a copyright." [D.E. 65] Despite having withdrawn that position on account of the Copyright Office's issuance of the Copyright Registration as noted in the Complaint and Exhibit 1 thereto [D.E. 70], the Defendants nevertheless make vestigial allusions to it.  *See, e.g.* Defendants' Mem. at FN 9. The attempt at resurrection should be rejected out of hand.

---

[1] *See* Exhibit 1 filed in conjunction with Plaintiff's response in opposition.

II.     **The statutory preclusion against copyright of government works does not apply here.**

A.  **The Interviews, Audiobook and the Derivative Works are not uncopyrightable government works.**

17 U.S.C. § 105 of the Copyright Act provides:

Copyright protection under this title is not available for any work of the United States Government, but the United States Government is not precluded from receiving and holding copyrights transferred to it by assignment, bequest, or otherwise.

A "work of the United States government" is "a work prepared by an officer or employee of the United States government as part of that person's official duties." 17 U.S.C. § 101. The Defendants have had a tunnel vision approach to this provision from the outset. In their view, the exclusion automatically applies here based upon President Trump's service as president. That is an incorrect application of the government works doctrine.

As a starting point, for the government works exclusion to apply, the underlying works would not only have to be prepared by an officer or employee of the United States, but also be prepared as part of that person's official duties. 17 U.S.C. § 101. Defendants try to satisfy these two separate elements by repeatedly harping on President Trump's status as an officer or employee of the United States by way of his presidency; however, case law confirms that presidential status, or indeed governmental status, is not an automatic trigger for application of the government works doctrine. *See, e.g.*, *Pub. Affs. Assocs. v. Rickover*, 109 U.S. App. D.C. 128, 284 F.2d 262, 269 (D.C. Cir. 1960) ("It cannot be properly said . . . that a government official who speaks or writes of matters with which he is concerned as an official is by the very fact of being such an official barred from copyright on his productions.'"); 1 Nimmer on Copyright § 5.13 (quoting H.Rep., p. 58 for the proposition that "'a Government official or employee would

2

not be prevented from securing copyright in a work written at that person's own volition and outside his or her duties, even though the subject matter involves the Government work or professional field of the official or employee.'"); *Harper & Row, Publishers, Inc.* v. *Nation Enters.*, 723 F.2d 195 (2d Cir. 1983), *rev'd on other grounds*, 471 U.S. 539, 105 S. Ct. 2218, 85 L. Ed. 2d 588 (1985) (refusing to go so far as to find that the words Ford spoke when he was in office may not be copyrighted by him as works of the United States government, for the reason that "[t]he conversations originated with Ford, and unlike the testimony before the Hungate Committee, were neither fixed as writings nor publicly delivered as part of any person's official duties . . . the phrasing of the sentence itself may be copyrighted by that official if and when it is later written down.")

To be sure, if presidential status was synonymous with "uncopyrightable," the subject exclusion would be an express "presidential works" exclusion, and there would be no case law affording a president or other government figure the benefit of copyright protection. Axiomatically, there is no such narrowly-tailored exception, and such case law does exist. *See supra.* Thus, one can be a presidential or other government figure and still benefit from the protections of the Copyright Act.

Even if President Trump were an officer or employee of the United States, the Defendants must still show that the Interviews were prepared in the course of his official duties. Defendants fail to establish this element. Short of saying who was present during the interviews, the Defendants offer no evidence but only self-serving statements of their own allegedly edited work. Indeed, the evidence adduced to date establishes that the Interviews were prepared at President Trump's instigation and outside of his official duties. *See* Garson Dec. at ¶ 20. The

3

mere fact President Trump was situated in office during some interviews is not tantamount to the interviews being conducted in the course of official duties. Defendants go from "if" to "then" without consideration of the in-between and without consideration of the fact that being a President is both a temporal role and a duty, fulfilled at home, in an office (which are both in the same building) and offsite; one can be a president and play golf, be an equestrian, and be a parent.

Under these facts, and as a matter of case law, whether any works were prepared in the course of official duties entails a factual determination, and that cannot be made at this stage. *See Pub. Affs. Assocs. v. Rickover*, 268 F. Supp. 444, 450 (D.D.C. 1967) (holding that "the circumstances of the preparation and delivery of the speeches and the speeches themselves must be examined to determine whether the Admiral was acting in his public or his private capacity."). The determinations to be made are not only legal but also factual. *Id.* at 450. Indeed, *Rickover* was decided based upon not only a matter of law but also based upon findings of fact. *Id.* At this stage of litigation, there is no fact-finding; this is against the basic principles of pleading that, *inter alia*, all factual allegations in a complaint are to be taken as true and that a complaint must simply plead enough to state a plausible claim, which is satisfied when the plaintiff pleads enough content that allows for the reasonable inference that the defendant is liable for the conduct alleged. *See* Rule 12(b)(6), Fla. R. Civ. P.; *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)); *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F. 3d 705, 717 (2d Cir. 2013). Any in any event, if the Defendants wish to invoke the government works exclusion, they are tasked with sufficiently alleging with why it applies. President Trump is not required to plead

it for them.

Woodward argues the Work, including the Interviews, are a work of government copyright, and belongs to the "People" and the "public domain" but he has unabashedly asserted *sole* copyright to the Work and asserted his own copyright.  *See* Defendants' Mem. at pp. 10, 15, 22, 23; *see also* Garson Dec. at 7-12. This is internally incongruous. Had this occurred to Defendants prior to the instant action, and Defendants had recognized that there are government works, they would have abided by § 403 of the Copyright Act. The law requires that derivative works consisting predominantly of government works must have the required copyright notice, which includes a statement specifically identifying those parts of the work that are *not* U.S. Government work, in order for copyright protection to apply. Defendants' inconsistency, and hypocrisy, is glaring. It is inconceivable that the statutory prohibition on copyrighting government works could negate President Trump's copyrights, render it a matter of public domain, but yet also lay the foundation for Defendants' purported sole and private copyright.

Woodward tries to obscure the inherent hypocrisy by trying to frame the Audiobook as a transformative retrofit of the Interviews, but the nature and extent of that retrofit remains a factual issue; the Court does not have before it any opportunity to reconcile the interviews as they were originally recorded and as they appear within the Audiobook and derivative works. This is why, even though a text can be considered on a Rule 12(b)(6) motion, the Audiobook and its textual derivatives cannot; in other words, although the Defendants often cite to the Audiobook as evidence, the reliability of that Audiobook as any kind of evidence is questionable because the Defendants also claim that the Audiobook was the result of various editing

processes. Put in other words, what the Audiobook states cannot simply speak for itself, or what happened during the subject interviews—if the Defendants wanted the interviews to speak for themselves, they were obliged to produce the actual recordings. Without those exact, raw recordings—and since they claim the Audiobook is not an exact match to the Recordings—the Defendants' government works argument cannot be analyzed properly by this Court.

### B. Defendants belittle the importance of the Copyright Office and its Compendium.

The Copyright Office is no stranger to the government works exclusion. Indeed, the exclusion is embedded within its guidelines. *See* Compendium at section 313.(c)(1), at p. 35 (citing H.R. REP. NO. 94-1476, at 58 (1976), reprinted in 1976 U.S.C.C.A.N. at 5671) (one of the Compendium-recognized exceptions to the government works exclusion is that "[a] work prepared by an officer or employee of the U.S. government may be registered if the work was prepared at that person's own volition and outside his or her official duties, even if the subject matter focuses on the author's work for the government."). In this instance, the Copyright Office was indisputably aware of the Plaintiff's former presidency and nevertheless determined that he has copyright over the Work. That determination, and the subsequent issuance of the Copyright Registration, cannot be ignored, and must be afforded deference.

The "Compendium of U.S. Copyright Offices Practices, Third Addition" ("Compendium") is more than just a secondary authority. *See Urban Textile, Inc. v. Rue 21, Inc.*, 2017 U.S. District. Lexis 49573 at *1, n1 (C.D. Cal. 2017). It "is an internal manual" published by The Copyright Office "that instructs its employees who are tasked with reviewing and registering copyrights how to **apply the relevant provisions of the Copyright Act uniformly**." *Varsity Brands, Inc. v. Star Athletica, LLC*, 799 F.3d 468, 480 (6th Cir. 2015) (citing the Compendium at §§ 903.1, 924- 924.3(D)

6

(emphasis added)).  *See also* Compendium at pp. 1, 2;  *Kieselstein-Cord v. Accessories by Pearl, Inc.*, 632 F.2d 989, 994 (2d Cir. 1980) ("The Copyright Office continually engages in the drawing of lines between that which may be and that which may not be copyrighted."). *See* Compendium at p. 2 (itemizing various copyright cases in which courts have cited the Compendium). If the Copyright Office issued the Copyright Registration to a presidential figure, it did so for a reason. Defendants' self-serving disagreement with the Copyright Office does not justify granting Defendant's Rule 12(b)(6) motion.

### C.  While the government works exclusion does not apply, the Presidential Records Act does, and confirms the copyrightability of the Interviews and the Work.

The Presidential Records Act ("PRA") shows why Defendants' government works argument is fraught with frailty. The government works preclusion cannot be dispositive of President Trump's rights with respect to the Work—in particular, the Interviews—because these works are personal records, not presidential records, under the PRA. *See* 45 U.S.C. §§ 2201-2207 (1988).[2] The PRA was enacted to "prevent a repeat of Watergate's legal drama surrounding ownership of presidential records by asserting public ownership of such records and to ensure the preservation and public availability of presidential records by imposing certain specified procedures." *Presidential Records Act: The President And Judicial Review  Under The Records Acts.*, 60 Geo. Wash. L. Rev. 1477, 1483 (1992) (citing *See* H.R. REP. NO. 1487, 5th Cong., 2d Sess. 2 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5732, 5733). Defendants incorrectly argue that

---

[2] There is no interplay, as a matter of law, between the PRA and the Copyright Act. There are two possible lines of reasoning: (i) the Copyright Act does not apply to the President at all. If it did then the entirety of the PRA would be otiose; or (ii) the PRA is a predicate for applicability to the CA, in that if the PRA bites on any given work, any government works doctrine would flow from that primary determination.

the point of the PRA is to prevent a "profit" situation; rather, the PRA contemplates the parameters and limitations of public access to a former President's records. To that end, it distinguishes between "Presidential records" and "personal records." 44 U.S.C.S. § 2201 (LexisNexis, Lexis Advance through Public Law 118-3, approved April 10, 2023).

Pursuant to the PRA, the United States "reserve[s] and retain[s] complete, ownership, possession, and control of *Presidential records*." 44 U.S.C.S § 2201(2) (emphasis added). There is no designated provision to *personal records*, confirming the United States *does not* reserve or retain complete ownership, possession, and control of Presidential records.  At issue in this action are not Presidential records, but rather personal records in the nature of "diaries, journals, or other personal notes serving as the functional equivalent of a diary or journal which are not prepared or utilized for, or circulated or communicated in the course of, transacting Government business." 44 U.S.C.S. § 2201(3) (category of PRA-recognized personal records).

The Interviews as memorialized by the Work were not conducted in the form of official press conferences, not prepared or utilized for, or circulated or communicated in the course of, transacting government business. Further, the SSI website concedes that the Trump Tapes and Rage both fall under the category of Biography & Memoirs,[3] a functional equivalent of a diary or journal. President Trump submits that the Work falls within the PRA, which, on one hand, functions independent of and as a functional exception to the Copyright Act and its government works provision, and on the other hand, informs the Copyright Act provision relating to copyrightability of government works.  It does so by first defining the nature of a presidential

---

[3] https://www.simonandschuster.com/search/books/Author-Bob-Woodward/Category-Biography-Autobiography/Available-For-Sale-Now/_/N-1z13w6gZhr0Zpgz/Ne-pgt

work that is subject to government ownership and providing that if the work is deemed a personal record, there can be no government ownership and thus no government copyright. The Defendants incorrectly have considered the PRA and the Copyright Act in their respective vacuums, without considering the impact of the PRA upon the government works doctrine. That failure defeats the instant motion.

### III.     President Trump has sufficiently pled his joint authorship of the Work.

### A.  The Copyright Office has already determined President Trump is a joint author.

In filing the SAC, President Trump has sought a declaration of his rights as, at minimum, joint author and has asked this Court to take judicial notice of the same. Defendants acknowledge that "[t]he existence of a valid copyright can be established by the introduction into evidence of a Copyright Office certificate of registration." *Durham Indus., Inc. v. Tomy Corp.*, 630 F.2d 905, 908 (2d Cir. 1980) (noting certificate is "prima facie evidence of the validity of the copyright and of the facts stated in the certificate."). In an effort to challenge the weight of the certificate of registration, Defendants cite to the principal in *Durham* that "[i]t is clear, however, that a certificate of registration creates no irrebuttable presumption of copyright validity. Where other evidence in the record casts doubt on the question, validity will not be assumed." *Durham*, 630 F.2d at 908. Therein lies the issue with Defendants' argument: there is no "other evidence in the record" for this Court to consider. Before this Court is a Rule 12(b)(6) motion, which allows for consideration of matters on the four corners of the complaint, not "other evidence". Defendants ask the Court to cast aside the legitimacy of the Copyright Registration because of supposedly deficient allegations with the SAC; however, there are two problems with that request: (i) the allegations are sufficient and (ii) the fact of registration by itself creates a

rebuttable presumption as to validity, which means the Plaintiff is not required to plead any more detail than he already has.  The determination that the Defendants urge this Court to make is not one that can be made at the motion to dismiss stage. Indeed, *Durham* is the culmination of a motion for summary judgment. *Durham*, 630 F.2d at 908. *Childress v. Taylor,* 945 F.2d 500 (2d Cir. 1991), was also decided at the motion for summary judgment stage. *Thomson v. Larson* was an appeal of a district court's conclusion regarding authorship based upon a president court's *findings of fact*. 147 F. 3d 195, 197 (2d Cir. 1998) (emphasis added).

In summary, the Plaintiff has not merely legally concluded that he is a joint author; the Copyright Office has declared that he is, and that declaration, pled in the Complaint, creates a rebuttable presumption, one the Defendants have not rebutted in any manner. They offer no sworn declaration, and their position is at odds with the Copyright Office, contrary to one of the authorities cited by Defendants, *McLaren v.  Chicos FAS Inc.*, 2010 WL 4615772, at *4 (S.D.N.Y. Nov. 9, 2010).

### B.  The SAC supersedes any prior iterations of the Complaint.

Because the Defendants are unable to rebut the presumption of the validity of the copyright issued to the Plaintiff, they resort to the argument that the SAC should be dismissed due to purported misalignment between the SAC and earlier pleadings. This argument fails.

The general rule within the Second Circuit (and most other jurisdictions) is that an amended pleading supersedes the original and renders it of no legal effect. *See In re Crysen/Montenay Energy Co.*, 226 F.3d 160, 162 (2d Cir. 2000); *Dluhos v. Floating & Abandoned Vessel, Known as N.Y.*, 162 F.3d 63, 68 (2d Cir. 1998); *Arce v. Walker*, 139 F.3d 329, 332 n.4 (2d Cir. 1998); *see also Goldrich v. Masco Corp.*, No. 22-CV-3769 (KMK), 2023 U.S. Dist. LEXIS 52095,

at *2 (S.D.N.Y. Mar. 27, 2023); *Pratt v. City of N.Y.*, 929 F. Supp. 2d 314, 319 n.3 (S.D.N.Y. 2013).

It is true that courts within the Second Circuit "have taken various approaches to dealing with allegations in an amended complaint that directly contradict allegations set forth in a prior version of the complaint." *Goldrich*, 2023 U.S. Dist. LEXIS 52095, at *3 (citing *Monterey Bay Mil. Hous., LLC v. Ambac Assurance Corp.*, 531 F. Supp. 3d 673, 712 (S.D.N.Y. 2021)). "In some cases, courts have found that, irrespective of the contradictions, "'once an amended pleading is filed, a court may not import information that was contained in 'the prior pleading but omitted from the amended pleading.'" *Goldrich*, 2023 U.S. Dist. LEXIS 52095, at *3 (collecting various case law); *see also  **Xie v. JPMorgan Chase Short-Term Disability Plan**, 2016 U.S. Dist. LEXIS 95200, 2016 WL 3963113, at *3 (S.D.N.Y. July 20, 2016) ("Although the change in the Complaint . . . raises doubt, at the motion to dismiss stage the truthfulness of the allegations is assumed, and any attempt to use [the] [p]laintiff's prior pleadings against her as an admission is premature.")*  (emphasis added). Meanwhile, some courts have taken a different approach in the case of "direct" or "blatant" "contradictions.  *See Goldrich*, 2023 U.S. Dist. LEXIS 52095, at *3-4 (S.D.N.Y. Mar. 27, 2023) (collecting cases).

Ultimately, [i]t is "rare" for Second Circuit courts to consider prior pleadings. *See 2002 Lawrence R. Buchalter Alaska Tr. v. Phila. Fin. Life Assurance Co.*, 96 F. Supp. 3d 182, 206-07 (S.D.N.Y. 2015). "[C]ourts only do this when "the plaintiff **directly contradicts** the facts set forth in his original complaint," which is not the case . . . [where Plaintiffs have] merely removed certain allegations from their Complaint and First Amended Complaint instead of alleging directly contradictory facts.") (emphasis added).

11

"While there may be a rare occasion to disregard the contradictory and manipulated allegations of an amended pleading, the more usual and benevolent option is to accept the superseded pleadings but allow the factfinder to consider the earlier pleadings as admissions in due course." *Barris v. Hamilton*, No. 96-CV-9541, 1999 U.S. Dist. LEXIS 7225, 1999 WL 311813, at *2 (S.D.N.Y. May 17, 1999) (citation omitted); *Accord Russell v. Hollister Corp.*, No. 13-CV-5273, 2014 U.S. Dist. LEXIS 82360, 2014 WL 2723236, at *4—5 (S.D.N.Y. June 17, 2014)*; Kermanshah v. Kermanshah*, 580 F. Supp. 2d 247, 266—67 (S.D.N.Y. 2008).

There can be no contradiction as the copyright registration had not been granted yet, as which Plaintiff foreshadowed in prior filings. [D.E. 44, 61]. However, even when there are inconsistencies which are not the same as direct contradictions, *see Kermanshah*, that "should not trump the Court's obligation under Rule 12(b)(6) to accept a complaint's allegations as true. Indeed, there are valid reasons why a plaintiff would amend a complaint in a contradictory fashion." *Palm Beach Strategic Income*, 2011 U.S. Dist. LEXIS 46867, 2011 WL 1655575, at *6 (E.D.N.Y. 2011). Rule 8(e) explicitly permits litigants, even within the same pleadings, to "state as many separate claims or defenses as the party has regardless of consistency." Fed. R. Civ. P. 8(e) (emphasis added).

Here, any changes or omissions are hardly the sort of direct change or blatant contradiction that would warrant dismissing the complaint or disregarding the allegation of joint ownership. For instance, President Trump did not first argue he had no rights, and then argued he had some rights. President Trump always asserted that he held copyright interest in the Interviews and the Work. And, the SAC was not filed in connection with the last motion to dismiss but rather in connection with this Court's entry of an order instructing the Plaintiff to do so after

the Copyright Office issued the Copyright Registration. [D.E. 66]. Even if the allegations are

deemed incongruous, they are not in such direct contradiction so as to warrant abandonment of

any deference to the SAC. *See Roman v. City of Mount Vernon*, 1022 US Dist Lexis 128074 at *17

(S.D. 2022). There is no blatant reversal here, and no reason for the Court to look outside the

four corners of the SAC.  As such, the Court should not revert to prior pleadings.

IV. **President Trump has sufficiently pled his claim of copyright interest in the Responses to Woodward's questions.**

A. **Compendium**

Section 719 of the Compendium specifically covers the subject of interviews, defined as

a "written or recorded account of a conversation between two or more individuals [whereby]

typically, the interviewer poses a series of questions that elicit a response from the

interviewee(s)." *See* Compendium at § 719, p. 33. The Copyright Office thus confirms that an

interview may be the object of copyright registration. *Id.* Here, the Interviews are most certainly

fixed in a tangible medium of expression, as they were recorded. Moreover, the Interviews are

replete with creative expression in the form of questions and certainly Plaintiff's responses,

conceded by Woodward as being the catalyst for publication. *See* Garson Dec., citing

Woodward's various statements).

As set forth in the Compendium, in pertinent part,

The U.S. Copyright Office will assume that the interviewer and the interviewee own the copyright in their respective questions and responses unless **(i) the work is claimed as a joint work, (ii) the applicant provides a transfer statement indicating that the interviewer or the interviewee transferred his or her rights to the copyright claimant, or (iii) the applicant indicates that the interview was created or commissioned as a work made for hire.**

*Id.* at § 719, p. 33 (emphasis added).

13

In this case, the Copyright Office concluded, in its specialized experience and investigation, that subsection (i) applies, and has construed his submission of *The Trump Tapes* as a joint work but has rejected it as a work authored solely by him. *See supra.* Therefore, presumptively, at the very minimum, President Trump has such rights as a matter of law, and it is undoubtedly the burden of Defendants to shoulder the burden in rebutting the presumption.

With this presumption in place as a matter of law, the argument that Woodward is the sole author and owner is legally tenuous but also disputed. Given the evidence of Woodward's agreement limiting his use of the Interviews, *see* Compl. at ¶¶ 46-52, and his admission that the publication of an interview in this matter was completely new territory for him,[4] *see* Garson Dec. at ¶10, whether Woodward is the sole author/owner is a factual matter that may not be disposed of at this early stage of litigation, without further discovery. Because of factual questions that are still pending a response from the Defendants, it cannot be decided as a matter of law that Woodward, as opposed to President Trump, has full authorship and copyrights to the Interviews and the Work. These factual questions include the following: (i) what discussions did Woodward and the Plaintiff have beyond the text featured in the Interviews?; (ii) what edits did Woodward and others actually make to the raw recordings of Plaintiff in incorporating them into the Audiobook and the Derivative Works? (iii) what did Woodward mean by referring to "for the history" in conversations with President Trump; (iv) what does Woodward mean by "historical record," and is his meaning of that different now, post-litigation, different than it was in conversation with President Trump. Defendants' failure

---

[4] None of the defendants are relying upon an "advice of counsel" defense, as discussed counsel-to-counsel.

to answer them requires denial of this motion and commencement of the discovery process.

Defendants rely heavily upon *Georgia v. Pub. Resource.Org, Inc.*, 140 S. Ct. 1498, 1510 (2020), but that case has nothing to do with interviews or the rights afforded to an interviewee as opposed to the interviewer. *Georgia*, 140 S. Ct. at 1501. Neither *Georgia* nor *16 Case Duse* has anything to do with interviews or journalism, and any reference to "swiss cheese" in the latter has no impact upon the claims brought by the Plaintiff. *See* Defendants' Mem. at p. 22. The Defendants are simply invoking catchy phrases from inapposite cases to distract from the merits of this case.

**B. Defendants' "Dominant Author" Analysis.**

Defendants contend President Trump does not own a copyright either in the Interviews or the Work because Woodward is purportedly the "dominant author" of the Interviews and the Work. *See* Defendants' Mem. at p. 19-23. This factual determination, which is not for this stage of proceedings, will clearly show that President Trump is dominant throughout the Interviews and the Work. Woodward is very much the submissive Critobulus with President Trump being the dominant Socrates.

For the "dominant author" analysis, the Defendants cite to *16 Casa Duse, LLC v. Merkin*, 791 F. 3d 247, 258 (2d Cir. 2015), which suggests that when "multiple individuals lay claim to the copyright in a single work, the dispositive inquiry is which of the putative authors is the "dominant author." *Casa Duse* further suggests that determining which of multiple authors is "dominant" involves consideration of certain elements, including decision making authority, billing and written agreements with third parties. *Id.* at 260.  Defendants' "dominant author" approach must be applied to not only the Audiobook and the Derivative Works, but also the

Interviews themselves. Applying that here, the argument fails on both fronts.

<u>The Interviews</u>

To conduct the Interviews, Woodward had to seek the Plaintiff's consent to be recorded and to speak to him. *See* Compl. at ¶ 35. But for Plaintiff's consent, Woodward would not have had access to any of the information conveyed to him via the Interviews; there would be no Interviews to publish. It was the Plaintiff's decision to be interviewed and to allow Woodward to question him that enabled the Interviews to materialize. Defendants argue Plaintiff admitted "he had no control over what Woodward would write," *see* Defendants' Mem. at p. 29, but Defendants miss the point: Woodward had no control over what the Plaintiff would say, and the raw Interviews which were turned into the Audiobook and the Derivative Works were about what President Trump said, and how he said it. The hallmark of the Interviews are Plaintiff's stream-of-consciousness, his articulation, and the uniqueness of his voice—indeed, President Trump's unique voice is, on Woodward's own admission, is what prompted Woodward to publish the Interviews for the world to hear—and to see on paper. *See* D.E. 37-1, Woodward Dec. at ¶ 17. Woodward's role, on the other hand, was, on many occasions, to press the "record button" when President Trump talked and listen to the President speak. Pushing the "record button" is not tantamount to dominance of authorship; to the contrary, it is secretarial, and confirms the value of the Plaintiff's voice and words. Woodward may have come up with questions of his own, but the Interviews were clearly not a traditional question and answer format, as President Trump apparently "could take [him] on a freeway to nowhere in an instant," *see* Exh A. at 85; Defendants' Mem. at p. 4. Further, this is not a situation where only Woodward contacted President Trump to pose questions to him; as Woodward notes in his

Declaration, "on some occasions, President Trump called me at my home in Washington D.C." *See* D.E. 37-1, Woodward Dec. at 12. As such, the Defendants cannot simply rely upon other sources that discuss a journalist's copyrights; they must take into consider nuanced, unusual nature of the Interviews. They fail to do that here.

As to the elements of billing and relevant third-party agreements, Defendants make absolutely no argument as it pertains to the Interviews, instead focusing solely on the Audiobook and the Derivative Works. *See* Defendants' Mem. at pp. 11-13. The Interviews, in the context of the Work, are not credited or billed as the *Woodward Tapes* featuring President Trump but rather *The Trump Tapes*. Thus, the billing factor also favors Plaintiff. As to "third party agreements," there are none in the context of the Interviews, making this element neutral. As such, as it relates to the Interviews, President Trump is the "dominant author."

The Audiobook and Derivative Works

The Defendants claim Woodward had "decision making authority" as to the Audiobook and Derivative Works, but this argument fails to consider the extent to which both are the direct byproduct of the Interviews. The claim Woodward edited the Interviews and somehow made it "his own," *see, e.g.* Defendants' Mem. at p. 22, 23, 24, is self-serving where the Defendants have withheld the original Interview recordings and thus precluded President Trump as well as this Court from reconciling the original Interviews and the materials that have been deposited with this Court. By Woodward's own admission, he *incorporated edited versions* of the Interviews in the Work, but the question remains what he edited and what remained the same. *See* Woodward Dec. at ¶ 18 (emphasis supplied). As long as that question remains unanswered, and the Defendants have repeatedly failed to answer it, relief under Rule 12(b)(6) is not proper.

17

As to "billing," Defendants' allusion to the fact that the "front cover and copyright page of the Work list [Woodward] as the sole author" is incredibly self-serving.  *See* Defendants' Mem. at p. 21.  After all, Woodward and the other Defendants were directly involved in the placement of that language there. *See* Woodward Dec. at pp. 5-6.   As the Defendants acknowledge, a website shows that the audio version of the Word is "by Bob Woodward, Donald J. Trump," and even if the subject website is a third-party vendor, that billing raises a genuine issue of fact that precludes relief under Rule 12(b)(6). *Id.* at p. 13, n.7.  Multiple advertisements for sale of the Audiobook and Derivative Works refer to President Trump as a "reader" and as a "narrator," all of which credits the President Trump. *See* Garson Dec. at p. 3; Compl. at ¶ 55. Woodward argues this is "weak," *see* Defendants' Mem. at p. 21, n.11, but that is only because the objective facts are not in favor of the Defendants. Moreover, a Rule 12(b)(6) motion is not the proper mechanism to argue what is "weak" or "strong." Drawing all  inferences in favor of the Plaintiff, this element favors the Plaintiff. Finally, Defendants conclude, without explanation, that Woodward "executed all of the relevant third-party agreements." Defendants' Mem. at p. 22. What agreements? This statement is so devoid of explanation and of evidentiary support that it cannot lean in favor of Woodward and is, at best, neutral.

### V.    Defendants' fair use claim fails.

It must be pointed out that the Defendants have changed tack in asserting this defense. Prior Defendants asserted fair use as to the publication of the Work as a whole, whereas now, the publication of President Trump's responses are fair use, despite the Compendium giving no such life preserver. In determining whether a defendant's use of a copyrighted work constitutes fair use, courts look at four factors, discussed below. *See Harper & Row, Publrs. v. Nation*

18

*Enters.*, 471 U.S. 539, 561 (1985) (noting that fair use, as codified in the Copyright Act, functions "as an affirmative defense requiring a case-by-case analysis). Further, because it is "designed to accommodate First Amendment Concerns, [it] is notoriously fact sensitive and often cannot be resolved without a trial." *Georgia*, 140 S. Ct. at 1513.

Defendants cited to *Swatch Group Mgmt. Servs. v. Bloomberg L.P.*, 756 F. 3d 73, 86-87 (2d Cir. 2014) to suggest discovery is not necessary in the fair use context, but that case is inapplicable. First, *Swatch* deals with a motion for summary judgment, not a motion to dismiss; further, there, the Second Circuit simply noted that the discovery sought would not alter its analysis. There may have been no need for discovery there, based on the facts of that case, but that is not the case here. *See supra,* at p. 7. Further, *Swatch* was not decided "on the pleadings" as the Defendants claim. *See* Defendants' Mem. at p. 24-25. Moreover, that decision is inapposite here because of the completely different nature of the interview.

### i.   Factor 1: Purpose and Character of Use (Commercial Nature or Nonprofit Education?)

Central to Defendants' argument as to why the first factor favors the Defendants is the claim that the Work "add[ed] extensive supplemental materials." *See* Defendant's Mem. at p. 7, 22. This is a self-serving statement which cannot be relied upon at the motion to dismiss stage because there is nothing before this Court to suggest the Defendants added anything of the sort. Defendants have not provided the raw, unedited recordings to which, according to the testimony of Woodward and no one else, purportedly added "extensive materials." *See* Defendant's Mem. at p. 7, 22. Defendants have produced a copy of the Work as published but have failed to present to the court the *original* recordings and interviews between President Trump and Woodward. Having failed to show the "before and after," the Defendants have not

shown, as a matter of fact or law, that they somehow transformed the original work. The allegation of transformation is, in fact, highly specious based upon Woodward's characterization own statement about the Work.[5] *See* Garson Dec. at ¶ 9. It cannot be taken for granted.[6] Defendants' references to "at times break[ing] frame" but also to the addition of "extensive supplemental materials," and an overall inability to get their story straight, necessitates discovery proceedings. *Compare* Garson Dec. at ¶ 9 *with* Defendant's Mem. at p. 7, 23-24.

Defendants claim the Work qualifies as fair use because criticism and news reporting constitute fair use. But "[a]lthough news reporting is an example of fair use, it is not sufficient itself to sustain a *per se* finding of fair use." *Monge v. Maya Magazines, Inc.*, 688 F.3d 1164, 1173 (9th Cir. 2012). *See also Iowa State Univ. Research Found. v. ABC*, 621 F.2d 57, 60 (2d Cir. 1980) (noting that resolution of a fair use claim "depends on an examination of the facts in each case (and) cannot be determined by resort to any arbitrary rules or fixed criteria," and citing to *Meeropol v. Nizer,* 560 F.2d 1061, 1068 (2d Cir. 1977), cert. denied, 434 U.S. 1013, 98 S. Ct. 727, 54 L. Ed. 2d 756 (1978)). Even if there was an element of newsworthiness, "newsworthiness itself does not lead to transformation." *Monge*, 688 F. 3d at 1176. "Wholesale copying sprinkled with written commentary . . . [is] at best minimally transformative. *Id.* Plaintiff submits that the Work is, at best, wholesale copying sprinkled with written commentary–which is at best minimally transformative. *Id.*

---

[5] https://www.bobwoodward.com/books/trump-tapes
[6] Especially given the recent case law on what constitutes transformative, which erodes Defendants' contentions. See *Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith*, 143 S. Ct. 1258 (2023).

Notably, the Defendants never address the commercial use and educational/non-profit dichotomy and have waived this argument. In any event, President Trump submits the Work is emblematic of commercial use. The Audiobook and the Derivative Works have been sold for a profit to the Defendants. Despite claiming that this is somehow other than commercial use by invoking use of the "historical record" (a self-serving, contrived defense unknown to law), the Defendants have all profited from sales, as reflected in sales data produced by the Defendants. Woodwards' own writings confirm he perceived publication of President Trump's quotations as a money-maker. *See* Garson Dec. at ¶¶ 9, 10, 12.  This factor thus weighs heavily in favor of Plaintiff.

### ii.    Factor 2: Nature of Copyrighted Work

The third factor looks at the "nature of the work." This factor "recognizes that creative works are 'closer to the core of intended copyright protection' than informational and functional works, 'with the consequence that fair use is more difficult to establish when the former works are copied." *Dr. Seuss Enters, L.P. v. Penguin Books USA, Inc.*,109 F. 3d 1394, 1402 (9th Cir. 1997). Here, the creativity, imagination and originality of the Sound Recordings tilts the scale against fair use. *Id.* at 1190. The Interviews were not information or functional, but rather a creative work. Woodward himself concedes the critical nature of the creativity imbued by hearing and reading President Trump's words as articulated by the speaker rather than the biographer. Modulation is the key in that the power, pitch, pause, pace and overall tone color of President Trump's narrative, as spoken by him in his unique style, was the motivating factor in its publication. President Trump is currently one of the most mimicked, and often lampooned, public figures, which is largely due to his stream-of-consciousness style of speaking with

repetition and emphasis of certain words but is undoubtedly unique in its creativity.[7] To academics of linguistics this is known as his "idiolect," the idiosyncratic form of language that is unique to an individual and there have been publication on this specific subject such as *Talking Donald Trump: A Sociolinguistic Study of Style, Metadiscourse, and Political Identity* by Jennifer Sclafani (Routledge 2018).

Part of this analysis is whether the copied work is unpublished. *Dr. Seuss Enters, L.P.*, 983 F. 3d 443 (noting that the unpublished nature of a work is a key, though not necessarily determinative, factor, tending to negate a defense of fair use.) "Under ordinary circumstances, the author's right to control the first public appearance of his undisseminated expression will outweigh a claim of fair use." *Harper & Row,* 471 U.S. at 553. The Interview Sound Recordings was a creative work, interviews, that President Trump could publish. He had a right to do so. This factor weighs heavily in favor of Plaintiff.

### iii. Factor 3: Amount and Substantiality of the Portion Used in Relation to the Copyrighted work as a Whole.

This factor asks whether "the amount and substantiality of the portion used in relation to the copyrighted work as a whole" "are reasonable in relation to the purpose of the copying." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 587 (1994). Part of the analysis is the quantity and value of the materials used; "this factor calls for thought not only about the quantity of the materials used, but about their quality and importance." *Id.* The Supreme Court has agreed that whether a substantial portion of the infringing work was copied verbatim from the copyrighted

---

[7] https://www.vox.com/policy-and-politics/2017/1/11/14238274/trumps-speaking-style-press- conference-linguists-explain

work is a relevant question. *See id.* "The more of a copyrighted work that is taken, the less likely the use is to be fair [and] even a less substantial taking may be unfair if it captures the essence of the copyrighted work." *See Infinity Broad Corp v. Kirkwood*, 150 F. 3d 104 (2d Cir. 1998) (citing *Harper & Row*). "Generally, it may not constitute a fair use if the entire work is reproduced." *Id.* (citing Nimmer on Copyright, § 13.05[A][3] at 13-178 (1997)).

Here, Defendants have taken the Interview Sound Recordings in their entirety to publish the Audiobook and the Derivative Works. That does not coalesce with the fair use doctrine. *See Associated Press v. Meltwater U.S. Holdings, Inc.,* 931 F.Supp.2d 537, 558 (S.D.N.Y. 2013). (*"appropriation of a copyrighted work in its entirety weighs against a finding of fair use"*); *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 613 (2d Cir. 2006) ("[n]either our court nor any of our sister circuits has ever ruled that the copying of an entire work favors fair use.")

The Audiobook and Derivative Works are entirely predicated upon the Interviews; the interviews were reproduced wholesale; to the extent the Defendants claim the reproduction is not wholesale, the Defendants were tasked with producing the Interviews, but they have not done so.

### iv.    Factor 4: Effect of Use upon Potential Market for or Value of Copyrighted Work.

The fourth fair use factor considers the effect of use upon a potential market for or value of the copyrighted work. 17 U.S.C. § 107(4). This factor "requires courts to consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also "whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market" for the original."

*Campbell*, 510 U.S. at 590. Market harm may be presumed here. *See Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 450 (1984) (holding that "every commercial use of copyrighted material is presumptively an unfair exploitation of the monopoly privilege that belongs to the owner of the copyright"). "A presumption of market harm "makes common sense[ ] when a commercial use amounts to mere duplication of the entirety of an original." *Campbell*, 510 U.S. at 591. Because the Defendants' use constituted a mere duplication of the original Interview Sound Recordings, market harm may be presumed here.

Defendants' use impairs the actual market for the Interview Sound Recordings because the Work serves the very same purpose as the Interview Sound Recordings. *See Associated Press*, 931 F.Supp.2d at 559. The publication of the Interview Sound Recordings rendered it unlikely that the market would purchase the Interview sound Recordings from Plaintiff and diminished any licensing value of the copyright. Defendant's use therefore supplanted the normal market in which President Trump had a reasonable expectation to earn licensing revenue. Moreover, Defendants' use impairs the potential market for the Interview Sound Recordings because "unrestricted and widespread conduct of the sort engaged in by the defendant ... would result in the substantially adverse impact on the potential market for [licensing of] the original." *Campbell*, 510 U.S. at 590 (internal quotation omitted). Here, the wholesale copying of the Interviews means that any authorized market for the original work was severely reduced or even eradicated. The Defendants' conduct undermined President Trump's opportunity to exploit the value of his copyright during its peak demand in the marketplace. For the foregoing reasons, the fourth fair use factor should weigh heavily in Plaintiff's favor.

Defendants do not delve into an analysis of these elements, and instead focus entirely upon the impossibility of a market for Presidents for interviews conducted during the presidency. Defendants assert a bright line rule against a former president's copyright protection which, as set forth above, does not exist.[8]

Defendants seem to conflate the phrase "historical record" with "fair use," but the former is not part of the analysis. The claim that the Work was published for the "historical record" is not only a later contrived defense but one that it unknown at law. *See* Defendants' Mem. at pp. 2, 7, 15, 24, 27. Simply stating that an infringement or violation is justified because it is for the "historical record" is completely and utterly meaningless and would justify all matter of infringements. There is a question of fact as to what it means, thus making any reliance upon it a matter not suitable for discussion at the motion to dismiss stage. Secondly, the Compendium *prima facie* disagrees; otherwise, it would not give a presumptive copyright for an interviewee. *See supra.* Thirdly, oral historians as a matter of best practices require releases in advance of publication. *See* Neuenschwander, John A. A Guide to Oral History and the Law (Oxford Oral History Series) Second Edition (2014) (p. 132). Oxford University Press. Kindle Edition. "Interviewees hold the copyright to their interviews until and unless they transfer those rights to an individual or institution. This is done by the interviewee signing a release form or in

---

[8] One aspect which the fair use analysis does not consider fully is the nature of releases and the voice over market as a whole in which written releases fare the bedrock of the industry. For a major publisher to publish a voice work without the written release of the narrator or artist would be outrageous in the normal course of events, as it denudes the narrator of control of the use of his or her voice and the nature of the publication. Moreover, the nature of the publication often dictates the nature of the read, in that the manner of articulation and word choice is different if the narrator knows it is for dissemination in the recorded form.

exceptional circumstances recording an oral statement to the same effect."[9] According to oral historians, their role does not give carte blanche to ride roughshod over copyright.

Ultimately, the Defendants ask this Court to dismiss this matter because of a contrived and ethereal concept of "historical record."  Woodward claims that the Work represents his release of Plaintiff's language "for the historical record," but the problem is that Woodward is not using this term as professional historians do. And, significantly, Woodward does not describe himself as a historian. *See* Woodward Dec. at D.E. 37-1 at ¶ 2.

VI.    **President Trump's claims against the Defendants are not subject to preemption.**

A. **President Trump's claims are not barred by preemption via the government works doctrine.**

Defendants argue that the government works doctrine preempts President Trump's claims.  However, for the reasons already set forth above, the government works doctrine is irrelevant here. The preemption argument is entirely premised on the incorrect assumption that President Trump cannot be an author and cannot hold copyright. The two are not mutually exclusive. The state claims stand independently of the copyright claims and this case would not fall with an adverse determination on copyright.

Modelling this out, if the Court were to rule that either there was a government works exception which removed copyright protection for Plaintiff and diluted Woodward's copyright interests, or even that Woodward was the sole owner, the contract, unjust enrichment and other claims in equity and law stand nevertheless. The recordings themselves and the

---

[9]The Oral History Association's 2009 statement on "Principles and Best Practices" fully expects oral history participants to sign over their rights as part of the standard procedure for conducting interviews. https://oralhistory.org/about/principles-and-practices-revised-2009/

representations contained therein give rise to a *prima facie case* that Woodward obtained the recordings based on certain representations and circumscribed his use of the recordings, accordingly. To give an example, a voiceover artist agrees to lend her voice to an audio project for certain markets; the publisher uses the recording in other markets, outside of the agreed-to scope. While the copyright may be determined to lie with the publisher, the artists would still have claims in contract, unjust enrichment and the like. The difference is how damages, disgorgement and the like are proved and calculated.

### VII.    President Trump's state claims are not barred by 17 U.S.C. § 301.

Section 301 of the Copyright Act "preempts only those state law rights that 'may be abridged by an act which, in and of itself, would infringe one of the exclusive rights' provided by federal copyright law.'" *Computer Assocs. Int'l v. Altai, Inc.*, 982 F.2d 693, 716 (2d Cir. 1992)) (citing *Harper & Row, Publishers, Inc. v. Nation Enters.,* 723 F.2d 195, 200 (2d Cir. 1983), *rev'd on other grounds,* 471 U.S. 539, 85 L. Ed. 2d 588, 105 S. Ct. 2218 (1985)). "[B]ut if an 'extra element is required instead of or in addition to the acts of reproduction, performance, distribution or display, in order to constitute a state-created cause of action.'" *Computer Assocs.*, 982 F. 2d at 716 (citing 1 Nimmer § 1.01[B], at 1-14-15.

"Courts in the [Second] Circuit apply a two-part test, both parts of which must be satisfied for preemption to apply." *Melendez v. Sirius XM Radio, Inc.*, 50 F. 4th 294, 300-01 (2d Cir. 2022). The first prong, the subject matter requirement,

> is satisfied when the plaintiff's "claim applies to a work of authorship fixed in a tangible medium of expression and falling within the ambit of one of the categories of copyrightable works."

*Melendez*, 50 F.4th at 301 (citing *Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.*, 373 F.3d 296, 305

(2d Cir. 2004)).  The second prong, the general scope requirement, is satisfied when

> the state-created right may be abridged by an act that would, by itself, infringe one of the exclusive rights provided by federal copyright law." *Id.* In evaluating the application of this prong, a court "looks at the right being asserted (over a work that comes within the 'subject matter of copyright') and requires (for preemption to apply) that the right be '*equivalent* to any of the exclusive rights within the *general scope of copyright* as specified by section 106 [of the Copyright Act].'" *Jackson*, 972 F.3d at 43 (quoting 17 U.S.C. § 301(a)).

*Melendez*, 50 F.4th at 301-02. *See also Greer v. Media*, 2023 U.S. App. Lexis 7407, at *2-3 (2d Cir. 2023). The inquiry requires a "holistic evaluation of the nature of the 'rights sought to be enforced" and a determination of qualitative difference between the state law action and the copyright infringement action. *See Melendez*, 50 F. 4th at 301.

There does not appear to be any dispute here that the subject matter at issue is copyrightable, especially given that Woodward has asserted his own copyright in the Work. *See* Garson Dec. at ¶ 12. As to the general scope requirement, neither the unjust enrichment claim or the breach of contract claims falls within the general scope of copyright because the unjust enrichment claim because both are premised upon specific representations made by Woodward to President Trump and the agreement they reached with each other irrespective of copyright law.[10] Woodward promised to President Trump that he would not publish the work outside of the book *Rage*. Regardless of the copyright protection afforded to the work, he made an oral promise to President Trump that he would not be using the recording other than for the initial book, implicit in which is that the interviews themselves would not be released at all. But he breached that promise. At issue here is a contract that gives President Trump protection

---

[10] Plaintiff previously dispensed with argument regarding its claim for implied covenant of good faith and fair dealing.

beyond that provided by copyright law, it limited Woodwards' rights in the recordings as consideration for them being recorded at all. Accordingly, the breach of contract claim, and by extension the claim of unjust enrichment, is not within the general scope of copyright.

The unjust enrichment claims are permissibly pled in the alternative to President Trump's contract claims and seek relief should the Court find no contract exists. *See infra.* As the claims meet the extra element, and a different analysis is required, they are not preempted. These claims center on the oral representations made by Woodward, the understanding of each of the participants when agreeing to being recorded, the legitimate expectations of the participants when the recording was made, the subsequent behavior of the defendants, whether they come to equity with clean hands, whether disgorgement is appropriate, whether the defendants have the right to any offset in quantum meruit. For the purposes of quantum meruit, many of the above factors would also be considered, in addition, the Court would also consider the time commitment by the Plaintiff, the "going rate" for a narrator of his standard, quality and notoriety, analysis of industry standards to be able to determine liability in the absence of a release and quantum of damages.

### VIII. President Trump's state law claims are sufficient to state a cause of action.

#### A. Breach of Contract/Unjust Enrichment

The breach of contract claim and unjust enrichment claims, which can be pled in the alternative, are not preempted by the copyright claims because they serve two different functions in the context of the SAC. These two claims cater for the damages arising out of monies that President Trump is not already entitled to under Copyright Law. President Trump is entitled to an accounting for 50% of the profits/revenues under copyright law. It is the other

50% that President Trump is interested in. When Woodward agreed not to utilize the materials in which he has a copyright interest other than for the purposes of a single book, he breached that contract. Copyright law itself does not cater for this scenario or eventuality where a person who has a copyright interest utilizes that copyright interest when he is bound not to by virtue of an order contract. It is the contract that limited him from exploiting the material in which he had an interest. And it is contract law that provide the remedy for his breaches.

There are two separate analyses dealing with two separate parts of the interviews. If, *arguendo*, under 718 of the Compendium, copyright only provides a remedy for the use of President Trump's answers, contract law serves to provide a remedy for Woodward's use of his questions.

(i)      "For the book"

First, the evidence before this Court is that Woodward materially averred and promised President Trump that the Interviews would be used only for the book *Rage. See* Compl. at ¶¶ 42-51. If Woodward has a different account of events and of context, that gives rise to a factual dispute not amenable to resolution via a Rule 12(b)(6) motion.

(ii)      Statute of Frauds and breach of contract.

Defendant's statute of frauds claim is devoid of any merit. It is premised on the fallacy that the asserted agreement "prohibit[ing] [Woodward's] reuse of the Interviews extended into perpetuity. *See* Defendants' Mem. at p. 30. The predicate of the agreement is not a prohibition, but rather an allowance.  The agreement was to permit Woodward to use President Trump's interview for the purpose of a single book, i.e. *Rage*, not to prohibit him from publishing indefinitely. That book could have been, and was in fact, published within a year. *See* Woodward

30

Dec. at ¶ 16. D.E. 37-1.  Whereas allowance contemplates being able to do something that a person otherwise does not have a right to do, prohibition refers to having a right to do something and being precluded from doing it. The former applies here, while the latter has nothing to do with this case. The Defendants' analysis on this point is emblematic of looking at the horse from the wrong end. *LLC v. Mega Intl. Commer. Bank Co.*, 2019 US Dist LEXIS 169750, at *15-16 (S.D.N.Y. 2019); *Khmaladze v. Vorotyntsev*, 2019 US Dist LEXIS 66375, at *9-10 (S.D.N.Y 2019); *Personal Watercraft Prod. SARL v. Robinson*, 2017 U.S. Dist. LEXIS 143336, 2017 WL 4329790, at *11 (S.D.N.Y. 2017).

    (iii)    Claim duplication.

    Defendant's duplication claim fails. President Trump is permitted to argue in the alternative. Moreover, the Defendants' perception that there has been no injustice cannot be dispositive of the Plaintiffs' claims. The Defendants are essentially contradicting President Trump's allegations regarding the purpose, scope and limitations of the Interviews. By creating that conflict, the Defendants are demonstrating why they are not entitled to relief under Rule 12(b)(6). Importantly, if the Defendants claim that the title of the work reflects President Trump's contributions to the Work, the question arises why the Defendants have not remitted any payment to President Trump for that contribution, and why they are contesting President Trump's rights to the Works. Discovery is clearly a necessary precursor to any attempt by the Defendants to dismiss the Plaintiff's claims.

    **IX.**    **Claims against Paramount Global.**

    The Defendants claim in elementary fashion that the allegation that Paramount exerts direct control over the executive leadership is insufficient. *See* Defendants' Mem. at pp. 31-32;

Compl. at ¶ 16.  First and foremost, the Plaintiff's pleading on this point is, as required, a short and plain statement of the facts. Secondly, this claim of insufficiency is belied by public record showing that, over the past two years, Paramount has attempted to sell off SSI on a number of occasions. *See* 10-Q filing, attached as and referenced in Exhibit D to the Garson Declaration.

It is thus clear from public filings that Paramount was exercising its right and ability to supervise beyond the parent-subsidiary relationship and trespassed into day-fto-day control. *Bennett v. Tu-Cows, Inc.,* 2007 U.S. Dist. LEXIS 54816, 2007 WL 2178317, at *6 (E.D. Mich. July 27, 2007) (citations omitted). Close scrutiny was being applied by Paramount particularly as, despite being presented as a discontinued operation, for the purposes of Paramount's credit facility, it was in fact treated as a continuing operation for the purposes of calculating Consolidated EBITDA until its disposition. *See* 10-Q filing at p. 16.  This treatment allowed Paramount as a whole meet to principal financial covenant of its leverage ratio. Failure to meet such a covenant would have been perilous for Paramount. These publicly available documents show that for the purposes of Paramount's liquidity, the projected sale of SSI was a key consideration for liquidity and capital resources; the sale was necessary for increased investment in streaming services. *See* 10-Q filing at p. 41. In effect, the publicly available evidence demonstrates direct control by Paramount over the finances of SSI.  Moreover, Woodward is indisputably one of SSI'S championed authors, and the publication of a high-profile title during sale of the company (i.e., the Work) is something which Paramount would have undoubtedly been aware of and directly involved with. In effect, to the extent Defendants are seeking "indicia beyond the mere legal relationship showing that the parent is actually involved with the decisions, processes, or personnel directly responsible for the infringing

activity," *Banff Ltd. v. Limited, Inc.*, 869 F.Supp. 1103, 1109 (S.D.N.Y. 1994), that indicia is before the court, and will be solidified through the discovery process.

**X.     Conclusion**

For the reasons set forth herein, the Motion should be denied.

Dated: November 30, 2023
Aventura, Florida

**GS2 LAW PLLC**
By: /s/ <u>Robert Garson</u>
Robert Garson, (RG-1521)
Yanina Zilberman, (Pro Hac Vice
Pending)
20803 Biscayne Blvd., #405
Aventura, Florida 33180
(305) 780-5212
rg@gs2law.com; yz@gs2law.com
*Attorneys for Plaintiff*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on November 30, 2023, I served the foregoing Memorandum of

Law  in Opposition upon counsel of record.

/s/ Robert Garson

<u>**Service List**</u>

**DAVIS WRIGHT TREMAINE LLP**
Elizabeth A. McNamara (NYBN
1930643) Linda J. Steinman (NYBN
2137305)
John M. Browning (NYBN 5213038)
Leena Charlton (NYBN 5622147)
1251 Avenue of the Americas, 21st Floor
New York, NY 10020
Phone: (212) 489-8230
Email: lizmcnamara@dwt.com

lindasteinman@dwt.com
jackbrowning@dwt.com
leenacharlton@dwt.com

*Attorneys for Robert Woodward,*
*Simon & Schuster, Inc. and Paramount Global*

**CERTIFICATION OF WORD COUNT**

I hereby certify that this Memorandum in Opposition complies with the Order granting

permission to file an oversized document, not to exceed 10,000 words. D.E. 54. According to

the word-processing system used to prepare this Memorandum in Opposition, the total word

count for all printed text exclusive of the material omitted under Rule 7.1 is 9963.

By: /s/ Robert Garson_____