UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DONALD J. TRUMP, 45th President of the
United States of America, in his individual
capacity,

                    Plaintiff,

          - against -

SIMON & SCHUSTER, INC., ROBERT
WOODWARD, and PARAMOUNT
GLOBAL,

                    Defendants.

**MEMORANDUM
OPINION & ORDER**

23 Civ. 6883 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

          Between March 2016 and August 2020, Plaintiff Donald J. Trump was

interviewed by Defendant Robert Woodward on twenty separate occasions.  Recordings of these

twenty interviews were later used in The Trump Tapes:  Bob Woodward's Twenty Interviews

with President Trump, an audiobook published by Defendant Simon & Schuster, Inc., and in

certain companion works.  (Second Am. Cmplt. ("SAC") (Dkt. No. 70) ¶¶ 36, 39)[1]

          In this action, Plaintiff Trump seeks a declaration that he is "the joint author and

copyright owner of the Interview Sound Recordings, Audiobook, and Derivative Works"

associated with The Trump Tapes.[2]  (Id. at 20)[3]  In the alternative, Plaintiff seeks a declaration

---

[1]  Simon and Schuster was, at all relevant times, a subsidiary of Defendant Paramount Global.
(Id. ¶ 2)
[2]  The SAC defines "Interview Sound Recordings" as Woodward's interviews of Plaintiff Trump
between December 5, 2019 and August 14, 2020.  (Id. ¶ 36)  "Audiobook" – as used in the SAC
– refers to the audiobook version of "The Trump Tapes."  (Id. ¶ 39)  "Derivative Works" refers
to paperback, e-book, and CD versions of the Audiobook.  (Id. ¶ 45)
[3]  Except as to the paperback version of The Trump Tapes, the page numbers of documents cited
in this Opinion correspond to the page numbers designated by this District's Electronic Case

that he holds "a copyright interest in his responses in the Interview Sound Recordings,

Audiobook, and Derivative Works [associated with The Trump Tapes]." (Id. at 21).  In addition

to the declaratory judgment-copyright claim, the SAC asserts (1) an unjust enrichment claim (id.

¶¶ 74-100) and seeks an accounting (id. ¶¶ 66-73) as to all defendants; and (2) a breach of

contract claim and a breach of the covenant of good faith and fair dealing claim against

Defendant Woodward.  (Id. ¶¶ 101-13)

　　　　Defendants have moved to dismiss under Fed. R. Civ. P. 12(b)(6) for failure to

state a claim.  (See Dkt. No. 72)  For the reasons stated below, that motion will be granted.

## **BACKGROUND**

I.　　**FACTS**[4]

　　A.　　**The Interviews**

　　　　Defendant Woodward is the author of multiple books that chronicle Plaintiff

Trump's first term as President of the United States.  (SAC (Dkt. No. 70) ¶¶ 13-14, 33-34)  Fear:

Trump in the White House was published by Defendant Simon & Schuster on September 10,

---

Files ("ECF") system.  Citations to the paperback version of The Trump Tapes refer to the book's
pagination.
[4]  The Court's factual statement is drawn from the SAC, documents that the SAC incorporates by
reference, and public records subject to judicial notice under Fed. R. Evid. 201(b).  Well-pled
facts in a complaint are presumed true for purposes of resolving a motion to dismiss.  See
Kramer v. Time Warner Inc., 937 F.2d 767, 773 (2d Cir. 1991).

In resolving Defendants' motion to dismiss, the Court has considered the paperback version of
The Trump Tapes.  (See McNamara Decl., Ex. A (The Trump Tapes paperback) (Dkt. No. 74-1))
Given that The Trump Tapes is – in all its forms – "integral to" Plaintiff's claims and is quoted in
the SAC, the Court may consider it in connection with the motion to dismiss.  See Roth v.
Jennings, 489 F.3d 499, 509 (2d Cir. 2007) (courts may consider on a motion to dismiss "a
document upon which the complaint solely relies and which is integral to the complaint," even
where that document is not attached to the complaint) (citation omitted and alteration accepted);
Hord v. Jackson, 281 F. Supp. 3d 417, 420 n.4 (S.D.N.Y. 2017) (considering disputed script in
connection with a motion to dismiss copyright infringement claims, because it was "incorporated
into the [c]omplaint by reference").

2019. (Id. ¶ 34)  Rage – Woodward's second book about the Trump presidency – was published

on September 14, 2021.  (Id. ¶ 35)

In connection with his research for Rage, Woodward asked Trump if he would

agree to be interviewed.  (Id. ¶¶ 35-36)  Trump consented to being interviewed, including "to

being recorded," but the SAC alleges that he consented "only for the purpose[] of the book . . .

Rage" and not for any other purpose.  (Id. ¶¶ 36, 42, 102 (internal quotation marks omitted))

The SAC does not allege that Trump and Woodward entered into any sort of

written agreement concerning the Trump interviews.  As to an oral agreement, the SAC cites the

following exchange during "Interview 4" on December 30, 2019:

**Woodward**:  On the record for the book, unless you—

**Trump**:  For the book only, right?  Only for the book.

**Woodward**:  The book only, yeah, I'm not—

**Trump**:  For the book only, right?  So there's no—

**[Hogan] Gidley**:  Right.  So there's no stories coming out, okay.

(Id. ¶ 49)[5]

The SAC asserts that the "interviews were not provided in the scope of President

Trump's employment by the [F]ederal government," but were instead "prepared at President

Trump's own volition and outside of his official duties."  (Id. ¶ 37)

---

[5]  As set forth in The Trump Tapes paperback version, the exchange was as follows:

> BW:  I'm going to turn this on.  On the record for the book.  Unless you modify—
> TRUMP:  For the book only, right?  Only for the book?
> BW:  Book only, yeah.  I'm not—
> TRUMP:  Okay.  For the book only.  Right?
> [HOGAN] GIDLEY:  Right.  No stories coming out, no nothing.

(McNamara Decl., Ex. A (The Trump Tapes paperback) (Dkt. No. 74-1) at 137)  Hogan Gidley
was, at the time, President Trump's deputy press secretary.  (Id.)

Over a seven-month period between December 5, 2019 and August 14, 2020, Defendant Woodward interviewed Plaintiff Trump on nineteen separate occasions. (Id. ¶¶ 35-36) These interviews took place in person at the Oval Office in the White House and at Trump's Mar-a-Lago home in Palm Beach, Florida, and by telephone after the COVID-19 pandemic began in March 2020. (Id. ¶ 36) At each interview Plaintiff agreed that the interview was "on the record" and could be recorded by "tape recorder." On one occasion, Woodward – with Trump's permission – took handwritten notes. (McNamara Decl., Ex. A (The Trump Tapes paperback) (Dkt. No. 74-1) at 175)

Woodward sometimes interviewed Trump alone, and sometimes with members of his administration. For example, during the December 5, 2019 interview, Trump was joined by Vice President Pence, Senator Lindsey Graham, Chief of Staff Mick Mulvaney, Deputy Press Secretary Hogan Gidley, and Senior Political Counselor Kellyanne Conway. (Id. at 45, 78) Deputy Press Secretary Gidley was present for two other interviews in December 2019. (Id. at 86, 137) Trump's Senior Advisor Jared Kushner joined by telephone on February 19, 2020 (id. at 212, 220-22), and Deputy Chief of Staff for Communications Dan Scavino was present on several occasions. (Id. at 86, 112, 169) Members of the administration sometimes interjected comments during the interviews. (See, e.g., id. at 116 (Dan Scavino "weigh[ing] in" that he "never once heard [Trump say] the word – ever – Russia" on "the campaign trail"))

B. **_The Trump Tapes_**

On October 25, 2022, Simon & Schuster published "more than eight hours of 'raw' interviews with President Trump" as an audiobook entitled The Trump Tapes:  Bob Woodward's Twenty Interviews with President Donald Trump. (SAC (Dkt. No. 70) ¶ 39) Simon & Schuster later released an audio version in CD format, and paperback and e-book versions of the original audiobook. (Id. ¶ 45)

4

The SAC alleges that, in preparing the The Trump Tapes audiobook for publication, Defendants Simon & Schuster and Woodward "collate[d] and cobble[d] together more than eight hours of 'raw' interviews with President Trump," "alter[ed] the spoken words," and "remov[ed] context." (SAC (Dkt. No. 70) ¶¶ 39, 112(c))

The Trump Tapes paperback version begins with a "personal note" written by Woodward, an "opening selection of excerpts" from the interviews, and a three-page introduction by Woodward. (McNamara Decl., Ex. A (The Trump Tapes paperback) (Dkt. No. 74-1) at vii-ix, 1-3) Transcriptions of the interviews follow, together with commentary. (Id. at 5) The Trump Tapes closes with a six-page epilogue written by Woodward (id. at 414-19), followed by an appendix of letters between Kim Jong-Un and Trump. (Id. at 423-54)

The Trump Tapes includes Woodward's nineteen interviews of Trump between December 2019 and August 2020, as well as a March 31, 2016 interview of Trump conducted by Woodward and political reporter Robert Costa when Trump was a presidential candidate about to secure the Republican nomination. (See id. at 5-44; SAC (Dkt. No. 70) ¶ 36) Each of the Trump interviews is the subject of a separate chapter in The Trump Tapes, and the title of each chapter is a line selected from that interview. For example, one chapter is entitled "Interview 8: I'm Number One," which is a statement Trump made during that interview. (See McNamara Decl., Ex. A (The Trump Tapes paperback) (Dkt. No. 74-1) at 212)[6]

---

[6] In addition to the interviews of Trump, The Trump Tapes includes Woodward's May and June 2020 interviews of Trump's national security advisers Robert O'Brien and Matthew Pottinger. These interviews are found in a chapter entitled "Turning Point: Trump's National Security Advisers." (Id. at 295-310; id. at 296 ("I am including parts of my interviews with O'Brien and Pottinger because my discussions with them represented a fundamental turning point in my reporting for the book.")) In the "Turning Point" chapter, Woodward presents a "montage" of audio clips from his March 19, 2020 interview of Trump, which Woodward described as "evidence of Trump's failure to lead the country. . . ." (Id. at 308)

As noted above, The Trump Tapes includes commentary from Woodward along with the interviews.  For example, Woodward opens each chapter by providing context for the interview that will follow, such as the date of the interview and a reference to contemporaneous political events.  (See, e.g., id. at 254-55)  Woodward also frequently inserts commentary in the midst of interviews in order "to provide essential context or clarification."  (Id. at 2)  According to The Trump Tapes, Woodward created "227 new commentaries" for the work.  (Id. at vii)

Some of Woodward's remarks are quite short (see, e.g., id. at 91 ("Trump is referring to Ukrainian president Zelensky."); id. at 348 ("He seemed not to understand racial inequality went way beyond job numbers."); id. at 55 ("This is not true.  North Korean Leader Kim Jong Un had written letters to other presidents and world leaders."); id. at 325 ("Trump was exaggerating.  Saudi Arabia paid the U.S. approximately $500 million for its troop presence in December 2019."); id. at 72 ("This is probably not true, and I could find no evidence to support what Trump had said.")), while others are lengthy.  For example, Woodward provides a page-and-a-half of commentary concerning Trump's response to the COVID-19 pandemic.  (Id. at 406-07)

In The Trump Tapes, Woodward also discusses his investigative and writing process for Rage.  For example, he explains how his focus shifted over time from Trump's foreign policy decisions to "the absence of presidential leadership" in responding to the COVID-19 pandemic.  According to Woodward, this shift in focus took place only "[s]even and a half weeks . . . from [his] publishing deadline."  (Id. at 302; see also id. at 338 (in May 2020, "I completely reconfigured my book. . . ."))

Woodward also discusses his strategy for the Trump interviews:  how he "wanted to lay [the questions] out as starkly and candidly as [he] could" (id. at 255), and how he did his

6

"homework" before each interview (id. at 417), preparing a "list of questions" or a list of

"priority areas" to cover. (Id. at 5, 255)

Woodward's December 30, 2019 interview of Trump concerned, inter alia, his

"impeachment by the Democratic House of Representatives twelve days earlier on December

18th." (Id. at 136)  A portion of Woodward's commentary concerning this interview – and the

exchange between him and Trump concerning Trump's call to Ukraine President Zelensky about

investigating former Vice President Biden for corruption – is set forth below:

> COMMENTARY:  I then proceeded to question Trump on the impeachment issue.
> Since he never testified at his impeachment trial it is the only time he was
> aggressively questioned – even interrogated – about it.

> BW:        Will you allow me to persist with I think this is the important, core
>            question in this?

> TRUMP:     There wasn't a thing – excuse me, Bob, there wasn't a thing wrong
>            with that call.

> BW:        Well –

> TRUMP:     And those people – now here's what was –

> BW:        Do you want the policy of the United States to be that the president
>            of the United States can talk to foreign leaders and say,
>            investigate?  I want you to talk to the attorney general about
>            investigating somebody who's a political opponent?

> TRUMP:     No.  No.  No.  I want them to investigate corruption.  What he did
>            was corrupt.  I want them to investigate corruption.  And I didn't
>            say, call my campaign manager.  I said, the attorney general of the
>            United States –

> . . . .

> BW:        I understand the points you're making.  I'm asking the policy
>            question, is this a good policy for the president of the United
>            States, to be talking to foreign leaders about—

> TRUMP:     Okay, ready?

> BW:        – investigating anyone –

TRUMP:          Corruption.  Yes, corruption.

BW:             Well, but naming a political opponent.

TRUMP:          If the political opponent is corrupt, they can let us know.  Look, his son –

BW:             Do you think that's the president's job?

TRUMP:          His son –

BW:             Is that the president's job?  I'm sorry to persist on this, but –

TRUMP:          The president's job is to investigate corruption.

BW:             Yeah.

TRUMP:          If there was corruption, we're giving billions of dollars to a country, that country should let us know if there's corruption.

BW:             You don't see the other side on this at all?

TRUMP:          I don't see it at all, no.

BW:             Zero?

TRUMP:          No. . . .

(Id. at 157-59)

      After a further exchange concerning this same topic, Woodward inserts the following commentary:

> COMMENTARY:  I believed what Trump had done was wrong.  But I knew from our past interviews once Trump dug in he'd be immovable, especially in the middle of his impeachment trial.  I was trying to get him to instead look at it from a different perspective.  And I wanted to engage him with the broader policy question.  Was it good policy for a sitting president to ask a foreign leader to investigate his political opponent?

(Id. at 164)

      Woodward also inserts commentary to explain why he asked Trump certain questions:

BW:            Where do you start the movie of your decision –

TRUMP:        Yeah, I saw that.

BW:            – to run for president? . . .

COMMENTARY:  I intentionally asked Trump:  when does the movie begin because I knew that Trump thought in terms of movies, visuals, big spectacular events.  He wants to talk about his success, not his decision to run for the presidency.

(Id. at 5, 8)

In connection with the COVID-19 pandemic, Woodward asked Trump whether he

had "been able to talk to Bill Gates?"  He then inserted the following commentary"

COMMENTARY:  I believed that Bill Gates, the Microsoft billionaire who had worked on virus eradication worldwide, could help Trump understand the necessity of full mobilization.

(Id. at 280)

And after asking Trump – "who was the first person to tell you in January or

February and alert you to, my God, this is the plague, this is going to be the big event of your

presidency?" – Woodward inserted the following commentary:

COMMENTARY:  I was probing to see if he would bring up O'Brien and Pottinger's January 28th early warning.  Trump, however, made no reference to it.

(Id. at 317)

When The Trump Tapes audiobook was published, Simon & Schuster's website

billed it as "By Bob Woodward" and "Read by Donald J. Trump and Bob Woodward":







The Trump Tapes

Bob Woodward's Twenty Interviews with President Donald Trump

By Bob Woodward

Read by Donald J. Trump and Bob Woodward

Unabridged Audio Download ⌄

LIST PRICE $24.99

PRICE MAY VARY BY RETAILER

(SAC (Dkt. No. 70) ¶ 43, fig. 1)  The SAC alleges, however, that The Trump Tapes was published "[w]ithout President Trump's permission" (id. ¶ 39), and that Trump "has received no compensation in connection with said work."  (Id. ¶¶ 43-45)

On February 23, 2023, Woodward obtained from the U.S. Copyright Office a copyright registration for the paperback version of The Trump Tapes.  (McNamara Decl., Ex. E (Woodward Copyright Registration) (Dkt. No. 76-1))  As for the "basis of the claim," the registration cites

> text of literary work in questions and spoken commentary as fixed in the phonorecord, and the selection and arrangement of the work as a whole, including any selection, arrangement and/or editing of the responses by third parties.

(Id.)  That same day, Simon & Schuster obtained a copyright registration for "10 Compact Discs" making up the audiobook version of The Trump Tapes.  The "type of work" is identified as a "sound recording."  (Id., Ex. F (Simon & Schuster Copyright Registration) (Dkt. No. 76-2))

On February 28, 2023, Plaintiff submitted an application to the U.S. Copyright Office asserting that he had "sole authorship of the Interviews, Audiobook, and the Derivative

10

Works [associated with <u>The Trump Tapes</u>]."  (Garson Decl. (Dkt. No. 77-1) ¶ 13)  On October 13, 2023, the Copyright Office issued a copyright registration to Donald J. Trump and Bob Woodward for <u>The Trump Tapes</u> "sound recording, texts."  In the registration, Trump and Woodward are both listed as the "author" and the "copyright claimant."  (SAC, Ex. A (Trump/Woodward Copyright Registration) (Dkt. No. 70-1)[7]

In a November 30, 2023 letter to Simon &Schuster, the Copyright Office provided the following explanation concerning the conflicting registrations:

> We recently completed two registrations for . . . "The Trump Tapes" under the registration numbers TX0009335307 and SR0000981326.  We also received an adverse claim in the same work from Robert Garson on behalf of Donald Trump.
>
> As we explained previously, the Copyright Office is an office of record and it does not have the authority to adjudicate adverse or conflicting claims submitted for registration.  Each claim is examined to determine whether it complies with statutory and regulatory requirements; if it does, it is registered.  Where conflicting claims are received, the Office may put both claims on record if each is acceptable on its own merits.  It is the responsibility of the parties involved in the dispute to pursue their rights in their works.
>
> We are notifying you that we completed the registration submitted on behalf of Mr. Trump under registration number SR0000975712.  We will also be notifying Mr. Trump of your completed registrations.
>
> This letter is for your information only; no reply is necessary.

(McNamara Decl., Ex. G (Nov. 30, 2023 U.S. Copyright Office Ltr.) (Dkt. No. 76-3))[8]

---

[7]  The Trump/Woodward Copyright Registration references International Standard Book Number ("ISBN") 9781797124735.  (<u>Id.</u>)  That ISBN corresponds with the audiobook version of <u>The Trump Tapes</u>.  (<u>See</u> SAC (Dkt. No. 70) ¶ 39 n.13)  "An IBSN . . . is a 13-digit number that uniquely identifies books and book-like products, such as audiobooks."  <u>Warren v. Xlibris Corp.</u>, No. 1:11 CV 200, 2012 WL 266956, at *1 n.1 (W.D. Mich. Jan. 6, 2012).
[8]  U.S. Copyright Office registration numbers TX0009335307 and SR0000981326 are for the paperback and audiobook versions of <u>The Trump Tapes</u>, respectively.  (<u>Id.</u>, Exs. E, F)

## II.    **PROCEDURAL HISTORY**

The Complaint was filed in the Northern District of Florida, Pensacola Division, on January 30, 2023, and seeks a declaration that Plaintiff "owns the Interview Sound Recordings, Audiobook, and Derivative Works in full." (Cmplt. (Dkt. No. 1) ¶ 64)  The Complaint also asserts claims for, inter alia, breach of contract against Woodward, breach of the covenant of good faith and fair dealing against Woodward, and unjust enrichment against all Defendants.  (See Cmplt. (Dkt. No. 1) ¶¶ 67-127)

The Amended Complaint was filed on April 24, 2023.  (Am. Cmplt. (Dkt. No. 32))  The substantive allegations of the Complaint and the Amended Complaint are materially identical, but the Amended Complaint adds allegations regarding jurisdiction and venue. (Compare Cmplt. (Dkt. No. 1) ¶¶ 8-18 with Am. Cmplt. (Dkt. No. 32) ¶¶ 7-24)  After the case was transferred to this District pursuant to 28 U.S.C. § 1404(a) and Fed. R. Civ. P. 12(b)(3) (see Aug. 4, 2023 Transfer Order (Dkt. No. 48) at 23), Defendants moved to dismiss the Amended Complaint.  (Sept. 11, 2023 Mot. to Dismiss (Dkt. No. 57))

In a November 1, 2023 letter – submitted after the motion to dismiss was fully briefed – Plaintiff informed this Court that the Copyright Office had registered the "sound recording" and "text" of the The Trump Tapes audiobook to Trump and Woodward effective February 28, 2023.  (Pltf. Nov. 1, 2023 Ltr. (Dkt. No. 64) at 1)  Plaintiff then filed the Second Amended Complaint, which addresses the copyright registration and asserts seven claims against Defendants.  (See SAC (Dkt. No. 70) ¶¶ 58-113)[9]

---

[9]  In addition to addressing the newly issued copyright registration (see SAC (Dkt. No. 70) at 3, ¶ 57 and Ex. A), the SAC drops the Amended Complaint's allegations that "President Trump never sought to create a work of joint authorship" (see Am. Cmplt. (Dkt. No. 32) ¶ 53) and that Defendants "manipulated" Trump's answers "to support the particular narrative desired" by Defendants.  (See id. ¶¶ 58-63)  The SAC also drops the Amended Complaint's promissory estoppel and Florida Deceptive and Unfair Trade Practices Act claims.  (See id. ¶¶ 108-123)

In Count I of the SAC, which is alleged against all Defendants, Plaintiff seeks a declaration that he "is, at minimum, the joint author and copyright owner in the Interview Sound Recordings, Audiobook, and Derivative Works . . . and therefore is entitled to the pro rata revenues arising from the exploitation of such works[.]" (SAC (Dkt. No. 70) at 20)  In the alternative, Plaintiff seeks a declaration that he "has a copyright interest in his responses in the Interview Sound Recordings, Audiobook, and Derivative Works . . . and therefore is entitled to the pro rata revenues arising from the exploitation of such works[.]"  (Id. at 21)

In the SAC's Count II, which is alleged against all Defendants, Plaintiff seeks an accounting as to the "income earned on the Interview Sound Recordings, Audiobook, and Derivative Works."  (Id. ¶¶ 66-73)

In Counts III, IV, and V, the SAC alleges unjust enrichment claims against all three Defendants, asserting that they have "received the benefit of revenues, fees, royalties, and other consideration" from the "unauthorized Audiobook and Derivative Works" and have not compensated Plaintiff for his "contributions to the Audiobook and all Derivative Works."  (Id. ¶¶ 75-100)

In Count VI, the SAC alleges breach of contract against Woodward.  Plaintiff alleges that he "entered into an agreement whereby Woodward represented, warranted, and agreed that the Interview Sound Recordings could be utilized only for the purposes of writing a singular book."  (Id. ¶ 102)  Woodward thus "had a limited license to utilize the Interview Sound Recordings" (id. ¶ 103), and breached that license "upon publication of the Audiobook . . . [and] the Derivative Works."  (Id. ¶¶ 106-07)

In Count VII, the SAC alleges that Woodward breached the implied covenant of good faith and fair dealing by

. . . [p]articipating and otherwise being complicit in the publication of the Interview Sound Recordings via the Audiobook and the Derivative Works with knowledge of the agreement between him and President Trump regarding the limitations of any license granted to publish portions of the same;

. . . [p]ublication of the Interview Sound Recordings to capitalize and benefit from President Trump's voice to the detriment of President Trump's ability to publish his own voice given his position as author;

. . . [p]ublication of the Interview Sound Recordings with alteration in the spoken words and removal of context, to cast a poor light on President Trump and to mislead and deceive other customers into viewing him in a poor light.

(Id. ¶ 112)

On December 6, 2023, Defendants moved to dismiss the SAC. As to Plaintiff's declaratory judgment-copyright claim, Defendants argue that (1) that claim is barred by the government works doctrine; (2) Plaintiff has no copyright interest in the interview recordings, in his interview responses, in the audiobook, or in the derivative works; and (3) the publication of Plaintiff's interview responses in the audiobook and the derivative works constitutes a fair use. (Def. Br. (Dkt. No. 73) at 16-32) Defendants further contend that the SAC's state law claims should be dismissed as preempted by the Copyright Act; that the breach of contract claim against Woodward fails to state a claim; and that no claim of any sort has been pled against Defendant Paramount Global. (Id. at 34-38)

## DISCUSSION

## I.    LEGAL STANDARDS

### A.    Rule 12(b)(6)

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "In considering a motion to dismiss[,] . . . the court is to accept as true all facts alleged in the

14

complaint," <u>Kassner v. 2nd Ave. Delicatessen Inc.</u>, 496 F.3d 229, 237 (2d Cir. 2007) (citing

<u>Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals</u>, 282 F.3d 83, 87 (2d Cir. 2002)), and

must "draw all reasonable inferences in favor of the plaintiff." <u>Id.</u> (citing <u>Fernandez v. Chertoff</u>,

471 F.3d 45, 51 (2d Cir. 2006)).

A complaint is inadequately pled "if it tenders 'naked assertion[s]' devoid of

'further factual enhancement,'" <u>Iqbal</u>, 556 U.S. at 678 (quoting <u>Twombly</u>, 550 U.S. at 557), and

does not provide factual allegations sufficient "to give the defendant fair notice of what the claim

is and the grounds upon which it rests." <u>Port Dock & Stone Corp. v. Oldcastle Northeast Inc.</u>,

507 F.3d 117, 121 (2d Cir. 2007) (citing <u>Twombly</u>, 550 U.S. at 555). "Threadbare recitals of the

elements of a cause of action, supported by mere conclusory statements, do not suffice [to

establish an entitlement to relief]." <u>Iqbal</u>, 556 U.S. at 678.

"In considering a motion to dismiss for failure to state a claim pursuant to Rule

12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to

the complaint as exhibits, and documents incorporated by reference in the complaint." <u>DiFolco</u>

<u>v. MSNBC Cable L.L.C.</u>, 622 F.3d 104, 111 (2d Cir. 2010) (citing <u>Chambers v. Time Warner, Inc.</u>,

282 F.3d 147, 153 (2d Cir. 2002) and <u>Hayden v. Cty. of Nassau</u>, 180 F.3d 42, 54 (2d Cir. 1999)).

"Where a document is not incorporated by reference, the court may never[the]less consider it

where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document

'integral' to the complaint." <u>Id.</u> (quoting <u>Mangiafico v. Blumenthal</u>, 471 F.3d 391, 398 (2d Cir.

2006)) In resolving a motion to dismiss, "a district court . . . may also consider matters of which

judicial notice may be taken under Fed. R. Evid. 201." <u>Kramer</u>, 937 F.2d at 773.

**B.    Copyright Act**

Section 102(a) of the Copyright Act of 1976 protects "original works of authorship

fixed in any tangible medium of expression," including "literary works" and "sound recordings."

15

17 U.S.C. § 102(a); <u>16 Casa Duse, LLC v. Merkin</u>, 791 F.3d 247, 256 (2d Cir. 2015) (same).

Under the Copyright Act, a "sound recording" is a

> work[] that result[s] from the fixation of a series of musical, spoken, or other
> sounds, but not including the sounds accompanying a motion picture or other
> audiovisual work, regardless of the nature of the material objects, such as disks,
> tapes, or other phonorecords in which they are embodied.

17 U.S.C. § 101.

For purposes of the Copyright Act, "the author is the party who actually creates the

work, that is, the person who translates an idea into a fixed, tangible expression entitled to

copyright protection." <u>Cmty. for Creative Non-Violence v. Reid</u>, 490 U.S. 730, 737 (1989) (citing

17 U.S.C. § 102).

Under the Copyright Act,

> [a] work is "fixed" in a tangible medium of expression when its embodiment in a
> copy or phonorecord, by or under the authority of the author, is sufficiently
> permanent or stable to permit it to be perceived, reproduced, or otherwise
> communicated for a period of more than transitory duration.

17 U.S.C. § 101. Fixation must be done "by or under the authority of the author." <u>Id.</u>

The Copyright Act "does not protect ideas, [of course,] but only 'the original or

unique way that an author expresses those ideas.'" <u>Andy Warhol Found. for the Visual Arts, Inc.</u>

<u>v. Goldsmith</u>, 11 F.4th 26, 46 (2d Cir. 2021), <u>aff'd</u>, 598 U.S. 508 (2023) (quoting <u>Rogers v.</u>

<u>Koons</u>, 960 F.2d 301, 308 (2d Cir. 1992)).

Although the Copyright Act does not explicitly address interviews, courts have

afforded them protection under the Act as "literary works," "sound recordings," or

"compilation[s]." 17 U.S.C. § 101; <u>see</u>, <u>e.g.</u>, <u>Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.</u>,

808 F. Supp. 2d 634, 636-37 (S.D.N.Y. 2011) (concluding that recorded interview was subject to

copyright protection as a "sound recording"); <u>Quinto v. Legal Times of Washington, Inc.</u>, 506 F.

Supp. 554, 559 (D.D.C. 1981) (affording copyright protection to a series of interviews as a "compilation").

## II.    ANALYSIS

### A.    Declaratory Judgment-Copyright Claim

As discussed above, Plaintiff contends that he is, "at minimum, the joint author and copyright owner in the Interview Sound Recordings, Audiobook, and Derivative Works at issue. . . ."  (SAC (Dkt. No. 70) ¶ 65(a))  This claim is premised on the notion that Woodward and Plaintiff are joint authors of the works at issue, as reflected in the February 28, 2023 copyright registration issued by the U.S. Copyright Office to Plaintiff and Woodward.  (Id. ¶ 62; id., Ex. A)  In the alternative, Plaintiff contends that he has "a copyright interest in his [interview] responses" as set forth in these works.  (Id. ¶ 65(b))  Defendants counter that Plaintiff "cannot state a claim for joint authorship of the Work or ownership of his responses in the [i]nterviews."  (Def. Br. (Dkt. No. 73) at 22)

#### 1.    Copyright Premised on Joint Authorship

##### a.    Applicable Law

The Copyright Act recognizes that a single work may have more than one "author," see 17 U.S.C. § 201(a), and defines a "joint work" as "a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole."  17 U.S.C. § 101.  "Joint authorship entitles the co-authors to equal undivided interests in the whole work," and "each joint author has the right to use or to license the work as he or she wishes, subject only to the obligation to account to the other joint owner for any profits that are made."  Thomson v. Larson, 147 F.3d 195, 199 (2d Cir. 1998).

The "touchstone" of joint authorship "'is the intention at the time the writing is done that the parts be absorbed or combined into an integrated unit.'"  Id. at 199 (quoting

17

H.R.Rep. No. 1476, 94th Cong. 120, 121 (1976)). An intent to create an "integrated unit" is not

sufficient standing alone, however, because

> an inquiry so limited would extend joint author status to many persons who are
> not likely to have been within the contemplation of Congress. For example, a
> writer frequently works with an editor who makes numerous useful revisions to
> the first draft, some of which will consist of additions of copyrightable
> expression. Both intend their contributions to be merged into inseparable parts of
> a unitary whole, yet very few editors and even fewer writers would expect the
> editor to be accorded the status of joint author, enjoying an undivided half interest
> in the copyright in the published work.

Childress v. Taylor, 945 F.2d 500, 507 (2d Cir. 1991).

Accordingly, the Second Circuit has set forth a two-pronged test to assess co-

authorship claims where, as here, the parties did not enter into a written agreement concerning a

work. Under the Second Circuit's test, the party claiming co-authorship "bears the burden of

establishing that each of the putative co-authors (1) made independently copyrightable

contributions to the work; and (2) fully intended to be co-authors." Thomson, 147 F.3d at 200

(citing Childress, 945 F.2d at 507-08); see also 16 Casa Duse, 791 F.3d at 255 (same). In

formulating this test, the court sought to "strike a balance between 'ensur[ing] that true

collaborators in the creative process are accorded the perquisites of co-authorship,' while at the

same time, 'guard[ing] against the risk that a sole author is denied exclusive authorship status

simply because another person render[s] some form of assistance.'" Thomson, 147 F.3d at 200

(alterations in original) (internal citations omitted) (quoting Childress, 945 F.2d at 504).

While the parties' subjective intent at the time the work was created is the

"touchstone" for the analysis, "subsequent conduct" can be "probative of [the parties'] prior state

of mind." Childress, 945 F.2d at 509 (citations omitted). In addition to evidence of the parties'

subjective intent – such as "the parties' own words or professed state of mind" – courts consider

objective "factual indicia" of how the putative joint authors "regarded [them]selves in relation to

18

the work. . . ." <u>Thomson</u>, 147 F.3d at 201.  Such objective "factual indicia" might include

evidence as to which party or parties had "decision[-]making" authority over the work, how the

parties chose to "bill[] and credit" themselves with respect to the work, and what party had the

"right to enter into contracts" with third parties regarding the work.  <u>Id.</u> (citing <u>Childress</u>, 945

F.2d at 508-09).

### b. Whether the SAC Plausibly Alleges that Woodward and Trump Were Co-Authors

Here, the SAC does not plausibly allege that Trump and Woodward "fully

intended to be co-authors."  <u>Id.</u> at 200.  Indeed, the SAC's factual allegations are entirely

inconsistent with the notion that Trump and Woodward "intended to be co-authors."

As to the parties' subjective intent, the SAC alleges that Woodward has

"consistently claimed, and still maintains, that he is the original and sole author" of <u>The Trump</u>

<u>Tapes</u>.  (SAC (Dkt. No. 70) ¶ 63)

As to Plaintiff, the SAC asserts that he never understood or intended that any

audiobook of the interviews or related work would be created, and that he never consented to any

such use of the interviews.  According to the SAC, Plaintiff understood that the "interviews were

for the sole purpose of a <u>book</u>.  That book, entitled <u>Rage</u>, was released on September 14, 2021."

(<u>Id.</u> ¶ 35 (emphasis in original); <u>see also id.</u> ¶ 42 (stating that "President Trump had consented to

being recorded only for the purposes of 'the book,' namely <u>Rage</u>, and never consented to release

of any audio recording, inclusive of the Interview Sound Recordings"); ¶ 49 (quoting Trump as

saying, during "Interview 4," that the interviews were "[f]or the book only. . . . Only for the

book."); <u>id.</u> ¶ 51 ("President Trump told Woodward numerous times that the Interviews were to

be used by Woodward – and Woodward only – for the sole purpose of accurately quoting

President Trump for the 'written word,' i.e., <u>Rage</u>, and not for any other purpose. . . .")) The

SAC also pleads that "the parties intended that the copyright for any recordings would remain with President Trump." (Id. ¶ 49)

In sum, according to the SAC, Plaintiff never agreed, understood, or intended that the interviews would be used for any purpose other than Woodward's upcoming book Rage. There was thus no intention – on Plaintiff's part – to create a joint work such as The Trump Tapes, much less that Plaintiff and Woodward would be co-authors of such a work. Indeed, according to the SAC, Plaintiff never knew that his interview responses would be merged "into a unitary whole" in the form of The Trump Tapes, and the interviews were released without his permission. (See also id. ¶ 39 (alleging that Defendants released The Trump Tapes "[w]ithout President Trump's permission"); id. ¶ 38 ("Woodward [alone] decided to . . . releas[e]" the audiobook); id. ¶ 40 ("Defendants unilaterally proceeded with [the] publication" of the audiobook); id. ¶ 53 (Woodward's "intention" to release The Trump Tapes "arose" after "initially recording President Trump"))[10]

---

[10] The SAC's joint authorship claim also directly contradicts allegations in the Complaint (Dkt. No. 1) and the Amended Complaint (Dkt. No. 32), which both state that "President Trump never sought to create a work of joint authorship. . . ." (Cmplt. (Dkt. No. 1) ¶ 47; Am. Cmplt. (Dkt. No. 32) ¶ 53 (same)) Indeed, in moving to dismiss the Amended Complaint's declaratory judgment-copyright claim, Defendants pointed out that "President Trump disclaims joint authorship." (Def. MTD Am. Cmplt. (Dkt. No. 58) at 18; see id. at 19 ("But the issue of joint authorship is not presented here because the Complaint [and Amended Complaint] disavow[] joint authorship by stating 'President Trump never sought to create a work of joint authorship. . . .'") (quoting Am. Cmplt. (Dkt. No. 32) ¶ 53)) Accordingly, in alleging in the SAC that he is "the joint author and copyright owner in the Interview Sound Recordings, Audiobook, and Derivative Works at issue" (SAC (Dkt. No. 70) ¶ 65(a)), Plaintiff pleads the exact opposite of what he alleged in his Complaint and Amended Complaint.

Litigation is not a game, and where – as here – a complaint's allegations directly contradict allegations set forth in earlier pleadings, courts may disregard the contradictory allegations in resolving a motion to dismiss. See, e.g., Colliton v. Cravath, Swaine & Moore LLP, No. 08 Civ. 0400 (NRB), 2008 WL 4386764, at *6 (S.D.N.Y. Sept. 24, 2008) (where a "plaintiff blatantly changes his statement of the facts in order to respond to the defendant['s] motion to dismiss . . . [and] directly contradicts the facts set forth in his original complaint," a court may "accept the

Objective factual indicia in the SAC likewise do not suggest that Woodward and Trump "fully intended to be co-authors." Thomson, 147 F.3d at 200.

As to decision-making authority, the Second Circuit has instructed courts to consider who had "authority over what changes are made [to a work] and what is included in [the] work." Id. at 202-03. Here, the SAC states that it was Simon & Schuster and Woodward who "collate[d] and cobble[d] together more than eight hours of 'raw' interview recordings with President Trump" in order to create The Trump Tapes. (SAC (Dkt. No. 70) ¶ 39) And according to The Trump Tapes, it was Defendants who "edited out excessive repetition, irrelevant material, background noise, and unintelligible audio." (McNamara Decl., Ex. A (The Trump Tapes paperback) (Dkt. No. 74-1) at 2) Plaintiff, for his part, complains in the SAC that Defendants published the "Interview Sound Recordings with alteration in the spoken words and removal of

_____

facts described in the original complaint as true") (internal quotation marks and citation omitted), aff'd, 356 F. App'x 535 (2d Cir. 2009); Wheeler v. Slanovec, No. 16 Civ. 9065 (KMK), 2019 WL 2994193, at *6 (S.D.N.Y. July 9, 2019) ("In cases 'where allegations in an amended pleading "directly contradict" pleadings in the original complaint, courts have disregarded the amended pleading.'") (quoting Brooks v. 1st Precinct Police Dep't, No. 11-CV-6070, 2014 WL 1875037, at *2 (E.D.N.Y. May 9, 2014)); Dozier v. Deutsche Bank Trust Co. Ams., No. 09-CV-9865, 2011 WL 4058100, at *2 (S.D.N.Y. Sept. 1, 2011) ("[T]he court need not accept as true allegations that conflict with a plaintiff's prior allegations."); Azzarmi v. Sedgwick Claims Mgmt. Servs., Inc., No. 20-CV-9155 (KMK), 2025 WL 35003, at *4 (S.D.N.Y. Jan. 6, 2025) ("[I]t is well settled that a district court may ignore newly asserted facts where 'a plaintiff blatantly changes his statement of the facts in order to respond to the defendant's motion to dismiss and directly contradicts the facts set forth in his original complaint.'") (quoting Vasquez v. Reilly, No. 15-CV-9528, 2017 WL 946306, at *3 (S.D.N.Y. Mar. 9, 2017)); cf. Kant v. Columbia Univ., No. 08 CIV 7476 (PGG), 2010 WL 807442, at *7 (S.D.N.Y. Mar. 9, 2010) ("Courts are free to consider direct contradictions between earlier pleadings and a proposed amended pleading in determining whether to grant leave to amend, particularly when the proposed amendments concern facts clearly within the plaintiff's knowledge when previous complaints were filed.").

And such treatment is particularly appropriate where the subject matter of the contradictory allegations – here Plaintiff's state of mind concerning the joint authorship issue – was clearly within his knowledge at the time he filed the earlier pleadings.

21

context. . . ."  (SAC (Dkt. No. 70) ¶ 112(c))  In sum, according to the SAC, only Defendants exercised authority and control over the content of The Trump Tapes.

Defendants also exercised decision-making authority over the creation of The Trump Tapes.  For example, Defendant Woodward initiated the project (see id. ¶ 35); chose the questions to ask Trump (McNamara Decl., Ex. A (The Trump Tapes paperback) (Dkt. No. 74-1) at 417); selected who would be interviewed (id. at 295-310 (interviewing two White House National Security Advisors)); exercised "discretion" in recording (SAC (Dkt. No. 70) ¶ 48); and coordinated the work's publicity and release.  (Id. ¶ 39)  Defendants' alleged exclusive decision-making authority and control over the creation of The Trump Tapes weighs against any claim of joint authorship.

As to how the parties chose to "bill or credit themselves" for the work, Thomson, 147 F.3d at 203, the SAC states that Simon & Schuster "credit[s]" Trump "as a reader on the Audiobook and the CD," but lists the work as "By Bob Woodward."  (SAC (Dkt. No. 70) ¶¶ 43, 55 & fig. 1)  Given that the audiobook, the paperback version of The Trump Tapes, and Simon & Schuster's promotional material for The Trump Tapes all identify Woodward as the sole author (see id. at fig. 1; McNamara Decl., Ex. A (The Trump Tapes paperback) (Dkt. No. 74-1) (cover); McNamara Decl., Ex. B (The Trump Tapes audiobook) (Dkt. No. 74-2) (cover and back cover)), the identification of Plaintiff as a "reader" does not provide a basis for a joint authorship claim.  See Thomson, 147 F.3d at 204 (defendant's decision to credit plaintiff as "dramaturg" – a literary adviser or editor – for disputed work did not constitute evidence that defendant intended to be a co-author with plaintiff).  Finally, and as the SAC alleges, Woodward attributed The Trump Tapes only to "himself and his publisher," and did not "acknowledge or cite to President Trump's

contributions to the Audiobook and all Derivative Works." (Id. ¶ 79)  In sum, the billing and credit factor weighs against a finding of joint authorship.[11]

As to contracts with third parties, the SAC alludes to Woodward's business relationship with Defendant Simon & Schuster (see id. at 2 (stating that Simon & Schuster is "a major publishing company which brings the work of many authors, including Woodward, to hundreds of countries and territories"); id. ¶ 13 ("Woodward regularly authors books which [Simon & Schuster] regularly publishes on a global scale."); id. ¶ 25 ("The licenses obtained by [Simon & Schuster] generally include the right to publish a book in various formats. . . ."; id. ¶ 26 (stating that Woodward has "authored twenty-one books, which have all been published by [Simon & Schuster]")), but does not otherwise address any contractual relationship between them.  As to Plaintiff, the SAC does not plead that he entered into any contracts with third parties regarding the interviews.  The Court concludes that this factor is neutral for purposes of the joint authorship analysis.

Having considered the subjective and objective factors relevant to the issue of whether the parties intended to be co-authors, the Court finds that the SAC does not plausibly allege that the parties "fully intended to be co-authors" of a joint work.  Thomson, 147 F.3d at 200.  Indeed, as discussed above, the SAC alleges the opposite.  See 16 Casa Duse, 791 F.3d at 256 (finding that the record "'establishes that [Casa Duse] . . . never intended to share authorship

---

[11]  While the SAC asserts that "[o]nline sites where the [a]udiobook can be purchased credit President Trump as author and 'Narrator,' recognizing that he has rights in the publication," (SAC (Dkt. No. 70) ¶ 44 & fig. 2 (attaching screenshot of Barnes & Noble website advertising The Trump Tapes "by Bob Woodward, Donald J. Trump")), this allegation is not relevant to the Court's analysis.  In determining whether parties "fully intended to be co-authors," Thomson, 147 F.3d at 200, courts look to the intent of each putative co-author.  The views of third parties are irrelevant to that analysis.  See id. at 203 ("[B]illing or credit is . . . a window on the mind of the party who is responsible for giving the billing or the credit.") (internal quotation marks omitted).

of the film with Merkin . . . ,' and '[t]here is also considerable evidence that Merkin never intended to be [Casa Duse's] co-author.'") (quoting <u>16 Casa Duse, LLC v. Merkin</u>, No. 12 CIV. 3492 RJS, 2013 WL 5510770, at *8-9 (S.D.N.Y. Sept. 27, 2013)).  Accordingly, to the extent that Plaintiff's declaratory judgment-copyright claim is premised on a theory that Woodward and Plaintiff intended to be joint authors, that claim will be dismissed.

**2.      Joint Authorship Premised on Copyright Registration**

The SAC pleads that "the United States Copyright Office has registered Mr. Trump and Defendant Mr. Woodward as co-authors, <u>i.e.</u>, co-claimants, of [<u>The Trump Tapes</u>]." (SAC (Dkt. No. 70) ¶ 57)  And in opposing Defendants' motion to dismiss his declaratory judgment-copyright claim, Plaintiff argues that this copyright registration "creates a rebuttable presumption [of joint authorship]" sufficient to defeat a motion to dismiss.  (Pltf. Opp. (Dkt. No. 77) at 17)

a.      **Applicable Law**

A copyright registration does not create any substantive ownership rights in a registrant.  A registration merely constitutes evidence of ownership rights.  <u>See</u> <u>Blue Planet Software, Inc. v. Games Int'l, LLC</u>, 334 F. Supp. 2d 425, 436 (S.D.N.Y. 2004) ("[W]hile registrations may be prima facie evidence of ownership, the mere fact that a party registers its copyrights or trademark rights does not create substantive ownership rights in the registrant. Rather, substantive copyrights spring to life at the moment of the genesis of the creative work and attach to the creator or author immediately. . . . Accordingly, registrations merely offer evidence of ownership, and that showing need not be dispositive of the matter if contrary proof is available."); <u>Chere Amie, Inc. v. Windstar Apparel, Corp.</u>, 191 F. Supp. 2d 343, 350 (S.D.N.Y. 2001) ("Copyright exists automatically upon the creation and fixation of an original work of

24

authorship in a tangible medium of expression.  See 17 U.S.C. 102(a).  The Copyright Office does not grant copyrights.").

As a general matter, "[a] certificate of registration from the United States Register of Copyrights constitutes prima facie evidence of the valid ownership of a copyright, although that presumption of ownership may be rebutted."  Hamil Am. Inc. v. GFI, 193 F.3d 92, 98 (2d Cir. 1999); see also 17 U.S.C. § 410(c) ("In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate.  The evidentiary weight to be accorded the certificate of a registration made thereafter shall be within the discretion of the court.").

The presumption of ownership accompanying a copyright registration may be rebutted by, inter alia, evidence that the registrant is not an author of the work, or has otherwise failed to substantiate his, her, or its registration.  See, e.g., Shah v. NYP Holdings, Inc., No. 21-CV-06148, 2023 WL 266511, at *3 (N.D. Ill. Jan. 18, 2023) (presumption of valid copyright ownership was overcome on Rule 12(b)(6) motion because plaintiff's "allegations fail to reveal any intent . . . to be joint authors"), aff'd, No. 23-1127, 2024 WL 3825220 (7th Cir. Aug. 15, 2024); McLaren v. Chico's FAS, Inc., No. 10 CIV. 2481 JSR, 2010 WL 4615772, at *4 (S.D.N.Y. Nov. 9, 2010) (ruling, on a motion to dismiss, that defendant "rebutted [the presumption of valid ownership] by showing that the registration is invalid as a matter of law"); see also Medforms, Inc. v. Healthcare Mgmt. Solutions, Inc., 290 F.3d 98, 109 (2d Cir. 2002) (upholding jury determination that copyright registrations were invalid because registrant was not an author of the registered works); Murphy v. Murphy, No. 20-CV-2388-JRC, 2025 WL 963999, at *6 (E.D.N.Y. Mar. 30, 2025) (finding, at summary judgment, that "defendant has come forward with

sufficient evidence to rebut the presumption that the plaintiff is the author of the copyrighted works"); Pan v. Kohl's Dep't Stores, Inc., No. 2:12-CV-1063, 2016 WL 1270665, at *5 (S.D. Ohio Mar. 31, 2016) (Ruling, at summary judgment, that defendants "have successfully rebutted the presumption of the validity of Plaintiff's copyright by proving that Plaintiff is not the author of the work. If Plaintiff is not the author of the work, Plaintiff has no valid copyright. If Plaintiff has no valid copyright, Plaintiff has no standing to sue.")

Moreover – and consistent with the November 30, 2023 U.S. Copyright Office letter quoted above – where parties submit conflicting or adverse copyright registration applications, the Copyright Office does not sit as a tribunal resolving those competing claims. See Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Ctr. of Contemporary Dance, Inc., 224 F.Supp.2d 567, 586 (S.D.N.Y. 2002) ("'The Copyright Office is an office of record and it does not have the authority to adjudicate adverse or conflicting claims submitted for registration. Each claim is examined to determine if it complies with statutory and regulatory requirements; if it does, it is registered. When conflicting claims are received, the Office may put both claims on record if each is acceptable on its own merits. It is the responsibility of the parties involved in a dispute to pursue their rights in their works.'") (quoting Copyright Office correspondence), vacated in part on other grounds, 380 F.3d 624 (2d Cir. 2004); see also Est. of Burne Hogarth v. Edgar Rice Burroughs, Inc., 342 F.3d 149, 167 (2d Cir. 2003) (noting that the Copyright Office "'will register adverse claims by more than one party,'" which is "'not unusual'") (quoting Copyright Office correspondence).

Where – as here – a court is faced with conflicting or adverse copyright registrations, it must make an independent determination as to ownership, and may conclude that no competing registration has prima facie validity. Faulkner v. Nat'l Geographic Soc'y, 211 F.

Supp. 2d 450, 462 (S.D.N.Y. 2002) (noting that "the district court makes an independent determination of copyright ownership," and that the Copyright Office's registration decision "is not conclusive on the district court"); Martha Graham Sch. & Dance Found., 224 F.Supp.2d at 586 ("Neither side is entitled to a presumption of copyright validity for those competing certificates of registration."), vacated in part on other grounds, 380 F.3d 624 (2d Cir. 2004); Peterson v. Kolodin, No. 13 CIV. 793 JSR, 2013 WL 5226114, at *5 (S.D.N.Y. Sept. 10, 2013) ("[T]he Court concludes that any [] evidentiary weight that might be due one registration is counterbalanced by the other, leaving no presumption on either side."); see also 5 Patry on Copyright § 17:120 ("Where both registrations were obtained contemporaneously, and especially in contemplation of litigation[,] neither certificate should be granted prima facie status."); 3-12 Nimmer on Copyright § 12.11[B][i] ("It might be argued that plaintiff's and defendant's certificates cancel each other out with respect to either party's right to claim a prima facie presumption. . . .").

And contrary to Plaintiff's assertions (see Pltf. Opp. (Dkt. No. 77) at 16-17), it is appropriate for a court to determine on a motion to dismiss what weight to give a copyright registration. See McLaren, 2010 WL 4615772, at *4 (concluding on a motion to dismiss that the presumption of validity that attaches to a copyright registration was overcome by allegations in the complaint that "some of the illustrations" in the collection for which plaintiff received a copyright registration had previously been published); MMS Trading Co. Pty Ltd. v. Hutton Toys, LLC, No. 20-CV-1360 (MKB), 2021 WL 1193947, at *7 (E.D.N.Y. Mar. 29, 2021) (concluding on a motion to dismiss an action alleging copyright invalidity and noninfringement that plaintiff had plausibly alleged "that the subject matter of [d]efendant's copyright registration lacks the originality required to warrant copyright protection").

b.    <u>Analysis</u>

As discussed above, Plaintiff contends that Defendants' motion to dismiss his declaratory judgment-copyright claim should be denied on the basis of the February 28, 2023 copyright registration he obtained, which designates Plaintiff and Woodward as joint authors of "The Trump Tapes." (<u>See</u> Pltf. Opp. (Dkt. No. 77) at 17; <u>see also</u> SAC (Dkt. No. 70) at 3, ¶¶ 57, 62; <u>id.</u>, Ex. A) The Court concludes that this copyright registration is not sufficient to plausibly allege joint authorship.

As discussed above, while a copyright registration may constitute <u>prima facie</u> evidence of ownership, where there are conflicting and adverse copyright registrations, the Copyright Office does not resolve the competing claims, and courts are called upon to make "an independent determination of copyright ownership." <u>Faulkner</u>, 211 F. Supp. 2d at 462.

Here, for the reasons explained above, the representation in the February 28, 2023 copyright registration that Plaintiff and Woodward are joint authors of <u>The Trump Tapes</u> is contradicted by the SAC's allegations, which make clear that Plaintiff and Woodward did not "fully intend[] to be co-authors," and indeed had no intention of being co-authors. <u>Thomson</u>, 147 F.3d at 200; <u>see also</u> <u>id.</u> at 201 (noting "requirement of mutual intent" for any claim of co-authorship). Accordingly, the February 28, 2023 copyright registration naming Plaintiff and Woodward as joint authors does not alter this Court's determination that the SAC does not plausibly allege joint authorship.

*    *    *    *

The SAC does not plausibly allege that Woodward and Trump intended to be joint authors of <u>The Trump Tapes</u>. Accordingly, to the extent that Plaintiff seeks a declaration that he

has a copyright interest in <u>The Trump Tapes</u> premised on a theory of joint authorship, his

declaratory judgment-copyright claim will be dismissed.

### 3.    <u>Claimed Copyright Interest in Interview Responses</u>

Failing a declaration that he is a joint author and copyright owner of <u>The Trump</u>

<u>Tapes</u>, Plaintiff seeks a declaration that he "has a copyright interest in his responses" to

Woodward's questions during the interviews.  (SAC (Dkt. No. 70) ¶ 65(b))  In arguing that any

such claim must be dismissed, Defendants contend that Trump's interview responses do not

constitute a "work of authorship" protected by copyright law.  (Def. Br. (Dkt. No. 73) at 26-30)

### a.    <u>Case Law Precedent</u>

Interviewees seeking to assert a copyright interest in their stand-alone responses

to an interviewer's questions have generally not prevailed, although the rationales courts have

used for rejecting these claims have varied, and the reasoning has not always been entirely

sound.

Certain courts have concluded that an interviewee is not entitled to copyright

protection because an interviewee is not an "author" who "fixe[s]" a work into "a tangible

medium of expression."

The Supreme Court has instructed that, under the Copyright Act, "the author is the

party who actually creates the work, that is, the person who translates an idea into a fixed,

tangible expression entitled to copyright protection." <u>Reid</u>, 490 U.S. at 737.  And, as discussed

above, the Copyright Act protects "original works of authorship fixed in any tangible medium of

expression," including "literary works" and "sound recordings."  17 U.S.C. § 102(a).

As stated previously, under the Copyright Act

[a] work is "fixed" in a tangible medium of expression when its embodiment in a
copy or phonorecord, by or under the authority of the author, is sufficiently

permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration.

17 U.S.C. § 101.

Applying this statutory language, the court in McGillvary v. Netflix, Inc., No. 2:23-CV-01195-JLS-SK, 2024 WL 3588043 (C.D. Cal. July 30, 2024), concluded that the plaintiff interviewee did not own a copyright in interviews he gave to a television station – in which he described assaulting a motorist who had hit a pedestrian – because it was the television station's employees who "fixed" the plaintiff's interviews by "recording him using [equipment] controlled[] and operated [by the station.]" Id. at *7.

Similarly, in Taggart v. WMAQ Channel 5 Chicago, No. CIV.A. 00-4205-GPM, 2000 WL 1923322 (S.D. Ill. Oct. 30, 2000), the court considered a copyright claim brought by a prison inmate who had given an interview to a television reporter. Plaintiff complained, inter alia, that portions of the interview had later been broadcast in violation of conditions he had placed on its use. In rejecting the inmate's copyright claim, the court noted that

> "[t]o qualify as an author, one must supply more than mere direction or ideas. An author is the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection.'" Eri[c]kson v. Trinity Theater, Inc., 13 F.3d 1061, 1071 (7th Cir. 1994) (citing Community for Creative Non-Violence v. Reid, 490 U.S. 730, 737, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989)). Therefore, if anyone was the "author," it may very well have been the cameraman who fixed the ideas into a tangible expression, the videotape.

Id. at *4 (first alteration in original); cf. Garcia v. Google, Inc., 786 F.3d 733, 743 (9th Cir. 2015) (en banc) (holding that actor had no copyright interest in her film performance because "[s]he never fixed her acting performance in a tangible medium").

In rejecting copyright claims from interviewees, other courts have concluded that an interviewee's stand-alone responses to questions are uncopyrightable ideas. For example, in

<u>Falwell v. Penthouse Int'l, Ltd.</u>, 521 F. Supp. 1204 (W.D. Va. 1981), the Reverend Jerry Falwell

claimed a common law copyright interest in an interview he had given to magazine reporters. As

here, Falwell contended that the interview appeared without his consent and violated oral

conditions he had set at the time of the interview. <u>Id.</u> at 1206. In rejecting Falwell's copyright

claim, the court concluded that it was

> not founded on any existing principle of law, nor is it even analogous to any of the
> circumstances which heretofore have been contemplated by the courts. Plaintiff's
> claim of copyright presupposes that every utterance he makes is a valuable
> property right. If this were true, the courts would be inundated with claims from
> celebrities and public figures all of whom may argue that their expressions should
> also be afforded the extraordinary protection of copyright. Such a result was
> never contemplated by the development of the law. . . .
>
> Plaintiff cannot seriously contend that each of his responses in the published
> interview setting forth his ideas and opinions is a product of his intellectual labors
> which should be recognized as a literary or even intellectual creation. There is
> nothing concrete which distinguishes his particular expression of his ideas from
> the ordinary. Although it is sometimes difficult to differentiate, the expression of
> ideas is a separate and distinct concept from that of the ideas themselves. As
> stated in Nimmer, The Law of Copyright, Vol. I, Sec. 2.02 at pp. 2-19 (1980):
>
>> It is a fundamental precept of copyright that only the expression of ideas,
>> and not the ideas themselves, are copyrightable.
>
> However different or unique plaintiff's thoughts or opinions may be, the
> expression of those opinions or thoughts is too general and abstract to rise to the
> level of a literary or intellectual creation that may enjoy the protection of
> copyright. Although the general subject matter of the interview may have been
> outlined in the reporters' minds prior to their meeting with plaintiff, the actual
> dialogue, including the unprepared responses of plaintiff, was spontaneous and
> proceeded in a question and answer format. There is no defined segregation,
> either by design or by implication of any of plaintiff's expressions of his thoughts
> and opinions on the subjects discussed which would aid in identifying plaintiff's
> purported copyrighted material.

<u>Id.</u> at 1207-08.[12]

---

[12] In suggesting that copyright protection for Falwell's remarks should be denied because they
do not "rise to the level of a literary or intellectual creation" worthy of such protection, the
<u>Falwell</u> court appears to make a value judgment that courts have generally sought to avoid in the

Similarly, in Taggart, the court found that the inmate's responses to the reporter's questions were not copyrightable, because his responses were

> not an expression of an idea for the purpose of copyright law, they [were] simply an idea, and thus not subject to copyright protection. See Feist Publications, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 344-45, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991). See also, Falwell, 521 F.Supp. at 1208. Plaintiff's reading of copyright law to protect his interview comments with WMAQ as a work of authorship conflicts with the "most fundamental axiom of copyright law [that no] author may copyright his ideas or the facts he narrates." Feist, 499 U.S. at 344-345. The ambit of materials to which copyright protection extends does not include "ideas which are not protected under the Copyright Act." Erickson, 13 F.3d at 1071; see also 17 U.S.C. § 102(b) ("In no case does copyright protection for an original work of authorship extend to any idea . . . embodied in such a work."). Affording such protection would make each vocalization a piece of property that is afforded the formidable protection of copyright law. Furthermore, affording such protection to materials gathered in the daily task of the news reporter would essentially bring the industry to a halt.

Taggart, 2000 WL 1923322, at *4 (second alteration in original).[13]

### b.  **Analysis**

In the SAC, Plaintiff seeks a declaration that he has a copyright interest in his stand-alone responses to Woodward's questions as presented in The Trump Tapes. (SAC (Dkt.

---

copyright context. See, e.g., Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith, 598 U.S. 508, 544 (2023) ("A court should not attempt to evaluate the artistic significance of a particular work."); Bleistein v. Donaldson Lithographing Co., 188 U.S. 239, 251 (1903) (Holmes, J.) ("It would be a dangerous undertaking for persons trained only to the law to constitute themselves final judges of the worth of [a work], outside of the narrowest and most obvious limits"); Wade Williams Distribution, Inc. v. Am. Broad. Co., No. 00 CIV. 5002 (LMM), 2005 WL 774275, at *9 (S.D.N.Y. Apr. 5, 2005) ("Courts have consistently and prudently avoided subjective judgments in copyright cases. . . .").

[13] The Taggart court also says that the plaintiff inmate's "comments during the interview were unprepared and spontaneous responses" that do "not rise to the level of a literary or intellectual creation that enjoys the protection of the copyright law." Id. at *5. But nothing in the Copyright Act suggests that only statements that are the product of careful thought and preparation are entitled to protection. Indeed, the Second Circuit has stated that a work of art that is the result of mistake, inadvertence, a sudden loud noise, or the artist's physical defect or condition may nonetheless be entitled to copyright protection. See Alfred Bell & Co. v. Catalda Fine Arts, Inc., 191 F.2d 99, 104-05 (2d Cir. 1951).

No. 70) ¶ 65(b))  As explained below, the Court concludes that the SAC does not plausibly allege any such interest because (1) Plaintiff does not plead that he "fixed" his answers into "a tangible medium of expression," or that such fixation occurred "under [his] authority"; and (2) his responses to Woodward's questions do not themselves constitute a work of authorship entitled to copyright protection.

> ### i.    Whether the SAC Plausibly Alleges that Plaintiff Fixed his Responses to Interview Questions in a "Tangible Medium of Expression" or that Such Was Done Under His Authority

As discussed above, a copyrightable work "is 'fixed' in a tangible medium of expression when its embodiment in a copy or phonorecord, by or under the authority of the author, is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration."  17 U.S.C. § 101; see also EMI Christian Music Grp., Inc. v. MP3tunes, LLC, 844 F.3d 79, 87 n.3 (2d Cir. 2016).  A person who does not "fix" the work "in a tangible medium of expression" is therefore generally not regarded as an "author" of the work entitled to seek copyright protection.  See Reid, 490 U.S. at 737 ("As a general rule, the author is the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection."); see also 16 Casa Duse, 791 F.3d at 258 ("[O]riginality and fixation are necessary prerequisites to obtaining copyright protection, see 17 U.S.C. § 102(a)"; "[a]uthors are not entitled to copyright protection except for the 'works of authorship' they create and fix").

Here, Woodward recorded the interviews at issue (see SAC (Dkt. No. 70) ¶ 48 (alleging that Woodward said, "I'm going to turn on my recorder"); id. ¶ 53 (referring to Woodward "recording President Trump")), and thereby fixed the interviews in a "tangible medium of expression."  See McGillvary, 2024 WL 3588043, at *7 (television station's

"employees 'fixed' McGillvary's performances – recording him using [station] controlled-and operated-equipment"); <u>Swatch Group</u>, 808 F. Supp. 2d at 636 (holding that plaintiff's "audio recording of the [earnings] call satisfies the requirement of fixation [for purposes of the Copyright Act]"); <u>Taggart</u>, 2000 WL 1923322, at *4 (stating that "it may have very well been the cameraman who fixed the ideas into a tangible expression, [that being] the videotape"); <u>see</u> <u>also</u> Mary Catherine Amerine, <u>Wrestling Over Republication Rights:  Who Owns the Copyright of Interviews</u>, 21 Marq. Intell. Prop. L. Rev. 159, 163 n.22 (2017) (hereinafter "Amerine") ("The requirement of fixation for [copyright] protection is also met by the journalists' authorized recording of the interview in various mediums.").

   Plaintiff – for his part – does not allege in the SAC or assert in briefing that he played any role in "fixing" the interviews into "a tangible medium of expression," and does not respond to Defendants' argument that the "author" – for purposes of copyright law – is "'the person who translates an idea into a fixed, tangible expression.'"  (Def. Br. (Dkt. No. 73) at 26-27 (quoting <u>Reid</u>, 490 U.S. at 737) (emphasis omitted))  As discussed above, courts have rejected interviewees' copyright claims where the interviewee played no part in fixing the interview in a "tangible medium of expression."  <u>See</u> <u>McGillvary</u>, 2024 WL 3588043, at *7 (dismissing interviewee's copyright claim where television station's employees recorded the interview, thereby "fix[ing]" the interview for purposes of copyright law); <u>Taggart</u>, 2000 WL 1923322, at *4 (rejecting interviewee's copyright claim and finding that it was a television station "cameraman who fixed the ideas into a tangible expression"); <u>see</u> <u>also</u> <u>Garcia</u>, 786 F.3d at 743-44 (holding that an actor had no copyright interest in her film performance because "[s]he never fixed her acting performance in a tangible medium").

Fixation can, of course, occur "under the authority of the author," 17 U.S.C. § 101, even where the author does not personally perform the act of fixation. See, e.g., Mourabit v. Klein, 816 F. App'x 574, 576-79 (2d Cir. 2020) (plaintiff Mourabit "'d[id] the make up artistry'" for a magazine's photo shoot while defendant Klein was the photographer for the photo shoot; plaintiff alleged that defendants wrongfully used one of Klein's photos without crediting plaintiff for a model's makeup; seeking to avoid Copyright Act preemption, plaintiff argued that his "makeup artistry" was not "fixed in a tangible medium of expression"; court held that the "makeup artistry" was "fixed" in Klein's photograph; "[a]lthough Klein, not Mourabit, took the [p]hotograph, that fact is of no import here because a work of authorship may be fixed 'by or under the authority of the author,'" and Mourabit "plainly consented to the photographing of his work by Klein: after all, creating such a [p]hotograph was the goal of the [p]hoto [s]hoot") (emphasis in Mourabit) (citing Baltimore Orioles, Inc. v. Major League Baseball Players Ass'n, 805 F.2d 663, 675 n.22 (7th Cir. 1986) (observing that a work may be fixed in tangible form by someone other than the author when the author knowingly consents to the fixation); see also 1 Nimmer on Copyright § 2.03 (an author's "voluntar[y] participat[ion]" in the fixation of his or her work constitutes "fixation taking place under the author's 'authority'")); Medforms, Inc., 290 F.3d at 107 ("[A]n 'author' can authorize another to 'fix' his original idea."); see also Andrien v. S. Ocean Cnty. Chamber of Com., 927 F.2d 132, 135 (3d Cir. 1991) ("Poets, essayists, novelists, and the like may have copyrights even if they do not run the printing presses or process the photographic plates necessary to fix the writings into book form. These writers are entitled to copyright protection even if they do not perform with their own hands the mechanical tasks of putting the material into the form distributed to the public.").

35

Here, the SAC pleads that Plaintiff consented to Woodward's recording of the interviews (SAC (Dkt. No. 70) ¶¶ 35, 42, 46-51), whereby the interviews were "'fixed' in a tangible medium of expression" for purposes of the Copyright Act. McGillvary, 2024 WL 3588043, at *7 (interview "fixed" by recording it); Taggart, 2000 WL 1923322, at *4 (interview "fixed" when cameraman videotaped it). Such consent does not mean that fixation occurred "under the authority of [Plaintiff]," however, given the SAC's allegations. Garcia v. Google, Inc., 786 F.3d 733 (9th Cir. 2015) (en banc) is instructive on this point.

In Garcia, the Ninth Circuit – sitting en banc – considered an actress's claim that she had a standalone copyright interest in that portion of a film in which she appeared. Garcia had responded to a casting call for a film entitled Desert Warrior, and was cast in a cameo role. Desert Warrior was never released, but the director used a portion of the film – including the snippet in which Garcia appeared – for "an anti-Islam polemic renamed Innocence of Muslims." That film portrays the Prophet Mohammed as "a murderer, pedophile, and homosexual." Garcia, 786 F.3d at 736-37. The director "uploaded . . . a trailer of Innocence of Muslims to YouTube, the video-sharing website owned by Google." "[T]he film fomented outrage across the Middle East . . . [and was] linked to numerous violent protests. . . . Garcia received multiple death threats." After failing to persuade Google to take down the film, Garcia brought a copyright infringement claim against Google and the director, seeking a temporary restraining order and preliminary injunction requiring Google not to host Innocence of Muslims. The district court denied her application for injunctive relief, but a divided panel of the Ninth Circuit reversed. The court then granted rehearing en banc. Id. at 737-39.

The en banc court concluded that Garcia had not shown a likelihood of success on her copyright claim. In particular, the court found that "the law does not clearly favor Garcia's

position" as to whether she or someone under her authority had "'fixed [her performance in the film] in [a] tangible medium of expression.'"  (Id. at 741 (quoting 17 U.S.C. §§ 101, 102(a))  In this regard, the en banc court noted that Garcia

> never fixed her acting performance in a tangible medium, as required by 17 U.S.C. § 101 ("A work is 'fixed' in a tangible medium of expression when its embodiment in a copy or phonorecord, by or under the authority of the author, is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration.") (emphasis added).  According to the Supreme Court, "the author is the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection."  Cmty. for Creative Non-Violence v. Reid, 490 U.S. 730, 737, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989).  Garcia did nothing of the sort.

> For better or for worse, [the director] and his crew "fixed" Garcia's performance in the tangible medium, whether in physical film or in digital form.  However one might characterize Garcia's performance, she played no role in fixation.  On top of this, Garcia claims that she never agreed to the film's ultimate rendition or how she was portrayed in Innocence of Muslims, so she can hardly argue that the film or her cameo in it was fixed "by or under [her] authority."  17 U.S.C. § 101.

Id. at 743-44 (footnote omitted).  The en banc court went on to affirm the district judge's denial of Garcia's motion for a preliminary injunction.  (Id. at 744, 747)

As to the "fixed in a medium of tangible expression" issue, the facts here are analogous to those in Garcia.  As with Garcia, Plaintiff has not alleged or argued that he played any role in the fixation of the works at issue.  (See SAC (Dkt. No. 70) ¶¶ 35, 48, 53 (alleging that Woodward performed the recording))

And like Garcia – who consented to be filmed, see Garcia, 786 F.3d at 736 – Plaintiff "consented to being recorded."  (SAC (Dkt. No. 70) ¶ 42)

And like Garcia, Plaintiff claims that Defendants used the work at issue for a purpose to which he had not consented.  As to Garcia, she consented to appear for a cameo in the film Desert Warrior, but the defendant director used her cameo in Innocence of Muslims, a use to

which she had not consented.  Trump, for his part, says that while he consented to the recording of the interviews for purposes of Woodward's upcoming book Rage, Woodward – the party who "fixed" the interviews in "a medium of tangible expression" – used the recordings for a purpose to which he had not consented.  (Id.)

In Garcia, the en banc Ninth Circuit concluded that Garcia's performance – while "fixed" in the film recording her cameo – had not been fixed under her authority, because "she never agreed to the film's ultimate rendition or how she was portrayed" in the film.  Garcia, 786 F.3d at 744.  Similarly here, Plaintiff claims that he never agreed to the interview recordings' "ultimate rendition" – The Trump Tapes in all its forms – or to how he is portrayed in the recordings.  (SAC (Dkt. No. 70) ¶ 42; id. ¶ 112(c) (alleging that in The Trump Tapes the interviews are presented "with alteration in the spoken words and removal of context," and that this was done "to cast a poor light on President Trump and to mislead and deceive other customers into viewing him in a poor light")

Under Garcia, however, where the fixation of a work is "'in derogation of [a party's] permission,'" the fixation is not done "under the authority" of that party.  Del Rio v. Virgin America, Inc., 2018 WL 5099720, at *6 (C.D. CA June 28, 2018) (quoting Nimmer on Copyright § 2.13[B][3] (2018)); see also Mourabit, 816 F. App'x. at 579 (consent sufficient for fixation under plaintiff's authority where the "fixed" work – a photograph of plaintiff's "makeup artistry" – was consistent with "the goal" of the photo shoot to which plaintiff had consented).

In sum, the SAC does not plausibly allege either that Plaintiff fixed his interview responses in a "tangible medium of expression" or that such was done under his authority.  As to the latter, the SAC pleads that Plaintiff did not consent to the "ultimate rendition" of his interview responses – given that he did not consent to the release of The Trump Tapes in any

form (see SAC (Dkt. No. 70) ¶ 42) – and did not consent to how he would be portrayed in these works. (See id. ¶ 112(c)) Because the SAC alleges that the fixation of the interviews was in derogation of Plaintiff's permission, the interviews were not "fixed" under Plaintiff's authority. Accordingly, the SAC does not plausibly allege that Plaintiff has a copyright interest in his responses to Woodward's questions.

ii.     **Whether Plaintiff's Stand-Alone Responses to Interview Questions are Subject to Copyright Protection**

Although Plaintiff played no role in "fixing" either Woodward's questions or his answers to Woodward's questions, he contends that he has a copyright interest in his stand-alone responses to Woodward's questions. (Pltf. Opp. (Dkt. No. 77) at 20)

Woodward's interviews of Trump are, of course, a collaborative exercise: Woodward asked questions, and Plaintiff provided answers. But the fact that the interviews required Plaintiff's active cooperation and participation does not mean that he automatically is entitled to a copyright interest in his responses to Woodward's questions. Indeed, courts have repeatedly held that the fact that someone has made meaningful contributions to a work does not mean that they have a copyright interest in that work. Moreover, and as discussed above, there is almost no support in the case law for the notion that an interviewee has a copyright interest in his responses to interview questions, and such a conclusion would run counter to animating principles of the Copyright Act.

The Constitution gives Congress the power to "promote the Progress of Science and useful Arts" through copyright law. U.S. Const. Art. 1, § 8, cl. 8. The Second Circuit has stated that the "'principal purpose' of the Copyright Act . . . is 'to encourage the origination of creative works by attaching enforceable property rights to them.'" Davis v. Blige, 505 F.3d 90, 105 (2d Cir. 2007) (quoting Diamond v. Am-Law Publ'g Corp., 745 F.2d 142, 147 (2d Cir. 1984));

see also Veeck v. S. Bldg. Code Congress Int'l Inc., 241 F.3d 398, 402 (5th Cir. 2001) ("The core purpose of copyright law is 'to secure a fair return for an author's creative labor' and thereby 'to stimulate artistic creativity for the general public good.'") (quoting Twentieth Century Music Corp. v. Aiken, 422 U.S. 151, 156 (1975)); Fox Film Corp. v. Doyal, 286 U.S. 123, 127 (1932) ("The sole interest of the United States and the primary object in conferring the monopoly [that copyright affords] lie[s] in the general benefits derived by the public from the labors of authors."); Salinger v. Colting, 607 F.3d 68, 82 (2d Cir. 2010) ("The object of copyright law is to promote the store of knowledge available to the public.").  Courts have been hesitant to adopt interpretations of copyright law that could "threaten to stifle creativity," thus "undermin[ing]" these purposes.  Structured Asset Sales, LLC v. Sheeran, 120 F.4th 1066, 1081 (2d Cir. 2024); see also BWP Media USA Inc. v. Polyvore, Inc., 922 F.3d 42, 66 (2d Cir. 2019) (Newman, J., concurring) ("[C]opyright law . . . must avoid . . . an expansive regime of protection [where authors] are unduly deterred from making socially useful contributions to widespread access to information.").

> One commentator has pointed out that

> . . . splitting an interview into two separately copyrightable parts [– questions and answers –] does not comply with the incentive-based theory of the purpose of the copyright law.  The Copyright Clause of the Constitution establishes the purpose of the copyright law as "promot[ing] the Progress of Science," through what has been widely understood as economic incentivization. As Richard Posner writes, copyright protection "trades off the costs of limiting access to a work against the benefits of providing incentives to create the work in the first place." . . . By splitting the copyright interest in an interview into two parts, neither of which alone is commercially valuable as a stand-alone work, the interviewer's work is essentially stripped of value, forcing potentially costly negotiations with the interviewee in order for the journalist to utilize the interview, which cuts against the central goal of copyright law.

Amerine, 21 Marq. Intell. Prop. L. Rev. at 173 (footnotes omitted).

Where multiple parties claim a copyright interest in the same work, the Second Circuit has traditionally applied the joint authorship intent analysis discussed above.[14]  In conducting that analysis, the court has made clear that even where a party makes useful contributions to a work – whether as an editor, as a researcher, or in some other capacity – that party does not necessarily "enjoy[] an undivided half interest in the copyright in the published work," even where there was an intent that "their contributions [would] be merged into inseparable parts of a unitary whole." Childress, 945 F.2d at 507; see id. 504 ("Care must be taken . . . to guard against the risk that a sole author is denied exclusive authorship status simply because another person render[s] some form of assistance."); see also Thomson, 147 F.3d at 198 n.10, 205 (putative co-author's claim to have "developed [a play's] plot and theme, contributed extensively to the story, created many character elements, [and written] a significant portion of the dialogue and song lyrics" did not render her a joint author of play).

The Second Circuit's decision in 16 Casa Duse, LLC v. Merkin, 791 F.3d 247 (2d Cir. 2015) is instructive on the issue of whether Trump's responses can be stripped out from the interviews and separately afforded copyright protection.

In that case, the Second Circuit considered a dispute between 16 Casa Duse – a film production company – and Alex Merkin, who plaintiff had hired to direct a film. Id. at 251. Although the parties never entered into a formal agreement governing Merkin's work, filming was completed, and plaintiff gave Merkin a hard drive containing the raw film footage "in the hope that Merkin would be able to edit the footage." Id. at 251-52.  Negotiations between the parties concerning Merkin's agreement later collapsed, and the parties began to dispute whether

---

[14]  As noted earlier, the SAC does not plausibly allege that Woodward and Trump intended to be joint authors for purposes of The Trump Tapes.

Merkin owned a copyright interest in the raw film footage and in any final film. Merkin then

registered a copyright in the raw film footage as its sole author. Id. at 252-53. 16 Casa Duse later

sued Merkin seeking, inter alia, a declaration that (1) Merkin had no copyright interest in the final

film – for which plaintiff had retained a different editor; and (2) Merkin's copyright interest in

the raw film footage was invalid. Id. at 253.

   The Second Circuit held that – despite Merkin's highly significant creative

contributions as the film's director – he did not have a copyright interest in the completed film:

> We have never decided whether an individual's non-de minimis creative
> contributions to a work in which copyright protection subsists, such as a film, fall
> within the subject matter of copyright, when the contributions are inseparable
> from the work and the individual is neither the sole nor a joint author of the work
> and is not a party to a work-for-hire arrangement. See Thomson, 147 F.3d at 206
> (acknowledging open question and resolving case on alternative grounds). We
> answer that question in the negative on the facts of the present case, finding that
> the Copyright Act's terms, structure, and history support the conclusion that
> Merkin's contributions to the film do not themselves constitute a "work of
> authorship" amenable to copyright protection.

Id. at 256. The court went on to hold that "inseparable contributions integrated into a single

work cannot separately obtain [copyright] protection." Id. at 257.[15]

   Applying 16 Casa Duse here, the Court finds that Plaintiff "is neither the sole nor

a joint author of [The Trump Tapes] and is not a party to a work-for-hire arrangement." Id. at

256. The Court further finds that Plaintiff made non-de minimis contributions to The Trump

Tapes – which is "a work in which copyright protection subsists" – but that his "contributions are

inseparable from the work." Id. Because Plaintiff's "inseparable contributions [were] integrated

into a single work," they "cannot separately obtain [copyright] protection." Id. at 257.

---

[15] In so holding, the Second Circuit noted that that "[i]f copyright subsisted separately in each
. . . contribution[] to the completed film, the copyright in the film itself, which is recognized by
statute as a work of authorship, could be undermined by any number of individual claims." Id. at
258.

In reaching this result, the Court acknowledges that a series of interviews are quite different from the film at issue in <u>16 Casa Duse</u>.  The Court nonetheless views the question and answer interview format as something that – like the film in <u>16 Casa Duse</u> – must be viewed as a "unified work, rather than [as a series of] individual statements."  Amerine, 21 Marq. Intell. Prop. L. Rev. at 181.  Stripping out the answers from an interviewer's questions is not only inconsistent with the animating principles of the Copyright Act; it also ignores the fundamental reality that an interview is a unified, integrated work and not a collection of disjointed and unrelated random thoughts and phrases.[16]

Plaintiff's responses and Woodward's questions have "little or no independent meaning standing alone," <u>Childress</u>, 945 F.2d at 505, and thus the interviews reflecting their exchanges must be treated as what they are:  a unified, integrated work.  And because Plaintiff's contributions to that unified integrated work "are inseparable from the work," they "cannot separately obtain [copyright] protection."  <u>16 Casa Duse</u>, 791 F.3d at 257.

Plaintiff argues, however, that the Copyright Office – in its Compendium of U.S. Copyright Office Practices – has stated that when it receives a request to copyright an interview, it

> will assume that the interviewer and the interviewee own the copyright in their respective questions and responses unless (i) the work is claimed as a joint work, (ii) the applicant provides a transfer statement indicating that the interviewer or

---

[16]  Indeed, if Plaintiff's answers in <u>The Trump Tapes</u> are considered separate and apart from Woodward's questions, the result is often unintelligible gibberish.  To illustrate this point, the Court includes in the attached Appendix numerous examples of Plaintiffs' responses, first separately and then together with Woodward's questions.  This exercise reveals that it is Woodward's questions that make Plaintiff's answers intelligible.  Because an interviewer's questions are of little to no value absent the interviewee's answers, and because an interviewee's answers are frequently unintelligible absent the interviewer's questions, providing for the separate copyrightability of questions and answers in an interview setting is not rational, does not advance the purposes of copyright law, and ignores the reality that an interview must be considered as a unified whole.

43

> the interviewee transferred his or her rights to the copyright claimant, or (iii) the
> applicant indicates that the interview was created or commissioned as a work
> made for hire.

(Pltf. Opp. (Dkt. No. 77) at 20 (emphasis omitted) (quoting U.S. Copyright Office, Compendium

of U.S. Copyright Office Practices, 3rd ed. (2021) ("Compendium"), § 719)  According to

Plaintiff, this provision from the Compendium establishes as a "matter of law" that Plaintiff is

entitled to a copyright interest in his responses to Woodward's questions.  (Id. at 21; see also SAC

(Dkt. No. 70) at 2 n.2 (stating that Defendants have acted "in direct contravention of the law laid

out in the compendium of U.S. Copyright Office Practices"))

    As an initial matter, the Copyright Office's Compendium does not have the force

of law.

> [T]he Compendium "is the administrative manual of the Register of Copyrights
> concerning the Copyright Act and regulations promulgated thereunder."  It
> "provides instruction to agency staff regarding their statutory duties and provides
> expert guidance to copyright applicants, practitioners, scholars, the courts, and
> members of the general public regarding institutional practices and related
> principles of law."

Lieb v. Korangy Publ'g, Inc., No. CV 15-0040 (AYS), 2022 WL 1124850, at *9 (E.D.N.Y. Apr.

14, 2022) (quoting the Compendium at 1).  As the Compendium itself states, however, "[t]he

policies and practices set forth in the Compendium do not in themselves have the force and effect

of law and are not binding upon the Register of Copyrights or Copyright Office staff."

(Compendium at 2).

    The Supreme Court has instructed that "the Compendium is a non-binding

administrative manual that at most merits deference under [Skidmore].  That means we must

follow it only to the extent it has the 'power to persuade.'"  Georgia v. Public.Resource.Org., Inc.,

590 U.S. 255, 271 (2020) (quoting Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944)).  "The

weight of deference afforded to agency interpretations under Skidmore depends upon 'the

thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade.'" Univ. of Texas Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 360 (2013) (quoting Skidmore, 323 U.S. at 140).

Consistent with the Supreme Court's instruction in Public.Resource.Org, courts frequently diverge from guidance provided by the Copyright Office in the Compendium and other sources. See, e.g., Public.Resource.Org, 590 U.S. at 271 ("Because our precedents answer the question before us, we find any competing guidance in the Compendium unpersuasive."); Cartoon Network LP, LLLP v. CSC Holdings, Inc., 536 F.3d 121, 129 (2d Cir. 2008) (declining to defer to a Copyright Office report under Skidmore because "the Office's interpretation does not explain why Congress would include language in a definition if it intended courts to ignore that language"); Bartok v. Boosey & Hawkes, Inc., 523 F.2d 941, 946-47 (2d Cir. 1975) (finding that district judge had erred in relying on Copyright Office's definition of "'posthumous' as a 'work first published and copyrighted after the death of the author'"; noting that "the Copyright Office has no authority to give opinions or define legal terms and its interpretation on an issue never before decided should not be given controlling weight") (footnotes omitted); Muench Photography, Inc. v. Houghton Mifflin Harcourt Pub. Co., 712 F. Supp. 2d 84, 92-93 (S.D.N.Y. 2010) ("[T]he Court will not defer to the Copyright Office's interpretations of the Copyright Act . . . because the interpretations conflict with a plain reading of 17 U.S.C. § 409."), on reconsideration in part, No. 09-CV-2669 LAP, 2010 WL 3958841 (S.D.N.Y. Sept. 27, 2010); Pryimachenko v. Home Box Off., Inc., No. 23-CV-10034 (LAK) (RWL), 2025 WL 567988, at *5 n.7 (S.D.N.Y. Jan. 14, 2025) ("Here, the Court does not defer to the Compendium's explanation of 'publication,' . . . ."), report and recommendation adopted, No. 23-CV-10034 (LAK), 2025 WL 673473 (S.D.N.Y. Mar. 3, 2025); see also VHT, Inc. v. Zillow Grp., Inc., 69 F.4th 983, 991 (9th

Cir. 2023) (stating that the Compendium's "evolving stance" on whether "registering photographs as part of a photographic database . . . limit[s] the copyright owner's ability to seek certain remedies in an infringement action" has "no traction here").

      The Compendium excerpt cited by Plaintiff is not persuasive here, for a number of reasons. As an initial matter, the Compendium has not adjusted to developments in the law, in which courts – including the Second Circuit – have ruled that "inseparable contributions integrated into a single work cannot separately obtain [copyright] protection." 16 Casa Duse, 791 F.3d at 257; see also Garcia, 786 F.3d at 740-44 (rejecting actor's argument that she had a copyright interest in her performance in a film, which court found was a "single integrated work"). Second, as discussed above, courts have rejected the notion that an interviewee has a copyright interest in the answers he or she provides in an interview. Third, and for reasons also discussed above, the Copyright Office's instruction in the Compendium that copyright registration should be sought separately for questions and answers in an interview ignores the fact that an interviewer's questions and an interviewee's responses would "have little or no independent meaning standing alone," Childress, 945 F.2d at 505, because the work resulting from an interview is an inseparable, unitary whole.

      For all these reasons, the Court concludes that Plaintiff does not have a copyright interest in his stand-alone interview responses.

*    *    *    *

Because the SAC does not plausibly allege either that Plaintiff is a joint author of The Trump Tapes or otherwise has a copyright interest in The Trump Tapes, Defendants' motion to dismiss Plaintiff's request for declaratory relief (Count I of the SAC) will be granted.[17]

**B.    State Law Claims**

In addition to the declaratory judgment-copyright claim, the SAC asserts an unjust enrichment claim and request for an accounting as to all Defendants, and a breach of contract and breach of the implied covenant of good faith and fair dealing claim against Woodward. (SAC (Dkt. No. 70) ¶¶ 66-113)  In moving to dismiss the SAC, Defendants argue that Trump's state law claims are preempted by the Copyright Act, 17 U.S.C. § 301.[18]  (Def. Br. (Dkt. No. 73) at 34-36)  Defendants further argue that (1) the SAC's contract claim against Woodward fails, because the SAC does not allege that Woodward entered into a binding agreement with Trump not to use the interviews for purposes other than Rage; and (2) the SAC does not allege that Defendant Paramount engaged in any actionable conduct.  (Id. at 36-38)  Plaintiff counters, inter

---

[17]  Having concluded that Plaintiff is not a joint author of The Trump Tapes and does not hold a copyright interest in his responses to Woodward's questions, the Court does not reach Defendants' fair use and "government works doctrine" arguments.  (See Def. Br. (Dkt. No. 73) at 16-22, 30-32)  The Court notes, however, that both of these arguments are fact intensive and generally not appropriate for resolution on a motion to dismiss.  For example, Defendants' "government works doctrine" argument turns on whether Plaintiff was acting in his personal or official capacity when he participated in the interviews with Woodward.  That issue requires a "fact specific" approach that turns on "an objective analysis of 'content, form, and context' . . . ." Trump v. United States, 603 U.S. 593, 629 (2024) (quoting Snyder v. Phelps, 562 U.S. 443, 453 (2011)); see also Pub. Affs. Assocs., Inc. v. Rickover, 369 U.S. 111, 113-14 (1962) (in connection with motion to dismiss a declaratory judgment claim, refusing to address a government works doctrine issue where the circumstances of the preparation and delivery of the speeches at issue were only "sketchily summarized").  Similarly, "it is rarely appropriate for a court to make the fact-intensive determination of fair use at the motion to dismiss stage."  Bus. Casual Holdings, LLC v. TV-Novosti, No. 21-CV-2007 (JGK), 2022 WL 784049, at *3 (S.D.N.Y. Mar. 14, 2022).
[18]  Defendants also argue that the SAC's state law claims are preempted under the doctrine of "conflict preemption."  Defendants' conflict preemption point turns on their government works doctrine arguments (see Def. Br. (Dkt. No. 73) at 32-34), however, and – as stated above – this Court cannot resolve the government works doctrine arguments on a motion to dismiss.

alia, that contract and unjust enrichment law "gives President Trump protection beyond that provided by copyright law," and therefore these claims are not preempted.[19] (Pltf. Opp. (Dkt. No. 77) at 35-36).[20]

       For the reasons explained below, this Court concludes that the SAC's state law claims are preempted by the Copyright Act. Accordingly, Defendants' motion to dismiss the SAC's state law claims will be granted.[21]

_____

[19] Plaintiff does not specify in either the SAC or his opposition brief what state law he is relying on. In arguing that Plaintiff's state law claims are preempted by the Copyright Act, Defendants cite generally to New York law, except as to Plaintiff's breach of contract claim against Woodward. (See Def. Br. (Dkt. No. 73) at 35-36) As to the contract claim, Defendants say that District of Columbia law applies, as "supplemented by New York decisions." (See id. at 36 n.13) The Court concludes that the application of New York law to all the state law claims is appropriate here. Where parties have cited to the forum's law or are silent as to the choice of law issue, courts may apply the forum's law. See Cole v. John Wiley & Sons, Inc., No. 11 CIV. 2090 DF, 2012 WL 3133520, at *16 n.11 (S.D.N.Y. Aug. 1, 2012) (where "neither party offers any choice-of-law analysis . . . 'the Court may apply the law of the forum'") (quoting Global Switching Inc. v. Kasper, No. CV–06–412 (CPS), 2006 WL 1800001, at *11 n.10 (E.D.N.Y. June 29, 2006)); Motorola Credit Corp. v. Uzan, 388 F.3d 39, 61 (2d Cir. 2004) (where the parties' briefing assumes that the forum's law is applicable, that briefing constitutes "implied consent" "sufficient to establish choice of law.") (internal quotations omitted). As to the contract claim, Defendants have not argued that District of Columbia law differs from New York law in any material way. Accordingly, for purposes of the preemption analysis, this Court assumes that Plaintiff's state law claims are brought under New York law. See Johnson v. Priceline.com, Inc., 711 F.3d 271, 276 n.2 (2d Cir. 2013) ("[C]ourts sitting in diversity may properly rely on the forum state's law where neither party asserts that another jurisdiction's law meaningfully differs. . . ."); VTech Holdings, Ltd. v. Pricewaterhouse Coopers, LLP, 348 F. Supp. 2d 255, 262 n.48 (S.D.N.Y. 2004) ("The law of the forum state governs where, as here, neither party alleges that the law of a different state would control and differs from New York law.").

[20] In his opposition brief, Plaintiff states that he "previously dispensed with argument regarding [his] claim for [breach of the] implied covenant of good faith and fair dealing." (Pltf. Opp. (Dkt. No. 77) at 35 n.10) Plaintiff is alluding to his brief opposing Defendants' motion to dismiss the Amended Complaint, in which Plaintiff conceded "that, under New York law, there is no separate cause of action for breach of the implied covenant of good faith and fair dealing where breach of contract, based upon the same facts, is also pled." (Pltf. Opp (Dkt. No. 61) at 36 n.14 (internal quotations and citations omitted)) Given this concession, the SAC's good faith and fair dealing claim (Count VII) will be dismissed.

[21] The fact that this Court has concluded that Plaintiff has not pled a plausible copyright claim does not mean that his state law claims are not preempted by the Copyright Act. That is because "[t]he scope of copyright for preemption purposes . . . extends beyond the scope of available

1.      **Applicable Law**

Section 301 of the Copyright Act provides that "all legal or equitable rights that

are equivalent to any of the exclusive rights within the general scope of copyright . . . in works of

authorship that are fixed in a tangible medium of expression and come within the subject matter

of copyright . . . are governed exclusively by this title." 17 U.S.C. § 301.  The Second Circuit has

acknowledged that, in providing for broad preemption, Congress sought to "ensure a nationwide,

uniform federal copyright system, ousting the states from imposing any control of the area."  In

re Jackson, 972 F.3d 25, 42 (2d Cir. 2020).

Under In re Jackson, courts conduct a two-part analysis in determining whether a

state law claim is preempted under the Copyright Act, § 301.

Under the first prong of the analysis, a court "looks at the work that would be

affected by the plaintiff's exercise of a state-created right, and requires (as an essential element

of preemption) that the work 'come within the subject matter of copyright as specified by

sections 102 and 103.'"  Id. (quoting 17 U.S.C. § 301(a)).  Where "the work against which the

---

copyright protection."  Forest Park v. Universal TV Network, Inc., 683 F.3d 424, 429-30 (2d Cir. 2012); see also U.S. ex rel. Berge v. Bd. of Trs. of the Univ. of Alabama, 104 F.3d 1453, 1463 (4th Cir. 1997) ("[T]he shadow actually cast by the [Copyright] Act's preemption is notably broader than the wing of its protection.").  Accordingly, Plaintiff's state law claims may be preempted even where he does not possess a valid copyright interest in The Trump Tapes.  See, e.g., RBC Nice Bearings, Inc. v. Peer Bearing Co., 676 F. Supp. 2d 9, 34 n.8 (D. Conn. 2009) ("The fact that the Court has granted summary judgment [to defendant] on [p]laintiff's copyright claim does not preclude the preemption of [plaintiff's] state law claims."), aff'd, 410 F. App'x 362 (2d Cir. 2010); Greer v. Fox Corp., No. 20-CV-5484-LTS-SDA, 2022 WL 4093155, at *4 (S.D.N.Y. Sept. 7, 2022) (finding plaintiff's state law claims preempted where plaintiff did not possess a copyright registration), aff'd sub nom., Greer v. Fox News Media, No. 22-1970-CV, 2023 WL 2671796 (2d Cir. Mar. 29, 2023) (summary order); see also Elliot v. Cartagena, No. 19 CIV. 1998 (NRB), 2025 WL 486634, at *13 (S.D.N.Y. Feb. 13, 2025) (the Copyright Act "can preempt a state law claim even if the plaintiff did not bring [a copyright] infringement claim"); KTS Karaoke, Inc. v. Sony/ATV Music Publ'g LLC, No. CV1200014MWFJEMX, 2014 WL 12567169, at *7 (C.D. Cal. Jan. 14, 2014) (finding state law claim preempted by Copyright Act even though "[p]laintiffs do not claim [copyright] ownership").

plaintiff claims rights is a 'literary work[],' a 'musical work[],' a 'sound recording[], or any other category of 'work[] of authorship' within the 'subject matter of copyright' . . . the plaintiff's claim is subject to the possibility of statutory preemption." Id. at 42-43 (quoting 17 U.S.C. § 102(a)). In analyzing this prong, courts are to focus on "the gravamen of the claim and the allegations supporting it." Id. at 47.

 The second prong of the analysis – often referred to as the "equivalence" requirement – "looks at the right being asserted (over a work that comes within the 'subject matter of copyright') and requires (for preemption to apply) that the right be 'equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106.'" Id. at 43 (emphasis in Jackson) (quoting 17 U.S.C. § 301(a)). "[S]tate law rights are equivalent to those within copyright's general scope '[w]hen [those state law rights] may be abridged by an act which, in and of itself, would infringe one of the exclusive rights [provided in Section 106].'" Id. (first alteration added) (quoting Harper & Row Publishers, Inc. v. Nation Enterprises, 723 F.2d 195, 200 (2d Cir. 1983), rev'd on other grounds, 471 U.S. 539 (1985)). "'Conversely, when a state law violation is predicated upon an act incorporating elements beyond mere reproduction or the like, the rights involved are not equivalent and preemption will not occur.'" Id. (quoting Harper & Row, 723 F.2d at 200).

 The "critical inquiry" in connection with the second prong is whether the "extra elements of the state law claim beyond what is required for copyright infringement 'change[] the nature of the action so that it is qualitatively different from a copyright infringement claim.'" Id. at 43-44 (emphasis and alterations in Jackson) (quoting Comput. Assocs. Int'l., Inc. v. Altai, Inc., 982 F.2d 693, 716 (2d Cir. 1992)). "To determine whether a claim is qualitatively different, [courts] look at 'what [the] plaintiff seeks to protect, the theories in which the matter is thought

to be protected and the rights sought to be enforced.'" <u>Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.</u>, 373 F.3d 296, 306 (2d Cir. 2004) (second alteration in <u>Briarpatch</u>) (quoting <u>Comput. Assocs.</u>, 982 F.2d at 816). The Second Circuit has instructed courts to "take a restrictive view of what extra elements transform an otherwise equivalent claim into one that is qualitatively different from a copyright infringement claim." <u>Id.</u>

Where it "'is evident from the face of the complaint'" that a plaintiff's state law claims are preempted by the Copyright Act, dismissal of those claims is appropriate. <u>Ricci v. Teamsters Union Local 456</u>, 781 F.3d 25, 28 (2d Cir. 2015) (quoting <u>Klayman v. Zuckerberg</u>, 753 F.3d 1354, 1357 (D.C. Cir. 2014)).

### 2.    Analysis

There is no dispute here that <u>The Trump Tapes</u> "'come within the subject matter of copyright as specified by sections 102 and 103 [of the Copyright Act].'" <u>In re Jackson</u>, 972 F.3d at 42 (quoting 17 U.S.C. § 301(a)). The paperback and audiobook versions of <u>The Trump Tapes</u> "against which the plaintiff claims rights" are, respectively, "a 'literary work[]' [and] . . . a 'sound recording[],'" and fall "within the 'subject matter of copyright.'" Plaintiff's state law claims are thus "subject to the possibility of statutory preemption." <u>Id.</u> at 42-43 (quoting 17 U.S.C. § 102(a)).

The first prong of the preemption analysis is satisfied as to each of Plaintiff's state law claims because the gravamen of each claim is that Defendants have made wrongful use of the interview recordings, which is a matter "within the subject matter of copyright."

As to the second prong of the analysis – the "equivalence" requirement – the Court considers separately below each state law claim pled in the SAC.

a.     **Unjust Enrichment**

In the SAC's unjust enrichment claims against Woodward, Simon & Schuster, and Paramount, Plaintiff alleges that he "conferred a benefit" on Woodward by participating in the interviews and allowing them to be recorded for use in Rage, and that the interview recordings were subsequently "acqui[red]" by Simon & Schuster and Paramount. (SAC (Dkt. No. 70) ¶¶ 76, 85, 94) The SAC further alleges that each Defendant "accepted" this benefit and then "exploited" it to "enrich" themselves "without accounting to and compensating President Trump." (See id. ¶¶ 76-78 (Woodward); id. ¶¶ 85-87 (Simon & Schuster); id. ¶¶ 94-96 (Paramount))

"The basic elements of an unjust enrichment claim in New York require proof that (1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." Briarpatch Ltd., 373 F.3d at 306 (citing Clark v. Daby, 751 N.Y.S.2d 622, 623 (2002)). "While enrichment is not required for copyright infringement[,] . . . [the Second Circuit has ruled that that distinction does not go] far enough to make [an] unjust enrichment claim qualitatively different from a copyright infringement claim." Id.

Plaintiff argues, however, that his unjust enrichment claims require "a different analysis," and urges the Court to consider the "understanding of each of the participants when agreeing to being recorded, the legitimate expectations when the recording was made, the subsequent behavior of the defendants, whether they come to equity with clean hands, whether disgorgement is appropriate, [and] whether the defendants have the right to any offset in quantum meruit." (Pltf. Opp. (Dkt. No. 77) at 36)

As discussed above, however, the "critical inquiry" is whether the "extra elements" of the state law claim make it "qualitatively different" from a copyright infringement

claim.[22] Jackson, 972 F.3d at 43-44.  Under Briarpatch – which Plaintiff does not address in any

fashion – Plaintiff's unjust enrichment claims are not qualitatively different from a copyright

infringement claim, see Briarpatch, 373 F.3d at 306, and accordingly those claims are preempted

by the Copyright Act and will be dismissed.

### b.    Breach of Contract

In the SAC's breach of contract claim against Woodward, Plaintiff alleges that the

parties "agreed that the Interview Sound Recordings could be utilized only for the purposes of

writing a singular book[– that being Rage]."  (SAC (Dkt. No. 70) ¶ 102)  According to Plaintiff,

Woodward "agreed he had a limited license" to use the interview recordings.  (Id. ¶ 103; see also

id. ¶ 104 (alleging that Woodward "assented and agreed to the terms of the limitations in such

license"))  Plaintiff further alleges that he "performed and gave the requested [i]nterviews such

that Woodward could write a singular book."  (Id. ¶ 105)  But Woodward published the

audiobook and derivative works and thereby "breached the terms of the license."  (Id. ¶¶ 106-07)

The elements of a breach of contract claim under New York and District of

Columbia law are:  "(1) the existence of a contract between [the plaintiff] and th[e] defendant; (2)

performance of the plaintiff's obligations under the contract; (3) breach of the contract by th[e]

defendant; and (4) damages to the plaintiff caused by th[e] defendant's breach."  Diesel Props

S.r.l. v. Greystone Bus. Credit II LLC, 631 F.3d 42, 52 (2d Cir. 2011); see also Armenian

Assembly of Am., Inc. v. Cafesjian, 772 F. Supp. 2d 20, 123 (D.D.C. 2011) ("To prevail on a

breach of contract claim [under District of Columbia law], a party must demonstrate that a

---

[22]  The knowledge and intent issues raised by Plaintiff (see Pltf. Opp. (Dkt. No 77) at 36 (citing "the understanding of each of the participants" and their "legitimate expectations")) are not relevant to the analysis.  "An action will not be saved from preemption by elements such as awareness or intent, which 'alter the action's scope but not its nature[.]'"  Comput. Assocs., 982 F.2d at 717 (quoting Mayer v. Josiah Wedgwood & Sons, Ltd., 601 F. Supp. 1523, 1535 (S.D.N.Y. 1985)).

contract existed, that the party performed his contractual obligations, that the other party

breached the contract, and that the party suffered damages due to the breach.").

Generally speaking, "a contract that 'does not purport to give [the plaintiff] any

protection beyond that provided . . . by copyright law itself' would be preempted." Universal

Instruments Corp. v. Micro Sys. Eng'g, Inc., 924 F.3d 32, 49 (2d Cir. 2019) (alterations and

omissions in original) (quoting 5 Nimmer on Copyright § 19D.03[C][2][b]).  "Whether a breach

of contract claim is preempted depends on the precise nature of the contract right being

enforced." Red Apple Media, Inc. v. Batchelor, 729 F. Supp. 3d 350, 363 (S.D.N.Y. 2024).[23]  For

---

[23] There has been widespread "disagreement among the district courts in this Circuit about how [the] '[extra] elements' test applies to a breach of contract claim . . . ." Dow Jones & Co., Inc. v. Juwai Ltd., No. 21 Civ. 7284 (PKC), 2023 WL 2561588, at *7 (S.D.N.Y. Mar. 17, 2023).  Some courts have ruled that breach of contract claims are categorically exempt from Copyright Act preemption because there is a "promise inherent in every contract." BroadVision Inc. v. Gen. Elec. Co., No. 08 Civ. 1489 (WHP), 2008 WL 4684114, at *4 (S.D.N.Y. Oct. 15, 2008).  Other courts have rejected a categorical rule, instead holding that "'a breach of contract claim is preempted if it is merely based on allegations that the defendant did something that the copyright laws reserve exclusively to the plaintiff (such as unauthorized reproduction, performance, distribution, or display).'" Canal+ Image UK Ltd. v. Lutvak, 773 F. Supp. 2d 419, 443 (S.D.N.Y. 2011) (collecting cases) (quoting Am. Movie Classics Co. v. Turner Ent. Co., 922 F. Supp. 926, 931 (S.D.N.Y. 1996)).

In Universal Instruments Corp., however, the Second Circuit made clear that

> vindication of an exclusive right under the Copyright Act, read into a license by
> negative implication, is preempted by the Copyright Act.  See 3 Nimmer §
> 10.15[A] (noting that "use by the grantee without authority from the grantor" leads
> to the legal consequence "that the grantee's conduct may constitute copyright
> infringement").  In Kamakazi Music Corp. v. Robbins Music Corp., we held that a
> licensor's suit against a licensee whose license had expired was for copyright
> infringement, not breach of contract.  684 F.2d 228, 230 (2d Cir. 1982).  This
> rationale extends equally to a licensor whose use arguably exceeds the scope,
> rather than the duration, of a license.  See Marshall v. New Kids On The Block
> P'ship, 780 F. Supp. 1005, 1008-09 (S.D.N.Y. 1991).  Because this portion of
> Universal's breach of contract claim seeks solely to vindicate an exclusive right
> under the Copyright Act, it is preempted.  It thus fails as a matter of law. . . .

Universal Instruments Corp., 924 F.3d at 49.

example, a breach of contract claim is generally preempted where it seeks to "vindicate one of the rights protected by the Copyright Act (i.e., the right to distribute, reproduce, display, [etc.] the work)." Id.  "On the other hand, where a contract claim seeks to vindicate a right beyond those provided by Copyright law, such as a promise to pay, the claim is not preempted." Id.

Here, the SAC's contract claim against Woodward is preempted because it seeks only to vindicate rights protected by the Copyright Act.  The gravamen of the claim is that Woodward "distributed" the alleged protected work (Trump's responses to Woodward's interview questions) in violation of their agreement.  Woodward's challenged act – creating and distributing The Trump Tapes – "by itself, infringe[s] one of the exclusive rights provided by federal copyright law," such as "reproduction, adaptation, performance, distribution, or display." Briarpatch, 373 F.3d at 305.  In seeking to control the release and distribution of his interview responses, Plaintiff is seeking to vindicate a copyright interest in his interview responses. Accordingly, the alleged agreement between Plaintiff and Woodward does not give Plaintiff "protection beyond that provided . . . by copyright law itself." As a consequence, the contract claim is preempted as a matter of law.  Universal Instruments Corp., 924 F.3d at 49.

Plaintiff argues, however, that his and Woodward's agreement that the interviews would be used only for purposes of Rage means that the agreement "gives President Trump protection beyond that provided by copyright law," because it limited "Woodward['s] rights in the recordings as consideration for them being recorded at all."  (Pltf. Opp. (Dkt. No. 77) at 35-36)  In Universal Instruments Corp., however, the Second Circuit rejected the argument that exceeding the scope of a license entails an "extra element" that saves a breach of contract claim from preemption.  924 F.3d at 49.  There, plaintiff alleged that defendant had modified its source code, thereby exceeding the scope of the license reflected in the parties' agreement.  Id.  While

the "prohibition against modification" was not set forth in that agreement, it was "arguably implied[,] because copyright licenses are assumed not to permit those uses not expressly authorized." Id. (citing Gilliam v. Am. Broad. Cos., Inc., 538 F.2d 14, 20 (2d Cir. 1976)). Accordingly, the Second Circuit held that the plaintiff "necessarily [sought] to vindicate its exclusive rights under 17 U.S.C. § 106" through its breach of contract claim. As a result, that claim was preempted. Id. That the plaintiff and defendant were "in contractual privity [did] nothing to change the fact that vindication of an exclusive right under the Copyright Act, read into a license by negative implication, is preempted by the Copyright Act." Id. (citing 3 Nimmer § 10.15[A] ("use by the grantee without authority from the grantor" leads to the legal consequence "that the grantee's conduct may constitute copyright infringement")).

Here, as in Universal Instruments Corp., Plaintiff's claim that Woodward exceeded the scope of his limited license by releasing The Trump Tapes necessarily means that he is seeking to vindicate his rights under the Copyright Act. The nature of a copyright license is such that it is "assumed not to permit those uses not expressly authorized." Id. Accordingly, Trump's claim that Woodward's use of the recordings to produce The Trump Tapes exceeded the limited license he was granted is a claim that "seeks solely to vindicate an exclusive right under the Copyright Act. . . ." Id. Such a claim is not "qualitatively different" from a copyright claim and is therefore preempted. Jackson, 972 F.3d at 44 (emphasis in original).

Accordingly, Defendants' motion to dismiss the SAC's breach of contract claim against Woodward will be granted.

### c.     Accounting Claim

"To establish a claim for [an] accounting under New York law, a party must establish '(1) relations of a mutual and confidential nature; (2) money or property entrusted to the defendant imposing upon him a burden of accounting; (3) that there is no adequate legal remedy;

and (4) in some cases, a demand for an accounting and a refusal.'" Baiul v. NBC Sports, No. 15-cv-9920, 2016 WL 1587250, at *10 (S.D.N.Y. Apr. 19, 2016) (quoting Dayan Enters., Corp. v. Nautica Apparel, Inc., No. 03-cv-5706, 2003 WL 22832706, at *1 (S.D.N.Y. Nov. 26, 2003)). Numerous courts in this District have held that "claims for [an] accounting based on the defendant's alleged misappropriation and exploitation of a copyright work are preempted by the Copyright Act." Id.; see also, e.g., McKenzie-Morris v. V.P. Recs. Retail Outlet, Inc., No. 1:22-CV-1138-GHW, 2023 WL 5211054, *10-11 (S.D.N.Y. Aug. 13, 2023) (claim for an accounting preempted where it was based on defendants' alleged misappropriation and exploitation of copyrighted works); Gary Friedrich Enters., LLC v. Marvel Enters., Inc., 713 F. Supp. 2d 215, 233 (S.D.N.Y. 2010) (dismissing accounting claim as preempted by the Copyright Act); Weber v. Geffen Recs., 63 F. Supp. 2d 458, 463 (S.D.N.Y. 1999) (same).

Here, the SAC's accounting claim is premised on Defendants' alleged "intentional and continued exploitation of the Interview Sound Recordings, Audiobook, and Derivative Works . . . ." (SAC (Dkt. No. 70) ¶ 67) Because the accounting claim is "based on [Defendants'] alleged misappropriation and exploitation of . . . copyrighted work[s]," it is "preempted by the Copyright Act." Baiul, 2016 WL 1587250, at *10.

Accordingly, Defendants' motion to dismiss the SAC's claim for an accounting will be granted.

## III.    LEAVE TO AMEND

District courts have "broad discretion in determining whether to grant leave to amend . . . ." Gurary v. Winehouse, 235 F.3d 792, 801 (2d Cir. 2000). Leave to amend may properly be denied in cases of "'undue delay, bad faith, or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment,

etc.'" <u>Ruotolo v. City of N.Y.</u>, 514 F.3d 184, 191 (2d Cir. 2008) (quoting <u>Foman v. Davis</u>, 371 U.S. 178, 182 (1962)). "Where the possibility exists that [a] defect can be cured," leave to amend "should normally be granted" at least once. <u>Wright v. Ernst & Young LLP</u>, No. 97 CIV. 2189 (SAS), 1997 WL 563782, at *3 (S.D.N.Y. Sept. 10, 1997), <u>aff'd</u>, 152 F.3d 169 (2d Cir. 1998) (citing <u>Oliver Schs., Inc. v. Foley</u>, 930 F.2d 248, 253 (2d Cir. 1991)). Moreover, where a claim is dismissed on the grounds that it is "inadequate[ly] [pled]," there is "a strong preference for allowing plaintiffs to amend." <u>In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.</u>, No. 08 MDL 1963, 2011 WL 4072027, at *2 (S.D.N.Y. Sept. 13, 2011) (citing <u>Ronzani v. Sanofi S.A.</u>, 899 F.2d 195, 198 (2d Cir. 1990)). However, a court may dismiss without leave to amend where amendment would be "futile," because the amended claim would not survive a motion to dismiss. <u>Hutchison v. Deutsche Bank Sec. Inc.</u>, 647 F.3d 479, 491 (2d Cir. 2011).

While it appears unlikely that Plaintiff can adequately plead a plausible copyright interest in <u>The Trump Tapes</u> or any non-preempted state law claim, this Court cannot find at this stage that any amendment would be futile. Accordingly, leave to move to amend is granted. Any motion for leave to file a Third Amended Complaint will be filed by **August 18, 2025**, and will explain how the new pleading addresses the defects cited in this Opinion. The proposed Third Amended Complaint will be attached as an exhibit to the motion.

## CONCLUSION

For the reasons stated above, Defendants' motion to dismiss the Second Amended

Complaint is granted.  The Clerk of Court is directed to terminate the motion (Dkt. No. 72).

Dated: New York, New York
       July 18, 2025

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge

**APPENDIX**
**(Excerpts from <u>The Trump Tapes</u> Paperback)**

**Page 59:**

| Trump's Answers | Full Transcript |
|---|---|
| TRUMP: Yeah | BW: So, hard question, President Trump. |
| | TRUMP: Yeah |
| | BW: I understand we really came close to war. |
| TRUMP: Them? | TRUMP: Them? |
| | BW: With North Korea. |
| TRUMP: Very. | TRUMP: Very. |
| | BW: Pardon? |
| TRUMP: Much closer than anyone would know. | TRUMP: Much closer than anyone would know. |
| | BW: Yeah. I realize— |
| TRUMP: Much closer. | TRUMP: Much closer. |
| | BW: —one more ICBM test, and— |
| TRUMP: Much closer. You know. He knows it better than anybody. | TRUMP: Much closer. You know. He knows it better than anybody. |

**Page 72:**

| Trump's Answers | Full Transcript |
|---|---|
| | BW:  Okay, now, why do people love you? |
| TRUMP:  I don't know. | TRUMP:  I don't know. |
| | BW:  Why do they like— |
| TRUMP:  Because I'm real.  Because I love them. | TRUMP:  Because I'm real.  Because I love them. |
| | BW:  Here's my anecdotal—talked to people, and why are you for Trump?  And they'll say—one answer you get more than anything:  He's not politically correct.  They don't like political correctness. |
| TRUMP:  I don't think of it that way.  I don't think— | TRUMP:  I don't think of it that way.  I don't think— |
| | BW:  You think that's— |
| TRUMP:  They say I have the strongest base in the history of politics.  Remember the statement?  I could— | TRUMP:  They say I have the strongest base in the history of politics.  Remember the statement?  I could— |
| | BW:  Who said that? |
| TRUMP:  Everybody.  They say it now.  I don't think there's ever been a base like this.  And because I love them, they love me.  I mean it's just a great base. | TRUMP:  Everybody.  They say it now.  I don't think there's ever been a base like this.  And because I love them, they love me.  I mean it's just a great base. |

**Page 75:**

| Trump's Answers | Full Transcript |
|---|---|
| | BW:  This is an important moment in history, where they're going to impeach you, the House is going to impeach you— |
| TRUMP:  Yeah. | TRUMP:  Yeah. |
| | BW:  —and we're sitting in the Oval Office here.  And you are content, happy, proud. |
| TRUMP:  Sure. | TRUMP:  Sure. |
| | BW:  Any angst? |
| TRUMP:  No. | TRUMP:  No. |

**Page 84:**

| Trump's Answers | Full Transcript |
|---|---|
|  | BW: . . . Now, what do presidents do?  My final, bottom line on this, presidents are talent scouts. |
| TRUMP:  Well, to a certain extent. | TRUMP:  Well, to a certain extent. |
|  | BW:  That's your biggest job.  Pick— |
| TRUMP:  To a certain extent.  And we have a great Cabinet. | TRUMP:  To a certain extent.  And we have a great Cabinet. |
|  | BW:  Would you agree with that? |
| TRUMP:  Yes, very much so. | TRUMP:  Yes, very much so. |

**Page 90:**

| Trump's Answers | Full Transcript |
|---|---|
| | BW: —for the book, sir what's your relationship with Mitch McConnell? |
| TRUMP: Very good. | TRUMP: Very good. |
| | BW: Probably the most important relationship in Washington in the next couple of months, or maybe year. |
| TRUMP: So it's a very good relationship. And people are surprised, because we're sort of opposites. We've put in more judges—you know, judges at a record level. Record. We have every record, other than George Washington, who has a higher percentage. He had 100 percent, but he only had 16 judges. Okay? I'm going to be up to 167 judges. And it'll be 182 before normalization. | TRUMP: So it's a very good relationship. And people are surprised, because we're sort of opposites. We've put in more judges—you know, judges at a record level. Record. We have every record, other than George Washington, who has a higher percentage. He had 100 percent, but he only had 16 judges. Okay? I'm going to be up to 167 judges. And it'll be 182 before normalization. |
| | BW: Yes, you mentioned— |
| TRUMP: A hundred and eighty-two judges. | TRUMP: A hundred and eighty-two judges. |
| | BW: So what does McConnell say to you, President Trump, about what's going on on the Hill and what the Senate's going to do? |
| TRUMP: So we talk. You know, this is not a legal process, this is a political process. Right? | TRUMP: So we talk. You know, this is not a legal process, this is a political process. Right? |
| | BW: I've noticed. |

**Page 93:**

| Trump's Answers | Full Transcript |
|---|---|
| | BW: Okay. Here is my policy assumption in doing this book. Your predecessors, George W. Bush, Obama, didn't figure out how to deal with Kim. |
| TRUMP: They couldn't—they called him all the time. | TRUMP: They couldn't—they called him all the time. |
| | BW: And you came in—and this I need an answer to—you threw him the ultimate curveball. Other words, I'll meet with you. I'll treat you with respect. |
| TRUMP: But before I did that, Bob—there was never tougher rhetoric in the history of our country. | TRUMP: But before I did that, Bob—there was never tougher rhetoric in the history of our country. |
| | BW: I know. For the first year. You know, just blasting away at each other. |
| TRUMP: Blasting. Okay. Without that, it wouldn't have ever happened. | TRUMP: Blasting. Okay. Without that, it wouldn't have ever happened. |

**Page 106:**

| Trump's Answers | Full Transcript |
|---|---|
| | BW: Did Kim Jong Un, if I may ask this, did he say anything that was threatening? Because— |
| TRUMP: Not even a little bit. No. | TRUMP: Not even a little bit. No. |
| | BW: And you know he's getting these— |
| TRUMP: I just know he wasn't ready. | TRUMP: I just know he wasn't ready. |
| | BW: —eight-axle mobile missile launchers from China— |
| TRUMP: Yeah. | TRUMP: Yeah. |
| | BW: —that give him— |
| TRUMP: But China—look | TRUMP: But China—look |
| | BW: Why's China doing that? |
| TRUMP: I have a great relationship there. Well, because I'm breaking China's ass on trade. | TRUMP: I have a great relationship there. Well, because I'm breaking China's ass on trade. |

**Page 110:**

| Trump's Answers | Full Transcript |
|---|---|
|  | BW: But you're aware that the possibility he might shoot that missile— |
| TRUMP: There is a possibility, yeah. I think— | TRUMP: There is a possibility, yeah. I think— |
|  | BW: —drove the military crazy. Out at NORTHCOM, I mean, they have to—we talked about this last time—they delegate the presidential authority down to a two-start general to shoot down with an interceptor a missile— |
| TRUMP: They're always prepared. They have to be prepared. You have to be prepared. | TRUMP: They're always prepared. They have to be prepared. You have to be prepared. |
|  | BW: So they conduct—when it looked like a missile was coming up, they— |
| TRUMP: I don't think it happens. I don't think he wants to mess with us. I think he likes me, a lot. | TRUMP: I don't think it happens. I don't think he wants to mess with us. I think he likes me, a lot. |
|  | BW: Yeah. He could like you and still feel he's in a pinch. |
| TRUMP: Well, I know, but I don't—Look, you read the letters. | TRUMP: Well, I know, but I don't—Look, you read the letters. |

**Page 116:**

| Trump's Answers | Full Transcript |
|---|---|
|  | BW: You know they start counterintelligence investigations [*snaps fingers*]. Because, oh, we've got an anonymous phone call. |
| TRUMP: Yeah. | TRUMP: Yeah. |
|  | BW: And are you familiar with counterintelligence investigations? |
| TRUMP: A little bit. | TRUMP: A little bit. |
|  | BW: Do they brief you on them? |
| TRUMP: No. No. | TRUMP: No. No. |
|  | BW: Do you know all the— |
| TRUMP: Yeah, I get a lot of briefings, but— | TRUMP: Yeah, I get a lot of briefings, but— |

**Pages 119-20:**

| Trump's Answers | Full Transcript |
|---|---|
|  | BW: Do you think there's too much concentration of power in the presidency now? |
| TRUMP: No. | TRUMP: No. |
|  | BW: I'm astounded, going back—I've done nine presidents sir. |
| TRUMP: Right. | TRUMP: Right. |
|  | BW: And power grows, from Nixon to you. And I wonder is there too much power concentrated? |
| TRUMP: No. I think you have a lot of checks and balances. . . . | TRUMP: No. I think you have a lot of checks and balances. . . . |

**Page 141:**

| Trump's Answers | Full Transcript |
|---|---|
| | BW: But as you know, they can find things, they can dig things up. |
| TRUMP: Sure. | TRUMP: Sure. |
| | BW: And this went on for two years. |
| TRUMP: Two years and they had nothing. Well, I'll tell you— | TRUMP: Two years and they had nothing. Well, I'll tell you— |
| | BW: And the question is, when did you feel relief? And did you get some information— |
| TRUMP: I never felt relief. | TRUMP: I never felt relief. |
| | BW: Why? |
| TRUMP: I never felt relief. Because that was the way it was being played. They were dirty cops. | TRUMP: I never felt relief. Because that was the way it was being played. They were dirty cops. |
| | BW: So what Rosenstein said to Muller was, let me know if you find anything that shows coordination or conspiracy. It never came. |
| TRUMP: Yeah. | TRUMP: Yeah. |
| | BW: And he knew this earlier this year, before the report came out. He said he bulletproofed you for 2020, which is— |
| TRUMP: Big statement. | TRUMP: Big statement. |
| | BW: —pretty important bulletproofing. |
| TRUMP: That's a big statement. Now, that's a big statement. | TRUMP: That's a big statement. Now, that's a big statement. |
| | BW: Did you know that? |
| TRUMP: I didn't know that. No, I never heard that. | TRUMP: I didn't know that. No, I never heard that. |
| | BW: Have you talked to him since? |
| TRUMP: I have not. | TRUMP: I have not. |

**Page 147-48:**

| Trump's Answers | Full Transcript |
|---|---|
|  | BW:  . . . The question about the Syrian situation is, I've found, and my assistant, that you have what they call kind of a shadow system on the phone of calling people where the intel people don't know and it pisses them off.  Is that correct? |
| TRUMP:  I don't know if it pisses them off. | TRUMP:  I don't know if it pisses them off. |
|  | BW:  Okay, but you do have a shadow— |
| TRUMP:  But I get better intel the way I do it than I can ever get from other people. | TRUMP:  But I get better intel the way I do it than I can ever get from other people. |

**Page 149:**

| Trump's Answers | Full Transcript |
|---|---|
| | BW: Did you tell Erdogan, look, it's all yours, we're done, and then four days later you tweeted it and announced it? |
| TRUMP: No. No. Well, you saw the letter I wrote. Didn't you see the very strong— | TRUMP: No. No. Well, you saw the letter I wrote. Didn't you see the very strong— |
| | BW: Yes sir. [*laughs*] Very— |
| TRUMP: No, I didn't say that. | TRUMP: No, I didn't say that. |
| | BW: "Don't be a fool." |
| TRUMP: I said, don't do it, but we're leaving. But I don't think you should do it. | TRUMP: I said, don't do it, but we're leaving. But I don't think you should do it. |
| | BW: Yeah. But you do have a shadow communication system, that's correct? |
| TRUMP: He decided—well, no, I get along with world leaders. Excuse me, NATO. I just—you know I just raised $530 billion. | TRUMP: He decided—well, no, I get along with world leaders. Excuse me, NATO. I just—you know I just raised $530 billion. |
| | BW: Yes, sir. I know. |
| TRUMP: Which nobody in the newspapers write about. | TRUMP: Which nobody in the newspapers write about. |
| | BW: But you do have a shadow communication system. |
| TRUMP: I get along with people. I talk to people. Yeah, I mean, I do. | TRUMP: I get along with people. I talk to people. Yeah, I mean, I do. |

**Pages 191-92:**

| Trump's Answers | Full Transcript |
|---|---|
|  | BW: Let me go back to MBS and Saudi Arabia. What did you say to him? |
| TRUMP: Look. To me he will always say that he didn't do it. He says that to everybody, and frankly, I'm happy he says that. But he will say that to you, he will say that to Congress, and he will say that to everybody. He's never said he did it. | TRUMP: Look. To me he will always say that he didn't do it. He says that to everybody, and frankly, I'm happy he says that. But he will say that to you, he will say that to Congress, and he will say that to everybody. He's never said he did it. |
|  | BW: Do you believe that he did it? |
| TRUMP: No, he says that he didn't do it. | TRUMP: No, he says that he didn't do it. |

**Page 231:**

| Trump's Answers | Full Transcript |
|---|---|
|  | BW: Okay. So now tell me about the relationship with Fauci. You know, Fauci—as you now say you're a wartime president, and I think that's exactly right, by the way. |
| TRUMP: This is a war. | TRUMP: This is a war. |
|  | BW: This is a war. And he's in many ways your Eisenhower. |
| TRUMP: Well, he's a very good guy. He's done it before. He's a sharp guy. I think he's 79 years old. | TRUMP: Well, he's a very good guy. He's done it before. He's a sharp guy. I think he's 79 years old. |
|  | BW: Yes, he is. |
| TRUMP: Very good. | TRUMP: Very good. |
|  | BW: He's even older than you or me. |
| TRUMP: Well, when you compare him— listen, when you compare that to Biden, and when you compare it to a lot of the people we see, right—no, he's sharp. And he's doing a good job. He's a very dedicated guy. | TRUMP: Well, when you compare him— listen, when you compare that to Biden, and when you compare it to a lot of the people we see, right—no, he's sharp. And he's doing a good job. He's a very dedicated guy. |

**Pages 235-36:**

| Trump's Answers | Full Transcript |
|---|---|
| | BW: . . . Was there a moment in all of this, last two months, where you said to yourself, ah, this is the leadership test of a lifetime? |
| TRUMP: No. | TRUMP: No. |
| | BW: No? |
| TRUMP: I think it might be, but I don't think that. All I want to do is get it solved. There are many people that said that to me. They said, you're now a wartime president. | TRUMP: I think it might be, but I don't think that. All I want to do is get it solved. There are many people that said that to me. They said, you're now a wartime president. |

**Page 245:**

| Trump's Answers | Full Transcript |
|---|---|
| | BW: How's Pompeo? |
| TRUMP: Doing a very good job. Solid rock. | TRUMP: Doing a very good job. Solid rock. |
| | BW: What's his focus now? |
| TRUMP: Yeah, he's doing a good job. Smart guy. Number one in his class at West Point. | TRUMP: Yeah, he's doing a good job. Smart guy. Number one in his class at West Point. |
| | BW: Right. |
| TRUMP: Smart guy. Number one at Harvard, I understand. | TRUMP: Smart guy. Number one at Harvard, I understand. |
| | BW: What's his assignment now? |
| TRUMP: The world, you know. He's doing everything. We're having lots of different discussions about a lots of different things. He's a very good person. Good guy. Good, solid guy. | TRUMP: The world, you know. He's doing everything. We're having lots of different discussions about a lots of different things. He's a very good person. Good guy. Good, solid guy. |

**Page 251:**

| Trump's Answers | Full Transcript |
|---|---|
| | BW: How's Xi's Mood? Because they've been clobbered also. I understand from the intel that there's— |
| TRUMP: They've been clobbered far worse than you read. | TRUMP: They've been clobbered far worse than you read. |
| | BW: Yeah. And I understand that it shows in North Korea they're being clobbered too. |
| TRUMP: Like you wouldn't believe. | TRUMP: Like you wouldn't believe. |
| | BW: Yeah. |
| TRUMP: Oh, I got another letter from him by the way. | TRUMP: Oh, I got another letter from him by the way. |
| | BW: Oh, good. Well I've got those 29 letters— |
| TRUMP: I'll show you. Yeah. Very good letter. | TRUMP: I'll show you. Yeah. Very good letter. |
| | BW: —and we'll get that history right. |

**Page 261:**

| Trump's Answers | Full Transcript |
|---|---|
|  | BW: Okay.  The fourth area is the small business loans.  I know you said— |
| TRUMP:  That is going really well, Bob.  I mean, that—you know, I don't know if you saw.  It was opened on Friday. | TRUMP:  That is going really well, Bob.  I mean, that—you know, I don't know if you saw.  It was opened on Friday. |
|  | BW: I understand.  But some of the banks are not participating because they say that— |
| TRUMP:  Well, if they don't participate we're not going to be happy with them.  But Bank of America, JP Morgan Chase, they had to get their own stuff straightened out.  It had nothing to do with us. | TRUMP:  Well, if they don't participate we're not going to be happy with them.  But Bank of America, JP Morgan Chase, they had to get their own stuff straightened out.  It had nothing to do with us. |
|  | BW: They say the interest rate is too low and they're reluctant to participate in full. |
| TRUMP:  Well, didn't we sell $13 billion in one day? | TRUMP:  Well, didn't we sell $13 billion in one day? |
|  | BW:  Whatever it was, yes.  But the number has got to be up to, what, $300 billion.  $377. |
| TRUMP:  We're probably going to have to raise it, because we're going to need—which is a good thing not a bad thing.  No it's going out very fast, Bob.  And the banks are doing it.  And the biggest thing are the community banks are doing it.  You know? | TRUMP:  We're probably going to have to raise it, because we're going to need—which is a good thing not a bad thing.  No it's going out very fast, Bob.  And the banks are doing it.  And the biggest thing are the community banks are doing it.  You know? |

**Page 266:**

| Trump's Answers | Full Transcript |
|---|---|
| | BW: How about the small government Republicans who, you know, are real leery of all this spending of trillions of dollars? |
| TRUMP: Sure. But they're allowed to their views. I mean, you know, if I did that I wouldn't have closed the country. | TRUMP: Sure. But they're allowed to their views. I mean, you know, if I did that I wouldn't have closed the country. |
| | BW: Are they obstacles? |
| TRUMP: If I, you know, listened there I wouldn't have closed the country. | TRUMP: If I, you know, listened there I wouldn't have closed the country. |
| | BW: Okay. How about the intelligence agencies? How's Gina doing telling you what's going on in the world. |
| TRUMP: I meet with her every day, practically. Her or her people. | TRUMP: I meet with her every day, practically. Her or her people. |
| | COMMENTARY: I was asking Trump about his CIA Director Gina Haspel |
| | BW: And do you feel that you know what's going on in the world? |
| TRUMP: Better than any president's known in 30 years. | TRUMP: Better than any president's known in 30 years. |

**Page 317:**

| Trump's Answers | Full Transcript |
|---|---|
|  | BW: For the serious history of this, coming out in the fall, how's your relationship with Fauci? |
| TRUMP: Very good. No problem. No problem. | TRUMP: Very good. No problem. No problem. |
|  | BW: Okay? He's used— |
| TRUMP: Everybody said—look he's a Democrat, but we have a good—you see that. | TRUMP: Everybody said—look he's a Democrat, but we have a good—you see that. |
|  | BW: Yeah. |
| TRUMP: If there was a problem, he'd know about it. So would you. No, no problem. | TRUMP: If there was a problem, he'd know about it. So would you. No, no problem. |

**Page 318:**

| Trump's Answers | Full Transcript |
|---|---|
|  | BW: —your new national security advisor, O'Brien— |
| TRUMP: Right, well— | TRUMP: Right, well— |
|  | BW: —said to you on January 28, "Mr. President, this virus is going to be the biggest national security threat to your presidency." Do you remember that? |
| TRUMP: No. No. | TRUMP: No. No. |
|  | BW: You don't? |
| TRUMP: No, I don't. No, I don't. I'm sure if he said it—you know, I'm sure he said it. Nice guy. | TRUMP: No, I don't. No, I don't. I'm sure if he said it—you know, I'm sure he said it. Nice guy. |

**Page 330:**

| Trump's Answers | Full Transcript |
|---|---|
| | BW: . . . I want to get the, you know, what happened, step-by-step, in reaction to the George Floyd tape.  Did you see it? |
| TRUMP:  Yeah, I saw it.  It was terrible.  I thought it was a terrible thing.  I've said it— | TRUMP:  Yeah, I saw it.  It was terrible.  I thought it was a terrible thing.  I've said it— |
| | BW:  I know you have. |
| TRUMP:  During my speech.  My rocket speech on Saturday. | TRUMP:  During my speech.  My rocket speech on Saturday. |
| | BW:  Yes. |
| TRUMP:  Which you probably saw. | TRUMP:  Which you probably saw. |
| | BW:  Yeah.  Of course. |
| TRUMP:  I said it during my China speech on Friday.  And I said it the day before yesterday. | TRUMP:  I said it during my China speech on Friday.  And I said it the day before yesterday. |
| | BW:  Did you see it and, you know, watch the whole thing, or just parts of it? |
| TRUMP:  I got to watch—oh yeah, sure I got to watch it.  Everybody did.  All you need is a television, it was on. | TRUMP:  I got to watch—oh yeah, sure I got to watch it.  Everybody did.  All you need is a television, it was on. |

**Pages 335-36:**

| Trump's Answers | Full Transcript |
|---|---|
| | BW:  Well, we're going into the election. |
| TRUMP:  Very well-organized. | TRUMP:  Very well-organized. |
| | BW:  Everyone keeps asking, suppose it's a close election, and it's contested.  What are you going to do?  Everyone says Trump is going to stay in the White House if it's contested.  Have you thought— |
| TRUMP:  Well, I'm not—I—I don't want to even comment on that, Bob.  I don't want to comment on that at this time.  Hey, Bob, I got all these people.  I'll talk to you later on tonight.  Because I have to go because of the— | TRUMP:  Well, I'm not—I—I don't want to even comment on that, Bob.  I don't want to comment on that at this time.  Hey, Bob, I got all these people.  I'll talk to you later on tonight.  Because I have to go because of the— |

**Pages 341-42:**

| Trump's Answers | Full Transcript |
|---|---|
| | BW: Let me ask you this. I mean we share one thing in common. We're white, privileged who—my father was a lawyer and judge in Illinois. And we know what your dad did. And do you have any sense that that privilege has isolated and put you in a cave, to a certain extent, as it put me—and I think lots of white, privileged people—in a cave? And that we have to work our way out of it to understand the anger and the pain, particularly, Black people feel in this country? Do you see— |
| TRUMP: No. You really drank the Kool-Aid, didn't you? Just listen to you. Wow. No, I don't feel that at all. | TRUMP: No. You really drank the Kool-Aid, didn't you? Just listen to you. Wow. No, I don't feel that at all. |

**Pages 343-44:**

| Trump's Answers | Full Transcript |
|---|---|
| | BW: . . . But do you consider [slavery] an atrocity, do you consider— |
| TRUMP: Oh, absolutely. Slavery? Absolutely. | TRUMP: Oh, absolutely. Slavery? Absolutely. |
| | BW: And what's happened after, up to this day, that we do not have a system of equality and equal opportunity? |
| TRUMP: [*exhales*] Well— | TRUMP: [*exhales*] Well— |
| | BW: I'm pushing. |
| TRUMP: It's been going on for a hundred years, Bob. | TRUMP: It's been going on for a hundred years, Bob. |
| | BW: Sure, but— |
| TRUMP: It's been going on for a hundred years, plus. | TRUMP: It's been going on for a hundred years, plus. |
| | BW: Okay. You see what I'm asking. |
| TRUMP: I fully do. No, it's very fair. It's been going on for a hundred years plus. It's been going on for a long time. And we've made a lot of progress in a lot of different ways. And a lot of progress is being made as we speak. I mean right now. More than you would even think. But this has been going on for many, many years. Many, many years. | TRUMP: I fully do. No, it's very fair. It's been going on for a hundred years plus. It's been going on for a long time. And we've made a lot of progress in a lot of different ways. And a lot of progress is being made as we speak. I mean right now. More than you would even think. But this has been going on for many, many years. Many, many years. |

**Pages 363-64:**

| Trump's Answers | Full Transcript |
|---|---|
|  | BW:  Okay.  Suppose I had ten Black Lives Matter people here as a focus group. |
| TRUMP:  Okay. | TRUMP:  Okay. |
|  | BW:  And I said, here's President Trump.  And this is what President Trump wants to say to you about he can step out of his shoes. |
| TRUMP:  Right. | TRUMP:  Right. |
|  | BW:  To understand what life is like in your shoes.  And what are you going to say? |
| TRUMP:  Bob, I'm somebody that likes to get things done rather than talk. | TRUMP:  Bob, I'm somebody that likes to get things done rather than talk. |
|  | BW:  Okay. |
| TRUMP:  And what I would do is I would not say—I would not think of it the way I believe you would like me to thing of it— | TRUMP:  And what I would do is I would not say—I would not think of it the way I believe you would like me to thing of it— |
|  | BW:  No, I'm not—I don't like you one way or another.  Don't get me wrong.  [*crosstalk*] |
| TRUMP:  Rather, I would tell them what I've done. | TRUMP:  Rather, I would tell them what I've done. |

**Page 391:**

| Trump's Answers | Full Transcript |
|---|---|
|  | BW:  . . . But, you know, this is a genuine crisis.  And the question I have for this book is what have you learned about yourself? |
| TRUMP:  Well, I'm fighting on many fronts.  I'm fighting this, I was fighting the fake Russia, Russia, Russia thing, which that turned out to be a total fake.  You'll see that— | TRUMP:  Well, I'm fighting on many fronts.  I'm fighting this, I was fighting the fake Russia, Russia, Russia thing, which that turned out to be a total fake.  You'll see that— |
|  | BW:  I understand. |
| TRUMP:  —in a very short period of time.  We caught 'em spying on my campaign. | TRUMP:  —in a very short period of time.  We caught 'em spying on my campaign. |

**Page 411:**

| Trump's Answers | Full Transcript |
|---|---|
| TRUMP: What won't I like, Bob? | BW: . . . I mean, there are parts of the book you're not gonna like. And— |
| | TRUMP: What won't I like, Bob? |
| | BW: Well, it's tough times. The virus, as you repeatedly told me, and as you've said publicly, it's derailed things. And it's a big reality in people's lives, as you know. |
| TRUMP: You know the market's coming back very strong, you do know that. | TRUMP: You know the market's coming back very strong, you do know that. |
| | BW: Yes, of course. |