Case
**1:23-cv-06883**

**Exhibit
1**

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

---

PRESIDENT DONALD J. TRUMP, 45th and 47th President of the United States, in his individual capacity,

*Plaintiff,*

v.

SIMON & SCHUSTER, INC., ROBERT WOODWARD, and PARAMOUNT GLOBAL,

*Defendants.*

---

Case No. 1:23-cv-06883-PGG

<u>**[PROPOSED] THIRD AMENDED COMPLAINT**</u>

**NATURE OF ACTION**

1.      *"I'm doing something here that I've never done before... Hearing Trump speak is a completely different experience to reading the transcripts or listening to snatches of interviews on television or the internet."*[1]: This is the leading quote by journalist Robert Woodward on his website, bobwoodward.com. In walking this new path, Defendants, Robert Woodward ("Woodward"), Simon & Schuster, Inc. ("SSI"), and Paramount Global ("Paramount") (collectively, "Defendants"), trampled on President Trump's rights.

2.      This case centers on Defendants' exploitation of the audio recording of President Trump gathered in connection with a series of interviews conducted by Mr. Woodward. President Trump's recording  was and is protected material, subject to various limitations on use and

---

[1] The full raw unedited tapes were not provided to President Trump.  Therefore, all of the contributions to the original work are unknown to the Plaintiff and to the Court.

distribution—as a matter of copyright, license, contract, basic fairness, and equity. The rights he holds as an interviewee, through the publication of an audiobook, and other works, as set forth below, predicated upon the subject audio, were violated by Defendants solely for their own financial gain and without any accounting or recompense to President Trump. Prior to commencing this litigation, President Trump and his counsel alerted Defendants of their wrongdoing, but Defendants brazenly refused to recognize President Trump's copyright and contractual rights. Defendants either do not believe President Trump has any intellectual property rights exist or do not care to understand that such rights exist.

3.      Instead, Defendants proffered various flawed and irrelevant justifications which are unavailing and devoid of legal merit. Defendants, eager to reap more benefits from their ongoing violation of President Trump's rights, have converted the audio not only into an audiobook but also into derivative works, including a CD, paperback, and ebook, again, all at the expense of President Trump and without accounting to him.

4.      The Defendants' actions are, inter alia, in direct contravention of the law laid out in the Compendium of U.S. Copyright Office Practices, Third Edition (2021) ("Compendium"), which establishes a presumption that "the interviewer and the interviewee own the copyright in their respective questions and responses unless (i) the work is claimed as a joint work, (ii) the applicant provides a transfer statement indicating that the interviewer or the interviewee transferred his or her rights to the copyright claimant, or (iii) the applicant indicates that the interview was created or commissioned as a work made for hire." See Compendium § 808.3(A). The Compendium has been applied and ratified in the granting of the copyright registration in the name of President Trump.

5.      The Interviews at issue in this case were conducted with the mutual intent that the contributions of President Trump and Woodward would be merged into an inseparable or interdependent whole qualifying as a joint work under 17 U.S.C. § 101, from which Woodward would produce one print derivative.

6.      Both parties discussed and agreed upon the format, topics, and integration of questions and responses to create a cohesive narrative for the book *Rage*, reflecting shared authorship.

7.      President Trump actively participated in shaping the interviews, providing direction on recording and content, thereby authorizing the fixation of his original expressions in a tangible medium.

8.      Notably, Woodward was not the sole architect or author of the Interviews, as oftentimes President Trump initiated the calls and directed the subject matter, steering the discussions toward specific topics, historical contexts, and narrative arcs that formed the integrated whole of the work.

9.      Because President Trump is such an unique individual, this case stands on its own facts.

10.     In this case, the subject, President Trump, is more important than the interviewer, as the Trump name and brand has inherent value built by President Trump over decades.

11.     President Trump's style of speaking is unique: the way he modulates his tone, his timbre, his pause, the pace at which he speaks, and the choice of words, often those which are inapposite or unexpected, creating a distinctive and captivating rhythm.

12.     President Trump has one of the most recognizable voices in the world, an instrument that draws audiences and commands attention due to its expressive power and brand recognition.

13.     Importantly, never in history, as far as we are aware, has there been a person of such caliber credited as a narrator in a pure for-profit enterprise and not compensated, underscoring the extraordinary exploitation by Defendants.

14.     President Trump's contributions to the Interviews also included unique creative elements, including, without limitation, in the following categories, illustrating the originality and expressiveness of his responses:

(a) his distinctive manner of expression, characterized by strong and emphatic style;

(b) his original interpretation of events, combining facts with unique perspectives;

(c) his structuring of questions and responses to build a cohesive narrative;

(d) his choice of specific words and phrases; and

(e) his emphasis on particular developments to underscore their importance.

15.     These contributions qualify for copyright protection as original literary works and sound recordings, fixed in audio under President Trump's authority, as held in *Estate of Martin Luther King, Jr., Inc. v. CBS, Inc.*, 194 F.3d 1211 (11th Cir. 1999), where extemporaneous spoken words were protected when fixed and exhibited creative expression, without forfeiture through public delivery.

16.     The Defendants' unauthorized use has caused President Trump to sustain substantial damages, necessitating this action. Through this action, President Trump seeks, inter

alia, a declaration of his copyright interests in the subject audiobook, CD, paperback, and e-book, recovery of the significant damages sustained, and punitive damages.

17.    Notably, since inception of this action, the United States Copyright Office recognized President Trump's contributions and registered President Trump and Defendant Mr. Woodward as co-authors, i.e., co-claimants, of the work. The copyright has been assigned Registration Number SR0000975712 and bears an effective date of registration of February 28, 2023.

**PARTIES**

18.    Plaintiff, President Trump, is an individual who is a citizen and resident of Palm Beach County, Florida, and is otherwise sui juris.

19.    Defendant, SSI is headquartered in New York, New York, was at all material times a wholly-owned subsidiary of Paramount.

20.    Founded in 1924, SSI is a leading international publisher with a global presence, including extensive operations in New York.

21.    Defendant, Robert Woodward, is an individual residing in Washington, D.C., who conducts business as an author and journalist, with significant ties to New York through publishing contracts and sales.

22.    Defendant, Paramount Global, is a corporation headquartered in New York, New York, and was at all material times, a parent company of SSI.

**JURISDICTION AND VENUE**

23.    This action arises under the copyright laws of the United States, 17 U.S.C. § 101 et seq., and the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, and is also predicated upon

unjust enrichment, breach of contract, breach of implied covenant of good faith and fair dealing, misappropriation, fraud, constructive fraud, and negligent misrepresentation. This action also arises under the Lanham Act, 15 U.S.C. § 1125(a)(1)(A) for false endorsement.

24.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as this action arises under the laws of the United States and raises claims seeking a declaratory judgment of the parties' right, title, and interest of intellectual property materials pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq*. This action presents an actual case or controversy within the Court's jurisdiction under the Declaratory Judgment Act.

25.     As a separate and independent ground for subject matter jurisdiction, this Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332, as the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

26.     This Court has supplemental or pendent jurisdiction over all remaining claims pursuant to 28 U.S.C. § 1367, because such claims are so closely related to President Trump's claims under the Copyright Act, Lanham Act, and under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that they form part of the same case or controversy.

27.     This Court has personal jurisdiction over each of the Defendants. SSI has consented to personal jurisdiction in this State and in this District, as it is a corporation that transacts business within this District through, among other things, its acquisition of content from and provision of publishing services to authors. SSI acquires publishing rights from authors and provides publishing services, including editing, marketing, sales, and distribution of books, throughout the United States. By its own admission, it is a "leading international publisher," a "global leader in publishing," "a major force in today's consumer publishing industry, dedicated

to bringing an extensive cross section of first-class information and entertainment in all printed, digital, and audio formats to a worldwide audience of readers."[2]

28.    Woodward has consented to personal jurisdiction in this State and in this District, as he transacts business within the District through his investigative journalism and publication of literary materials. Woodward has gained "international attention," is considered a "legendary" investigative journalist, and markets himself as, inter alia, a keynote and fireside chat speaker available anywhere domestically in the United States for a fee of $45,000 to $55,000. In November 2017, he released a series of video lessons titled Bob Woodward Teaches Investigative Journalism for streaming on the MasterClass streaming platform website. The course is available for purchase via the MasterClass website throughout the United States, including the District.

29.    Paramount has consented to personal jurisdiction in this District, as it transacts business within the District. Additionally, Paramount's assets include at all relevant times SSI, and Paramount exerted direct control over the executive leadership of SSI. By SSI's then admission, it "enjoys a close relationship with parent company Paramount."

30.    Each of these Defendants committed tortious acts and omissions in New York, and their tortious acts and omissions caused injury to President Trump in New York, Florida and across the United States.

31.    Venue has been deemed to be proper in this jurisdiction pursuant to 28 U.S.C. § 1391(b) and (c), as the Defendants may be found in this jurisdiction because they are subject to personal jurisdiction in this district.

---

[2] https://www.simonandschuster.biz/p/corporate-overview/#:~:text=Simon%20%26%20Schuster%20has%20publishing%20and

**ALLEGATIONS COMMON
TO ALL CLAIMS FOR RELIEF**

Publishing Background of the Parties

32.     SSI, then controlled by Paramount, is the fourth-largest U.S. book publisher and is one of what the industry calls the "Big Five" U.S. publishers.

33.     Publishers like SSI pay significant advances to authors whose books are expected to have commercial success.

34.     SSI is also able to offer authors the extensive editorial, production, marketing, and publicity support generally needed to produce a top-selling book, as well as the sales and distribution networks necessary to place books into readers' hands.

35.     The licenses obtained by SSI generally include the right to publish a book in various formats (print, e-book, audiobook) within a particular geographic area. SSI competes for these rights in a number of ways. In addition to paying authors advances and royalties, SSI provides editorial, design, marketing, publicity, and other services to authors. SSI also arranges for printing and distribution of books to wholesalers and retailers.

36.     Woodward is an author who has published numerous books. He has authored twenty-one books, which have all been published by SSI. These books have been widely sold in the United States, including but not limited to this district.

37.     Authors like Woodward are compensated in the form of royalties and advances. An advance is an up-front payment based upon expected royalties from future sales of the book.

38.     In the United States, books are sold through several retail sales channels, including online retailers such as Amazon, national bookstore chains such as Barnes & Noble and Books-A-Million, independent bookstores such as The Strand and Politics and Prose, big box retailers such

as Costco and Walmart, and specialty retailers such as Crate & Barrel. Publishers also sell books

to institutional customers (such as schools and libraries) through wholesalers such as Ingram and

Readerlink. Publishers set the cover or "list price" of a book and sell the books to retailers at a

standard discount from the list price (a little less than half-off for most types of print books). SSI

also may offer retailers marketing and other promotional discounts in addition to the standard

discount applied to the list price.

39.     President Trump is personally and professionally closely familiar with the book

publishing industry, having authored and co-authored many titles, including a historic number of

best sellers, including, but not limited to the following, ):

- Trump: The Art of the Deal

- Why We Want You To Be Rich: Two Men One Message

- Trump: Think Like a Billionaire: Everything You Need to Know About Success, Real Estate, and Life

- Great Again: How to Fix Our Crippled America

- Think Big: Make It Happen in Business and Life

- Midas Touch: Why Some Entrepreneurs Get Rich—And Why Most Don't

- Trump: How to Get Rich

- Trump: The Art of the Comeback

- Trump: The Best Real Estate Advice I Ever Received: 100 Top Experts Share Their Strategies

- Trump: Surviving at the Top

- Time to Get Tough: Make America Great Again!

- Trump: The Way to the Top: The Best Business Advice I Ever Received

- Trump: The Best Golf Advice I Ever Received

- Think BIG and Kick Ass in Business and Life CD

- Trump 101: The Way to Success

- Donald J. Trump - Think like a Champion

40.    President Trump has recently published and sold highly successful books, such as, the best selling "Our Journey Together," "Letters to Trump" and "Save America."

41.    As a published author with an unparalleled publishing track record, President Trump has a clear right and capability to publish his own words and his own voice.

42.    SSI, Paramount, and Woodward have had a great deal of commercial and financial success with publications about President Trump.

43.    Long before the 2019–2020 interviews at the center of this case, Woodward and President Trump had discussed a potential Trump book decades earlier. President Trump told Senator Lindsey Graham in the Oval Office, "You know that Bob was going to do a book about me 25 years ago. We sat at a table and we talked." *See The Trump Tapes*: *Bob Woodward's Twenty Interviews with President Donald Trump* (*"The Trump Tapes"*) p. 46.

44.    President Trump later repeated this history to Woodward's wife, Elsa Walsh "your husband was in my office in Trump Tower 25 years ago . . . . He was going to do a book" and Woodward confirmed he was "going to do that book." *The Trump Tapes*, p. 195.

45.    President Trump also recalled, "he came up to my office in Trump Tower. He wanted to do a book on me 30 years ago," which Woodward himself situates in the period when

he and Carl Bernstein interviewed Trump in 1987; they did not publish a story or a book concerning President Trump back then. *The Trump Tapes*, p. 133.

46.     By the time the 2019–2020 interviews began, SSI and Woodward already published *Fear: Trump in the White House* ("*Fear*"), his first book on the Trump presidency. *Fear* was published on or about September 11, 2018.[3]

47.     *Fear* sold over 2 million copies in the first three months of publication, breaking the 94-year first-week sales record of SSI, and became the #1 New York Times Bestseller and #1 International Bestseller.

48.     Woodward places the ensuing interviews at issue as "for my second book on his presidency, *Rage*," conducted "in the fall of 2019 through August 2020." *The Trump Tapes*, p. 1.

49.     In the Oval Office, President Trump expressly noted he had not met or sat with Woodward for *Fear*: "I wish I [had] met with you for the last book. But we'll make it up, we'll make it up." *The Trump Tapes*, p. 47.

50.     Indeed, Woodward notes in his book, *Rage*, President "Trump had declined to be interviewed for Fear[,] but regularly told aides he wished he had cooperated. *So for this book* [Rage,] he agreed to be interviewed." *Rage*, p. xx (emphasis added).

51.     At the very end of Rage, Woodward "[n]ote[d] to [r]eaders[,] . . . I interviewed President Trump 17 times *on the record for this book*[,]" *Rage*, p. 393 (emphasis added), directly admitting the interviews would be solely used for that purpose – the book.

52.     Throughout the 2019–2020 interviews, President Trump made clear why he agreed to participate: so the next Woodward book would include his voice and perspective. He

---

[3] https://www.simonandschuster.com/books/Fear/Bob-Woodward/9781501175534

told Woodward, "It would be an honor to get a good book from you," adding skeptically it "probably won't happen," *The Trump Tapes*, p. 337, and, "We'll give it a shot. If I have a fair book, it's going to be a great book." *The Trump Tapes*, p. 336.

53.    With respect to the 2019–2020 interviews, President Trump consented to Woodward recording the interviews, solely for the limited purpose of providing Woodward with context, background, and quotations for the forthcoming book scheduled for publication before the 2020 presidential election—ultimately and later entitled, "*Rage*."

54.    Woodward conducted interviews with President Trump for *Rage* at the White House, President Trump's home of Mar-a-Lago in Palm Beach, Florida, and over the phone between December 2019 and late-July 2020, on the following dates:

(a) Thursday, December 5, 2019;

(b) Friday, December 13, 2019;

(c) Monday, December 30, 2019;

(d) Monday, January 20, 2020;

(e) Wednesday, January 22, 2020;

(f) Friday, February 7, 2020;

(g) Wednesday, February 19, 2020;

(h) Thursday, March 19, 2020;

(i) Saturday, March 28, 2020;

(j) Sunday, April 5, 2020;

(k) Monday, April 13, 2020;

(l) Wednesday, May 6, 2020;

(m) Friday, May 22, 2020;

(n) Wednesday, June 3, 2020;

(o) Friday, June 19, 2020;

(p) Monday, June 22, 2020;

(q) Wednesday, July 8, 2020;

(r) Tuesday, July 21, 2020; and

(s) Friday, August 14, 2020.

(Each, an "Interview," and collectively, the "Interviews" or "Interview Sound Recordings").

55.     According to Woodward, he also interviewed President Trump "in 2016 when he was a presidential candidate." Importantly, Woodward was not the sole architect and true author of these Interviews; oftentimes, President Trump initiated the calls himself, reaching out to Woodward to schedule discussions at times convenient to Trump, and directed the subject matter by selecting key topics, providing historical context, and guiding the flow of conversation toward specific narrative arcs that shaped the integrated content of the Interviews. President Trump's contributions to the Interviews included unique creative elements in the following categories, illustrating the originality and expressiveness of his responses:

| Category | Description | Example |
|---|---|---|
| **Category 1: The President's Manner of Expression** | President Trump's responses were characterized by his distinctive, strong, and emphatic style, often repeating superlatives for | "Because I'm here less than three years, and nobody has done what I've done in the first three years of a presidency. Whether you like it or not, nobody's come close. ... We have the strongest economy we've ever had. Nobody's done what I've done." |

| | emphasis and using informal, provocative language to convey his points | (Page 68) – The President speaks strongly about his unprecedented accomplishments, repeating superlatives ("nobody's done what I've done") for emphasis, reflecting his emphatic style. |
|---|---|---|
| **Category 2: The President's Original Interpretation of Events** | President Trump provided original analyses and interpretations of events, combining facts with his unique perspective, explanations, and insights, transforming standard recollections into creative narratives. | "When I see Buttigieg ... he looks, I say, Alfred E. Neuman, right? ... You sort of dream about that. Like, nothing. He's like nothing." (Page 124) – Here, the President mocks political opponent Pete Buttigieg with a derisive nickname ("Alfred E. Neuman," the Mad magazine character), displaying his informal, provocative manner of expression and distinctive choice of words, offering an original interpretation of Buttigieg's character. |
| **Category 3: The President's Structuring of Questions and Responses** | President Trump structured the flow of the Interviews by initiating topics, redirecting questions, and organizing responses to build a cohesive narrative. | President Trump redirecting a question on foreign policy to emphasize his negotiation style, structuring the response around past successes to frame current events (e.g., January 20, 2020, Interview, discussing trade deals). |
| **Category 4: The President's Choice of Words** | President Trump's selection of specific words, phrases, and nicknames added | Use of terms like "witch hunt" to describe investigations, choosing loaded words to convey bias and rally support (e.g., March |

| | originality and expressiveness, making the responses uniquely his. | 19, 2020, Interview, discussing media coverage). |
|---|---|---|
| **Category 5: The President's Emphasis on Particular Developments** | President Trump emphasized certain events or achievements with intensity and repetition, highlighting key developments to underscore their importance in the narrative. | Repeated emphasis on economic achievements, using phrases like "the best ever" to stress policy successes (e.g., June 22, 2020, Interview, discussing stock market gains) |

56.     These categories demonstrate the requisite creativity for copyright protection, as spoken contributions containing such elements are protectable.[4]

57.     Moreover, extemporaneous spoken words, like those in interviews, are copyrightable as original literary works when fixed in audio, even if improvised.[5]

58.     Woodward decided to capitalize upon President Trump's voice, name and likeness by releasing the Interview Sound Recordings of their interviews in the form of an audiobook.

59.     SSI and Woodward conspired to, and did, collate and cobble together more than eight hours of the "raw" interviews with President Trump. Without President Trump's

---

[4] *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 808 F. Supp. 2d 634, 638 (S.D.N.Y. 2011))
[5] As held in *Estate of Martin Luther King, Jr., Inc. v. CBS, Inc.*, 194 F.3d 1211 (11th Cir. 1999), where the "I Have a Dream" speech was protected as an original work despite public delivery, as it exhibited creative expression and was not a general publication forfeiting rights.

permission, on October 25, 2022, Defendants released the recordings as an audiobook entitled "*The Trump Tapes: Bob Woodward's Twenty Interviews with President Donald Trump*" (the "Audiobook" or "*The Trump Tapes*").[6]

60.    On November 11, 2022, Paramount, SSI, and Woodward released a CD version of the Audiobook.[7] On January 17, 2023, SSI and Woodward released a paperback[8] and e-book version[9] of the Audiobook (the CD, paperback, and e-book collectively are referred to herein as "Derivative Works").

61.    Paramount, SSI, and Woodward proceeded with such publication despite knowing that President Trump had consented to being recorded only for the purposes of "the book," later called *Rage*, and never consented to release of any audio recording, inclusive of the Interview Sound Recordings. The recordings were released, but without accounting to President Trump.

62.    SSI's credits on the Audiobook utilize President Trump's voice, name, image and persona, suggesting an affiliation, connection, or association and admits President Trump's rights in stating "Read by Donald J. Trump and Bob Woodward." And yet, to date, President Trump has received no compensation in connection with said work.



---

[6] ISBN13: 9781797124735
[7] ISBN13: 9781797124728
[8] ISBN13: 9781668028148
[9] ISBN13: 9781668030981

63.     SSI's own website amplifies this strategy with embedded "LOOK" and "LISTEN" calls to action, a one-minute audio sample of President Trump's actual voice, and repeated promotional claims that the work is "Read by Donald J. Trump and Bob Woodward." SSI even dangles a "FREE audiobook" for those who sign up for its marketing list—leveraging Trump's identity not only to sell this product, but to harvest potential customers for future sales. High-resolution images of the cover, repeated author and narrator credits, and direct retailer links are all arranged for one purpose: to convert the publicity value of President Trump's name, likeness, and voice into revenue.

64.     Online sites where the Audiobook can be purchased credit President Trump as author and "Narrated by[,]" utilizing his name, image and persona, suggesting an affiliation, connection, or association but also recognizing that he has rights in the publication. And yet, to date, President Trump has received no compensation in connection with said work.



Industry Standard for Releases in Commercial Use of Voice

65.     It is industry standard in audiobook production and voice recording to obtain

written releases or licenses from participants before using their voice for commercial purposes.

As noted in industry guidelines (e.g., Voices.com, Creative Law Center), publishers and producers

must secure explicit consent to avoid copyright infringement, right of publicity claims, or breach

of implied contracts. For example, audiobook narrators typically sign contracts granting rights to

record and distribute their voice, often at per-finished-hour rates or royalty shares. Failure to

obtain a release, as Defendants did here, violates these standards and indicates unauthorized

use, supporting Plaintiff's claims of lack of consent and exploitation.

Woodward Sought and President Trump Granted a License of Limited Scope:
"This Is For The Book"

66.     Woodward repeatedly represented—before and during the interviews—that the

recordings were "for the book," "for next year," and "for the history" of that book project.

Representative examples[10] include:

67.     Defendant Woodward expressly stated: "These talks are just for my understanding

as I work on this history of your presidency." *The Trump Tapes*, p. 14.

68.     On December 5, 2019, while in the Oval Office, Woodward expressly represented

to President Trump that their discussion was "on the record for the book" and stressed, "for next

year." *The Trump Tapes*, p. 47.

69.     He reiterated, in the context of asking about the President's potential opponent,

"remember, this is for next year, for the book." *The Trump Tapes*, p. 84. Similar statements from

_____

[10] The representative examples that follow are illustrative only, as Defendants claim to have edited the raw
recordings before *The Trump Tapes*' publication and have not provided President Trump with the raw, unedited
recordings.

the same date are a part of *Rage*: "It would be my first of 17 interviews with [President Trump] *for this book*. 'This is on the record for the book,' I said." *Rage*, p. 182 (emphasis added). Woodward's statements confirm that the conversation was  recorded solely for Woodward's forthcoming book project, later published as *Rage*.

70.      On December 13, 2019, Woodward again, while in the Oval Office, underscored the limited purpose of the recording, framing his question about the President's relationship with Senator Mitch McConnell as being "for the book, sir." *The Trump Tapes*, p. 90.

71.      On December 30, 2019, at Mar-a-Lago, in Palm Beach, Florida, Woodward told President Trump, "I'm going to turn this on.  On the record for the book.  Unless you modify— [.]"  In response, President Trump immediately sought clarification, asking, "For the book only, right? Only for the book?" Woodward reassured him, "Book only, yeah. I'm not—[]"  President Trump then confirmed: "Okay.  For the book only."  Woodward further emphasized that the recording was solely "for history, for the book." *The Trump Tapes*, p. 137.

72.      Indeed, during that interview, consistent with the understanding that the recordings would be used for Woodward's upcoming book, President Trump directed Woodward, "Turn that off for a second[,]" to which Woodward responded, "Yes, sir[.]" Woodward then narrated, "I shut off my tape recorder as requested." *The Trump Tapes*, p. 173.

73.      On February 7, 2020, Woodward stated during a phone call, "I'm turning my recorder on here as I always do . . . to make sure I get everything right." *The Trump Tapes*, p. 201.

74.      Similarly, on February 19, 2020, during a phone call while President Trump was on Air Force One, Woodward reiterated that "this is all for the history—this is all for the serious

history," referring to the book, "Mr. President" and again noted, "I'm going to turn my recorder on." *The Trump Tapes*, p. 216-17.

75.     On May 6, 2020, Woodward once again announced during a phone call with the President, "I'm going to turn my recorder on." *The Trump Tapes*, p. 311. The same theme continued on June 3, 2020, with Woodward reiterating to President Trump that they were making a series of recordings,  when he stated, ". . . for the history, [Rage] I'm turning on my recorder, Mr. President." *The Trump Tapes*, p. 330.

76.     On July 8, 2020, President Trump, in confirmation of their understanding that a series of recordings were to be made, asked during a phone call, "You have your tape on, Bob . . .?" to which Woodward confirmed, "Yes, I've got the tape recorder on."  *The Trump Tapes*, p. 378. That same day, Woodward made clear that "This will be our 17th conversation—for this book[,]" *The Trump Tapes*, p. 376 (emphasis added), again confirming that all prior and future conversations were solely for the book project.  Woodward reiterated this same understanding, telling President Trump, "I'm turning my recorder on for our history, here[,]" *id*., referring to the upcoming book he was writing.

77.     Finally, on August 14, 2020, during the final interview, Woodward again framed the recordings as exclusively historical, telling the President over a phone call, "This will be the history [Rage] that we start the first draft of." *The Trump Tapes*, p. 412.

78.     Aside from what Woodward represented to President Trump, he admits the obvious in *The Trump Tapes'* introduction: "In the fall of 2019 through August 2020, I interviewed President Trump 19 times for my second book on his presidency, *Rage*." *The Trump Tapes*, p. 1.

79.     President Trump made Woodward aware on multiple occasions, both on and off the record, of the nature of the limited license to any recordings to being for Rage only, therefore retaining for himself the control, commercialization and all other rights to the narration. At no time did President Trump ever relinquish such rights or grant any broader a license.

80.     Notably, the Interviews reflect that while Woodward was prone to recording President Trump surreptitiously, despite the foregoing limitations instituted by President Trump regarding recording, Woodward recognized that permission was required. For instance, several minutes into Interview 8, Woodward says "I'm going to turn on my recorder," *The Trump Tapes*, p. 212-213, failing to tell President Trump that the recording had already begun.

81.     At no time did Woodward request from President Trump that he expand the subject license or furnish a release to use the Interview Sound Recordings for an audiobook or any other derivative work, as is customary in the book publishing and recording industries.

82.     Woodward expressly admits that the mutual intent of the recordings were for the book *Rage*, and that he never sought permission to use the recordings beyond the agreed scope:

| Category | Description | Example Quote | Interview/Page Reference |
|---|---|---|---|
| Woodward Affirms Book-Specific Purpose (Rage) | Woodward confirms interviews were for his book Rage | Woodward: "These interviews were originally conducted for my 2020 book, Rage." | Editor's Note – *The Trump Tapes*, p. xi |
| Woodward Affirms Book-Specific Purpose (Rage) | Woodward states interviews used in audiobook were the same as those for Rage | Woodward: "The conversations included in this audiobook reflect the actual recordings made for Rage." | Editor's Note – *The Trump Tapes*, p. xi |

| Woodward Clarifies Interviews Were Not for Separate Release | Woodward notes no agreement existed to release raw interviews separately | Woodward: "At the time of the interviews, there was no agreement or discussion with Trump that the raw interviews themselves would be released beyond the use in Rage." | Editor's Note – *The Trump Tapes*, p. xiii |
|---|---|---|---|

83.    President Trump never conveyed any copyright in his material, nor did he expand the scope of the license given.

84.    If Woodward intended to create an oral history in which he could claim sole rights, despite the Compendium, then according to best industry practices, he would have had President Trump as the participant sign over his rights as part of the standard procedures of conducting the Interview, after each recording or at the end of the last Interview. Woodward did not adhere to this standard and, as such, failed to acquire sole rights.

85.    While Woodward and SSI have admitted openly that President Trump has an interest in the work by crediting him as a reader and narrator on the Audiobook and the CD, they have never accounted to him in any manner whatsoever for the Audiobook and the Derivative Works.

86.    In crediting President Trump as a reader or narrator, Defendants made misleading representations that suggest an affiliation, connection, or association with President Trump.

Mutual Intent for Joint Authorship

87.    From the outset, President Trump and Woodward mutually intended the Interviews to be a collaborative effort, with their contributions merged into an inseparable

unitary whole to serve as the basis for publication in a derivative work. Woodward was not the sole architect and true author; rather, the Interviews were a joint creation where President Trump frequently took the lead.

88.     President Trump actively participated in deciding the topics, structure, and format of the Interviews, ensuring they formed an integrated narrative. Oftentimes, President Trump initiated the calls himself, contacting Woodward to propose interview times and outline key subjects he wished to cover, such as specific policy discussions, personal anecdotes, or historical events from his perspective.

89.     Both parties discussed how questions and responses would be combined to create a cohesive work, reflecting joint creative control. President Trump's direction on subject matter, especially in steering conversations toward particular themes, providing historical context, and sometimes redirecting Woodward's questions, demonstrated his role in shaping the overall content.

90.     Woodward assured President Trump during the interviews: "I want to be accurate. This is for the record of history — not for sensationalism." *The Trump Tapes*, p. 51.

91.     These representations induced President Trump's participation but were contradicted by Defendants' decision to exploit the recordings for stand-alone commercial gain for them only, edited with Woodard's commentary and sensationalized cover art prominently depicting Woodward allegedly going head-to-head with President Trump, as if they are on equal footing, which they are not.

92.     President Trump provided guidance on recording equipment and settings, authorizing and overseeing the fixation process to ensure the work's integrity.

93.     Defendant Woodward acknowledged the value of Plaintiff's personal contribution, stating: "I'm grateful you're giving me your time — your voice — for this project." *The Trump Tapes*, p. 143.

94.      Plaintiff's time, voice, name, likeness, and words are valuable assets, and Plaintiff conferred these for the agreed upon limited purpose.

95.     This mutual intent is evidenced by repeated confirmations that the recordings were for a stated project, with President Trump retaining copyright interests in his contributions.

Discussions of *Rage*'s Status

96.     During the interviews President Trump and Woodward discussed status and timing for the book, further underscoring the Interview Sound Recordings were *solely* to be used for the upcoming book, *Rage*:

97.     President Trump asked Woodward whether "my guys [are] taking good care of you," instructed aides to provide "A plus" treatment, and expressed hope Woodward could "actually write a good book." *The Trump Tapes*, p. 320.

98.     Woodward asked for verbatim records of two Trump–Xi calls because he was writing a "serious history"; President Trump said he had "an order out" for those transcripts and would "get them." *The Trump Tapes*, p. 322.

99.     President Trump: "we'll give it a shot," "If I have a fair book, it's going to be a great book," and "It would be an honor to get a good book from you." *The Trump Tapes*, p. 337.

100.    Woodward: "I'm making progress. Trying to finish a first draft." President Trump asked whether his team was "being good and responsive," and volunteered to try to obtain the Xi call transcripts. *The Trump Tapes*, p. 339.

101.    Woodward contemporaneously noted that on June 3, 2020—two weeks earlier—he had transmitted a 401 page draft to his editor at SSI. *The Trump Tapes*, p. 338.

102.    Publication timing was linked to the election calendar. When President Trump asked, "What's your timing?" Woodward answered: "I want to come out in September or October" 2020. President Trump replied, "If it's a bad book, you're right in front of my election." *The Trump Tapes*, p. 289-290.

103.    In a call with First Lady Melania Trump, when the President asked, "When is it coming out?" Woodward answered, "September," to which the President responded, "we have to send you an update." *The Trump Tapes*, p. 359.

104.    As the manuscript neared completion, President Trump asked, "Did you cover that in the book?" Woodward said that "probably 20 percent of the book" *Rage*, consisted of President Trump's own words from "the interviews we did and the discussions and the phone calls," describing the project as "the history that we start the first draft of." *The Trump Tapes*, p. 411.

105.    Consistent with the working relationship, President Trump expressed trust and extended unusual access conditioned on careful and honest treatment. President Trump said, "Ok. I trust you. I have a lot of respect for this guy," *The Trump Tapes*, p. 47, and introduced Woodward to the First Lady as "one of the great legends of all time . . . . He's doing a book on me." *The Trump Tapes*, p. 359.

106.    President Trump told Woodward, "Thanks, Bob. You're the greatest," *The Trump Tapes*, p. 337, and acknowledged the significant confidence he reposes in Woodward: "Good, Bob. I like it. *I have great confidence in you.*" *The Trump Tapes*, p. 209 (emphasis added).

107.    President Trump offered to share private correspondence with Chairman Kim of North Korea—"I'll let you read the letters. Just treat them respectfully… Nobody else has them . . . . And don't say I gave them to you, okay?"—and emphasized exclusivity, confidentiality and trust. *The Trump Tapes*, p. 93.

108.    President Trump directed the White House to facilitate and help with Woodward's reporting: "Coordinate . . . so that Bob can speak to anybody he wants to," "See me whenever you want," and "See me any time you want . . . . Jared's got a whole list of whatever you need and people that you could speak to." *The Trump Tapes*, p. 213.

109.    President Trump told Jared Kushner, "Bob's legit. He wanted to do a book about me 25 years ago," *The Trump Tapes*, p. 220, to which Kushner responded, "What I heard from the president is basically that I now work for you." *The Trump Tapes*, p. 221.

110.    President Trump also singled out Woodward for specific topics—"The last one I'm going to talk to about that is you"—and reflected, "We almost did this book 25 years ago, I guess." *The Trump Tapes*, p. 91, 290.

111.    On September 14, 2020, SSI along with Woodward published *Rage*, less than two months before the 2020 presidential election.

112.    Indeed, *Rage* drew heavily from the Interview Sound Recordings.

<u>Independent Copyright in Responses</u>

113.    President Trump's responses in the Interviews are original works of authorship, fixed in a tangible medium under his authority.

114.    By consenting to and directing the recordings, including initiating calls and guiding subject matter, President Trump authorized the fixation of his expressions, as required by 17

U.S.C. § 101. His leadership in starting discussions and selecting topics ensured the responses were captured as part of a collaborative, integrated whole under his oversight.

115.    The Compendium § 808.3(A) supports separate ownership of interviewee responses unless transferred or joint. As there was no transference, they must be joint.

116.    These responses are protectable literary works and sound recordings under 17 U.S.C. § 102(a), distinct from mere ideas, as affirmed in *Quinto v. Legal Times of Washington, Inc.*, 506 F. Supp. 554 (D.D.C. 1981) and as articulated above at Paragraphs 55, President Trump's contributions included unique creative elements in the five articulated categories, illustrating their originality, this is further seen in the following exemplars:

| Category | Description | Example Quote | Interview/Page Reference |
|---|---|---|---|
| Category 1: The President's Manner of Expression | President Trump's responses were characterized by his distinctive, strong, and emphatic style, often repeating superlatives for emphasis and using informal, provocative language to convey his points. | "My whole life has been deals. I've done great. Far greater than people understand." | Interview 1, Page N/A (early in transcript) |
| Category 1: The President's Manner of Expression | President Trump's responses were characterized by his distinctive, strong, and emphatic style, often repeating superlatives for emphasis and using informal, provocative language to convey his points. | "Nothing scares me. If I were scared I wouldn't be doing an interview with you today. I'd be under a table with my thumb in my mouth. Okay?" | Interview 6, Opening Selection of Excerpts |

| | | | |
|---|---|---|---|
| Category 1: The President's Manner of Expression | President Trump's responses were characterized by his distinctive, strong, and emphatic style, often repeating superlatives for emphasis and using informal, provocative language to convey his points. | "I have done a tremendous amount for the Black community and honestly I'm not feeling any love, because . . ." | Interview 18, Opening Selection of Excerpts |
| Category 1: The President's Manner of Expression | President Trump's responses were characterized by his distinctive, strong, and emphatic style, often repeating superlatives for emphasis and using informal, provocative language to convey his points. | "I am a person that's going to bring this country together; I'm a person that is going to unify the country." | Interview 1, Page N/A (opening) |
| Category 1: The President's Manner of Expression | President Trump's responses were characterized by his distinctive, strong, and emphatic style, often repeating superlatives for emphasis and using informal, provocative language to convey his points. | "I will consider this one of my greatest achievements: getting the scum out of government and it's scum." | Interview 17, Opening Selection of Excerpts |
| Category 2: The President's Original Interpretation of Events | President Trump provided original analyses and interpretations of events, combining facts with his unique perspective, explanations, and insights, transforming standard recollections into creative narratives. | "Nixon failed... because of his personality... Very severe, very exclusive." | Interview 1, Page N/A |
| Category 2: The President's Original Interpretation of Events | President Trump provided original analyses and interpretations of events, combining facts with his unique perspective, explanations, and insights, transforming standard | "We're sitting on an economic bubble. A financial bubble." | Interview 1, Page N/A |

| | recollections into creative narratives. | | |
|---|---|---|---|
| Category 2: The President's Original Interpretation of Events | President Trump provided original analyses and interpretations of events, combining facts with his unique perspective, explanations, and insights, transforming standard recollections into creative narratives. | "This was a treasonous act. This was a terrible act." (on 2020 election) | Close/Commentary, Page N/A |
| Category 2: The President's Original Interpretation of Events | President Trump provided original analyses and interpretations of events, combining facts with his unique perspective, explanations, and insights, transforming standard recollections into creative narratives. | "They're rapists, and some I assume are good people." (on immigration) | Interview 1 Commentary, Page N/A |
| Category 2: The President's Original Interpretation of Events | President Trump provided original analyses and interpretations of events, combining facts with his unique perspective, explanations, and insights, transforming standard recollections into creative narratives. | "I wanted to always play it down. I still like playing it down because I don't want to create a panic." (on COVID-19) | Interview 9, Commentary |
| Category 3: The President's Structuring of Questions and Responses | President Trump structured the flow of the Interviews by initiating topics, redirecting questions, and organizing responses to build a cohesive narrative. | "Where do you start the movie? I think the start was standing on top of the escalator at Trump Tower..." | Interview 1, Page N/A |

| | | (redirecting decision-to-run question) | |
|---|---|---|---|
| Category 3: The President's Structuring of Questions and Responses | President Trump structured the flow of the Interviews by initiating topics, redirecting questions, and organizing responses to build a cohesive narrative. | "The biggest problem that I have is that I get a very unfair press." (pivoting coalition-building to media bias) | Interview 1, Page N/A |
| Category 3: The President's Structuring of Questions and Responses | President Trump structured the flow of the Interviews by initiating topics, redirecting questions, and organizing responses to build a cohesive narrative. | "Jack Nicklaus... called me up... could you do us all a favor?... Don't kill everybody." (using anecdote to structure tone change response) | Interview 1, Page N/A |
| Category 3: The President's Structuring of Questions and Responses | President Trump structured the flow of the Interviews by initiating topics, redirecting questions, and organizing responses to build a cohesive narrative. | "You have options." (framing policy response as choices, directing to flexibility) | Interview 12, TOC Reference |
| Category 3: The President's Structuring of Questions and Responses | President Trump structured the flow of the Interviews by initiating topics, redirecting questions, and organizing responses to build a cohesive narrative. | Redirecting foreign policy question to emphasize negotiation style (e.g., trade deals) | Interview 4, Commentary |

| | | | |
|---|---|---|---|
| Category 4: The President's Choice of Words | President Trump's selection of specific words, phrases, and nicknames added originality and expressiveness, making the responses uniquely his. | "I'm the Lone Ranger." (metaphorical self-description) | Interview 1, Page N/A |
| Category 4: The President's Choice of Words | President Trump's selection of specific words, phrases, and nicknames added originality and expressiveness, making the responses uniquely his. | "Break the egg." (idiom for aggressive tactics) | Interview 1, Page N/A |
| Category 4: The President's Choice of Words | President Trump's selection of specific words, phrases, and nicknames added originality and expressiveness, making the responses uniquely his. | "Words cause wars." (succinct framing of geopolitics) | Interview 10, TOC Reference |
| Category 4: The President's Choice of Words | President Trump's selection of specific words, phrases, and nicknames added originality and expressiveness, making the responses uniquely his. | "This is deadly stuff." (stark description of COVID-19) | Interview 7, Opening Selection |
| Category 4: The President's Choice of Words | President Trump's selection of specific words, phrases, and nicknames added originality and expressiveness, making the responses uniquely his. | "Witch hunt" (loaded term for investigations) | Interview 3, Commentary |
| Category 5: The President's Emphasis on Particular Developments | President Trump emphasized certain events or achievements with intensity and repetition, highlighting key developments to underscore their importance in the narrative. | "Winning solves a lot of problems." (repeated emphasis on victory) | Interview 1, Page N/A |

| Category 5: The President's Emphasis on Particular Developments | President Trump emphasized certain events or achievements with intensity and repetition, highlighting key developments to underscore their importance in the narrative. | "I have the biggest crowds." (focus on crowd sizes as strength indicator) | Interview 1, Page N/A |
|---|---|---|---|
| Category 5: The President's Emphasis on Particular Developments | President Trump emphasized certain events or achievements with intensity and repetition, highlighting key developments to underscore their importance in the narrative. | "Nobody's done what I've done." (intense focus on achievements) | Interview 17, Opening Selection |
| Category 5: The President's Emphasis on Particular Developments | President Trump emphasized certain events or achievements with intensity and repetition, highlighting key developments to underscore their importance in the narrative. | "Our summit in Singapore was a truly historic event." (repeated stress on diplomacy) | Appendix Letter, July 3, 2018 |
| Category 5: The President's Emphasis on Particular Developments | President Trump emphasized certain events or achievements with intensity and repetition, highlighting key developments to underscore their importance in the narrative. | "The potential of your country is truly limitless." (emphasis on North Korea's future) | Appendix Letter, June 30, 2019 |

117.    Moreover, the Eleventh Circuit in *Estate of Martin Luther King, Jr., Inc.* held that extemporaneous spoken words, like those in interviews, are copyrightable as original literary works when fixed in audio, including improvised, because they exhibit creative expression. President Trump's use of the superlative is not only supremely creative, it is his literary hallmark and is replete throughout the Audiobook and Derivative work:

| Category | Description | Example Quote | Interview/Page Reference |
|---|---|---|---|
| Unmatched Presidential Productivity | Statement of having done more in the first three years than any other president. | Nobody's ever done more in the first three years than I have. | March 19, 2020 – Pg. 25 |
| Historical Impact | Statements that President Trump has done more for the Black community than anyone since Lincoln. | I did more for the Black community than anybody since Abraham Lincoln. | July 21, 2020 – Pg. 121 |
| Economic Superlative | Describes the economy as the greatest in U.S. history. | This is the greatest economy we've ever had. | April 5, 2020 – Pg. 56 |
| Personal Skill Superiority | States that he is better at his role than anyone else. | I'm better at this than anybody else. | Feb. 7, 2020 – Pg. 18 |
| System Knowledge Superiority | Statements of unmatched knowledge of the system. | Nobody knows more about the system than me. | Jan. 22, 2020 – Pg. 12 |
| Administrative Praise | Generalized praise for Trump Administration performance. | We've done a tremendous job. | April 13, 2020 – Pg. 63 |
| Expertise Over Scientists | Statements of superior knowledge about COVID than scientists. | I know more about [the virus] than the scientists. | March 19, 2020 – Pg. 24 |
| Response Superlative | Describes pandemic response in grand terms. | Our response has been incredible. | April 5, 2020 – Pg. 56 |
| Vague Public Praise | Attributes success based on statements of others. | People are saying I've handled it better than anyone could have. | April 13, 2020 – Pg. 62 |
| Unique Achievement | Broad assertion of unmatched success. | There's never been anything like it. | May 6, 2020 – Pg. 39 |
| Personnel Praise | Statements that he has assembled top-tier people. | I have the best people. | March 19, 2020 – Pg. 25 |
| Performance Superiority | Says his handling was better than the best experts. | I handled it better than the best experts would have. | April 13, 2020 – Pg. 62 |
| Memory Superiority | Overarching claim about his memory. | I have the best memory in the world. | July 21, 2020 – Pg. 124 |
| Military Insight Superiority | Statement that he understands military matters better than top generals. | I understand it better than the best generals. | Aug. 3, 2020 – Pg. 136 |

118.    President Trump's responses, akin to Dr. King's "I Have a Dream" speech, were fixed in audio with his consent and control, and their delivery in private interviews constitutes a limited publication that does not forfeit copyright protection.

119.    The uniqueness of President Trump's voice further enhances the protectability of his contributions, as it is globally recognizable due to its distinctive modulation in tone, ranging from assertive to conversational; its unique timbre, with a resonant and commanding quality;  his use of pause - strategically deployed for emphasis or drama; his mastery of pace - often rapid to deliberate for effect; and, of course his word choice, which is often colloquial, and unconventional, such as the President's of the term  "witch hunt" or likening himself to be a "Lone Ranger."

120.    This vocal signature, coupled with President Trump's inherent and unparalleled brand value as a public figure, imbues his responses with a singular expressive quality that is uniquely his, making them a key draw for the Audiobook's commercial success.

121.    No precedent exists, to our knowledge, where a prominent person openly credited as a narrator in a for-profit enterprise like The Trump Tapes was not compensated or asked for a release, underscoring the Defendants' exploitation of President Trump's voice without his consent.

122.    The Defendants conspired to proceed with such publication knowing that President Trump's voice is one of the most recognizable voices in the world and hearing his words from his mouth or as directly articulated by him, is much more valuable and marketable than Woodward's interpretation of the interviews in *Rage*.

123.    Indeed, amid the publication of The Trump Tapes, Woodward began advertising President Trump's voice, stating that "[h]earing Trump speak is a completely different experience to reading the transcripts or listening to snatches of interviews on television or the internet,"[11] and describing President Trump's voice as "the most recognizable voice in the world, perhaps."[12] The Trump Tapes, p. 1.

124.    Defendants specifically sought to profit from President Trump's name, voice, likeness and persona.

125.    In The Trump Tapes introduction, Woodward stated he was "doing something… I've never done before, presenting the lengthy, raw interviews of my work," confirming that he interviewed President Trump throughout 2019–2020 for Rage and also in 2016 as a candidate. The Trump Tapes, p. 1.

126.    Woodward emphasized that hearing President Trump is "a completely different experience" from reading transcripts or watching clips: "You will hear Trump as I did. Raw, profane. Divisive and deceptive . . . . Yet, you will also hear him engaging and entertaining." Id.

127.    Woodward highlighted the uniqueness of the sound and quality of President Trump's voice, even going so far as to likening it to a musical instrument, replete with all the creativity output of the playing of such an instrument: "[President] Trump's voice is a concussive instrument… fast and loud… staggeringly incautious… and staggeringly repetitive." He concluded that hearing President Trump "in his own words, in his own voice" provides "an up close, unvarnished self portrait." Id.

---

[11] https://www.simonandschuster.com/p/the-trump-tapes
[12] https://www.youtube.com/watch?v=CzA2YX1y8E4

128.    In the Author's Note, Woodward admitted the extraordinary nature of this release: "This is the first time in 50 years of reporting that I have released full audio and transcripts of my work." In the Epilogue, after re listening, Woodward said "the real Trump was pounding in my ears in a way that the printed page does not capture," underscoring that the audio conveys something qualitatively different from text. *The Trump Tapes*, p. xvii.

129.    Woodward marketed, and told listeners that in these tapes "you heard [President] Trump's deception, performance, and grievance," framing the experience as if the audience were "in the Oval Office with me as Trump slams the Resolute Desk… or at his Mar a Lago estate… Or [to] experience my surprise when [President] Trump calls me at home out of the blue." *The Trump Tapes*, p. 414, 1.

<u>Manipulation and Extra Elements</u>

130.    Rather than remaining true to Woodward's commitment of creating a history, Defendants manipulated the recordings by altering words, removing context, and creating montages to mislead listeners and support a biased narrative, which the Defendants then profited from.

131.    This deceitful conduct breaches specific promises made during the Interviews and creates fiduciary duties arising from the collaborative relationship.

132.    Like the unauthorized use of unpublished letters in *Salinger v. Random House, Inc.*, 811 F.2d 90 (2d Cir. 1987), Defendants' release of the Audiobook and Derivative Works reproduces substantial portions of President Trump's original responses, fixed in the Interview Sound Recordings under his authority, without permission, exceeding the limited license for Rage

and infringing his exclusive rights to reproduction, distribution, and preparation of derivative works under 17 U.S.C. § 106.

133.    The Interview Sound Recordings were unpublished in audio form prior to Defendants' actions, affording them heightened protection against infringement, as the right to control first publication is a core authorial privilege.

134.    Defendants' use is not fair under 17 U.S.C. § 107, as it is commercial, non-transformative, takes the expressive "heart" of President Trump's contributions, including his distinctive voice, phrasing, and narratives, and harms the potential market for President Trump's own audio publications.

135.    President Trump owns a valid copyright in the Interview Sound Recordings as a joint work (Registration SR0000975712) or independently in his responses, satisfying the prerequisites for infringement under 17 U.S.C. § 411(a). Defendants had access to the recordings and copied them verbatim in the Audiobook and Derivative Works, constituting direct infringement.

## COUNT I: DECLARATORY JUDGMENT - COPYRIGHT
## (ALL DEFENDANTS)

136.    President Trump realleges and incorporates the allegations above as though fully set forth herein.

137.    An actual and justiciable controversy exists sufficient for this Court to declare the rights and remedies of the parties in that there is a dispute between President Trump and the Defendants concerning their respective rights and interests in the Interview Sound Recordings, Audiobook, and Derivative Works at issue.

138.    President Trump maintains he has an authorship and copyright interest in the Interview Sound Recordings, Audiobook, and Derivative Works, which rights have been recognized by the Copyright Office during the currency of this litigation. See Certificate of Registration at Exhibit 1 (acknowledging joint authorship status).

139.    Meanwhile, Woodward has consistently claimed, and still maintains, that he is the original and sole author and copyright owner thereof.

140.    Simultaneously, Woodward wrongly claims that the statutory preclusion against the copyright of government works apply here as justification for non-payment.

141.    A judicial declaration is necessary so that President Trump may ascertain his rights regarding the rights and interests in the Interview Sound Recordings, Audiobook, and Derivative Works.

WHEREFORE, the Plaintiff, President DONALD J. TRUMP respectfully requests that the Court grant the following relief against the Defendants in this matter:

   a)   Enter declaratory judgment adjudging that President Trump is, at minimum, the joint author and copyright owner in the Interview Sound Recordings, Audiobook, and Derivative Works at issue, as reflected in the Certificate of Registration attached hereto, and therefore is entitled to the pro rata revenues arising from the exploitation of such works;

   b)   In the alternative, enter declaratory judgment adjudging that President Trump has a copyright interest in his responses in the Interview Sound Recordings, Audiobook, and Derivative Works at issue, in accordance with, inter alia, the established practices of the U.S. Copyright Office (Compendium Third Edition §

808.3(A)) and therefore is entitled to the pro rata revenues arising from the exploitation of such works;

c) Award of compensatory damages and disgorgement of Defendants of at minimum $49,980,000.00, together with prejudgment interest, post-judgment interest, attorney's fees, costs of the action, and such other relief as the Court deems appropriate.

## COUNT II: COPYRIGHT INFRINGEMENT (17 U.S.C. § 501)
### (ALL DEFENDANTS)

142.    President Trump realleges and incorporates the allegations above as though fully set forth herein.

143.    This is an action for copyright infringement under 17 U.S.C. § 501 against all Defendants.

144.    President Trump is the joint owner (with Woodward) of a valid copyright in the Interview Sound Recordings, as evidenced by U.S. Copyright Office Registration Number SR0000975712 (effective February 28, 2023), which recognizes him as co-author and co-claimant. Alternatively, President Trump owns independent copyright in his original responses, which qualify as protectable literary works and sound recordings under 17 U.S.C. § 102(a), fixed with his consent and direction, as supported by Compendium § 808.3(A) and *Estate of Martin Luther King, Jr., Inc. v. CBS, Inc.*, 194 F.3d 1211 (11th Cir. 1999).

145.    Defendants violated President Trump's exclusive rights under 17 U.S.C. § 106 by, without authorization:

a) Reproducing the Interview Sound Recordings in the Audiobook, CD, paperback, and e-book (Derivative Works);

b) Distributing copies of these works to the public through sales and marketing;

c) Preparing derivative works based on the copyrighted recordings; and

d) Publicly performing or displaying the works.

146.    These acts exceed the limited license granted solely for the print book Rage, as repeatedly confirmed during the Interviews (e.g., "For the book only"). Analogous to *Salinger v. Random House, Inc.*, 811 F.2d 90 (2d Cir. 1987), where unauthorized reproduction of unpublished letters in a biography constituted infringement, Defendants exploited President Trump's unpublished audio expressions, his distinctive voice, phrasing, and narratives, for commercial gain, without fair use justification. The use is not transformative, takes substantial qualitative portions of the works, involves unpublished material, and harms Trump's market for his own audio publications.

147.    Defendants' infringement was willful, as they proceeded despite knowledge of the limited license, Trump's objections, and the Copyright Office's recognition of his rights, entitling President Trump to enhanced statutory damages.

148.    As a direct and proximate result, President Trump has suffered actual damages, including lost royalties and market value, and is entitled to Defendants' profits from the infringement.

WHEREFORE, the Plaintiff, President DONALD J. TRUMP, respectfully requests that the Court grant enter judgment for copyright infringement against the Defendants, award actual damages and disgorgement of profits under 17 U.S.C. § 504(b), award attorney's fees and costs

under 17 U.S.C. § 505; award prejudgment and post-judgment interest, and such other relief as the Court deems appropriate.

## COUNT III: ACCOUNTING
### (ALL DEFENDANTS)

149.    Based upon Defendants' position of exclusive control over such books and records, the Defendants owe to President Trump a duty to account and pay all applicable revenues on sales in connection with the Interview Sound Recordings, Audiobook, and Derivative Works at issue, arising from their use of President Trump's voice, name and persona and the fiduciary relationship created by their joint authorship and collaborative intent, where President Trump often initiated and directed the content.

150.    Upon information and belief, Defendants have not properly accounted to President Trump for income earned on the Interview Sound Recordings, Audiobook, and Derivative Works at issue.

151.    An accounting is necessary because Defendants have erroneously and unlawfully used his voice, name and persona, failed to recognize President Trump's rights and must account to him for the income derived from exploitation of his voice, name, persona, Interview Sound Recordings, Audiobook, and Derivative Works at issue.

152.    An accounting is also necessary and appropriate under the circumstances since the precise amount of money due to President Trump is unknown and cannot be ascertained without an accounting.

153.    President Trump has no adequate remedy at law .

WHEREFORE, the Plaintiff, President DONALD J. TRUMP, respectfully requests that this Court enter an order declaring that the actions of the Defendants, SIMON & SCHUSTER, INC., ROBERT WOODWARD, and PARAMOUNT GLOBAL entitle President Trump to an accounting of all income and profits derived from the use of his voice, name and personal, Interview Sound Recordings, Audiobook, and Derivative Works, for compensatory damages, prejudgment interest, post-judgment interest, attorney's fees, costs of the action, and such other relief as the Court deems appropriate.

## COUNT IV: UNJUST ENRICHMENT
### (ALL DEFENDANTS)

154.    President Trump realleges and incorporates the allegations above as though fully set forth herein.

155.    This is an action for unjust enrichment against Defendants, pled in the alternative to the breach of contract claim set forth herein.

156.    President Trump has conferred a benefit upon Defendants by engaging with Woodward for the Interviews and allowing recordation of the Interview Sound Recordings in connection with a singular book, which benefit Defendants accepted.

157.    Defendants exploited the Interview Sound Recordings to enrich themselves, as they converted the Interview Sound Recordings into an unauthorized Audiobook and Derivative Works through which he has derived and received the benefit of revenues, fees, royalties, and other consideration.

158.    Defendants have directly profited, and continue to profit, from such benefit without accounting to and compensating President Trump, and without the authority or consent of President Trump.

159.    Defendants have failed to acknowledge or cite to President Trump's contributions to the Audiobook and all Derivative Works, instead harvesting all the benefit for themselves.

160.    It is inequitable and not in good conscience that Defendants continue to reap such benefits from President Trump without compensating President Trump for the value of monies received in connection with the Audiobook and all Derivative Works, especially given the manipulative alterations and deceitful context removal, which constitute deceit and a breach of fiduciary duty arising from the collaborative relationship and mutual trust in their joint authorship venture, where Woodward owed a duty of loyalty and fair dealing to Trump as co-creator.

161.    Defendants' receipt of the benefits and privileges that President Trump has conferred without paying the revenues and other charges owing to President Trump in return for those benefits and privileges constitutes unjust enrichment and has damaged President Trump.

162.    It would be entirely inequitable for Defendants to retain any benefit without paying the value of any monies, including but not limited to revenues and other fees, generated from the Audiobook and all Derivative Works.

WHEREFORE, Plaintiff, President DONALD J. TRUMP, respectfully requests that this Court enter a judgment against Defendants for damages, together with costs, pre-judgment interest, attorney's fees, and such other and further relief that this Court deems just and proper.

## COUNT V: BREACH OF CONTRACT/QUASI-CONTRACT
### (ALL DEFENDANTS)

163.    President Trump realleges and incorporates the allegations above as though fully set forth herein.

164.    This is an action for breach of contract against Woodward.

165.    President Trump and Woodward entered into an agreement whereby President Trump granted Woodward a limited license to use the Interview Sound Recordings solely for the book "Rage", with the mutual understanding that the work was joint and that President Trump retained rights in his contributions. This agreement was formed through explicit confirmations, such as in Interview 4 where President Trump stated "For the book only, right?" and Woodward agreed "The book only, yeah," establishing a clear contractual limitation on use (see, e.g., *Canal+ Image UK Ltd. v. Lutvak, 773 F. Supp.* 2d 419, 430 (S.D.N.Y. 2011) (oral agreements limiting use of material enforceable as contracts)).

166.    The agreement included specific promises of fair use, as Woodward repeatedly assured the recordings were "for the book" only (e.g., Interview 9: "This again is for the book"), creating an implied covenant not to exploit for other purposes or manipulate content deceitfully (*see Architectronics, Inc. v. Control Sys., Inc.*, 935 F. Supp. 425, 440 (S.D.N.Y. 1996) (promises in license agreements add "extra elements" like covenant breaches)).

167.    President Trump performed his obligations under the agreement by granting substantial access, time, and information.

168.    Woodward breached this agreement by publishing the Audiobook and Derivative Works without permission, exceeding the license scope, and profiting from this wrongdoing.

169.    This breach includes manipulative edits and deceitful representations, violating specific promises of fair use, particularly in light of Trump's initiation and direction of many Interviews[13].

170.    Woodward has caused harm to President Trump arising from such breaches of the license.[14]

WHEREFORE, Plaintiff, President DONALD J. TRUMP, respectfully requests that this Court enter a judgment against the Defendant, ROBERT WOODWARD, for damages, together with costs, pre-judgment interest, attorney's fees, and such other and further relief that this Court deems just and proper.

### COUNT VI: BREACH OF IMPLIED COVENANT OF GOOD FAITH
### AND FAIR DEALING
### (ALL DEFENDANTS)

171.    President Trump realleges and incorporates the allegations above as though fully set forth herein.

172.    All contracts, including the license, impose an implied covenant of good faith and fair dealing upon the parties thereto. This covenant requires that the parties cooperate so that each party may obtain full benefit under the contract.

---

[13] *Nat'l Car Rental Sys., Inc. v. Computer Assocs. Int'l, Inc.,* 991 F.2d 426, 434 (8th Cir. 1993) (adopted in 2d Cir. reasoning; breaches of use restrictions not preempted as they involve private promises).

[14] This claim is not preempted by the Copyright Act, 17 U.S.C. § 301, as it involves "extra elements" of a contractual promise and covenant breach beyond mere unauthorized reproduction. See *Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004) (contract claims non-preempted if based on promise); *Canal+ Image UK Ltd.*, 773 F. Supp. 2d at 430 (oral limitations enforceable). The Second Circuit's unsettled law on preemption favors non-preemption for contracts with relational duties. See also *ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447, 1454-55 (7th Cir. 1996) (influential; contracts not preempted as they create private rights); *Taquino v. Teledyne Monarch Rubber,* 893 F.2d 1488, 1501 (5th Cir. 1990) (split noted, but 2d Cir. leans toward extra element test).

173.    Woodward impliedly promised to act in good faith and deal fairly in the course of performance of contractual obligations set forth herein.

174.    Woodward's actions in secretly planning to and ultimately releasing the audio recordings as a separate commercial product deprived President Trump of the benefits of the agreement and frustrated its core purpose.

175.    The statement at Ex.1; p. 298 evidences Woodward's intent to expand use for his own benefit at Plaintiff's expense.

176.    Woodward further breached this covenant in numerous and diverse ways, by, inter alia:

a.    Participating and otherwise being complicit in the publication of the Interview Sound Recordings via the Audiobook and the Derivative Works with knowledge of the agreement between him and President Trump regarding the limitations on the use of the Interview Sound Recordings.

b.    Publication of the Interview Sound Recordings to capitalize and benefit from President Trump's voice to the detriment of President Trump's ability to publish his own voice given his position as author.

c.    Publication of the Interview Sound Recordings with alteration in the spoken words and removal of context, to cast a poor and misleading light on President Trump and to mislead and deceive other customers into viewing him in a poor light, constituting deceit and breach of trust, especially given Trump's frequent initiation and direction of the Interviews as co-architect.

177.    As a direct and proximate result thereof, Woodward has breached the implied covenants of good faith and fair dealing in the agreement between him and President Trump, and President Trump has suffered damage in an amount to be proven at trial.

WHEREFORE, the Plaintiff, President DONALD J. TRUMP, respectfully requests that this Court enter a judgment against the Defendant, ROBERT WOODWARD, for damages, together with costs, pre-judgment interest, attorney's fees, and such other and further relief that this Court deems just and proper.

### COUNT VII: FALSE ENDORSEMENT UNDER THE LANHAM ACT
### (15 U.S.C. § 1125(A)(1)(A))
### (ALL DEFENDANTS)

178.    President Trump realleges and incorporates the allegations above as though fully set forth herein.

179.    This is an action for false endorsement under the Lanham Act, 15 U.S.C. § 1125(a)(1)(A), against all Defendants.

180.    President Trump's name, voice, persona and identity constitute distinctive marks and identity that have acquired secondary meaning in commerce, as evidenced by his unparalleled global recognition, brand value, and the commercial appeal of his voice, as acknowledged by Woodward.

181.    Defendants used President Trump's voice, name, image and credit as "narrator" in the Audiobook and Derivative Works without authorization, in connection with the sale and promotion of goods in interstate commerce.

182.    This use falsely implies President Trump's affiliation, sponsorship, approval, or endorsement of the products, likely causing consumer confusion, as the crediting and

exploitation of his name, image, voice and likeness, suggesting he participated willingly and endorsed the content.

183.    Defendants' actions are false and misleading, as President Trump did not endorse or sponsor the Audiobook or Derivative Works; he consented only to use for the upcoming book, later called *Rage* and explicitly limited the license to print.

184.    As a direct and proximate result, President Trump has suffered damages, including lost royalties, reputational harm, and disgorgement of profits from the unauthorized use.

WHEREFORE, Plaintiff, President DONALD J. TRUMP, respectfully requests that the Court enter a judgment against the Defendants for damages, including compensatory damages, disgorgement of profits, punitive damages, injunctive relief to cease the false endorsement, attorney's fees under 15 U.S.C. § 1117, costs, and such other relief as the Court deems appropriate.

### COUNT VIII: MISAPPROPRIATION / RIGHT OF PUBLICITY
### (VIOLATION OF FLORIDA STATUTES § 540.08)
### (ALL DEFENDANTS)

185.    President Trump realleges and incorporates the allegations above as though fully set forth herein.

186.    From in or about October 24, 2022, through the present, Defendants published, printed, displayed and/or otherwise publicly disseminated *The Trump Tapes*, and later the accompanying paperback and e-book, entitled *The Trump Tapes: Bob Woodward's Twenty Interviews with President Donald Trump*.

187.    In *The Trump Tapes* and the accompanying paperback and e-book versions, Defendants published, printed, displayed and/or otherwise publicly used the name, portrait, photograph, and/or other likeness of President Trump.

188.    Defendants did so for purposes of trade and/or for commercial and/or advertising purposes.

189.    Defendants did so without the express written or oral consent to such use given by President Trump.

190.    President Trump has a right to recover damages for loss and/or injury sustained by reason thereof, including an amount which would have been a reasonable royalty, and punitive or exemplary damages.

## COUNT IX: MISAPPROPRIATION / RIGHT OF PUBLICITY
### (FLORIDA LAW)
### (ALL DEFENDANTS)

191.    President Trump realleges and incorporates the allegations above as though fully set forth herein.

192.    From in or about October 24, 2022, through the present, Defendants published, printed, displayed and/or otherwise publicly disseminated *The Trump Tapes*, and later the accompanying paperback and e-book, entitled *The Trump Tapes*: *Bob Woodward's Twenty Interviews with President Donald Trump*.

193.    In *The Trump Tapes* and the accompanying paperback and e-book versions, Defendants published, printed, displayed and/or otherwise publicly used the name, portrait, photograph, and/or other likeness of President Trump.

194.     Defendants did so for purposes of trade and/or for commercial and/or advertising purposes.

195.     Defendants did so without the express written or oral consent to such use given by President Trump.

196.     President Trump has a right to recover damages for loss and/or injury sustained by reason thereof, including an amount which would have been a reasonable royalty, and punitive or exemplary damages.

### COUNT X: FRAUD / FRAUDULENT INDUCEMENT
### (FLORIDA LAW)
### (ALL DEFENDANTS)

197.     President Trump realleges and incorporates the allegations above as though fully set forth herein.

198.     On the dates and in the places alleged above, Woodward stated to President Trump that the Interview Sound Recordings would be used solely for the limited purpose of Woodward's forthcoming book, later published by SSI, as *Rage* (the "Representations").

199.     The Representations were false when made.

200.     The Representations concerned facts material to President Trump's agreement to sit for interviews with Woodward, to permit the Recordings, to allow his voice and likeness to be captured by Woodward, and/or to allow Woodward to make limited use thereof.

201.     Woodward, at the time he made the Representations, knew that the Representations were false, or acted with reckless disregard for the truth of the Representations.

202.    Woodward made the Representations with the intent to deceive President Trump and/or to induce him to act in reliance on the Representations, and to agree to participate in, and to be recorded during, the interviews.

203.    President Trump acted in justifiable reliance on the Representations.

204.    As a direct and proximate result of the foregoing, President Trump has suffered injury and is entitled to recover damages in an amount to be determined at trial.

205.    President Trump is also entitled to punitive damages, in an amount to be determined at trial, in that Defendants engaged in intentional misconduct, within the meaning of Fla. Stat. § 768.72(2)(a).

**COUNT XI: CONSTRUCTIVE FRAUD**
**(FLORIDA LAW)**
**(ALL DEFENDANTS)**
**(ALLEGED IN THE ALTERNATIVE)**

206.    President Trump realleges and incorporates the allegations above as though fully set forth herein.

207.    On the dates and in the places alleged above, Woodward made the Representations to President Trump that the Interview Sound Recordings would be used solely for the limited purpose of Woodward's forthcoming book, later published by SSI, as *Rage*.

208.    The Representations concerned facts material to President Trump's agreement to sit for interviews with Woodward, to permit the Recordings, to allow his voice and likeness to be captured by Woodward, and/or to allow Woodward to make limited use thereof.

209.    President Trump justifiably and reasonably relied on the Representations and Woodward's expertise as a journalist, trusting that the Recordings would be used solely for background and quotations in a forthcoming book, later published as *Rage*.

210.    President Trump reposed trust and confidence in Woodward, and Woodward accepted that trust and confidence by undertaking to use the Interview Sound Recordings only for the limited purpose authorized by President Trump.

211.    A confidential and/or fiduciary relationship arose and existed between President Trump and Woodward.

212.    Woodward, however, breached and abused that relationship by providing the Recordings to SSI, which then published, marketed, and sold *The Trump Tapes*.

213.    By means of the foregoing conduct, Defendants took unconscionable and/or improper advantage of the relationship between President Trump and Woodward, and/or exploited that relationship, at President Trump's expense.

214.    As a direct and proximate result of the foregoing, President Trump has suffered injury and is entitled to recover damages in an amount to be determined at trial.

215.    President Trump is also entitled to punitive damages, in an amount to be determined at trial, in that Defendants engaged in intentional misconduct, within the meaning of Fla. Stat. § 768.72(2)(a).

**COUNT XIII: NEGLIGENT MISREPRESENTATION**
**(FLORIDA LAW)**
**(ALL DEFENDANTS)**
**(ALLEGED IN THE ALTERNATIVE)**

216.    President Trump realleges and incorporates the allegations above as though fully set forth herein.

217.    On the dates and in the places alleged above, Woodward stated to President Trump that the Interview Sound Recordings would be used solely for the limited purpose of Woodward's forthcoming book, later published as *Rage*.

218.    Woodward, at the time he made the Representations, believed the Representations to be true, but the Representations were, in fact, false.

219.    The Representations concerned facts material to President Trump's agreement to sit for interviews with Woodward, to permit the Recordings, to allow his voice and likeness to be captured by Woodward, and/or to allow Woodward to make limited use thereof.

220.    Woodward was, at least, negligent in making the Representations, in that he should have known that the Representations were false.

221.    Woodward made the Representations with the intent to induce President Trump to act in reliance on the Representations, and to agree to participate in, and to be recorded during, the interviews.

222.    President Trump acted in justifiable reliance on the Representations.

223.    As a direct and proximate result of the foregoing, President Trump has suffered injury and is entitled to recover damages in an amount to be determined at trial.

224.    President Trump is also entitled to punitive damages, in an amount to be determined at trial, in that Defendants' conduct constitutes gross negligence, within the meaning of Fla. Stat. § 768.72 (2)(b).

**JURY DEMAND**

President Trump hereby requests a trial by jury on all issues so triable.

Dated: September 11, 2025

GS2LAW PLLC

By: _____

Robert Garson (RG 1521)
Kenneth A. Caruso (Of Counsel)
David Labkowski (Of Counsel)
Yanina Zilberman (*Pro Hac Vice*)
20801 Biscayne Blvd, Suite 506
Aventura, FL, 33180
rg@gs2law.com

*Attorneys for Plaintiff,*
*President Donald J. Trump,*
*45th and 47th President of the United*
*States, in his individual capacity*